## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **Marcus Bagwell**, individually and<br>on behalf of all others similarly situated; | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| **World Wrestling<br>Entertainment , Inc.,** | )<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendant. | ) |

## CLASS ACTION COMPLAINT

Plaintiff Marcus Bagwell, individually and on behalf of all others similarly situated,

alleges for his Class Action Complaint against defendant World Wrestling Entertainment, Inc.

("WWE")( "Defendant"), upon personal knowledge as to himself and his own acts, and as to all

other matters upon information and belief, based upon *inter alia*, the investigation made by his

attorneys, as follows:

### I.      NATURE OF THE ACTION

1.      Plaintiff Marcus Bagwell ("Plaintiff") brings this action on behalf of himself and

all similarly situated individuals under similar form contracts, who have not received

contractually owed royalty payments from World Wrestling Entertainment ("WWE") for certain

content that has been sold or licensed by the WWE on the World Wrestling Entertainment

Network ("WWE Network").

1

## II.    JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), which provides for the original jurisdiction of the Federal Courts for any class action in which any member of the plaintiff class is a citizen of a state different from any Defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000.00, exclusive of interest and costs.

3.      Plaintiff alleges that the total claims of the individual members of the Plaintiff Class in this action are in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. §1332 (d)(2), (5).  As set forth below, Plaintiff is a citizen of Georgia.  WWE is a Delaware corporation, headquartered in Stamford, Connecticut.  Diversity of citizenship exists under CAFA and supports subject matter jurisdiction under 28 U.S.C § 1332 (a)(1), (d)(2)(A).  More than two-thirds of all the members of the proposed Plaintiff Class in the aggregate are citizens of a state other than Connecticut, where this action is originally being filed, and the total number of members of the proposed Plaintiff Class is greater than 100, pursuant to 28 U.S.C. §1332 (d)(5)(B).

4.      <u>Personal Jurisdiction Over Defendant.</u> This Court has personal jurisdiction over Defendant pursuant to Defendant's Early Contract Release, from which the parties consent to personal jurisdiction in Connecticut for purposes of seeking legal relief arising from the booking contract.

5.      <u>Venue</u>. Venue is proper pursuant to Defendant's Early Contract Release, in which all parties consented to the United States District Court located in Bridgeport, Connecticut or the Judicial District Court of Stamford located in Stamford, Connecticut, as appropriate venue for purposes of Plaintiff seeking legal relief arising from Plaintiff's Early Contract Release.

### III.   Parties

6.     Plaintiff is a citizen of Woodstock, Georgia.  He was employed by Defendant as a professional wrestler from 1991 to 2001.

7.     Defendant World Wrestling Entertainment, Inc. ("WWE") is a Delaware corporation with a principal place of 1241 East Main Street, Stamford, Connecticut.  At all material times, WWE has organized, operated and promoted entertainment featuring professional wrestling personalities under the name "World Wrestling Entertainment."  WWE is the successor to Titan Sports, Inc. ("Titan").

### IV.   FACTUAL ALLEGATIONS

8.     Plaintiff is a highly successful professional wrestler and entertainer, having performed around the world for the past 25 years.

9.     Defendant WWE is a publically traded entertainment company that deals primarily in professional wrestling.  Since its incorporation in 1980, WWE has acquired other professional wrestling promotion's trademarks, tape libraries, contracts and other properties.

10.     On Friday, March 23, 2001, WWE announced the acquisition of World Championship Wrestling, Inc. ("WCW") from AOL Time Warner, with the deal to be officially signed on Monday March 26, 2001.  The acquisition included the rights to the name WCW, the copyrights to WCW's video library (including all WCW pay per views Plaintiff appeared on), and several WCW performer contracts.

11.     Plaintiff's 1998 contract with WCW expired on Sunday, March 25, 2001.

**EXHIBIT 1** (Plaintiff's March 26, 1998 WCW Independent Contractor Agreement expired March 25, 2001).

<u>Plaintiff's June 1, 2001 Contract</u>

3

12.     On June 4, 2001, Plaintiff signed as a professional wrestler with WCW (WWE) to perform under the ring name of "Buff Bagwell" ("Booking Contract").  **EXHIBIT 2** (Plaintiff's June 4, 2001 WCW (WWE) Booking Contract).

