# EXHIBIT 2

# WCW, INC.
# BOOKING CONTRACT

*June 4th for MB* ΣJK

This WCW, Inc. Booking Contract ("Agreement"), dated this Eighteenth (18th) day of May, 2001, and made effective as of ~~May 28~~, 2001, by and between WCW, Inc., a Delaware corporation, with its principal place of business at 1241 East Main Street, Stamford, Connecticut 06902 (hereinafter referred to as "WCW"), and Marcus Bagwell, an individual residing at ████████████████████ (hereinafter referred to as "WRESTLER").

## PREMISES

WHEREAS, WCW is engaged in the business of professional wrestling and of representing professional wrestlers in the promotion and exploitation of a professional wrestler's name, likeness, personality and character; and

WHEREAS, WCW intends to broadcast WCW's wrestling programs for purposes of publicizing WCW's professional wrestling exhibitions and/or events, as defined below, and WCW intends to broadcast on a pay-per-view basis and publicize, display and promote WCW's professional wrestling exhibitions; and

WHEREAS, WCW intends that its business operations will afford WRESTLER opportunities to wrestle and obtain public exposure which will increase the value of his wrestling services and his standing in the professional wrestling community and entertainment industry; and

WHEREAS, WRESTLER is duly licensed, as required, to engage in professional wrestling exhibitions and/or events, as defined below, and is actually engaged in the business of performing as a professional wrestler; and

WHEREAS, WRESTLER is a performing artist and the professional wrestling exhibitions arranged by WCW constitute demonstrations of wrestling skills and abilities designed to provide athletic-styled entertainment to the public, and such professional wrestling exhibitions and events constitute entertainment and are not competitive sports; and

WHEREAS, WRESTLER desires WCW to arrange professional wrestling exhibitions and/or events, as defined below, for WRESTLER and to assist WRESTLER in obtaining public exposure through live exhibitions, television programs, public appearances, and merchandising activities, or otherwise;

NOW THEREFORE, in consideration of the mutual promises and agreements as set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and the parties intending to be legally bound, do hereby agree as follows:

## 1. BOOKING

1.1  WRESTLER hereby grants exclusively to WCW, and WCW hereby accepts, the following worldwide rights:

1

(a) During the term of this Agreement as defined below, the right to engage WRESTLER's performance in wrestling matches at professional wrestling exhibitions, as well as appearances of any type at other events, engagements or entertainment programs in which WRESTLER performs services as a professional wrestler, entertainer or otherwise directed by WCW in its sole discretion (collectively the "Events"), whether such Events are staged before a live audience, in a television broadcast studio, on location (for later viewing or broadcast) or otherwise.

(b) During the term of this Agreement as defined below, the right, in perpetuity, to sell or otherwise distribute tickets of admission to the general public for viewing of any or all of the Events that include the performance or appearance of WRESTLER, as well as on any closed circuit television, pay-per-view television, video exhibition, or any other medium now known or hereinafter discovered, of the Events.

(c) During the term of this Agreement and thereafter, as provided for in this Agreement, the right to solicit, negotiate, and enter into agreements for and on behalf of WRESTLER for the exploitation of Intellectual Property (as defined hereinbelow) for merchandising, commercial tie-ups, publishing, personal appearances, performances in non-wrestling events, and endorsements.

1.2 In consideration of WRESTLER's granting of rights, license and other services, as set forth herein, and provided WRESTLER shall faithfully and fully perform all obligations hereunder, WCW shall endeavor to book WRESTLER as an individual or as a member of a group, which determination shall be made in WCW's sole discretion, in wrestling matches at various Events.

## 2. WORKS

2.1 If WCW books WRESTLER to appear and perform at Events, WRESTLER hereby grants to WCW and WCW hereby accepts, the exclusive right during the term of this Agreement to video tape, film, photograph, or otherwise record, or to authorize others to do so, by any media now known or hereinafter discovered, WRESTLER's appearance, performance, commentary, and any other work product for any or all of the Events. (These recordings by tape, disc, film, or otherwise are collectively referred to herein as the "Programs".)

2.2 Notwithstanding the termination of this Agreement for any reason, and notwithstanding any other provision of this Agreement, WCW shall have the right to produce, reproduce, reissue, manipulate, reconfigure, license, manufacture, record, perform, exhibit, broadcast, televise by any form of television (including without limitation, free, cable, pay cable, closed circuit and pay-per-view television), transmit, publish, copy, reconfigure, compile, print, reprint, vend, sell, distribute and use via any other medium now known or hereinafter discovered, and to authorize others to do so, the Programs, in perpetuity, in any manner or media and by any art, method or device, now known or hereinafter discovered (including without limitation, by means of videodisc, videocassette, optical, electrical and/or digital compilations, theatrical motion picture and/or non-theatrical motion picture). All gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible property provided to WRESTLER by WCW and/or containing New Intellectual Property as defined in paragraph 3.2(a) shall be immediately returned to WCW upon termination of this

Agreement for any reason.

2.3     WRESTLER's appearance, performance and work product in any or all of the Events and/or Programs shall be deemed work for hire; and notwithstanding the termination of this Agreement, WCW shall own, in perpetuity, all Programs and all of the rights, results, products and proceeds in and to, or derived from the Events and Programs (including without limitation, all incidents, dialogue, characters, actions, routines, ideas, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other tangible or intangible materials written, composed, submitted, added, improvised, or created by or for WRESTLER in connection with appearance at the Events and/or in the Programs) and WCW may obtain copyright and/or trademark and/or any other legal protection therefor, now known or hereinafter discovered, in the name of WCW and/or on behalf of WCW's designee.

2.4     If WCW directs WRESTLER, either singly or in conjunction with WCW, to create, design or develop any copyrightable work (herein referred to as a "Development"), such Development shall be deemed work for hire and WCW shall own such Development. All Programs and Developments referred to in this Agreement are collectively referred to as "Works."

