## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **Marcus Bagwell** and **Scott Levy**, | ) | |
| individually and on behalf of all others | ) | |
| similarly situated; | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 3:16-cv-01350-JCH |
| | ) | |
| **World Wrestling** | ) | |
| **Entertainment, Inc.; WCW, Inc.**, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Marcus Bagwell and Scott Levy, individually and on behalf of all others

similarly situated, allege for their Class Action Complaint against defendant World Wrestling

Entertainment, Inc. ("WWE") and WCW, Inc. ("WCW-WWE"), upon personal knowledge as to

themselves and their own acts, and as to all other matters, upon information and belief, based

upon *inter alia*, the investigation made by their attorneys, as follows:

### I.     NATURE OF THE ACTION

1.      Plaintiffs Marcus Bagwell and Scott Levy ("Plaintiffs") bring this action, on

behalf of themselves and all similarly situated individuals, under similar form contracts, who

have not received contractually owed royalty payments from World Wrestling Entertainment,

Inc. ("WWE") and/or WCW, Inc. ("WCW-WWE") for certain content that has been sold or

licensed by WWE or WCW-WWE on the World Wrestling Entertainment Network ("WWE

1

Network") and for the nonpayment of all categories of royalties within 90 days following the end of the fiscal quarter.

## II.    JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), which provides for the original jurisdiction of the Federal Courts for any class action in which any member of the plaintiff class is a citizen of a state different from any Defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000.00, exclusive of interest and costs.

3.      Plaintiffs allege that the total claims of the individual members of the Plaintiff Class in this action are in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. §1332 (d)(2), (5).  As set forth below, Plaintiffs are citizens of Georgia.  WWE and WCW, Inc. are Delaware corporations, headquartered in Stamford, Connecticut.  Diversity of citizenship exists under CAFA and supports subject matter jurisdiction under 28 U.S.C § 1332 (a)(1), (d)(2)(A).  More than two-thirds of all the members of the proposed Plaintiff Class in the aggregate are citizens of a state other than Connecticut, where this action is originally being filed, and the total number of members of the proposed Plaintiff Class is greater than 100, pursuant to 28 U.S.C. §1332 (d)(5)(B).

4.      Personal Jurisdiction Over WWE and WCW, Inc. This Court has personal jurisdiction over WWE and WCW-WWE pursuant to Plaintiff Levy's WWE Early Contract Release and Plaintiff Bagwell's WCW-WWE Early Contract Release, from which the parties consent to personal jurisdiction in Connecticut for purposes of seeking legal relief arising from the WWE and WCW-WWE early contract releases and WWE and WCW-WWE booking contracts.

2

5.      <u>Venue</u>. Venue is proper pursuant to Plaintiff Levy's WWE Early Contract Release and Plaintiff Bagwell's WCW-WWE Early Contract Release, in which all parties consented to the United States District Court located in Bridgeport, Connecticut or the Judicial District Court of Stamford located in Stamford, Connecticut, as appropriate venue for purposes of Plaintiffs seeking legal relief arising from Plaintiff Levy's WWE Early Contract Release and Plaintiff Bagwell's WCW-WWE Early Contract Release and both respective booking contracts.

## III.      Parties

6.      Defendant World Wrestling Entertainment, Inc. ("WWE") is a Delaware corporation with a principal place of business at 1241 East Main Street, Stamford, Connecticut. At all material times, WWE has organized, operated and promoted entertainment featuring professional wrestling personalities under the name "World Wrestling Entertainment", "World Wrestling Federation Entertainment, Inc.", and "World Wrestling Federation."  WWE is the successor to Titan Sports, Inc.

7.      Defendant WCW, INC. is a Delaware corporation with a principle place of business at 1241 East Main Street, Stamford, Connecticut.

8.      Plaintiff Bagwell is a citizen of Georgia.  He was employed as a professional wrestler by World Championship Wrestling, Inc. ("WCW") (a wholly-owned subsidiary of Turner Broadcast System, Inc.) from roughly 1991 to 2001, and WCW Inc. ("WCW-WWE") (a wholly owned subsidiary of World Wrestling Entertainment, Inc.[1]) from June 2001 through August 2001.

9.      Plaintiff Levy is a citizen of Georgia.  He was employed as a professional wrestler with World Championship Wrestling, Inc. ("WCW") from 1992-1993, World Wrestling

---

[1] WWE does not currently list WCW, Inc. as a subsidiary in its annual SEC 10-K filing.  **EXHIBIT 1** (February 12, 2016 WWE SEC 10-K).  WWE last listed WCW, Inc. as a subsidiary in 2011.  **EXHIBIT 2** (March 7, 2011 WWE SEC 10-K).

Federation (WWE) 1993-1994, WCW 1997-1998, and World Wrestling Federation (WWE) 2000-2003.

## IV.     FACTUAL ALLEGATIONS

### PLAINTIFF LEVY

#### Plaintiff Levy's June 30, 2000 Booking Contract

10.     On June 30, 2000, Plaintiff Levy signed a Booking Contract with World Wrestling Federation Entertainment, Inc. ("WWF").  **EXHIBIT 3** (Plaintiff Levy's June 30, 2000 WWF Booking Contract).

11.     On May, 6, 2002, World Wrestling Federation Entertainment, Inc. changed their name to World Wrestling Entertainment, Inc. ("WWE")[2], therefore Plaintiff Levy's June 30, 2000 contracting party will be referenced as WWF and WWE.

12.     Section 7.5(c)(i) of Plaintiff Levy's June 30, 2000 agreement requires WWF (WWE) to pay Royalties for Pay-Per-View Videos Sold by WWF (as WWF Video Products) under the following circumstances:

> WWF shall allocate 5% of the Net Receipts paid to WWF with respect to the direct sale by WWF of WWF Pay-Per-Views to a talent royalty pool.  Thereafter, WWF shall pro-rate payment to Plaintiff and all other talent appearing in such WWF Pay-Per-Views in the same proportion as was the compensation paid to Plaintiff for his appearances in the pay-per-views to the total amount paid to all talent for their appearances on the pay-per-views.

13.     Under 7.5 (c)(ii) of Plaintiff Levy's agreement, WWF is also obligated to pay Royalties for Pay-Per-View Videos Sold by WWF when:

> The WWF Video Product is a compilation or derivative work of multiple individual WWF Pay-Per-Views in their entirety, such as a collection of videos, e.g., a WrestleMania box set, payment to Plaintiff shall be calculated as follows: 5% of the Net Receipts paid to WWF shall comprise the talent royalty pool, which shall first be pro-rated based on the number of individual videos in the compilation, and then the payment to Plaintiff for each video shall be consistent

---

[2] http://corporate.wwe.com/news/company-news/2002/05-06-2002

with the royalty payment to the Plaintiff at the time each individual video was first released.

14.     For 7.5 (c)(i) and (c)(ii) calculations (royalty amount owed for sales of Pay-Per-View Videos), Net Receipts means the _gross amount_ received by WWF for the WWF Pay-Per-Views.  In 2015, the WWE Network segment _grossed_ revenue of $159.4 million. **EXHIBIT 4** (WWE's Fourth-Quarter 2015 Results).

15.      Under 7.5 (d) of Plaintiff's 2001 contract, WWF is also obligated to pay Plaintiff Levy Royalties for Non Pay-Per-View Videos Sold by WWF (as WWF Video Products) under the following circumstances:

> WWF shall allocate 5% of the Net Receipts paid to WWF with respect to the direct sale by Plaintiff of all other WWF Video Products other than those set forth in 7.5 (c)(i) and (c)(ii) above, to a talent royalty pool, from which WWF shall pay Plaintiff and all other talent appearing in such WWF Video Products pro-rata among Plaintiff and all other talent so featured.

16.     For 7.5 (d) calculations (royalty amount owed for sale of Non-Pay-Per-View Videos), Net Receipts means:

> The _gross amount_ received by WWF for the WWF Video Products. Notwithstanding the foregoing, if Plaintiff is deemed to be the "featured performer" as determined by WWF in its sole discretion, Plaintiff shall receive a bonus of an additional 5% of WWF's Net Receipts up to the sale of the first 150,000 units.  Once sales exceed 150,000, Plaintiff as a featured performer shall receive 10% of WWF's Net Receipts on all units sold, including the first 150,000 units.  If Plaintiff is part of a group that is determined to be the "featured performer," Plaintiff shall share pro-rata with each and every member of the group in any bonus monies that may be due in connection with such WWF Video Products.