13.     WWE owned WCW on June 4, 2001 (purchased on March 23, 2001), but used the same company name (WCW Inc.) that appeared on Plaintiff's prior WCW contracts, rather than WWE.  **EXHIBIT 1&2** (Plaintiff's March 26, 1998 Independent Contractor Agreement with WCW and Plaintiff's June 4, 2001 Booking Contract with WCW (WWE)).

14.     Edward Kaufman (Senior Vice President and General Counsel of WWE) signed the June 4, 2001 Booking Contract on behalf of WCW.

15.     Section 13.2 of Plaintiff's Booking Contract merges all prior agreements between Plaintiff and WCW:

> This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and *all prior understandings, negotiations and agreements are merged into this Agreement*.  There are no other agreements, representations, or warranties not set forth herein with respect to the subject matter hereof. . .

16.     The June 4, 2001 agreement between Plaintiff and WCW (WWE) govern any royalty obligations from Plaintiff's prior WCW contracts (1991-2001) because of the Section 13.2 "Merger" clause.

<u>June 4, 2001 Booking Contract Definitions</u>

17.     Section 7.5(c)(i) of Plaintiff's June 4, 2001 agreement requires WCW (WWE) to pay Royalties for Pay-Per-View Videos Sold by WCW (as WCW Video Products)  under the following circumstances:

> WCW shall allocate 5% of the Net Receipts paid to WCW with respect to the direct sale by WCW of WCW Pay-Per-Views to a talent royalty pool.  Thereafter, WCW shall pro-rate payment to Plaintiff and all other talent appearing in such WCW Pay-Per-Views in the same proportion as was the compensation paid to

Plaintiff for his appearances in the pay-per-views to the total amount paid to all talent for their appearances on the pay-per-views.

18.     Under 7.5 (c)(ii) of Plaintiff's agreement, WCW is also obligated to pay Royalties for Pay-Per-View Videos Sold by WCW when:

> The WCW Video Product is a compilation or derivative work of multiple individual WCW Pay-Per-Views in their entirety, such as a collection of videos, e.g., a WrestleMania box set, payment to Plaintiff shall be calculated as follows: 5% of the Net Receipts paid to WCW shall comprise the talent royalty pool, which shall first be pro-rated based on the number of individual videos in the compilation, and then the payment to Plaintiff for each video shall be consistent with the royalty payment to the Plaintiff at the time each individual video was first released.

19.     For 7.5 (c)(i) and (c)(ii) calculations (royalty amount owed for sales of Pay-Per-View Videos), Net Receipts means the *gross amount* received by WCW for the WCW Pay-Per-Views.  In 2015, the WWE Network segment *grossed* revenue of 159.4 million. **EXHIBIT 3** (WWE's Fourth-Quarter 2015 Results).

20.     Under 7.5 (d) of Plaintiff's 2001 contract, WCW is also obligated to pay Plaintiff Royalties for Non Pay-Per-View Videos Sold by WCW (as WCW Video Products) under the following circumstances:

> WCW shall allocate 5% of the Net Receipts paid to WCW with respect to the direct sale by Plaintiff of all other WCW Video Products other than those set forth in 7.5 (c)(i) and (c)(ii) above, to a talent royalty pool, from which WCW shall pay Plaintiff and all other talent appearing in such WCW Video Products pro-rata among Plaintiff and all other talent so featured.

21.     For 7.5 (d) calculations (royalty amount owed for sale of Non-Pay-Per-View Videos), Net Receipts means:

> The *gross amount* received by WWE for the WWE Video Products. Notwithstanding the foregoing, if Plaintiff is deemed to be the "featured performer" as determined by WWE in its sole discretion, Plaintiff shall receive a bonus of an additional 5% of WWE's Net Receipts up to the sale of the first 150,000 units.  Once sales exceed 150,000, Plaintiff as a featured performer shall receive 10% of WWE's Net Receipts on all units sold, including the first 150,000

units.  If Plaintiff is part of a group that is determined to be the "featured performer," Plaintiff shall share pro-rata with each and every member of the group in any bonus monies that may be due in connection with such WWE Video Products.

22.     The WWE Network segment _grossed_ revenue of 159.4 million in 2015.

**EXHIBIT 3** (WWE's Fourth-Quarter 2015 Results).

23.     The definition of WCW Video Products under Section 7.5 (a)(1) is:

 "video cassettes, videodiscs, CD ROM, or _other technology, including technology not yet created._"

24.     WCW Video Products includes streaming videos on the World Wrestling Entertainment Network ("WWE Network"), because under Section 7.5 (a)(1), streaming the WWE Network is "_other technology and/or technology not yet created_" at the time Plaintiff signed the June 4, 2001 Booking Contract.  *See* **EXHIBIT 4** (Definition of WCW Video Products in Plaintiff's 2001 Booking Contract).