2.5     All Works and WRESTLER's contributions thereto shall belong solely and exclusively to WCW in perpetuity notwithstanding any termination of this Agreement. To the extent that such Works are considered: (i) contributions to collective works, (ii) a compilation, (iii) a supplementary work and/or (iv) as part or component of a motion picture or other audio-visual work, the parties hereby expressly agree that the Works shall be considered "works made for hire" under the United States Copyright Act of 1976, as amended (17 U.S.C. § 101 et seq.). In accordance therewith, all rights in and to the Works shall belong exclusively to WCW in perpetuity, notwithstanding any termination of this Agreement. To the extent that such Works are deemed works other than "works made for hire," WRESTLER hereby assigns to WCW all right, title and interest in and to all rights in such Works and all renewals and extensions of the copyrights or other rights that may be secured under the laws now or hereafter in force and effect in the United States of America or any other country or countries.

## 3. INTELLECTUAL PROPERTY

3.1     The parties agree that as of the date of this Agreement, all service marks, trademarks and any and all other distinctive and identifying indicia under which WRESTLER claims any rights, including but not limited to WRESTLER's legal name, nickname, ring name, likeness, personality, character, caricatures, voice, signature, costumes, props, gimmicks, gestures, routines and themes, which are owned by WRESTLER or in which WRESTLER has any rights anywhere in the world (collectively, the "Original Intellectual Property") are described and identified on Schedule A attached hereto and incorporated herein by reference. WRESTLER hereby assigns, for the Term of this Agreement, in good faith to WCW and WCW hereby accepts all worldwide right, title and interest in and to WRESTLER's Original Intellectual Property, including, but not limited to, the rights to license, reproduce, manipulate, promote, expose, exploit and otherwise use the Original Intellectual Property anywhere in the world in any commercial manner, media, art form, method or device now known or hereinafter discovered.

3

3.2 (a) (i) With the exception of WRESTLER's Original Intellectual Property, any service marks, trademarks and/or distinctive and identifying indicia, including ring name, nickname, likeness, personality, character, caricatures, voice, signature, props, gestures, routines, themes, incidents, dialogue, actions, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible or intangible property written, composed, submitted, added, improvised, created and/or used by or associated with WRESTLER's performance in the business of professional wrestling or sports entertainment during the term of this Agreement (collectively the "New Intellectual Property") are hereby assigned to and shall belong to WCW, in perpetuity, with WCW retaining all such ownership rights exclusively throughout the world notwithstanding any termination of this Agreement.

(ii) Subject to Schedule A, WRESTLER acknowledges that WCW created and developed the ring name and persona of "Buff Bagwell" and that all the trademarks and service marks and related intellectual property set forth in paragraph 3.2 (a)(i) concerning "Buff Bagwell", used alone and/or as part of any tag team, are hereinafter deemed New Intellectual Property.

(b) Upon the termination of this Agreement, all rights in and to the Original Intellectual Property shall revert to WRESTLER, except that WCW, its licensees, sublicensees and assigns may continue to exploit any and all materials, goods, merchandise and other items incorporating the Original Intellectual Property made before such termination, until all such materials, goods and merchandise are sold off which sell-off period shall not exceed one (1) year from the date of termination of this Agreement.

3.3 It is the intention of the parties that the New Intellectual Property belongs to WCW, in perpetuity, even to the exclusion of WRESTLER, and shall survive the termination of this Agreement for any reason. WCW shall have the exclusive right to assign, license, sublicense, reproduce, promote, expose, exploit and otherwise use the New Intellectual Property in any commercial manner now known or hereinafter discovered, regardless of whether such rights are exercised during or after the Term of this Agreement and notwithstanding termination of this Agreement for any reason.

3.4 The Original Intellectual Property and the New Intellectual Property are hereinafter collectively referred to as "Intellectual Property."

3.5 WRESTLER agrees to cooperate fully and in good faith with WCW for the purpose of securing and preserving WCW's rights in and to the Intellectual Property. In connection herewith, WRESTLER acknowledges and hereby grants to WCW the exclusive worldwide right during the Term of this Agreement (with respect to Original Intellectual Property) and in perpetuity (with respect to New Intellectual Property) to apply for and obtain trademarks, service marks, copyrights and other registrations throughout the world in WCW's name and/or on behalf of WCW's designee. At WCW's expense and request, WCW and WRESTLER shall take such steps, as WCW deems necessary for any registration or any litigation or other proceeding, to protect WCW's rights in the Original Intellectual Property and/or New Intellectual Property and/or Works.

4

## 4. MERCHANDISING

4.1   WRESTLER hereby agrees that WCW shall have the exclusive right (i) during the Term of this Agreement and thereafter, as provided in this Agreement, to use the Original Intellectual Property and (ii) in perpetuity, to use the New Intellectual Property in connection with the manufacture, production, reproduction, reissuance, manipulation, reconfiguration, broadcast, rebroadcast, distribution, sale, and other commercial exploitation in any manner, now known or hereinafter discovered, of any and all materials, goods, merchandise and other items incorporating the Intellectual Property. As to all such materials, goods, merchandise or items created, developed, produced and/or distributed during the Term of this Agreement using the Original Intellectual Property, WCW shall have the exclusive right to sell and exploit such materials, goods and merchandise until the sell-off of same which shall not exceed one (1) year after the date of termination of this Agreement. As to all such materials, goods, merchandise or items using the New Intellectual Property, WCW shall have the exclusive right, in perpetuity, to sell and exploit same forever. By way of example and not of limitation, such items include t-shirts, posters, photos, video tapes and video cassettes, dolls, books, biographies, articles and stories, and any other such material goods, merchandise, or items relating to WRESTLER.

4.2   It is the intention of the parties that WCW's rights described under paragraph 4.1 are exclusive to WCW even to the exclusion of WRESTLER. WCW shall own all copyrights and trademarks in any and all such materials, goods, merchandise and items and shall be entitled to obtain copyright, trademark, service mark or other registrations in WCW's name or on behalf of its designee; and WRESTLER shall provide all reasonable assistance to WCW in so obtaining such copyright, trademark, service mark or other registrations.

## 5. EXCLUSIVITY

5.1   Except as otherwise set forth herein, it is the understanding of the parties that all rights, licenses, privileges and all other items herein given or granted or assigned by WRESTLER to WCW are exclusive to WCW even to the exclusion of WRESTLER.