17.     The WWE Network segment _grossed_ revenue of $159.4 million in 2015.

**EXHIBIT 3** (WWE's Fourth-Quarter 2015 Results).  As alleged supra, WWF is WWE.

18.     The definition of "WWF Video Products" under Section 7.5 (a)(1) is:

> "video cassettes, videodiscs, CD ROM, or _other technology, including technology not yet created._"

19.     WWF Video Products includes streaming videos on the World Wrestling Entertainment Network ("WWE Network"), because under Section 7.5 (a)(1), streaming the WWE Network is "*other technology and/or technology not yet created*" at the time Plaintiff Levy signed the June 30, 2000 Booking Contract.  *See* **EXHIBIT 5** (Definition of "WWF Video Products" in Plaintiff Levy's June 30, 2000 Booking Contract).

20.     The definition of Pay-Per-View Videos ("PPVs") under Section 7.5 (a) is, "WWF Pay-Per-Views in their entirety."  *See* **EXHIBIT 6** (Definition of WWF Pay-Per-Views in Plaintiff Levy's 2000 Booking Contract).

21.     The definition of Non-Pay-Per-View Videos ("Non-PPVs") under Section 7.5 (b) and 7.5 (d) is, "all other WWF Video Products, other than WWF Pay-Per-Views in their entirety and a compilation or derivative work of multiple individual WWF Pay-Per-Views in their entirety."  *See* **EXHIBIT 7** (Definition of Non Pay-Per-View Videos in Plaintiff Levy's 2000 Booking Contract).

22.     For several years (February 2014- present), WWE sold "WWF Video Products" (streaming videos on WWE Network) of Pay-Per-View Videos and Non-Pay-Per-View Videos featuring Plaintiff Levy without paying royalties to Plaintiff Levy.  (all pay per views he performed on for WWE—including WrestleMania 17 and numerous non pay per view videos featuring Plaintiff including "Ladies and Gentleman, My Name is Paul Heyman"—WWE pays Plaintiff Levy for the DVD Sales of "Ladies and Gentleman" and "The True Story of WrestleMania", but not from WWE Network revenues (both of those programs are available on WWE Network).  **EXHIBIT 8** (Plaintiff Levy's June 20, 2016 WWE royalty statement).

<u>Plaintiff Levy's WCW Performances on WWE Network</u>

23.     For the reasons described below in Plaintiff Bagwell's section, Plaintiff Levy is entitled to WWE Network royalties for his performances in WCW video library.

<u>Plaintiff Levy's January 21, 2003 Early Release Contract</u>

24.     On January 21, 2003, Plaintiff Levy and WWE agreed to an Early Contract Release.  **EXHIBIT 9** (Plaintiff Levy's January 21, 2003 WWE Early Contract Release).  The Early Contract Release included releases from the June 30, 2000 WWE contract (the "Contract") and any prior contracts, amendments or modifications.

25.     Plaintiff Levy's Early Contract Release declares, in paragraph (4. A.), the agreement is:

> . . . a full and complete buyout of Levy's services under the Contract (June 30, 2000 WWF contract) *other than the obligation to pay Levy the royalties due to him pursuant to, and as determined by, the Contract (June 30, 2000 WWF Contract).*

26.     As of January 21, 2003 (signing of the Early Contract Release), Plaintiff Levy's June 30, 2000 Booking Contract exists only to define WWE's royalty obligations owed to Plaintiff.

27.     Paragraph 6 of the Early Contract Release declares Plaintiff Levy forfeits any claims in law or equity against WWE in the following circumstances:

> Levy acknowledges that *except as expressly set forth herein (obligation to continue to pay royalties pursuant to June 30, 2000 agreement)*, no representations of any kind or character have been made to Levy by WWE or by an of WWE's agents, representatives or attorneys to induce the execution of this Release.  In order for Levy to induce WWE to sign this Release, Levy hereby releases WWE its parent companies, affiliates, subsidiaries, successors, assigns, and its and their respective officers, directors, employees, independent contractors, licensees, representatives and agents from any and all claims, liabilities and obligations whatsoever in law or equity (whether now known or hereinafter discovered) which Levy has or may ever have arising out of or in connection with the Contract (June 30, 2000).

28.     As a _condition precedent_ for Plaintiff Levy to "release WWE from any and all claims, liabilities and obligations whatsoever in law or equity, whether now known or hereinafter discovered," WWE must honor the representations (obligation to pay royalties pursuant to June 30, 2000 agreement) that induced Plaintiff Levy to sign the Early Release Contract.

29.     WWE breached its Early Contract Release with Plaintiff Levy by selling "WWF Video Products" (streaming videos on the WWE Network) of PPVs and Non-PPVs featuring Plaintiff Levy without paying any royalties to Plaintiff.   **EXHIBIT 8** (Plaintiff Levy's Second Quarter 2016 WWE Royalty Statement evidencing no royalties paid for WWE sale of "PPVs and Non PPVs" on WWE Network).

## PLAINTIFF BAGWELL

### WWE is WCW, Inc. (WCW-WWE)- Piercing the Corporate Veil

30.     On Friday, March 23, 2001, WWE announced the acquisition of World Championship Wrestling, Inc. ("WCW").  The acquisition included the rights to the name WCW, the copyrights to WCW's video library (including all WCW pay per views Plaintiff appeared on), and several WCW performer contracts.

31.     The corporate veil of WWE should be pierced because WWE actively and pervasively controlled WCW-WWE and intermingled the activities of the two corporations engaged in the same enterprise, while disregarding the separate nature of the corporate entities.

32.     When evidence of the following factors persists, the 2nd Circuit pierces the corporate veil of parent companies and subsidiaries:

(i)     Common Ownership

WWE owns all the stock of WCW-WWE as a subsidiary of WWE (WCW-WWE not listed as a subsidiary since 2011).

(ii)    <u>Pervasive control</u>

WWE controls the daily operations of WCW-WWE.

    a.    <u>WWE Purchase of WCW-WWE</u>

Despite WCW's successes and at one time holding status as the top wrestling promotion, Turner put WCW on the sale block in 2001. Although there appeared to be some buyers, the value of WCW crashed when new Turner programming executives announced they were cancelling WCW shows on TNT and TBS. WWE swooped in to purchase the assets and intellectual, completing the purchase around March 23, 2001.

On March 26, 2001, WCW ran its final independently-produced Nitro television show on TNT. Although it was referred to as the "season finale," the show never aired again. Portions of Nitro and the live Raw were simulcast, with Vince McMahon appearing on both shows at the same time. The storyline evolved that Shane McMahon purchased WCW to compete against his father.

With WCW-WWE brand now part of WWE, the parent company slowly integrated WCW into the fold. A handful of WCW wrestlers made a cameo appearance at WrestleMania XVII on April 1, 2001.

Although there were initial thoughts to run WCW-WWE as a separate promotion with its own TV and live events, the WCW-WWE became just part of a storyline within the main WWE shows (Raw and Smackdown!) as part of an "invasion angle"

The invasion angle started when WCW-WWE's Lance Storm interfered in a match on Raw on May 28. Over the next few weeks, WCW-WWE wrestlers would make surprise appearances on WWE's Raw.

The decision not to run WCW-WWE independently was sealed on the July 2, 2001 edition of Raw. The last 20 minutes were dedicated to WCW-WWE, with WCW-WWE themed graphics, ring design, referee and announcers.  Booker T defended his WCW World title versus Plaintiff Bagwell.

Instead of WCW as a stand-alone product, they were incorporated on regular WWE TV programming until November. A majority of the TV matches until then pitted a WCW-WWE versus a WWE branded wrestler. This led to a successful PPV on July 22, 2001 called "Invasion", the event featured WWE wrestlers facing WCW-WWE wrestlers.

       b.      <u>Bagwell's June 4, 2001 WCW-WWE Booking Contract</u>-

Plaintiff Bagwell signed his June 4, 2001 Booking Contract with WCW-WWE, but never once controlled his employment, WWE did.  Plaintiff Bagwell only performed twice under his June 4, 2001 WCW-WWE Booking Contract:

        1) On July 1, 2001, a live WWE house show (not WCW-WWE); and

        2) On July 2, 2001, WWE's Raw is War television show (not WCW-WWE).