25.     The definition of Pay-Per-View Videos ("PPVs") under Section 7.5 (a) is, "WCW Pay-Per-Views in their entirety."  *See* **EXHIBIT 5** (Definition of WCW Pay-Per-Views in Plaintiff's 2001 Booking Contract).

26.     The definition of Non-Pay-Per-View Videos ("Non-PPVs") under Section 7.5 (b) and 7.5 (d) is, "all other WCW Video Products, other than WCW Pay-Per-Views in their entirety and a compilation or derivative work of multiple individual WCW Pay-Per-Views in their entirety."  *See* **EXHIBIT 6** (Definition of Non Pay-Per-View Videos in Plaintiff's 2001 Booking Contract).

27.     For several years (February 2014- present), WWE sold WCW Video Products (streaming videos on WWE Network) of Pay-Per-View Videos and Non-Pay-Per-View Videos without paying royalties to Plaintiff.

<u>August 7, 2001 Early Release Contract</u>

28.     On August 7, 2001, Plaintiff and WCW (WWE) agreed to an Early Contract

Release.  **EXHIBIT 7** (Plaintiff's August 7, 2001 Early Contract Release with WCW (WWE)).

The Early Contract Release included releases from the June 4, 2001 WCW contract (the

"Contract") and any prior contracts, amendments or modifications.

29.     The Early Contract Release declares, in paragraph (4. A.), the agreement is:

> . . . a full and complete buyout of Bagwell's services under the Contract (June 4, 2001 WCW contract) *other than the obligation to pay Bagwell the royalties due to him pursuant to, and as determined by, the Contract (June 4, 2001 WCW contract)*.

30.     As of August 7, 2001 (signing of the Early Contract Release), Plaintiff's June 4,

2001 Booking Contract exists only to define WWE's royalty obligations owed to Plaintiff.

31.     Paragraph 6 of the Early Contract Release declares Plaintiff forfeits any claims in

law or equity against WCW (WWE) in the following circumstances:

> Bagwell acknowledges that *except as expressly set forth herein (obligation to continue to pay royalties pursuant to June 4, 2001 agreement)*, no representations of any kind or character have been made to Bagwell by WCW or by an of WCW's agents, representatives or attorneys to induce the execution of this Release.  In order for Bagwell to induce WCW to sign this Release, Bagwell hereby releases WCW, its parent companies, affiliates, subsidiaries, successors, assigns, and its and their respective officers, directors, employees, independent contractors, licensees, representatives and agents from any and all claims, liabilities and obligations whatsoever in law or equity (whether now known or hereinafter discovered) which Bagwell has or may ever have arising out of or in connection with the Contract (June 4, 2001).

32.     As a *condition precedent* for Plaintiff to "release WCW (WWE) from any and all

claims, liabilities and obligations whatsoever in law or equity (whether now known or hereinafter

discovered," WCW (WWE) must honor the representations (obligation to pay royalties pursuant

to June 4, 2001 agreement) that induced Plaintiff to sign the Early Release Contract.

33.     Defendant breached its Early Contract Release with Plaintiff by selling WCW Video Products (streaming videos on the WWE Network) of PPVs and Non-PPVs without paying any royalties to Plaintiff.   **EXHIBIT 8** (Plaintiff's First Quarter 2016 WWE Royalty Statement evidencing no royalties paid for sale of WCW PPVs and Non PPVs on WWE Network).

WWE NETWORK

34.     World Wrestling Entertainment Network ("WWE Network") is a 24/7 direct to consumer video streaming network (like a Netflix of WWE content), created, owned, and sold by WWE that was launched Monday, February 24, 2014.

35.     Because streaming video content and videos on demand on the WWE Network was "*other technology and/or technology not yet created*" at the time Plaintiff signed his June 4, 2001 Booking Contract, streaming videos on the WWE Network is within the definition of WCW Video Products under Section 7.5 (a)(i) of Plaintiff's Booking Contract.   ("video cassettes, videodiscs, CD ROM, or *other technology, including technology not yet created*" (*emphasis added*)).   **EXHIBIT 4** (Definition of WCW Video Products in Plaintiff's 2001 Booking Contract).