5.2   In the event WRESTLER desires upon reasonable notice to WCW during the Term of this Agreement either individually or through his authorized representative(s) to participate in movies, films, speaking engagements, commercials, product endorsements, videos, television programs or similar activities (collectively "Permitted Activities") and promotional events for the Permitted Activities, WRESTLER may do so subject to WCW's approval, which shall not be unreasonably withheld or delayed provided WRESTLER shall not utilize the New Intellectual Property in any manner in connection with such Permitted Activities without WCW's written consent, and that WCW retains first priority, to the exclusion of any such Permitted Activities, with respect to the use and scheduling of WRESTLER's services at all times during the Term (as defined below) of this Agreement. It is further agreed that WCW shall receive from WRESTLER a management fee to reimburse WCW for its reasonable administrative costs incurred in connection with WRESTLER's participation in each such Permitted Activity, provided that WCW's costs shall not be less than ten percent (10%) of any fees received by WRESTLER for each such Permitted Activity described herein. Additionally, all monies earned by WRESTLER from such Permitted Activities in a specific Contract Year shall be credited against the Minimum Annual Compensation for that

5

Contract Year as set forth in paragraph 7.1 below.

## 6. TERM AND TERRITORY

6.1   The term of the Agreement shall be three (3) years from the effective date hereof ("Initial Term").

6.2   Notwithstanding anything herein to the contrary, termination of this Agreement for any reason shall not affect WCW's ownership of and rights in, including but not limited to, any Works, New Intellectual Property and any registrations thereof, or the rights, results, products, and proceeds in and to and derived from WRESTLER during the Term of this Agreement; and the exploitation of rights set forth in Paragraphs 1, 2, 3 and 4 hereof in any and all media now known or hereinafter discovered.

6.3   The territory of this Agreement shall be the world.

## 7. PAYMENTS/ROYALTIES

7.1   (a)   Provided that WRESTLER fulfills all obligations and warranties and provided WRESTLER does not materially breach any of the terms of this Agreement, WCW guarantees WRESTLER that the total of the payments made to WRESTLER shall amount in the aggregate to be no less than ███████████████████████████████████████ for the First Contract Year of this Agreement; ███████████████████████████████████████ for the Second Contract Year of this Agreement; and ███████████████████████████████████████ for the Third Contract Year of this Agreement (referred to hereinafter as "Minimum Annual Compensation"), which shall be payable in fifty-two (52) equal weekly installments. In calculating such Minimum Annual Compensation, WCW shall credit any payments earned by WRESTLER under the paragraphs of this Section 7 against the Minimum Annual Compensation. For the purposes of this paragraph, any royalty payments due under the Agreement shall be deemed "earned" only at the time they are paid to WRESTLER.

(b)   Subject to paragraphs 7.9, if applicable, and 10.2 (b) below, within one hundred twenty (120) days after the Contract Year has ended, if it is determined that WRESTLER has earned more than the Minimum Annual Compensation for services rendered during the Contract Year, WRESTLER shall be paid in one lump sum within fifteen (15) days thereafter the difference between the Minimum Annual Compensation and what WRESTLER actually earned for services rendered during the Contract Year.

7.2   (a)   If WRESTLER appears and performs in any Event produced by WCW in an arena before a live audience at which admission is charged other than those arena events which are taped or broadcast for purposes pursuant to paragraph 7.2 (b) and paragraph 7.2 (c) hereof (hereinafter "House Shows"), Wrestler shall be paid by WCW an amount equal to such percentage of the paid receipts for such House Show from the live House Show gate receipts only as is consistent with the nature of the match in which WRESTLER appears, i.e., preliminary, mid-card, main event, etc. and any standards WCW establishes specifically for such House Show.

6

(b) If WRESTLER appears and performs in connection with an arena or studio Event produced by WCW which is taped or broadcast for use on WCW's television network ("TV Taping"), WRESTLER shall be paid by WCW an amount in accordance with the nature of the match in which WRESTLER performs, i.e., preliminary card, mid card, main event, etc. or any other standard WCW, in its sole discretion establishes specifically for that TV Taping.

(c) If Wrestler appears and performs in connection with an arena or studio Event produced by WCW which is aired or broadcast via satellite broadcast or pay-per-view distribution technology for use by WCW ("Pay-Per-View"), WRESTLER shall be paid by WCW an amount in accordance with the nature of the match in which WRESTLER performs, i.e., preliminary card, mid card, main event, etc., or any other standard WCW, in its sole discretion, establishes specifically for that Pay-Per-View.

7.3 (a) Licensed Product Royalties: In the event that the Original and/or New Intellectual Property are used by WCW and/or licensed, sublicensed, or otherwise assigned to third parties for production, reproduction and/or sale and distribution, in conjunction with any consumer materials, goods or merchandise, (hereinafter collectively referred to as "Licensed Products"), such that the applicable Licensed Product only features the Original and/or New Intellectual Property, WRESTLER shall be paid twenty-five percent (25%) of the "Licensed Products' Net Receipts" received by WCW with respect to any such licensing, sublicensing or assignment. "Licensed Products' Net Receipts" means the gross amount received by WCW less expenses incurred by WCW or its licensing agent for the applicable Licensed Product. WRESTLER acknowledges and agrees that WRESTLER shall not be eligible for any royalties with respect to television license, advertising and distribution fees paid to WCW by any entity in connection with the exploitation of Original and/or New Intellectual Property.

(b) In the event that the Original and/or New Intellectual Property are used by WCW or licensed, sublicensed, or otherwise assigned to third parties in connection with Licensed Products featuring WRESTLER with other wrestlers represented by WCW, WCW shall allocate twenty-five percent (25%) of the Licensed Products Net Receipts, to be paid pro-rata among WRESTLER and all other talent so featured.

7.4 (a) Direct Sales Royalties: In the event that WCW distributes and sells directly any Licensed Products other than any WCW Pay-Per-Views, as set forth in paragraph 7.5(c), below or any WCW Video Products, as set forth in Paragraph 7.5(d) below, including without limitation, at the arena, via mail order sales or directly on television, or via the Internet (hereinafter "Direct Sales Products"), such that the applicable product only features the Original and/or New Intellectual Property of the WRESTLER, WRESTLER shall be paid five percent (5%) of the Direct Sales Products' Net Receipts derived by WCW from such exploitation. For purposes of this paragraph, Direct Sales Products' Net Receipts mean the gross amount received by WCW for sales of such products after deduction of local taxes and applicable arena commission(s) allocated for concession sales and cost of goods.