At both events, Plaintiff Bagwell performed under the WWE brand (WWE sold tickets to both events, used WWE stage set), took commands from WWE officials (WWE creative writers schemed Plaintiff's match outcomes), and performed with WWE professional wrestlers (on July 2, 2001 Raw is War, Plaintiff Bagwell performed with WWE's "Stone Cold Steve Austin" and "Kurt Angle").

       c.      <u>July 9, 2001 Raw is War</u>

Prior to July 9, 2001's WWE Raw is War (another scheduled WWE controlled performance), Plaintiff Bagwell was notified by WWE (not WCW-WWE) Head of Talent Relations, Jim Ross, that the two parties would go separate ways.  Mr. Ross recently described

his role in Plaintiff Bagwell's departure from WCW-WWE on his November 2015 "The Ross Report" podcast:

"My former job as *head of WWE talent relations* was often times a thankless job"

"I'm sorry Marc feels like he does.  I'm sure he believes what's there is true but I never went out of my way to cause him any misery.  *I just was the guy that had to deliver the bad news*."[3]

 (iii)   Confused intermingling of business activity

        a.   WWE Pays Plaintiff Bagwell WCW Video Library Royalties

WWE pays Plaintiff Bagwell DVD WCW Video Library royalties (NWO Back in Black (WWE released DVD in 2002)) pursuant to Plaintiff's June 4, 2001 WCW-WWE booking contract Section 7.5 (d) (as non pay per view WCW Video Product (DVD) sales).  **EXHIBIT 10** (Plaintiff Bagwell's March 24, 2016 WWE royalty statement listing NWO Back in Black for a royalty).  It would follow that "NWO: The Revolution" on the WWE Network featuring Plaintiff in the WCW video library, would also be subject to royalty payments.  **WWE PAYS PLAINTIFF BAGWELL WCW VIDEO LIBRARY ROYALTIES AS A MATTER OF LAW AS OWNER OF WCW VIDEO LIBRARY COPYRIGHTS**.

        Plaintiff Bagwell never signed an agreement with a WWE affiliation other than the WCW-WWE June 4, 2001 Booking Contract (and subsequent Early Contract Release), any royalties Plaintiff receives must originate from June 4, 2001 booking contract (Section 7.5(d)).

        Exhibit 10 (March 24, 2016 WWE Royalty Statement) evidences that WWE pays Plaintiff Bagwell royalties, not WCW-WWE.  Plaintiff Bagwell's March 24, 2016 WWE royalty statement uses WWE letterhead, WWE's Director of Talent Participations' signature block, a WWE phone number to contact with questions, invoiced under World Wrestling Entertainment,

---

[3] http://www.wrestlezone.com/news/638843-jim-ross-responds-to-buff-bagwells-claim-that-jr-ruined-his-career-following-wwes-purchase-of-wcw

Inc., WWE issued check and check number, WWE account number listed at the top left of statement, a WWE talent name: Buff Bagwell heading, and label of royalty column states "WWE Earned Royalties."  But there is more, Plaintiff  Bagwell only performed twice under June 4, 2001 WCW-WWE Booking Contract, but neither performance was entitled to royalty payment, any royalties WWE pays Plaintiff originate from WCW Video library (Section 7.5 (d)):

> 1)  July 1, 2001 WWE house show (non-recorded, no royalty issue); and

> 2) July 2, 2001 WWE's Raw is War (no royalty issue, no royalties paid for television license fees).  **EXHIBIT 5** (Section 7.3 (a) of Plaintiff's 2001 Booking Contract specifically states no royalties paid for television license fees).

b)   <u>Plaintiff's August 7, 2001 WCW-WWE Early Contract Release</u>

Plaintiff Bagwell's WCW-WWE Early Contract Release uses WWE letterhead (World Wrestling Federation Entertainment, Inc.), listing Edward L. Kaufman, as Senior Vice President and General Counsel, of World Wrestling Federation Entertainment, Inc. (WWE), the letterhead does not indicate a WCW-WWE presence.  Paragraph B (ii) of Plaintiff's settlement further involves WWE in WCW-WWE's business:

> To that end, Bagwell further agrees that he shall not make any statement or comments (written or otherwise) that criticize, disparage, injure or harm the reputation of **WCW** and/or the **World Wrestling Federation** including, but not limited to any statements or comments regarding the Buff Bagwell character, the **McMahon Family** and/or any representative of WCW or **World Wrestling Federation Entertaining, Inc.**"

Also paragraph 11 declares:

> The parties further agree that because of the special and unique obligations of Bagwell under this Release, a breach by Bagwell of the provisions in this Release shall cause **WCW** and/or **World Wrestling Federation** irreparable injury which cannot be adequately measured by monetary relief.

Plaintiff Bagwell's WCW-WWE Early Contract Release references World Wrestling Federation Entertainment, Inc., WCW, Inc., World Wrestling Federation,

McMahon Family, and World Wrestling Federation Entertaining, Inc., which one is which?  Signaling further intertwining of business, Edward L. Kaufman signs the letter "very truly yours," not indicating what entity he signs on behalf of (on letterhead says WWE Senior Vice President and General Counsel).  *Id.*  Additionally, Mr. Kaufman cc's WWE Head of Talent Operations Jim Ross (who, around July 9, 2001, in capacity as WWE's Head of Talent Relations, informed Plaintiff that WWE was releasing Plaintiff).  *Id.*  Mr. Kaufman also cc's two other suspected WWE employees, Rich Hering and Benny Morales.  *Id.*  In further company collusion, Mr. Kaufman's signature block indicates a role as WCW-WWE Vice President and Secretary.  *Id.*

      (iv)    <u>Thin capitalization</u>

WCW-WWE failed to operate its own television show, live events, and product; WCW-WWE wrestlers performed on WWE television events, WWE live events, and most importantly WCW-WWE equaled WWE product.

      (v)    <u>Insolvency at the time of the litigated transaction</u>

WWE no longer lists WCW-WWE as a subsidiary on annual SEC 10-K reports; Plaintiff Bagwell suspects WCW-WWE insolvency.  WWE continues (and always has) sending royalty checks to Plaintiff Bagwell, never once receiving WCW-WWE royalty checks.

      (vi)    <u>Use of the corporation in promoting fraud</u>

WCW-WWE's and WWE's corporate structure promotes fraud.

<u>Plaintiff's June 1, 2001 Contract</u>

33.    As alleged *supra*, WWE is WCW-WWE throughout the entire complaint.

34.    On June 4, 2001, Plaintiff Bagwell signed as a professional wrestler with WCW-WWE to perform under the ring name of "Buff Bagwell" ("Booking Contract").  **EXHIBIT 13** (Plaintiff Bagwell's June 4, 2001 WCW-WWE Booking Contract).

35.    On June 4, 2001, WWE owned the WCW video library (purchased around March 23, 2001).

36.    As copyright owner of the WCW video library, WWE must honor Plaintiff Bagwell's prior existing contractual understandings in the WCW video library.  **EXHIBIT 14** (Plaintiff Bagwell's 1998 WCW Merchandise Agreement assigning rights to WCW video library in consideration for certain understandings).

37.    Section 13.2 of Plaintiff Bagwell's Booking Contract merges all prior understandings between Plaintiff Bagwell and WCW-WWE (actually WWE, as alleged *supra*), creating Plaintiff Bagwell's new WCW video library understandings:

> This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and *all prior understandings, negotiations and agreements are merged into this Agreement*.  There are no other agreements, representations, or warranties not set forth herein with respect to the subject matter hereof. . .

38.    Plaintiff Bagwell's WCW-WWE June 4, 2001 Booking Contract governs Plaintiff Bagwell's prior WCW video library understandings (1991-2001) because of the Section 13.2 "Merger" clause.

39.    Merger clauses apply to contracts between the same parties and same subject matter.  WWE purchased the WCW video library, creating a contractual relationship with Plaintiff (Plaintiff assigned rights in WCW video library in return for certain understandings), Plaintiff's understandings attached to WCW video library do not extinguish with a copyright sale.

40.     Plaintiff Bagwell's June 4, 2001 WCW-WWE contract altered Plaintiff Bagwell's understandings and obligations owed to him concerning the WCW video library because Plaintiff's WCW-WWE contract was a contract between same parties (WCW-WWE is WWE and WWE and Plaintiff Bagwell have contractual relationship through WCW video library). WWE evidences the validity of the June 4, 2001 merger clause, having only paid Plaintiff Bagwell WCW video library royalties subsequent of Plaintiff Bagwell's  June 4, 2001 WCW-WWE Booking Contract.