36.     WWE sells and promotes the WWE Network for $9.99 per month in more than 180 countries and territories.

37.     The streaming video content of the WWE Network (WCW Video Product) consists of all 12 WWE live monthly pay-per-view events, reality shows, documentaries (Non-PPV sold by WCW), past pay-per-view events (PPV sold by WCW), and classic wrestling matches (Non-PPV sold by WCW).

38.     WWE Network averaged 1.29 million paid subscribers over the first quarter of 2016 (WWE reached a record 1.82 million total subscribers in April 2016).  In 2015, WWE Network purchasers watched an estimated total of 256 million hours of content, representing an average of 188 hours per household.  **EXHIBIT 3** (WWE's Fourth-Quarter 2015 Press Release at pages 1-2); **EXHIBIT 9** (WWE's First-Quarter 2016 Press Release p.1).

39.     Defendant breached its Early Contract Release with Plaintiff by selling WCW Video Products (streaming videos on the WWE Network) of PPVs and Non-PPVs without paying any royalties to Plaintiff.  **EXHIBIT 8** (Plaintiff's First Quarter 2016 WWE Royalty Statement evidencing no royalties paid for WWE's sale of WCW PPVs and Non PPVs on WWE Network).

<u>Not a Copyright Act Issue</u>

40.     WCW assigned its video library copyrights to WWE on March 23, 2001.

41.     Generally, an assignment transfers to the assignee (WWE) all the right, title or interest of the assignor (WCW) in the thing assigned (WCW video library); the assignee (WWE), then stands in the shoes of the assignor (WCW).

42.     When WWE acquired the WCW video library copyrights (March 23, 2001), sales of copyrighted WCW Video Products including Plaintiff were not subject to royalty payments (Plaintiff assigned his intellectual property rights to WCW in consideration for other benefits, not for WCW Video Products royalties).  **EXHIBIT 10** (Plaintiff's March 26, 1998 Merchandising Agreement evidencing no royalty payments for sales of WCW video products in paragraph 6 (c)).

43.     The "Merger" clause of Plaintiff's June 4, 2001 contract modifies Plaintiff's 1998 WCW Merchandise Agreement (including modification of Plaintiff granting his intellectual property rights to WCW subject to no royalty payments for WCW Video Product sales).

44.     Plaintiff's June 4, 2001 Booking Contract governs royalty payment obligations both retrospectively (all of Plaintiff's previous contracts with WCW governed by terms of June 4, 2001 language) and prospectively (June 4, 2001and thereafter).

45.     WCW agreed to pay Plaintiff royalties (covering Plaintiff's prior WCW contracts and from June 4, 2001 forward) for the sales of WCW Video Products in consideration for Plaintiff agreeing to the terms of the June 4, 2001 Booking Contract.

46.     WWE sends Plaintiff royalty payments (not including WWE Network) for sales of WCW Video Products featuring Plaintiff's performances on WCW (1991-2001, prior to WWE acquiring WCW), self-confirming their  retrospective royalty payment to Plaintiff. **EXHIBIT 8** (Plaintiff's WWE First Quarter 2016 Royalty Statement for performances exclusively on WCW prior to WWE purchase of WCW).

47.     Royalties paid to Plaintiff by WWE only come from sales of Plaintiff's performances in WCW prior to WWE's acquisition (retrospective) because Plaintiff only performed twice under the June 4, 2001 Booking Contract with WCW (WWE):

1) A WWE house show (non-recorded, no royalty issue) on July 1, 2001; and

2) WWE's Raw is War (USA Network) on July 2, 2001 (no royalty issue, no royalties paid for television license fees.  **EXHIBIT 11** (Section 7.3 (a) of Plaintiff's 2001 Booking Contract specifically states no royalties paid for television license fees).

a.     <u>Copyright Act Preemption</u>

48.     The Copyright Act does not preempted Plaintiff's claims.

49.     Copyright preemption precludes states from enforcing penalties for copyright violations:

> If the intellectual property at issue falls within the "subject matter of copyright" as defined by federal law and if the claimed property rights are "equivalent to" the exclusive rights provided by federal copyright law.