(b) In the event that the Original and/or New Intellectual Property of the WRESTLER are exploited by WCW, such that Direct Sales Products feature WRESTLER with other wrestlers

7

represented by WCW, WCW shall allocate five percent (5%) of the Direct Sales Products Net Receipts to be paid pro-rata among WRESTLER and all other talent so featured.

7.5 (a) (i) Royalties/Pay-Per-View Videos Sold By Licensees: WCW shall allocate twenty-five percent (25%) of the Net Receipts paid to WCW by licensees authorized to reproduce and sell video cassettes, videodiscs, CD ROM, or other technology, including technology not yet created (hereinafter referred to as "WCW Video Products"), of WCW pay-per-views in their entirety ("WCW Pay-Per-Views") to a talent royalty pool. Thereafter, WCW shall pro-rate payment to WRESTLER and all other talent appearing in such WCW Pay-Per-Views in the same proportion as was the compensation paid to WRESTLER for his appearances in the pay-per-views to the total amount paid to all talent for their appearances in the pay-per-view. For purposes of paragraphs 7.5(a)(i) and 7.5(a)(ii), Net Receipts shall mean the gross amount received by WCW from the licensees for the WCW Pay-Per-Views less any and all costs incurred by WCW to produce and/or distribute such WCW Pay-Per-Views.

(ii) In the event that the WCW Video Products are a compilation or derivative work of multiple individual WCW Pay-Per-Views in their entirety, such as a collection of videos, e.g., a Wrestlemania box set, payment to WRESTLER shall be calculated as follows: twenty-five percent (25%) of the Net Receipts paid to WCW by licensees shall comprise the talent royalty pool, which shall first be pro-rated based on the number of individual videos in the compilation, and then the payment to WRESTLER for each video shall be consistent with the royalty payment to the WRESTLER at the time that each individual video was first released.

(b) Royalties/Non-Pay-Per-View Videos Sold By Licensees: WCW shall allocate twenty-five percent (25%) of the Net Receipts paid to WCW by licensees authorized to reproduce and sell all other WCW Video Products, other than those set forth in paragraphs 7.5(a)(i) and 7.5(a)(ii) above, to a talent royalty pool, from which WCW shall pay WRESTLER and all other talent appearing in such WCW Video Products pro-rata among WRESTLER and all other talent so featured. For purposes of this paragraph 7.5(b), Net Receipts shall mean the gross amount received by WCW for the WCW Video Products less any and all costs incurred by WCW to produce and/or distribute such WCW Video Products.

(c) (i) Royalties/Pay-Per-View Videos Sold By WCW: WCW shall allocate five percent (5%) of the Net Receipts paid to WCW with respect to the direct sale by WCW of WCW Pay-Per-Views to a talent royalty pool. Thereafter, WCW shall pro-rate payment to WRESTLER and all other talent appearing in such WCW Pay-Per-Views in the same proportion as was the compensation paid to WRESTLER for his appearances in the pay-per-views to the total amount paid to all talent for their appearances on the pay-per-views  For purposes of paragraphs 7.5(c)(i) and 7.5(c)(ii), Net Receipts shall mean the gross amount received by WCW for the WCW Pay-Per-Views.

(ii) In the event that the WCW Video Product is a compilation or derivative work of multiple individual WCW Pay-Per-Views in their entirety, such as a collection of videos, e.g., a Wrestlemania box set, payment to WRESTLER shall be calculated as follows: five percent (5%) of the Net Receipts paid to WCW shall comprise the talent royalty pool, which shall first be pro-rated based on the number of individual videos in the compilation, and then the payment to WRESTLER

8

for each video shall be consistent with the royalty payment to the WRESTLER at the time each individual video was first released.

(d) Royalties/Non Pay-Per-View Videos Sold By WCW: WCW shall allocate five percent (5%) of the Net Receipts paid to WCW with respect to the direct sale by WCW of all other WCW Video Products other than those set forth in paragraphs 7.5(c)(i) and 7.5(c)(ii) above, to a talent royalty pool, from which WCW shall pay WRESTLER and all other talent appearing in such WCW Video Products pro-rata among WRESTLER and all other talent so featured. For purposes of this paragraph 7.5(d), Net Receipts shall mean the gross amount received by WCW for the WCW Video Products. Notwithstanding the foregoing, if WRESTLER is deemed to be the "featured performer" as determined by WCW in its sole discretion, WRESTLER shall receive a bonus of an additional five percent (5%) of WCW's Net Receipts up to the sale of the first one hundred fifty thousand (150,000) units. Once sales exceed 150,000, WRESTLER as a featured performer shall receive ten percent (10%) of WCW's Net Receipts on all units sold, including the first 150,000 units. For example, the featured performer in the video entitled "Cause Stone Cold Said So" is "Stone Cold Steve Austin". If WRESTLER is part of a group that is determined to be the "featured performer", WRESTLER shall share pro-rata with each and every member of the group in any bonus monies that may be due in connection with such WCW Video Products.

7.6  In the event the Original and/or New Intellectual Property are used by WCW or licensed, sublicensed or assigned for non-wrestling personal appearances and performances such as personal appearances for advertising or non-wrestling promotional purposes, radio and television commercials, movies, etc., WRESTLER shall earn an amount to be mutually agreed to by WRESTLER and by WCW of the "Personal Appearance Net Receipts" received by WCW, which amount shall also be credited against WRESTLER'S Minimum Annual Compensation, if any. Personal Appearance Net Receipts means the amount received by WCW after payment of and provision for all of WCW's costs and expenses, except income taxes.

7.7  If WCW instructs WRESTLER to appear and perform in any Events or Programs as a commentator and/or to participate in post-Event production and/or voice-over activities as a commentator, WRESTLER's commentating shall be deemed work-for-hire and WRESTLER hereby assigns to WCW and WCW shall own all rights, in perpetuity, to all of WRESTLER's commentary and WRESTLER shall not be entitled to receive any royalty payments, or any additional compensation or residual payments whatsoever, as a result of WCW's commercial exploitation of such commentary in any form, whether broadcast programming, cable programming, pay-per-view programming, videotapes, videodiscs, the Internet or other mediums now or hereinafter discovered.