41.     WWE always intends to merge prior understandings concerning wrestler's rights in WWE owned video libraries, WWE's recent standardized contracts eliminate wresters' video on demand and internet subscription royalties (to avoid paying WWE Network and WWE Classics on Demand  royalties (predecessor to WWE Network)) to those who signed a WWE booking contract post 2003 (i.e. wrestler with year 2000 WWE booking contract would be entitled to WWE Network royalties, but if signed an additional WWE booking contract post 2004, the "merger" clause eliminates WWE Network royalty rights).

<u>June 4, 2001 Booking Contract Definitions</u>

42.     Section 7.5(c)(i) of Plaintiff Bagwell's June 4, 2001 agreement requires WCW - WWE to pay Royalties for Pay-Per-View Videos Sold by WCW-WWE (as WCW-WWE Video Products)  under the following circumstances:

> WCW shall allocate 5% of the Net Receipts paid to WCW with respect to the direct sale by WCW of WCW Pay-Per-Views to a talent royalty pool.  Thereafter, WCW shall pro-rate payment to Plaintiff and all other talent appearing in such WCW Pay-Per-Views in the same proportion as was the compensation paid to Plaintiff for his appearances in the pay-per-views to the total amount paid to all talent for their appearances on the pay-per-views.

43.     Under 7.5 (c)(ii) of Plaintiff Bagwell's agreement, WCW-WWE is also obligated to pay Royalties for Pay-Per-View Videos Sold by WCW-WWE when:

The WCW Video Product is a compilation or derivative work of multiple
individual WCW Pay-Per-Views in their entirety, such as a collection of videos,
e.g., a WrestleMania box set, payment to Plaintiff shall be calculated as follows:
5% of the Net Receipts paid to WCW shall comprise the talent royalty pool,
which shall first be pro-rated based on the number of individual videos in the
compilation, and then the payment to Plaintiff for each video shall be consistent
with the royalty payment to the Plaintiff at the time each individual video was
first released.

44.     For 7.5 (c)(i) and (c)(ii) calculations (royalty amount owed for sales of Pay-Per-
View Videos), Net Receipts means the *gross amount* received by WCW-WWE for the WCW
Pay-Per-Views.  In 2015, the WWE Network segment *grossed* revenue of 159.4 million.

**EXHIBIT 4** (WWE's Fourth-Quarter 2015 Results).

45.      Under 7.5 (d) of Plaintiff Bagwell's 2001 contract, WCW-WWE is also obligated
to pay Plaintiff Bagwell Royalties for Non Pay-Per-View Videos Sold by WCW-WWE (as
WCW-WWE Video Products) under the following circumstances:

WCW shall allocate 5% of the Net Receipts paid to WCW with respect to the
direct sale by Plaintiff of *all other WCW Video Products other than those set forth
in 7.5 (c)(i) and (c)(ii) above*, to a talent royalty pool, from which WCW shall pay
Plaintiff and all other talent appearing in such WCW Video Products pro-rata
among Plaintiff and all other talent so featured.

46.     Section 7.5 (d) of Plaintiff Bagwell's 2001 contract entitles Plaintiff Bagwell to
WWE Network royalties in WCW video library as a catchall for WCW-WWE sales of "WCW
Video Products- video cassettes, videodiscs, CD ROMs, or other technology, including
technology not yet created."

47.     For 7.5 (d) calculations (royalty amount owed for sale of Non-Pay-Per-View
Videos), Net Receipts means:

The *gross amount* received by WCW for the WCW Video Products.
Notwithstanding the foregoing, if Plaintiff is deemed to be the "featured
performer" as determined by WCW in its sole discretion, Plaintiff shall receive a
bonus of an additional 5% of WCW's Net Receipts up to the sale of the first
150,000 units.  Once sales exceed 150,000, Plaintiff as a featured performer shall

16

receive 10% of WCW's Net Receipts on all units sold, including the first 150,000 units.  If Plaintiff is part of a group that is determined to be the "featured performer," Plaintiff shall share pro-rata with each and every member of the group in any bonus monies that may be due in connection with such WCW Video Products.

48.     The WWE Network segment _grossed_ revenue of 159.4 million in 2015.

**EXHIBIT 4** (WWE's Fourth-Quarter 2015 Results).  As alleged _supra_, WCW-WWE is WWE.

49.     The definition of "WCW Video Products" under Section 7.5 (a)(1) is:

 "video cassettes, videodiscs, CD ROM, or _other technology, including technology not yet created._"

50.     WCW-WWE Video Products includes streaming videos on the World Wrestling Entertainment Network ("WWE Network"), because under Section 7.5 (a)(1), streaming the WWE Network is "_other technology and/or technology not yet created_" at the time Plaintiff signed the June 4, 2001 Booking Contract.  _See_ **EXHIBIT 15** (Definition of "WCW Video Products" in Plaintiff Bagwell's 2001 Booking Contract).

51.     The definition of Pay-Per-View Videos ("PPVs") under Section 7.5 (a) is, "WCW Pay-Per-Views in their entirety."  _See_ **EXHIBIT 16** (Definition of WCW Pay-Per-Views in Plaintiff Bagwell's 2001 Booking Contract).

52.     The definition of Non-Pay-Per-View Videos ("Non-PPVs") under Section 7.5 (b) and 7.5 (d) is, "all other WCW Video Products, other than WCW Pay-Per-Views in their entirety and a compilation or derivative work of multiple individual WCW Pay-Per-Views in their entirety."  _See_ **EXHIBIT 17** (Definition of Non Pay-Per-View Videos in Plaintiff Bagwell's 2001 Booking Contract).

53.     For several years (February 2014- present), WWE sold "WCW Video Products" (streaming videos on WWE Network) of Pay-Per-View Videos and Non-Pay-Per-View Videos

17

without paying royalties to Plaintiff Bagwell, including all DVD content that Plaintiff Bagwell receives WWE royalties for.

Plaintiff Bagwell's August 7, 2001 Early Release Contract

54.     On August 7, 2001, Plaintiff Bagwell and WCW-WWE agreed to an Early Contract Release.  **EXHIBIT 12** (Plaintiff's August 7, 2001 Early Contract Release with WCW-WWE).  The Early Contract Release included releases from the June 4, 2001 WCW-WWE contract (the "Contract") and any prior contracts, amendments or modifications.

55.     Plaintiff Bagwell's Early Contract Release declares, in paragraph (4. A.), the agreement is:

> . . . a full and complete buyout of Bagwell's services under the Contract (June 4, 2001 WCW contract) *other than the obligation to pay Bagwell the royalties due to him pursuant to, and as determined by, the Contract (June 4, 2001 WCW-WWE contract)*.

56.     As of August 7, 2001 (signing of the Early Contract Release), Plaintiff Bagwell's June 4, 2001 Booking Contract exists only to define WCW-WWE's royalty obligations owed to Plaintiff.

57.     Paragraph 6 of the Early Contract Release declares Plaintiff Bagwell forfeits any claims in law or equity against WCW-WWE in the following circumstances:

> Bagwell acknowledges that *except as expressly set forth herein (obligation to continue to pay royalties pursuant to June 4, 2001 agreement)*, no representations of any kind or character have been made to Bagwell by WCW or by an of WCW's agents, representatives or attorneys to induce the execution of this Release.  In order for Bagwell to induce WCW to sign this Release, Bagwell hereby releases WCW, its parent companies, affiliates, subsidiaries, successors, assigns, and its and their respective officers, directors, employees, independent contractors, licensees, representatives and agents from any and all claims, liabilities and obligations whatsoever in law or equity (whether now known or hereinafter discovered) which Bagwell has or may ever have arising out of or in connection with the Contract (June 4, 2001).

18

58.     As a *condition precedent* for Plaintiff Bagwell to "release WCW-WWE from any and all claims, liabilities and obligations whatsoever in law or equity, whether now known or hereinafter discovered," WCW-WWE must honor the representations (obligation to pay royalties pursuant to June 4, 2001 agreement) that induced Plaintiff to sign the Early Release Contract.

59.     WCW-WWE breached its Early Contract Release with Plaintiff Bagwell by selling "WCW Video Products" (streaming videos on the WWE Network) of PPVs and Non-PPVs without paying any royalties to Plaintiff.   **EXHIBIT 10** (Plaintiff's First Quarter 2016 WWE Royalty Statement evidencing no royalties paid for WWE sale of "PPVs and Non PPVs" on WWE Network).