50.     The Copyright Act preempted previous lawsuits against WWE (and ESPN) seeking unpaid royalties for exploiting performer's intellectual property.  *See Somerson v. McMahon,* 956 F. Supp. 2d 1345 (N.D. Ga. 2012); *Ray v. ESPN, Inc.*, District Court for Western District of Missouri, Case No.: 13-1179-CV-W-SOW (Order Motion to Dismiss)); *Somerson v. McMahon*, Superior Court of Fulton County, Georgia, Case No: 2011-CV-208637 (Complaint).

51.     Somerson, Gilbert, and Ray did not contractually grant their intellectual property rights to WWE in consideration for WWE's obligation to pay royalties for the sale of those copyrighted works.  They possessed no contract right to sue the WWE for unpaid royalties.

52.     Instead, Somerson, Gilbert, and Ray sued for the invasion of privacy, misappropriation of name, infringement of the right of publicity, and interference with prospective advantage – all claims that, under their circumstances, were undisputedly preempted by the Copyright Act.

53.     Plaintiff's breach of contract claim is not preempted by the Copyright Act because WWE owns the right to WCW copyrighted works featuring Plaintiff's intellectual property, subject to royalty payment obligations for the sale of those copyrighted works (WCW Video Products of PPVs and Non PPVs).

<u>Prerequisites to Filing a Lawsuit Challenging Royalty Statements Pursuant to Plaintiff's</u>

<u>June 4, 2001 Booking Contract</u>

a.      Section 7.12 (b) and (d)

54.      Section 7.12 (b) and (d) of Plaintiff's June 4, 2001 Booking Contract provides

prerequisites for Plaintiff to satisfy prior to filing a claim for unpaid royalty payments:

> 7.12 (d)- No claim shall be filed pursuant to paragraph 13.8 below against WCW
> or WCW's affiliates that disputes any statement of royalties or accounting given
> by WCW hereunder or that makes any claim for royalties or royalty payments,
> unless the same is commenced or filed within one (1) year after the date such
> statement or accounting is first given, delivered or sent to Wrestler, and _unless
> Wrestler has first exhausted his remedies pursuant to paragraph 7.12 (b)_ above.

> 7.12 (b) – WCW shall maintain books of account related to the payment of
> royalties hereunder at its principal place of business.  Wrestler or Wrestler's
> designated independent certified public accountant who is a member in good
> standing of the AICPA, may at Wrestler's sole expense examine WCW's books
> insofar as they pertain to this Agreement for the purpose of verifying the accuracy
> thereof, during WCW's normal business hours and upon reasonable notice.  Such
> audit shall be conducted in a manner that will not unreasonably interfere with
> WCW's normal business operations.  Wrestler shall not audit WCW's books and
> records more than twice during any calendar year and no such audit shall be
> conducted later than one (1) year after the last statement of royalties is given,
> delivered or sent to Wrestler.  Each audit is limited to seven (7) days in duration.
> Statements of royalties may be changed from time to time to reflect year-end
> adjustments, to correct clerical errors and for similar purposes.

55.      Pursuant to Section 7.12(b), Plaintiff engaged a certified public accountant, who

is a member in good standing of the AICPA, to examine WCW's books for purposes of verifying

the accuracy of royalty payments (no WWE Network royalty payments) received by Mr.

Bagwell.

56.      The accountant contacted WWE officials around June 23, 2016 to schedule a time

to examine WWE's books and was told the last week of July 2016 or the first week of August

2016 would be possible times to conduct an audit.

57.      However, on August 5, 2016, Plaintiff's counsel received a letter from K&L

Gates's Pittsburgh, Pennsylvania office declaring they are WWE's counsel; accusing  Plaintiff's

accountant of having "asserted a pretextual and invalid audit request to attempt to stealthily obtain that information (WWE network royalty audit)."

58.     The August 5, 2016 letter further declared that "neither [Plaintiff's accountant] nor any other purported representative of Mr. Bagwell will be permitted to audit WWE accounting records. . . Because your client is not paid any such royalties (WWE Network), there is nothing to audit."

59.     Plaintiff asserted his rights to audit WWE records (for purposes of verifying the accuracy of royalty payments (no WWE Network royalties)) and WWE denied his request, in violation of Plaintiff's June 4, 2001 contract.  By its denial of audit, WWE forfeits any claim that Plaintiff did not satisfy Section 7.12 (b) lawsuit prerequisites because WWE denied Plaintiff any chance to audit the records.