7.8  It is the understanding of the parties that WRESTLER shall not be paid anything for WCW's exploitation of the Original and/or New Intellectual Property in any of WCW's magazines or other publications, which WCW may publish, produce or distribute at arenas, at newsstands and/or by mail or through electronic or any other manner of media or distribution, now known or hereinafter discovered, including, but not limited to, publication or distribution on the Internet or America On Line.

7.9  If WRESTLER is unable to wrestle for eight (8) consecutive weeks due to an injury

9

F:\USERS\Legal Affairs\Booking Contracts\WCW, Inc\Bagwell Marcus 2001.doc
05/22/01

suffered in the ring while performing services at WCW's direction, for every house show or television show per Contract Year in which WRESTLER is unable to wrestle thereafter, WRESTLER's Minimum Annual Compensation as defined below for that Contract Year shall be reduced by .5%. Additionally, for every pay-per-view event per Contract Year in which WRESTLER is unable to wrestle, WRESTLER's Minimum Annual Compensation for that Contract Year shall be reduced by the average pay received by WRESTLER for the three (3) immediately preceding or fewer if less than three (3) similar pay-per-view events for which he was compensated, or .5% if there are none. If WRESTLER is unable to wrestle for any other reason during the Term of this Agreement, such deductions shall begin immediately.

7.10   For the avoidance of doubt and subject to paragraph 12.2, the non-compete provisions of this Agreement, it is acknowledged and agreed that as it relates to WRESTLER's appearance or performance of any services pursuant to this Agreement, including the appearance and or performance of WRESTLER's services at Events or other activities conducted by WCW, WRESTLER shall be eligible only for the payments and royalties specifically set forth in paragraphs 7.1 through 7.6. WRESTLER acknowledges and agrees that any payments or royalties earned in connection with any wrestling services WRESTLER may perform during the term of this Agreement for any other wrestling/sports entertainment organization and /or entity shall be credited against WRESTLER's Minimum Annual Compensation, if any.

7.11   All payments made to WRESTLER are in full without withholding, except where required by law. After the end of each calendar year, WCW shall issue to WRESTLER Internal Revenue Service Form 1099 showing all payments to WRESTLER during that calendar year.

7.12   (a)   WCW shall prepare and send statements as to royalties payable hereunder to WRESTLER within ninety (90) days following the end of each quarter, based upon the royalties received and processed by WCW in the previous quarter, together with payment of royalties, if any, earned by WRESTLER hereunder during such quarter-annual period, less advances and/or debits made by WCW on WRESTLER's behalf.

(b)   WCW shall maintain books of account related to the payment of royalties hereunder at its principal place of business. WRESTLER, or WRESTLER's designated independent certified public accountant who is a member in good standing of the AICPA, may at WRESTLER's sole expense examine WCW's books insofar as they pertain to this Agreement for the purpose of verifying the accuracy thereof, during WCW's normal business hours and upon reasonable notice. Such audit shall be conducted in a manner that will not unreasonably interfere with WCW's normal business operations. WRESTLER shall not audit WCW's books and records more than twice during any calendar year and no such audit shall be conducted later than one (1) year after the last statement of royalties is given, delivered or sent to WRESTLER. Each audit is limited to seven (7) days in duration. Statements of royalties may be changed from time to time to reflect year-end adjustments, to correct clerical errors and for similar purposes.

(c)   WRESTLER shall be deemed to have consented to all statements of royalties and all other accountings provided by WCW hereunder and each such statement of royalties or other accounting shall be conclusive, final, and binding; shall constitute an account stated; and shall not be subject to any objection for any reason whatsoever unless a specific objection in writing, stating

the basis thereof, is given by WRESTLER to WCW within one (1) year from the date the royalty statement was given, delivered or sent to WRESTLER.

(d) No claim shall be filed pursuant to paragraph 13.8 below against WCW or WCW's affiliates that disputes any statement of royalties or accounting given by WCW hereunder or that makes any claim for royalties or royalty payments, unless the same is commenced or filed within one (1) year after the date such statement or accounting is first given, delivered or sent to WRESTLER, and unless WRESTLER has first exhausted his remedies pursuant to paragraph 7.12(b) above.

## 8. WCW'S OBLIGATIONS

8.1 Although under paragraph 9.1 WRESTLER shall bear responsibility for obtaining appropriate licenses for participating in wrestling exhibitions, WCW shall be responsible for obtaining all other appropriate licenses to conduct professional wrestling exhibitions involving WRESTLER. If WCW, at its discretion, agrees to assist WRESTLER in obtaining his licenses, WRESTLER shall reimburse WCW for its fees and expenses incurred in connection therewith.

8.2 WCW shall bear the following costs in connection with the development and enhancement of the value of WRESTLER's performance hereunder and WRESTLER's standing in the professional wrestling community, all of which shall benefit WRESTLER:

(a) In connection with WRESTLER's appearances and performance at Events staged before a live audience, WCW shall bear the cost of location rental, WCW's third party comprehensive liability insurance for the benefit of the venues, applicable state and local admission taxes, promotional assistance, sound and light equipment, wrestling ring, officials, police and fire protection, and such additional security guards as WCW shall require in its discretion during a professional wrestling match;

(b) In connection with the production, distribution, and exploitation of the Programs, WCW shall bear all costs incurred in connection with such production, distribution, broadcast, transmission or other forms of mass media communication;

(c) In connection with any product or service licensing activities and/or merchandising activities, WCW shall bear all costs of negotiating, securing or otherwise obtaining the product or service licensing arrangements, including costs of agents, consultants, attorneys and others involved in making the product or service licensing activities; and WCW shall bear all costs of creating, designing, developing, producing and marketing merchandise or services. In order to fulfill these obligations, WCW may make any arrangements, contractual or otherwise, it deems appropriate to delegate, assign, or otherwise transfer its obligations.