<u>WWE NETWORK</u>

60.     World Wrestling Entertainment Network ("WWE Network") is a 24/7 direct to consumer video streaming network (like a Netflix of WWE content), created, owned, and sold by WWE that was launched Monday, February 24, 2014.

61.     Because streaming video content and videos on demand on the WWE Network was "*other technology and/or technology not yet created*" at the time Plaintiff Bagwell signed his June 4, 2001 WCW-WWE Booking Contract and Plaintiff Levy signed his June 30, 2000 Booking Contract, streaming videos on the WWE Network is within the definition of "WCW Video Products" under Section 7.5 (a)(i) of both Plaintiffs' Booking Contracts.   ("video cassettes, videodiscs, CD ROM, or *other technology, including technology not yet created*" (*emphasis added*)).   **EXHIBIT 15** (Definition of "WCW Video Products" in Plaintiff Bagwell's 2001 Booking Contract).   **EXHIBIT 5** (Definition of "WWF Video Products" in Plaintiff Levy's 2000 Booking Contract).

62.     WWE sells and promotes the WWE Network for $9.99 per month in more than 180 countries and territories.

63.     The streaming video content of the WWE Network ("WCW Video Product") consists of all 12 WWE live monthly pay-per-view events, reality shows, documentaries (Non-PPV sold by WCW-WWE), past pay-per-view events (PPV sold by WCW-WWE), and classic wrestling matches (Non-PPV sold by WCW-WWE).

64.     WWE Network reported 1.56 million subscribers at the end of the Second Quarter 2016 (WWE reached a record 1.82 million total subscribers in April 2016).  **EXHIBIT 18** (WWE's Second-Quarter 2016 Press Release p.3).  In 2015, WWE Network purchasers watched an estimated total of 256 million hours of content, representing an average of 188 hours per household.  **EXHIBIT 4** (WWE's Fourth-Quarter 2015 Press Release at pages 1-2).

65.     WCW-WWE and WWE breached their Early Contract Releases with Plaintiffs by selling "WCW Video Products and WWF Video Products" (streaming videos on the WWE Network) of PPVs and Non-PPVs without paying royalties to Plaintiffs.   **EXHIBIT 10** (Plaintiff Bagwell's First Quarter 2016 WWE Royalty Statement evidencing no WWE Network royalties).  **EXHIBIT 8** (Plaintiff Levy's Second Quarter 2016 WWE Royalty Statement evidencing no WWE Network royalties).

<u>WWE Pays Plaintiff Bagwell Royalties for WWE's DVD sales of Plaintiff's<br>Performances in WCW Video Library</u>

66.     Pursuant to Plaintiff Bagwell's June 4, 2001 WCW-WWE contract (7.5 (d)), WWE currently pays Plaintiff Bagwell WCW video library royalties (**EXHIBIT 10**).  At a bare minimum, any WWE DVD sales royalties ever` paid to Plaintiff Bagwell, where that same DVD content appears on the WWE Network, entitles Plaintiff to WWE Network royalties (WCW

Video Products include DVD sales, but also sales of *other technology, including technology not yet created*—streaming the WWE Network).

<u>WWE'S FAILURE TO PAY ROYALTIES WITHIN 90 DAYS FOLLOWING END OF FISCAL QUARTER</u>

        a.      <u>Failure to Pay Plaintiff Bagwell Within 90 Days</u>

73.     Under Section 7.12 (a) of Plaintiff Bagwell's Booking Contract:

*<u>PROMOTER shall prepare and send statements as to royalties payable hereunder to WRESTLER within ninety (90) days following the end of each quarter</u>*, based upon the royalties received and processed by PROMOTER in the previous quarter, together with payment of royalties, if any, earned by WRESTLER hereunder during such quarter-annual period, less advances and/or debits made by PROMOTER on WRESTLER's behalf.

74.     WWE admittedly states it did not pay Bagwell within 90 days following the end of certain quarters, as they create a royalty distinction between "Royalty Earned Current Quarter" and "Previously Unpaid Royalties Earned." **EXHIBIT 10** (Plaintiff Bagwell's Summary of Royalty Earnings p.1, evidencing Current Quarter Royalty of $40.81 and Previously Unpaid Royalties Earned $23.59)

75.     Plaintiff Bagwell's First Quarter 2016 Royalty statement evidences the nonpayment of royalties within 90 days dating back to the Third Quarter 2012. **EXHIBIT 10** (Plaintiff Bagwell's First Quarter 2016 royalty statement with payments from Third Quarter 2012).

76.     34.     Third Quarter 2012 royalties were due to Plaintiff Bagwell 90 days following the end of the Third Quarter 2012, not March 24, 2016.   (Even if the amount due is $0.01, payment is due within 90 days following the end of the quarter).

77.     WWE also failed to pay royalties to Plaintiff Bagwell within 90 days for the following quarters (list not exhaustive): Fourth Quarter 2012, First Quarter 2013, Second Quarter

2013, Fourth Quarter 2013, Second Quarter 2014, Second Quarter 2015, and Third Quarter 2015.

**EXHIBIT 10.**

78.     WWE has not paid WWE Network royalties to Plaintiff Bagwell in any quarter since the Network's inception in February 2014.

79.     WCW-WWE's nonpayment of royalties within 90 days is a breach of Plaintiff Bagwell's Early Contract Release and June 4, 2001 Booking Contract, and appears to be a widespread WWE pattern and practice.

80.     Additionally, Plaintiff Bagwell is paid royalties for the WWE pay per view "Vengeance 2002" in his First Quarter 2016 royalty statement.  However, Plaintiff did not appear on the pay per view, nor was he even employed by WWE in 2002.  At this point, WWE's royalty accounting practices cast serious doubt to accuracy; has Plaintiff Bagwell, or anyone owed royalties, ever been paid accurate WWE royalties?  Further questions arise because WWE denied Plaintiff Bagwell's attempt to audit their royalty accounting records.

81.     Plaintiff Bagwell's royalty statement also paid him $20.77 for a category named "Royalty/ Nostalgia Advance."  Plaintiff Bagwell has never signed a "Nostalgia" or "Legends" contract; there should be no Nostalgia advances.  What are these payments?

       b.    <u>Failure to Pay Plaintiff Levy Within 90 Days</u>

82.     Under Section 7.12 (a) of Plaintiff Levy's Booking Contract:

> *<u>PROMOTER shall prepare and send statements as to royalties payable hereunder to WRESTLER within ninety (90) days following the end of each quarter</u>*, based upon the royalties received and processed by PROMOTER in the previous quarter, together with payment of royalties, if any, earned by WRESTLER hereunder during such quarter-annual period, less advances and/or debits made by PROMOTER on WRESTLER's behalf.

83.     WWE states on page 1 of Plaintiff Levy's Second Quarter 2016 summary of royalty earnings, "Royalty Earned Current Quarter…. $130.83,"  this is wrong.  Page 2 and 3 of Plaintiff Levy's royalty statement evidences royalties earned in Quarter 4 of 2015, which should have been paid in First Quarter 2016, not Second Quarter 2016 (which is the nonpayment of royalties within 90 days following the end of the quarter).  **EXHIBIT 8** (Plaintiff Levy's Second Quarter 2016 royalty statement).

84.     Additionally, unlike Plaintiff Bagwell (WWE made a distinction between current quarter royalties and unpaid royalties (**EXHIBIT 10**)), there is no distinction made on Plaintiff Levy's summary of royalties, deceiving Plaintiff to believe he has received up to date royalties, which appears to be WWE's policy and practice.  **EXHIBIT 8** (No distinction of Plaintiff Levy's royalty earnings).

85.     WWE has also not paid WWE Network royalties to Plaintiff Levy in any quarter since the Network's inception in February 2014.

86.     Nonpayment of royalties within 90 days is a breach of Plaintiff Levy's Early Contract Release and June 30, 2000 Booking Contract.

### Prerequisites to Filing a Lawsuit Challenging Royalty Statements Pursuant to Plaintiff Bagwell's June 4, 2001 Booking Contract Have Been Satisfied

a.     Section 7.12 (b) and (d)

87.     Section 7.12 (b) and (d) of Plaintiff Bagwell's June 4, 2001 WCW-WWE Booking Contract provides prerequisites for Plaintiff Bagwell to satisfy prior to filing a claim for unpaid royalty payments:

7.12 (d) - No claim shall be filed pursuant to paragraph 13.8 below against WCW or WCW's affiliates that disputes any statement of royalties or accounting given by WCW hereunder or that makes any claim for royalties or royalty payments, unless the same is commenced or filed within one (1) year after the date such

statement or accounting is first given, delivered or sent to Wrestler, and *unless Wrestler has first exhausted his remedies pursuant to paragraph 7.12 (b)* above.