Plaintiff's Notice of Disputed Royalty Statement and Other Accountings- Section 7.12 (c)

60.     Section 7.12 (c) of Plaintiff's June 4, 2001 Booking Contract provides the notice procedure for disputing a royalty statement:

> Wrestler shall be deemed to have consented to all statements of royalties and all other accountings provided by WCW hereunder and each such statement of royalties or other accounting shall be conclusive, final, and binding; shall constitute an account stated; and shall not be subject to any objection for any reason whatsoever unless a specific objection in writing, stating the basis thereof, is given by Wrestler to WCW within one (1) year from the date the royalty statement was given, delivered or sent to Wrestler.

61.     This Complaint serves as Plaintiff's notice (providing specific objections, the basis of the objections, and within one year of March 24, 2016) pursuant to Section 7.12(c) that he does not consent to his March 24, 2016 royalty statement.

## V.     CLASS ACTION ALLEGATIONS

54.     Plaintiff brings this action for himself, and on behalf of all others similarly

situated.  The Class and Subclasses that Plaintiff seeks to represent are defined as follows:

> All individuals who have assigned their original and new intellectual property rights to
> WWE, in exchange for perpetual royalty payments from WWE's sales of past pay-per-
> view events or non pay-per-view productions.

> Excluded from the class are those who have signed a WWE "Nostalgia" or "Legends"
> Contract, a Booking Contract with WWE from January 1, 2004 – prospectively (all
> WWE contracts in this time period declare that no royalties will be paid for internet
> subscriptions and video on demand fees), or a settlement agreement with WWE that
> releases any claims in law or equity against WWE, except for enforcement of any royalty
> obligations that may exist.

> The included class is further defined by the following two Subclasses of former
> employees:

> a)     <u>WWE Controlled Performers</u>
> b)
> > <u>1) For the signing period of January 1, 1992 until January 1, 1999,</u>
> >
> > - All persons who signed a WWE Booking Contract when the
> >   definition of WWE Video Products was, "video programs."
> >
> > <u>2) For the signing period of January 1, 1999 until January 1, 2004</u>
> >
> > - All persons who signed a WWE or WCW Booking Contract
> >   when the definition of WWE or WCW Video Products was,
> >   "video cassettes, videodiscs, CD ROM, or other technology,
> >   including technology not yet created."

55.     Plaintiff reserves the right to amend the Class definition if further investigation

and discovery indicates that the Class definition should be narrowed, expanded, or otherwise

modified.  Excluded from the Class are Defendant; its officers and directors; any entity in which

Defendant has a controlling interest; the affiliates, legal representatives, attorneys, heirs, and

assigns of Defendant; any federal, state or local government entity; and any judge, justice or

judicial officer presiding over this matter and the members of their immediate families and

judicial staffs.

Rule 23(a) Criteria:

56.     **Numerosity.**   Plaintiff does not know the exact size or identities of the members of the proposed Class and subclasses, since such information is in the exclusive control of the Defendant.  Plaintiff believes that the Class and Subclasses encompasses hundreds of individuals whose identities and royalties owed can be readily ascertained from Defendant's books and records.  Accordingly, the members of the Class and Subclasses are so numerous that their individual joinder would be impracticable.

57.     **Commonality.**  There are numerous questions of law and fact that are common to the Plaintiff and all members of the Class and Subclasses, including, but not limited to the following:

> a) Whether Defendant breached its Booking Contract duties;
>
> b) Whether Plaintiff and Class members have suffered damages;
>
> c) Whether Plaintiff and Class members are entitled to punitive damages;
>
> d) Whether Plaintiff and Class members are entitled to equitable relief;
>
> e) Whether Plaintiff and Class members are entitled to injunctive relief.

58.     **Typicality.**  Plaintiff is a member of the Class and has claims that are typical of all members of the Class.  Plaintiff's claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendant and may be remedied under the same legal theories.

59.     **Adequacy.**  Plaintiff will fairly and adequately represent the interest of the members of the Class and Subclasses.  Plaintiff has no conflicts of interest with, or interest, that are any different from those of the other class members.  Plaintiff has retained competent counsel experienced in class action and other complex litigation.

Rule 23(b)Categories

60.   **Predominance.**  Common questions of law and fact predominate over questions affecting only individual class members, as class members, whose terms are substantially the same, having no individual issues other than calculating each member's royalty amount by an identical formula.