8.3 WCW shall schedule the Events and book WRESTLER for the Events. In doing so, WCW shall select the time and location of the Events at which WRESTLER is booked, WRESTLER's opponent, and any other wrestlers who will appear at such Event. WCW shall provide WRESTLER with reasonable advance notice of the date, time, and place of any such Event, and WRESTLER shall appear at the designated location for any such Event no later than one hour

11

before the designated time. If WRESTLER fails to appear as required without advance twenty-four (24) hours notice to WCW and WCW must substitute another wrestler to appear in WRESTLER's place at the Event, then WCW may fine, suspend or terminate WRESTLER in its sole discretion.

8.4    WCW agrees that it shall use commercially reasonable efforts to limit the number of Bookings each year of the Contract that WRESTLER will perform his wrestling services for or on behalf of WCW; provided, however, WCW shall not book WRESTLER for more than fifteen (15) days per month during each Contract Year of the Agreement. For the purposes of this Agreement, "Bookings" shall include house shows (whether live or taped) whether for distribution on television and/or on a pay-per-view basis and any personal appearances required by WCW occurring on days other than those on which a house show, television show or a pay-per-view is held.

8.5    Notwithstanding the above, if WRESTLER shall be prevented from appearing at an Event by reason of Force Majeure, the above fines shall not be imposed. For purposes of this Agreement, Force Majeure shall mean any act of God, fire, flood, war or other calamity; strike or labor difficulties; any governmental action or any other serious emergency affecting WRESTLER which occurrence is beyond WRESTLER's reasonable control, and, which despite best efforts prohibits WRESTLER's performance or appearance at such Event.

## 9. WRESTLER'S OBLIGATIONS

9.1    WRESTLER shall bear responsibility for obtaining all appropriate licenses to engage in, participate in, or otherwise appear in professional wrestling exhibitions.

9.2    WRESTLER shall be responsible for WRESTLER's own training, conditioning, and maintenance of wrestling skills and abilities, as long as they do not interfere with WRESTLER's appearance at scheduled events as follows:

   (a)    WRESTLER shall establish his own training program, shall select time of training, duration of training, exercises, pattern of exercise and other actions appropriate to obtaining and maintaining physical fitness for wrestling. WRESTLER shall select his own training apparatus, including mats, weights, machines and other exercise paraphernalia. WRESTLER is responsible for supplying his own training facilities and equipment, whether by purchase, lease, license, or otherwise.

   (b)    WRESTLER shall establish his own method of physical conditioning, shall select time for conditioning, duration of conditioning and form of conditioning. WRESTLER shall select time for sleep, time for eating, and time for other activities. WRESTLER shall select his own foods, vitamins and other ingested items, excepting illegal and/or controlled substances and drugs, which are prohibited by WCW's Drug Policy.

9.3    WRESTLER shall be responsible for providing all costumes, wardrobe, props, and make-up necessary for the performance of WRESTLER's services at any Event and WRESTLER shall bear all costs incurred in connection with his transportation to and from any such Events, as well as the costs of food consumed and hotel lodging utilized by WRESTLER in connection with his appearance at such Events. Notwithstanding, WCW shall pay for WRESTLER's air transportation

12

to and from the Events, which air transportation shall be "full-Y" round-trip airfare between domestic locations (i.e., within the United States), if available, and business class airfare where the point of origination or the destination are international (i.e., outside the United States), if available, as well as those other transportation costs which are covered by WCW's then current Travel Policy.

9.4   WRESTLER shall use best efforts in employing WRESTLER's skills and abilities as a professional wrestler and be responsible for developing and executing the various details, movements, and maneuvers required of wrestlers in a professional wrestling exhibition.

9.5   WRESTLER shall take such precautions as are appropriate to avoid any unreasonable risk of injury to other wrestlers in any and all Events. These precautions shall include, without limitation, pre-match review of all wrestling moves and maneuvers with wrestling partners and opponents; and pre-match demonstration and/or practice with wrestling partners and opponents to insure familiarity with anticipated wrestling moves and maneuvers during a wrestling match. In the event of injury to WRESTLER, and/or WRESTLER's partners and opponents during a wrestling match, WRESTLER shall immediately signal partner, opponent and/or referees that it is time for the match to end; and WRESTLER shall finish the match forthwith so as to avoid aggravation of such injury.

9.6   WRESTLER shall use best efforts in the ring in the performance of wrestling services for a match or other activity, in order to provide an honest exhibition of WRESTLER's wrestling skills and abilities, consistent with the customs of the professional wrestling industry; and WRESTLER agrees all matches shall be finished in accordance with the WCW's direction. Breach of this paragraph shall cause a forfeiture of any payment due WRESTLER pursuant to SECTION 7 of this Agreement and all other obligations of WCW to WRESTLER hereunder, shall entitle WCW to terminate this Agreement, but such breach shall not terminate WCW's licenses and other rights under this Agreement.

9.7   WRESTLER agrees to cooperate and assist without any additional payment in the publicizing, advertising and promoting of scheduled Events, including without limitation, appearing at and participating in a reasonable number of joint and/or separate press conferences, interviews, and other publicity or exploitation appearances or activities (any or all of which may be filmed, taped, or otherwise recorded, telecast by any form of television now known or hereafter discovered, including without limitation free, cable, pay cable, and closed circuit and pay-per-view television, broadcast, exhibited, distributed, and used in any manner or media and by any art, method, or device now known or hereafter created, including without limitation by means of videodisc, video cassette, theatrical motion picture and/or non-theatrical motion picture and Internet), at times and places designated by WCW, in connection therewith.

9.8   WRESTLER acknowledges the right of WCW to make decisions with respect to the preparation and exploitation of the Programs and/or the exercise of any other rights respecting Original and/or New Intellectual Property, and in this connection WRESTLER acknowledges and agrees that WCW's decision with respect to any agreements disposing of the rights to the Original and/or New Intellectual Property are final, except as to WRESTLER's legal name, and subject to Schedule A, which WCW may only dispose of upon WRESTLER's written consent. WRESTLER

13

agrees to execute any agreements consistent herewith that WCW deems necessary in connection with any such agreements, and if WRESTLER is unavailable or refuses to execute such agreements, WCW is hereby authorized to do so in WRESTLER's name as WRESTLER's attorney-in-fact. WCW shall provide copies of all such documents so executed.