7.12 (b) – WCW shall maintain books of account related to the payment of royalties hereunder at its principal place of business.  Wrestler or Wrestler's designated independent certified public accountant who is a member in good standing of the AICPA, may at Wrestler's sole expense examine WCW's books insofar as they pertain to this Agreement for the purpose of verifying the accuracy thereof, during WCW's normal business hours and upon reasonable notice.  Such audit shall be conducted in a manner that will not unreasonably interfere with WCW's normal business operations.  Wrestler shall not audit WCW's books and records more than twice during any calendar year and no such audit shall be conducted later than one (1) year after the last statement of royalties is given, delivered or sent to Wrestler.  Each audit is limited to seven (7) days in duration. Statements of royalties may be changed from time to time to reflect year-end adjustments, to correct clerical errors and for similar purposes.

88.     Pursuant to Section 7.12(b), Plaintiff Bagwell engaged a certified public accountant, who is a member in good standing of the AICPA, to examine WCW-WWE's books for purposes of verifying the accuracy of royalty payments (no WWE Network royalty payments) received by Plaintiff Bagwell.

89.     The accountant contacted WWE officials around June 23, 2016 to schedule a time to examine WWE's books and was told the last week of July 2016 or the first week of August 2016 would be possible times to conduct an audit.

90.     However, on August 5, 2016, Plaintiffs' counsel received a letter from K&L Gates's Pittsburgh, Pennsylvania office declaring they are WWE's counsel; accusing  Plaintiff Bagwell's accountant of having "asserted a pretextual and invalid audit request to attempt to stealthily obtain that information (WWE network royalty audit)."

91.     The August 5, 2016 letter further declared that "neither [Plaintiff's accountant] nor any other purported representative of Mr. Bagwell will be permitted to audit WWE

accounting records. . . Because your client is not paid any such royalties (WWE Network), there is nothing to audit."

92.     Plaintiff Bagwell asserted his rights to audit WCW-WWE records (for purposes of verifying the accuracy of royalty payments (no WWE Network royalties)) and WWE denied his request, in violation of Plaintiff Bagwell's June 4, 2001 contract.  By its denial of audit, WWE forfeits any claim that Plaintiff Bagwell did not satisfy Section 7.12 (b) lawsuit prerequisites because WWE denied Plaintiff Bagwell any chance to audit the records.

<u>Plaintiff Bagwell's Notice of Disputed Royalty Statement and Other Accountings- Section 7.12</u>

<u>(c)</u>

93.     Section 7.12 (c) of Plaintiff Bagwell's June 4, 2001 Booking Contract provides the notice procedure for disputing a royalty statement:

> Wrestler shall be deemed to have consented to all statements of royalties and all other accountings provided by WCW hereunder and each such statement of royalties or other accounting shall be conclusive, final, and binding; shall constitute an account stated; and shall not be subject to any objection for any reason whatsoever unless a specific objection in writing, stating the basis thereof, is given by Wrestler to WCW within one (1) year from the date the royalty statement was given, delivered or sent to Wrestler.

94.     This Complaint serves as Plaintiff Bagwell's notice (providing specific objections, the basis of the objections, and within one year of March 24, 2016) pursuant to Section 7.12(c) that he does not consent to his March 24, 2016 royalty statement.

95.     Plaintiff Bagwell does not consent to any inaccurate or nonpaid royalty statement he has ever received.

<u>Prerequisites to Filing a Lawsuit Challenging Royalty Statements Pursuant to Plaintiff Levy's June 30, 2000 Booking Contract Have Been Satisfied</u>

a.     <u>Section 7.12 (b) and (d)</u>

96.     Section 7.12 (b) and (d) of Plaintiff Levy's June 30, 2000 Booking Contract provides prerequisites for Plaintiff Levy to satisfy prior to filing a claim for unpaid royalty payments:

> 7.12 (d)- No claim shall be filed pursuant to paragraph 13.8 below against WWF or WWF's affiliates that disputes any statement of royalties or accounting given by WWF hereunder or that makes any claim for royalties or royalty payments, unless the same is commenced or filed within one (1) year after the date such statement or accounting is first given, delivered or sent to Wrestler, and *unless Wrestler has first exhausted his remedies pursuant to paragraph 7.12 (b)* above.

> 7.12 (b) – WWF shall maintain books of account related to the payment of royalties hereunder at its principal place of business.  Wrestler or Wrestler's designated independent certified public accountant who is a member in good standing of the AICPA, may at Wrestler's sole expense examine WWF's books insofar as they pertain to this Agreement for the purpose of verifying the accuracy thereof, during WWF's normal business hours and upon reasonable notice.  Such audit shall be conducted in a manner that will not unreasonably interfere with WWF's normal business operations.  Wrestler shall not audit WWF's books and records more than twice during any calendar year and no such audit shall be conducted later than six (6) months after the last statement of royalties is given, delivered or sent to Wrestler.  Each audit is limited to five (5) days in duration. Statements of royalties may be changed from time to time to reflect year-end adjustments, to correct clerical errors and for similar purposes.

97.     On August 5, 2016, Plaintiff Levy's counsel received a letter from K&L Gates's Pittsburgh, Pennsylvania office declaring ". . . Because your client (Plaintiff Bagwell) is not paid any such royalties (WWE Network), there is nothing to audit."

98.     Plaintiff Levy will not waste resources to attempt to audit something WWE has already denied Plaintiff Bagwell's right to and asserted there is nothing to audit for WWE Network royalties, thus Plaintiff Levy has satisfied all prerequisites.

 Plaintiff Levy's Notice of Disputed Royalty Statement and Other Accountings- Section 7.12 (c)

99.     Section 7.12 (c) of Plaintiff Levy's June 30, 2000 Booking Contract provides the notice procedure for disputing a royalty statement:

Wrestler shall be deemed to have consented to all statements of royalties and all other accountings provided by PROMOTER hereunder and each such statement of royalties or other accounting shall be conclusive, final, and binding; shall constitute an account stated; and shall not be subject to any objection for any reason whatsoever unless a specific objection in writing, stating the basis thereof, is given by Wrestler to PROMOTER within one (1) year from the date the royalty statement was given, delivered or sent to Wrestler.

100.    This Complaint serves as Plaintiff Levy's notice (providing specific objections, the basis of the objections, and within one year of June 20, 2016) pursuant to Section 7.12(c) that he does not consent to his June 20, 2016 royalty statement.

101.    Plaintiff Levy does not consent to any inaccurate or nonpaid royalty statement he has ever received.

## V.    CLASS ACTION ALLEGATIONS

102.    Plaintiffs bring this action for themselves, and on behalf of all others similarly situated.  The Class and Subclasses that Plaintiffs seek to represent are defined as follows:

WWE NETWORK CLASS

All individuals to whom WWE or WCW-WWE are obligated to pay royalties to for WWE's/ WCW-WWE's sales of "WWF or WCW Video Products" (as defined in boilerplate booking contracts) featuring "WWF or WCW pay per views or WWF or WWE non pay per views" (as defined in boilerplate booking contracts).

Excluded from the class are those who have signed a WWE "Nostalgia" or "Legends" Contract, a Booking Contract with WWE from January 1, 2004 – prospectively (all WWE contracts in this time period declare that no royalties will be paid for internet subscriptions and video on demand fees), or a settlement agreement with WWE or WCW-WWE, that releases any claims in law or equity against WWE, except for enforcement of any royalty obligations that may exist.

The included class is further defined by the following two Subclasses:

a)    WWE Controlled Performers

1) For the signing period of January 1, 1992 until January 1, 1999,

- All persons who signed a WWF Booking Contract when the definition of WWF Video Products was, "video programs."

<u>2) For the signing period of January 1, 1999 until January 1, 2004</u>

- All persons who signed a WWF, WWE, or WCW-WWE Booking Contract when the definition of WWE (or any other name WWE has used including World Wrestling Federation ("WWF") or WCW Video Products was, "video cassettes, videodiscs, CD ROM, or other technology, including technology not yet created."

<u>ROYALTIES NOT PAID WITHIN 90 DAYS SUBCLASS</u>

All individuals entitled to statements of royalties payed to them by WWE or WCW-WWE within 90 days following the end of each quarter and did not receive their statement of royalties within 90 days following the end of each quarter.