61.   **Superiority.**  A class action is superior to all other feasible alternatives for the resolution of this matter.  Individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the court and of the parties, and potentially could lead to inconsistent results that would be contrary to the interest of justice.  Absent a class action, it would be highly unlikely that the representative Plaintiff or any other members of the Class or any Subclass would be able to protect their own interest because the cost of litigation through individual lawsuits would exceed expected recovery.

62.   **Manageability.**  This case is well suited for treatment as a class action and can easily be managed as a class action because evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a class-wide basis, while the allocation and distribution of damages to class members would be essentially a ministerial function.

63.   Defendant has acted on grounds generally applicable to Plaintiff and the Class and Subclasses members through breach of contract.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief and punitive damages are appropriate with respect to the Class and Subclasses as a whole.

## VI. CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT—FAILURE TO PAY ROYALTIES

64.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

65.     Plaintiff brings this claim on his own behalf and on behalf of each member of the Class and Subclasses.

66.     Plaintiff and members of the Class and Subclasses formed binding and enforceable contracts when they executed written WWE Booking Contracts.

67.     Under Section 7.5 of Plaintiff's Booking Contract, Plaintiff and members of the Class and Subclasses are entitled to royalties from WCW's (WWE) sales of WCW Video Products (streaming video on WWE Network) containing Plaintiff in Pay-Per-Views and Non Pay-Per-Views.  **EXHIBIT 4** (Definition of WCW Video Products in Plaintiff's 2001 Booking Contract).

68.     WWE has not paid Plaintiff and members of the Class and Subclasses any royalties from WCW's sales of WCW Video Products (streaming video on WWE Network) of Pay-Per-Views and Non Pay-Per-Views.  **EXHIBIT 8** (Plaintiff's WWE 2016 first quarter royalty statement evidencing no royalties paid for sales of pay per views and non pay per views featuring Plaintiff on WWE Network).

69.     Plaintiff and members of the Class and Subclasses have been damaged by WCW's breach of the obligation to pay royalties to Plaintiff and members of the Class and Subclasses.

### COUNT II
### (BREACH OF FIDUCIARY DUTY)

70.     Plaintiff incorporates by reference each and every prior and subsequent allegation as though fully set forth at this point.

71.     In agreeing to allow Defendant to serve as its Promotor, Plaintiff and each member of a Plaintiff class placed a unique degree of trust and confidence in the Defendant, who clearly had superior knowledge, skill or expertise in managing such affairs and were under a duty to represent the interests of Plaintiff and each member of a Plaintiff class as his Promotor.

72.     Defendant's role as his Promotor placed it in a dominant position, thereby creating a relationship of dependency.

73.     Defendant placed itself in the role of Trustee of royalties due Plaintiff and each member of a Plaintiff class, who depended and continues to depend on Defendant's integrity and good faith in honoring the royalty obligation and properly accounting to Plaintiff and each member of a Plaintiff class all amounts justly due.

74.     Defendant has advanced its interests to the detriment of the Plaintiff and each member of a Plaintiff class by failing to properly pay royalties as described above.

75.     As a result therefrom, Plaintiff and each member of a Plaintiff class have sustained damages.

## COUNT III
### (UNJUST ENRICHMENT/RESTITUTION)

76.     Plaintiff incorporates by reference each and every prior and subsequent allegation as though fully set forth at this point.

77.     Defendant has, in violation of its clear obligation, engaged in a massive and profitable scheme, pattern and/or practice of intentionally underpaying required royalties, expressly designed to enrich Defendants at the expense of the Plaintiff and the class he brings this claim on behalf of.

78.     The Defendant has obtained substantial benefit as a direct result of its violation of the rights of the Plaintiff and members of the Plaintiff class, which it in equity and good conscience ought not to be able to keep.

## COUNT IV
### (VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT, C.G.S. §42-110A, *ET SEQ.*)

79.     Plaintiffs incorporate by reference each and every prior and subsequent allegation as though fully set forth at this point.

80.     Defendant has acted in bad faith and in breach of fiduciary duties owed to Plaintiff and members of the Plaintiff class by failing to account for millions of dollars in owed royalties.

81.     Defendant has repeatedly misrepresented to Plaintiff and each member of a Plaintiff class the amounts rightfully owed to them.

82.     Said conduct is a violation of the Connecticut Unfair Trade Practices Act, C.G.S. §42-110a, *et seq*. on the part of the Defendant in that said actions in the course of the Defendant's trade or business were immoral, oppressive, unscrupulous, and caused substantial injury to the Plaintiffs.