9.9   WRESTLER agrees to cooperate fully and in good faith with WCW to obtain any and all documentation, applications or physical examinations as may be required by any governing authority with respect to WRESTLER's appearance and/or performance in a professional wrestling match.

9.10   WRESTLER, on behalf of himself and his heirs successors, assigns and personal representatives, shall indemnify and defend WCW and WCW's licensees, assignees, parent corporation, subsidiaries and affiliates and its and their respective officers, directors, employees, advertisers, insurers and representatives and hold each of them harmless against any claims, demands, liabilities, actions, costs, suits, reasonable outside attorney fees, proceedings or expenses, incurred by any of them by reason of WRESTLER's breach or alleged breach of any warranty, undertaking, representation, agreement, or certification made or entered into herein or hereunder by WRESTLER. WRESTLER, on behalf of himself and his heirs, successors, assigns and personal representatives, shall indemnify and defend WCW and WCW's licensees, assignees, parent corporation, subsidiaries and affiliates and its and their respective officers, directors, employees, advertisers, insurers and representatives and hold each of the harmless against any and all claims, demands, liabilities, actions, costs, suits, reasonable outside attorney fees, proceedings or expenses, incurred by any of them, arising out of WRESTLER'S acts, transactions and/or conduct not directed by WCW within or around the ring, hallways, dressing rooms, parking lots, or other areas within or in the immediate vicinity of the facilities where WCW has scheduled Events at which WRESTLER is booked. Such indemnification shall include all claims arising out of any acts, transactions and/or conduct of WRESTLER or others occurring at Events or in connection with any appearances or performances by WRESTLER not conducted by WCW in accordance with this Agreement. WCW on behalf of its parent company, subsidiaries, successors and assigns and its and their officers, directors, employees, agents and representatives shall indemnify and defend WRESTLER and hold WRESTLER harmless against any claims, demands, liabilities, actions, costs, suits reasonable attorney fees, proceedings or expenses, incurred by WRESTLER by reason of WCW's breach of any warranty, undertaking, representation, agreement or certification made under this Agreement.

9.11   WRESTLER shall be responsible for payment of all of WRESTLER's own Federal, state or local income taxes; all social security, FICA and FUTA taxes, if any, as well as all contributions to retirement plans and programs, or other supplemental income plan or program that would provide WRESTLER with personal or monetary benefits upon retirement from professional wrestling.

9.12   (a)   WRESTLER shall be responsible for his own commercial general liability insurance, worker's compensation insurance, professional liability insurance, as well as any excess liability insurance, as WRESTLER deems appropriate to insure, indemnify and defend WRESTLER with respect to any and all claims arising out of WRESTLER's own acts, transactions, or conduct.

(b)   WRESTLER acknowledges that the participation and activities required by

14

prosecutions or other litigation matters, including without limitation any immigration or athletic commission related matters, affecting WRESTLER which would or might interfere with WCW's full and complete exercise or enjoyment of any rights or licenses granted hereunder. Any exceptions to this Warranty are set forth in Schedule B, attached hereto.

10.2 (a) WRESTLER represents, warrants and agrees that WRESTLER is in sound mental and physical condition; that WRESTLER is suffering from no disabilities that would impair or adversely affect WRESTLER's ability to perform professional wrestling services; and that WRESTLER is free from the influence of illegal drugs or controlled substances, which can threaten WRESTLER's well being and pose a risk of injury to WRESTLER or others. To insure compliance with this warranty, WRESTLER shall abide by WCW's Drug Policy for wrestlers, as well as any and all amendments, additions, or modifications to the WCW's Drug Policy implemented during the Term of this Agreement and consents to the sampling and testing of his urine in accordance with such Policy. In addition, WRESTLER agrees to submit annually to a complete physical examination by a physician either selected or approved by WCW. WCW's current Drug Policy, which WRESTLER acknowledges herewith receiving, is annexed hereto and incorporated by reference and made a part hereof.

(b) In the event that WRESTLER is unable to wrestle for eight (8) consecutive weeks during the Term of this Agreement due to an injury suffered in the ring while performing services at WCW's direction, WCW shall have the right to thereafter terminate this Agreement or suspend WRESTLER without pay. If WRESTLER is unable to wrestle for any other reason during the Term of this Agreement, WCW shall have the right to immediately terminate this Agreement or suspend WRESTLER without pay. WCW can opt in its discretion to extend the Term of this Agreement for a period of time equal to the period of suspension or any portion thereof. Upon certification by WRESTLER or WCW's physician during any period of suspension that WRESTLER is fully recovered and capable of performing all services as required under this Agreement, WCW can reinstate the Agreement, and it will therefore continue to be of full force and effect throughout the remainder of the Initial Term of this Agreement and any Renewal Term thereof. WRESTLER shall have the right to have his own physician present.

10.3 Upon reasonable notice, WCW reserves the right to have WRESTLER examined by a physician of its own choosing at its expense at any point during the Term of this Agreement.

10.4 WRESTLER further represents, warrants and agrees that this Agreement supersedes all prior agreements between WRESTLER and WCW, whether written or oral, and that he has been fully compensated, where applicable, under such prior agreement(s).

## 11. EARLY TERMINATION

11.1 This Agreement may be terminated prior to the end of its Term by a written instrument executed by each of the parties expressing their mutual consent to so terminate without any further liability on the part of either. In the event of such early termination, WCW shall pay WRESTLER for all uses of the Intellectual Property in accordance with paragraphs 7.3, 7.4, 7.5 and 7.6.

11.2 This Agreement will be terminated by WRESTLER's death during the Term, with no

16

further compensation due WRESTLER's heirs, successors, personal representatives or assigns.

11.3   Upon the termination of this Agreement for any reason, including breach, the parties acknowledge and agree that WCW shall own all right, title and interest in all Works, New Intellectual Property and any registrations thereof and WCW shall have the exclusive right to sell or otherwise dispose of any materials, goods, merchandise or other items (i) produced during the Term of this Agreement incorporating any Original Intellectual Property, and (ii) produced incorporating New Intellectual Property, in perpetuity.