103.    Plaintiffs reserve the right to amend the Class and Subclasses definitions if further investigation and discovery indicates that the Class and Subclasses definitions should be narrowed, expanded, or otherwise modified.  Excluded from the Class are Defendants; their officers and directors; any entity in which Defendants have a controlling interest; the affiliates, legal representatives, attorneys, heirs, and assigns of Defendants; any federal, state or local government entity; and any judge, justice or judicial officer presiding over this matter and the members of their immediate families and judicial staffs.

Rule 23(a) Criteria:

104.    **Numerosity.**   Plaintiffs do not know the exact size or identities of the members of the proposed Class and subclasses, since such information is in the exclusive control of the Defendants.  Plaintiff believes that the Class and Subclasses encompasses hundreds of individuals whose identities and royalties owed can be readily ascertained from Defendants' books and records.  Accordingly, the members of the Class and Subclasses are so numerous that their individual joinder would be impracticable.

28

105.   **Commonality.**  There are numerous questions of law and fact that are common to the Plaintiff and all members of the Class and Subclasses, including, but not limited to the following:

a) Whether WCW-WWE breached its Booking Contract duties;

b) Whether WCW-WWE breached its Early Contract Release duties;

c) Whether WWE breached its Booking Contract duties;

d) Whether WWE breached its Early Contract Release duties;

e) Whether Plaintiff and Class members have suffered damages;

f) Whether Plaintiff and Class members are entitled to punitive damages;

g) Whether Plaintiff and Class members are entitled to equitable relief;

h) Whether Plaintiff and Class members are entitled to injunctive relief.

106.   **Typicality.**  Plaintiffs are members of the Class and Subclasses and have claims that are typical of all members of the Class and Subclasses.  Plaintiffs' claims and all of the Class and Subclasses members' claims arise out of the same uniform course of conduct by Defendants and may be remedied under the same legal theories.

107.   **Adequacy.**  Plaintiffs will fairly and adequately represent the interest of the members of the Class and Subclasses.  Plaintiffs have no conflicts of interest with, or interest, that are any different from those of the other class members.  Plaintiffs have retained competent counsel experienced in class action and other complex litigation.

**Rule 23(b) Categories: (b)(2) and (b)(3)**

108.   **Predominance.**  Common questions of law and fact predominate over questions affecting only individual class members, as class members, whose terms are substantially the

same, having no individual issues other than calculating each member's royalty amount by an identical formula.

109.   **Superiority.**  A class action is superior to all other feasible alternatives for the resolution of this matter.  Individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the court and of the parties, and potentially could lead to inconsistent results that would be contrary to the interest of justice.  Absent a class action, it would be highly unlikely that the representative Plaintiffs or any other members of the Class or any Subclass would be able to protect their own interest because the cost of litigation through individual lawsuits would exceed expected recovery.

110.   **Manageability.**  This case is well suited for treatment as a class action and can easily be managed as a class action because evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a class-wide basis, while the allocation and distribution of damages to class members would be essentially a ministerial function.

111.   Defendants have acted on grounds generally applicable to Plaintiffs and the Class and Subclasses members through breach of contract.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief and punitive damages are appropriate with respect to the Class and Subclasses as a whole.

## VI. CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT—FAILURE TO PAY ROYALTIES

112.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

113.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class and Subclasses.

114.    Plaintiffs and members of the Class and Subclasses formed binding and enforceable contracts when they executed written WWE Booking Contracts, WCW-WWE Booking Contracts, WWE Early Contract Releases, and WCW-WWE Early Contract Releases.

115.    Plaintiff Bagwell's Early Contract Release declares, in paragraph (4. A.), the agreement is:

> . . . a full and complete buyout of Bagwell's services under the Contract (June 4, 2001 WCW contract) *other than the obligation to pay Bagwell the royalties due to him pursuant to, and as determined by, the Contract (June 4, 2001 WCW-WWE contract)*.

116.    Plaintiff Levy's Early Contract Release declares, in paragraph (4. A.), the agreement is:

> . . . a full and complete buyout of Levy's services under the Contract (June 30, 2000 WWF contract) *other than the obligation to pay Levy the royalties due to him pursuant to, and as determined by, the Contract (June 30, 2000 WWF contract)*.

117.    Under Section 7.5 of Plaintiff Bagwell's June 4, 2001 Booking Contract, Plaintiff and members of the Class and Subclasses are entitled to royalties from WCW-WWE's (WWE) sales of "WCW Video Products" (streaming video on WWE Network) featuring Plaintiff Bagwell in Pay-Per-Views and Non Pay-Per-Views.  **EXHIBIT 15** (Definition of WCW Video Products in Plaintiff Bagwell's 2001 Booking Contract).

118.    Under Section 7.5 of Plaintiff Levy's June 30, 2000 Booking Contract, Plaintiff and members of the Class and Subclasses are entitled to royalties from WWE's sales of "WWF Video Products" (streaming video on WWE Network) featuring Plaintiff Levy in Pay-Per-Views

and Non Pay-Per-Views.  **EXHIBIT 5** (Definition of WWF Video Products in Plaintiff Levy's

2000 Booking Contract).

119.    Neither WWE  nor WCW-WWE have paid Plaintiffs and members of the Class

and Subclasses any royalties from WCW-WWE's and WWF's sales of the WWE Network (a

WCW Video Product and WWF Video Product) featuring Plaintiffs in Pay-Per-Views and Non

Pay-Per-Views.

120.    Plaintiffs and members of the Class and Subclasses have been damaged by

WCW-WWE's and WWE's breach of the obligation to pay royalties to Plaintiffs and members

of the Class and Subclasses.

## COUNT II
## (BREACH OF FIDUCIARY DUTY)

121.    Plaintiffs incorporate by reference each and every prior and subsequent allegation

as though fully set forth at this point.

122.    In agreeing to allow WCW-WWE and WWE to serve as their Promotor, Plaintiffs

and each member of the Class and Subclasses placed a unique degree of trust and confidence in

WCW-WWE and WWE, who clearly had superior knowledge, skill or expertise in managing

such affairs and were under a duty to represent the interests of Plaintiffs and each member of the

Class and Subclasses as their Promotor.

123.    WCW-WWE's and WWE's role as Plaintiff's Promotor placed it in a dominant

position, thereby creating a relationship of dependency, particularly since Plaintiffs had no

meaningful access to the financial information upon which the royalty rights depend.

124.    WCW-WWE and WWE placed itself in the role of Trustee of royalties due to

Plaintiffs and each member of the Class and Subclasses, who depended and continues to depend

on WCW-WWE's and WWE's integrity and good faith in honoring the royalty obligation and

proper accounting (pay within 90 days) due to Plaintiffs and each member of the Class and Subclasses.

125.     WCW-WWE and WWE have advanced their interests to the detriment of Plaintiffs and each member of the Class and Subclass by failing to properly pay royalties as described above.

126.     As a result therefrom, Plaintiffs and each member of the Class and Subclasses have sustained damages.

### COUNT III
**(VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT, C.G.S. §42-110A, *ET SEQ.*)**

127.     Plaintiffs incorporate by reference each and every prior and subsequent allegation as though fully set forth at this point.

128.     Defendant WWE has acted in bad faith and in breach of fiduciary duties owed to Plaintiffs and members of the Class and Subclasses by failing to account for millions of dollars in owed WWE Network royalties and failed to pay royalties due within 90 days following the end of the quarter.

129.     Defendant WWE has repeatedly misrepresented to Plaintiffs and members of the Class and Subclasses the amounts rightfully owed to them (including nonpayment of royalties within 90 days).

130.     Said conduct is a violation of the Connecticut Unfair Trade Practices Act, C.G.S. §42-110a, *et seq.* on the part of the Defendant WWE, in that said actions, during the course of Defendant WWE's trade or business were immoral, oppressive, unscrupulous, and caused substantial injury to the Plaintiffs.

131.     WWE's conduct caused substantial ascertainable loss to the Plaintiffs and members of the Class and Subclasses, including but not limited to, the loss of valuable  WWE Network

royalties, the information necessary to determine the amounts properly due to Plaintiffs, and the loss of income each quarter from WWE's failure to send royalty payments within 90 days.

132.    Defendant WWE obtained substantial benefit as a direct result of its invasion of the privacy of Plaintiffs and members of Class and Subclasses, which in equity and good conscience ought not to be able to keep.