83.     The Defendant's conduct caused substantial ascertainable loss to the Plaintiff and members of the Plaintiff class, including but not limited to the loss of valuable royalties and the information necessary to determine the amounts properly due to Plaintiff.

84.     Additionally, the Defendant obtained substantial benefit as a direct result of its invasion of the privacy of the Plaintiff and members of the Plaintiffs class, which in equity and good conscience ought not to be able to keep.

85.     A copy of this complaint has been mailed to the Attorney General of the State of Connecticut and the Commissioner of Consumer Protection.

<u>COUNT V</u>
**Breach of Contract- Failure to Pay Royalties Within 90 Days of End of Quarter**

86.     Plaintiff incorporates by reference each and every prior and subsequent allegation as though fully set forth at this point.

87.     Plaintiff brings this claim on his own behalf and on behalf of each member of the Class and Subclasses.

88.     Plaintiff and members of the Class and Subclasses formed binding and enforceable contracts when they executed written WWE Booking Contracts.

89.     Under Section 7.12 (a) of Plaintiff's Booking Contract, Plaintiff and members of the Class and Subclasses are entitled to statements of royalties payable within 90 days following the end of each quarter.  **EXHIBIT 12** (Section 7.12(a) of Plaintiff's Booking Contract obligates WWE to pay royalties within 90 days of end of the quarter).

90.     WWE has not sent royalty statements within 90 days following the end of each quarter.  **EXHIBIT 8** (Plaintiff's 2016 First Quarter Royalty Statement evidencing 2012-2015 royalty payments unpaid within 90 days of the end of the quarter).

91.     Plaintiff and members of the Class and Subclasses have been damaged by WWE's breach of the obligation to pay royalties within 90 days following the end of each quarter to Plaintiff and members of the Class and Subclasses.

**VII.    PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of the Class and Subclasses of persons described herein, pray for an Order as follows:

a) Certify the Class and Subclasses as requested herein, appoint Plaintiff as Class Representative and his selection of counsel as lead Class Counsel, and order class-wide relief;

20

b) Adjudge and decree that Defendant has engaged in the conduct alleged herein;

c) Enjoin and restrain Defendant and its officers and agents from continuing or engaging in similar conduct as alleged herein;

d) Enjoin and restrain Defendant from placing Pay-Per-Views and Non Pay-Per-Views on the WWE Network until WWE pays Plaintiff's and the Class' and Subclass' royalty payments.

e) Imposing a constructive trust on amounts wrongfully withheld from Plaintiff and the Class and Subclasses members pending resolution of their claims herein;

f) Order that Defendant pay restitution to Plaintiff and the Class and Subclasses which would restore Plaintiff and the Class and Subclasses to the financial position they would have been in absent Defendant's breach of contract;

g) Order that Defendant pay all compensatory damages as a result of its breach of contract;

h) Order that Defendant pay punitive damages as a result of its breach of contract;

i) Order that Defendant pay interest on the monies wrongfully obtained from the date of nonpayment through the date of entry of judgement in this action;

j) Order Defendant to identify victims and amounts of unpaid royalties of its breach of contract;

k) Disgorgement of all proceeds unjustly flowing from Defendants' actions and/or omissions;

l) Award attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and

m) Grant all other relief as the Court deems necessary and proper.

## VIII.   JURY DEMAND

Plaintiff and members of the Class and Subclasses respectfully demand a trial by jury on all issues so triable.

Dated:  August 9, 2016                    Respectfully submitted,


Marcus Bagwell

By /s/ Brenden P. Leydon
Brenden P. Leydon, Esq.
TOOHER WOCL & LEYDON, L.L.C.
80 Fourth Street
Stamford, CT 06905
Phone: (203) 324-6164
Fax: (203) 324-1407
Email: BLeydon@tooherwocol.com
Federal Bar No.: CT16026


Pro hac motion pending for            KRISLOV & ASSOCIATES, LTD.
                                      Clinton A. Krislov (clint@krislovlaw.com)
                                      Matthew T. Peterson (matthew@krislovlaw.com)
                                      20 N. Wacker Dr.
                                      Suite 1300
                                      Chicago, Illinois   60606
                                      Tel.:   (312) 606-0500
                                      Fax.:  (312) 606-0207


                                      *Counsel for Plaintiffs*