## 12. BREACH

12.1   In addition to those reasons set forth elsewhere in this Agreement, WCW shall have the right, in its sole discretion, to immediately suspend or terminate the operation of this Agreement, both as to services and compensation, if any of the following occurs:

(a)   WRESTLER violates WCW's Drug Policy or fails WCW's pre-contract drug screening;

(b)   WRESTLER is habitually late and/or absent for scheduled Events or appearances as WCW determines in its sole discretion;

(c)   WRESTLER fails any physical examination conducted on behalf of WCW, as required herein;

(d)   WRESTLER fails to maintain physical condition or training such that his weight, and/or his performance is unsatisfactory as determined by WCW in its sole discretion; or

(e)   WCW is unable to obtain any necessary athletic commission licenses or immigration clearances for WRESTLER.

12.2   In the event WRESTLER breaches this Agreement, WCW may recover such actual direct damages as may be established in a court of law, as provided in Paragraph 13.8. In addition, in the event of termination pursuant to this Paragraph, WRESTLER shall forfeit any future payments due pursuant to paragraph 7 and WRESTLER shall not appear under, use, refer to or exploit in any manner, parenthetically or otherwise, the Original Intellectual Property for the remainder of the Term and the New Intellectual Property forever. Further, at WCW's sole option, the Term of this Agreement may be extended by the term of any suspension period, in whole or in part, with all other terms and conditions hereof remaining in full force and effect during such extended period. In the event WRESTLER breaches this Agreement, WRESTLER acknowledges and agrees that he shall not work or perform in any capacity for any other wrestling organization and/or entity not owned or controlled by WCW or any affiliated or subsidiary company thereof that promotes and/or broadcasts any wrestling Programs and/or Events in the United States, its territories and possessions, including without limitation appearances in live events, pay-per-view or other televised events, for one (1) year from the date of the termination of this Agreement as a result of breach of this Agreement by WRESTLER.

12.3  The parties further agree that because of the special, unique, and extraordinary nature of the obligations of WCW and WRESTLER respecting all rights and licenses concerning bookings, promoting, Programs, Events, Intellectual Property, which are the subject matter of this Agreement, WRESTLER's breach of this Agreement shall cause WCW irreparable injury which cannot be adequately measured by monetary relief; as a consequence WCW shall be entitled to seek injunctive and other equitable relief against WRESTLER to prevent WRESTLER's breach or default hereunder and such injunction or equitable relief shall be without prejudice to any other rights, remedies or damages which WCW is legally entitled to obtain.

12.4  In no circumstances, whatsoever, shall either party to this Agreement be liable to the other party for any punitive or exemplary damages; and all such damages, whether arising out of the breach of this Agreement or otherwise, are expressly waived.

## 13. MISCELLANEOUS

13.1  Nothing contained in this Agreement shall be construed to constitute WRESTLER as an employee, partner or joint venturer of WCW, nor shall WRESTLER have any authority to bind WCW in any respect. WRESTLER is an independent contractor and WRESTLER shall execute and hereby irrevocably appoints WCW attorney-in-fact to execute, if WRESTLER refuses to do so, any instruments necessary to accomplish or confirm the foregoing or any and all of the rights granted to WCW herein.

13.2  This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and all prior understandings, negotiations and agreements are merged in this Agreement. There are no other agreements, representations, or warranties not set forth herein with respect to the subject matter hereof; and the parties expressly acknowledge that any representation, promise or inducement by any party to any other party that is not embodied in this Agreement is not part of this Agreement, and they agree that no party shall be bound by or liable for any such alleged representation, promise or inducement not set forth herein.

13.3  This Agreement may not be changed or altered except in writing signed by WCW and WRESTLER.

13.4  If any provision or clause of this Agreement, or portion thereof, shall be held by any court or other tribunal of competent jurisdiction to be illegal, invalid, or unenforceable in such jurisdiction, the remainder of such provision shall not thereby be affected and shall be given full effect, without regard to the invalid portion. It is the intention of the parties that, if any court construes any provision or clause of this Agreement, or any portion thereof, to be illegal, void or unenforceable because of the duration of such provision or the area or matter covered thereby, such court shall reduce or modify the duration, area, or matter of such provision, and, in its reduced or modified form, such provision shall then be enforceable and shall be enforced.

13.5  WCW shall have the exclusive and unlimited right to assign, license, or transfer, in writing and upon notice to WRESTLER, any or all of the rights granted to and hereunder to any person, firm or corporation, provided such assignee has the financial ability to meet WCW's obligations hereunder and WRESTLER hereby consents to any assignment, license or transfer of such rights

18

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

| | |
|---|---|
| WCW, INC. ("WCW") | MARCUS BAGWELL ("WRESTLER") |
| By: _____<br>Edward L. Kaufman<br>Its: Vice President and Secretary | By: _____<br>Marcus Bagwell |

STATE OF CONNECTICUT    )
                       ) ss: Stamford
COUNTY OF FAIRFIELD    )

On _____June 1,_____ 2001 before me personally came Edward L. Kaufman, Vice President and Secretary, to me known, and known to me to be the individual described in, and who executed the foregoing, and duly acknowledged to me that he is a duly authorized corporate officer of WCW, Inc., and that he executed the same on behalf of said Company.

WITNESS my hand and notarial seal this _1st_ day of _June_, 2001.

KAREN SHAPIRO
NOTARY PUBLIC, STATE OF CT
MY COMMISSION EXPIRES SEP. 30, 2003

_____
Notary Public

My commission expires: _____

STATE OF _Georgia_    )
                     ) ss:
COUNTY OF _Cobb_     )

I am a Notary Public for said County and State, do hereby certify that Marcus Bagwell personally appeared before me this day and acknowledged the due execution of the foregoing instrument to be his free act and deed for the purposes therein expressed.

WITNESS my hand and notarial seal this _30TH_ day of _MAY_, 2001.

_____
Barbara S. Martin
Notary Public

Notary Public, Cobb County, Georgia
My Commission Expires May 20, 2004

My commission expires: _____

21

## SCHEDULE B
## EXCEPTIONS TO WARRANTY
## PENDING CONTRACTS/CLAIMS/LITIGATION WHICH MAY INTERFERE OR CONFLICT WITH
## WRESTLER'S PERFORMANCE AND/OR GRANT OF RIGHTS

Independent Contractor Agreement dated March 26, 1998 between Marcus Bagwell and World Championship Wrestling, Inc.

23