133.    A copy of this complaint has been mailed to the Attorney General of the State of Connecticut and the Commissioner of Consumer Protection.

**COUNT IV**

**Breach of Contract- Failure to Pay Royalties Within 90 Days Following the of End of Quarter**

134.    Plaintiffs incorporate by reference each and every prior and subsequent allegation as though fully set forth at this point.

135.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class and Subclasses.

136.    Plaintiffs and members of the Class and Subclasses formed binding and enforceable contracts when they executed written WWE Booking Contracts, WCW-WWE Booking Contracts, WWE Early Contract Releases, and WCW-WWE Early Contract Releases.

137.    Plaintiff Bagwell's Early Contract Release declares, in paragraph (4. A.), the agreement is:

. . . a full and complete buyout of Bagwell's services under the Contract (June 4, 2001 WCW-WWE contract) *other than the obligation to pay Bagwell the royalties due to him pursuant to, and as determined by, the Contract (June 4, 2001 WCW-WWE contract)*.

138.    Plaintiff Levy's Early Contract Release declares, in paragraph (4. A.), the agreement is:

. . . a full and complete buyout of Bagwell's services under the Contract (June 30, 2000 WWF contract) *other than the obligation to pay Levy the royalties due to him pursuant to, and as determined by, the Contract (June 30, 2000 WWF contract)*.

139.     Under Section 7.12 (a) of both Plaintiffs' Booking Contracts, Plaintiff sand members of the Class and Subclasses are entitled to statements of royalties payable within 90 days following the end of each quarter.

140.     WWE failed to send royalty statements within 90 days following the end of each quarter to Plaintiffs.  **EXHIBIT 10** (Plaintiff Bagwell's 2016 First Quarter Royalty Statement evidencing 2012-2015 royalty payments unpaid within 90 days following the end of the quarter); **EXHIBIT 8** (Plaintiff Levy's 2016 Second Quarter Royalty Statement evidencing WWE's failure to pay 2015 Fourth Quarter royalty payments within 90 days following the end of the quarter).

141.     Plaintiffs and members of the Class and Subclasses have been damaged by WWE's breach of the obligation to pay royalties within 90 days following the end of each quarter to Plaintiffs and members of the Class and Subclasses.

**COUNT V**
**Declaratory Relief**

142.     Plaintiffs incorporate by reference each and every prior and subsequent allegation as though fully set forth at this point.

143.     The foregoing facts support a declaration that the WWE Network is both a "WCW Video Product" and "WWF Video Product" because an internet streaming WWE Network is "other technology or technology not yet created," as defined in both Plaintiffs' Booking Contracts.

**COUNT VI**
**Declaratory Relief**

144.     Plaintiffs incorporate by reference each and every prior and subsequent allegation as though fully set forth at this point.

145.     The foregoing facts support a declaration that WCW-WWE and/or WWE pays Plaintiff Bagwell WCW video library royalties because of his June 4, 2001 Booking Contract (Section 13.2 "Merger Clause").

## COUNT VII
### Successor Liability

146.     Plaintiffs incorporate by reference each and every prior and subsequent allegation as though fully set forth at this point.

147.     World Championship Wrestling, Inc. was the owner of the World Championship Wrestling, Inc. video library.

148.     World Wrestling Entertainment, Inc. purchased the World Championship Wrestling, Inc. video library.

149.     World Wrestling Entertainment, Inc. is liable for the debts and liabilities of its predecessor World Championship Wrestling, Inc., including the WCW video library, at least with regards to any and all royalty obligations to Plaintiffs.

## COUNT VIII
### Breach of Contract

150.     Plaintiffs incorporate by reference each and every prior and subsequent allegation as though fully set forth at this point.

151.     Section 7.2(b) of Plaintiff Bagwell's June 4, 2001 Booking Contract declares: WRESTLER or WRESTLER's designated independent certified public accountant who is a member in good standing of the AICPA, may at WRESTLER's sole expense examine

PROMOTER's books insofar as they pertain to this Agreement for the purpose of verifying the accuracy thereof.

152.    Plaintiff Bagwell attempted to examine WWE's books and records and was denied access in breach of  Plaintiff Bagwell's June 4, 2001 Booking Contract (royalty obligations enforced by Early Release Contract).

153.    For reasons discussed above, an independent royalty rights auditing company (such as Kobalt Neighbouring Rights) must be employed to ensure performers are being compensated correctly (it is not known whether WWE's royalty calculations are accurate at this point).

**COUNT IX**
**Unjust Enrichment**

154.    Plaintiffs incorporate by reference each and every prior and subsequent allegation as though fully set forth at this point.

155.    WWE has been unjustly enriched by the failure to pay WWE Network (as a WWF, WWE, or WCW Video Product) royalties to past performers whose contracts entitle them to WWE Network royalties, and failure to timely pay royalties as required.

156.    WWE's enrichment has been at the expense of Plaintiffs and Class and Subclass members.

157.    The circumstances are such that in equity and good conscience WWE should pay the monies due for WWE Network royalties from 2014 to the present.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of the Class and Subclasses of persons described herein, pray for an Order as follows:

a) Certify the Class and Subclasses as requested herein, appoint Plaintiffs as Class Representative and their selection of counsel as lead Class Counsel, and order class-wide relief;

b) Adjudge and decree that WWE and WCW-WWE have engaged in the conduct alleged herein;

c) Declare the WWE Network is a WCW Video Product and WWF Video Product;

d) Declare that WCW-WWE and WWE have paid Plaintiff Bagwell WCW video library royalties because his June 4, 2001 Booking Contract (Section 13.2 "Merger Clause");

e) Enjoin and restrain WWE and WCW-WWE and its officers and agents from continuing or engaging in similar conduct as alleged herein;

f) Enjoin and restrain WWE and WCW-WWE from placing Pay-Per-Views and Non Pay-Per-Views on the WWE Network until WWE and WCW-WWE pay Plaintiffs' and the Class' and Subclass' WWE Network royalty payments.

g) Impose a constructive trust on amounts wrongfully withheld from Plaintiffs and the Class and Subclasses members pending resolution of their claims herein;

h) Order that WWE and WCW-WWE pay restitution to Plaintiffs and the Class and Subclasses which would restore Plaintiffs and the Class and Subclasses to the financial position they would have been in absent Defendant's breaches of contract;

i) Order that WWE and WCW-WWE pay all compensatory damages as a result of its breach of contract;

j) Order that WWE and WCW-WWE pay punitive damages as a result of its breach of contract;

k) Order that WWE and WCW-WWE pay interest on the monies wrongfully obtained from the date of nonpayment through the date of entry of judgement in this action;

l) Order WWE and WCW-WWE to identify victims and amounts of unpaid royalties from its breach of contract;

m) Disgorgement of all proceeds unjustly flowing from WWE's and WCW-WWE's actions and/or omissions;

n) Award attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and

o) Grant all other relief as the Court deems necessary and proper.

## VIII.   JURY DEMAND

Plaintiffs and members of the Class and Subclasses respectfully demand a trial by jury on all issues so triable.

Dated:  September 7, 2016

                              Respectfully submitted,

                              Marcus Bagwell
                              Scott Levy

                              By /s/ Brenden P. Leydon
                              Brenden P. Leydon, Esq.
                              TOOHER WOCL & LEYDON, L.L.C.
                              80 Fourth Street
                              Stamford, CT 06905
                              Phone: (203) 324-6164
                              Fax: (203) 324-1407
                              Email: BLeydon@tooherwocol.com

Federal Bar No.: CT16026

Pro hac                                    KRISLOV & ASSOCIATES, LTD.
                                           Clinton A. Krislov (clint@krislovlaw.com)
                                           Matthew T. Peterson (matthew@krislovlaw.com)
                                           20 N. Wacker Dr.
                                           Suite 1300
                                           Chicago, Illinois   60606
                                           Tel.:   (312) 606-0500
                                           Fax.:  (312) 606-0207


                                           *Counsel for Plaintiffs*


                          CERTIFICATE OF SERVICE

        I hereby certify that on September 7, 2016, a copy of the foregoing First Amended Class
Action Complaint was filed electronically and served by mail on another unable to accept
electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the
Court's electronic filing system or by mail to anyone unable to accept electronic filing as
indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's
CM/ECF System.


                          */s/ Brenden P. Leydon*_____
                          Brenden P. Leydon, Esq.