# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARCUS BAGWELL and SCOTT LEVY, individually and on behalf of all others similarly situated, | : | NO. 3:16-CV-01350-JCH |
| | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| vs. | : | |
| | : | |
| WORLD WRESTLING ENTERTAINMENT, INC. and WCW, INC., | : | |
| | : | |
| Defendants. | : | DECEMBER 2, 2016 |

---

## DEFENDANT WWE'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT

---

Jonathan B. Tropp (ct11295)
Jeffrey P. Mueller (ct27870)
DAY PITNEY LLP
242 Trumbull Street
Hartford, CT 06103
Phone: (860) 275-0100
Fax: (860) 275-0343
Email: jbtropp@daypitney.com
Email: jmueller@daypitney.com

Jerry S. McDevitt (pro hac vice)
Curtis B. Krasik (pro hac vice)
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
Telephone: (412) 355-6500
Facsimile: (412) 355-6501
Email: jerry.mcdevitt@klgates.com
Email: curtis.krasik@klgates.com

*Counsel for Defendant World Wrestling Entertainment, Inc.*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................1

II.   BACKGROUND .................................................................................................2

      A.   The Serial Complaints Against WWE Seeking to Burden WWE's Copyrights......2

      B.   WWE Exclusively Owns the Copyrighted Works Depicting Plaintiffs' Performances and the Contracts With Plaintiffs Govern Royalty Rights...............4

      C.   WWE Network Is a New Model for the Distribution of WWE Copyrighted Works ....................................................................................................6

      D.   Plaintiffs Are Not Entitled to Royalties on the WWE Network ............................8

III.  ARGUMENT ....................................................................................................12

      A.   Standard of Review...................................................................................12

      B.   Plaintiffs' Breach of Contract Claims for Non-Payment of Royalties on the WWE Network Must Be Dismissed Under the Plain Language of the Booking Contracts ...............................................................................................12

           1.   The Court Can and Should Construe the Booking Contracts as a Matter of Law on WWE's Motion to Dismiss........................................................ 12

           2.   Plaintiffs Are Not Entitled to Royalties on the WWE Network Under the Plain Language of Their Respective Booking Contracts .......................... 13

                a.   Streaming on the WWE Network Does Not Constitute a "Direct Sale" ...........................................................................................14

                b.   Content on the WWE Network Is Not a "Video Product".............17

                c.   Plaintiffs' Construction Conflicts with Other Provisions of the Booking  Contract and Would Lead to an Absurd Result .............20

                d.   Plaintiffs Cannot Use the Merger Doctrine to Create an Entitlement to Royalties on WCWI Video Works that Never Existed.........................................................................................22

      C.   Plaintiffs' Breach of Contract Claims for Royalties on Streaming of WCWI Works on the WWE Network Must Be Dismissed for Additional Reasons .........24

           1.   Bagwell's Claims Against WCW, Inc. Must Be Dismissed Because It No Longer Exists ................................................................................... 24

           2.   Plaintiffs Fail to State a Claim for Successor Liability............................ 26

                a.   Plaintiffs Fail to Plead the Liability of the Alleged Predecessor ....................................................................................26

b.      Plaintiffs Fail to Adequately Plead Successor Liability Against WWE ..................................................................................28

D.      Counts IV and VIII Alleging Breach of Contract Fail ............................................29

E.      Plaintiffs' Declaratory Judgment Counts Must Be Dismissed ............................30

F.      Plaintiffs' Non-Contractual State Law Counts Are Dependent on the Flawed WWE Network Royalty Claim and Therefore Should Be Dismissed as Well ......30

1.      Plaintiffs' Breach of Fiduciary Duty Claim (Count II) Should Be Dismissed ...................................................................... 30

2.      Plaintiffs' CUTPA Claim (Count III) Should Be Dismissed ................... 31

a.      A Breach of Contract Claim Is Not a CUTPA Violation..............31

b.      Plaintiffs Lack a Relationship With WWE Within the Scope of CUTPA ......................................................................32

c.      Plaintiffs Lack Standing to Pursue a Nationwide CUTPA Claim ...........................................................................34

3.      Plaintiffs Cannot Assert an Unjust Enrichment Claim (Count IX) Based on Incorporated Allegations of an Express Contract ..................................... 35

4.      All of Bagwell's Non-Contractual State Law Claims Are Preempted by Copyright Law ........................................................................ 36

IV.     CONCLUSION ...................................................................................................37

# **TABLE OF AUTHORITIES**

**Page(s)**

<u>**Cases**</u>

*24 Leggett St. Ltd. P'Ship v. Beacon Indus., Inc.*, 239 Conn. 284, 685 A.2d 305
(1996) ................................................................................................................18

*Alliance Grp. Servs., Inc. v. Grassi & Co.*, 406 F. Supp. 2d 157 (D. Conn. 2005) ......................35

*Alstom Power, Inc. v. Schwing Am., Inc.*, No. 3:04cv1311 (JBA),
2006 WL 2642412 (D. Conn. Sept. 14, 2006) ........................................................35

*Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705 (2d Cir. 1989) ......................................27

*Anthracite Capital, Inc. v. Maguire Partners-555 W. 5th Mezzanine, LLC*,
165 Fed. Appx. 875 (2d Cir. 2005) ........................................................................14

*Austin v. Ford Models, Inc.*, 149 F.3d 148 (2d Cir. 1998) ..........................................................27

*Aztec Energy Partners, Inc. v. Sensor Switch, Inc.*, 531 F. Supp. 2d 226
(D. Conn. 2007) ...................................................................................................31

*Batchelar v. Interactive Brokers, LLC*, No. 3:15-CV-01836(VLB),
2016 WL 5661980 (D. Conn. Sept. 28, 2016) ................................................... 12-13

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................................12

*Blood v. Titan Sports, Inc.*, No. 3:94CV307-P, 1997 U.S. Dist. LEXIS 24485
(W.D.N.C. May 13, 1997) .....................................................................................37

*Bobryk v. Lincoln Amusements, Inc.*, No. CV950547084S, 1996 WL 24566
(Conn. Super. Ct. Jan. 5, 1996) ........................................................................ 14-15

*Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029 (2d Cir. 1995) .................................31

*Buying Triangle, LLC v. Hartford Fire Ins. Co.*, No. CV106015469S,
2011 WL 3483469 (Conn. Super. Ct. July 7, 2011) ........................................... 33-34

*Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y. 2013) ........................16, 20

*Cayo v. Stop & Shop Supermarket Co.*, No. 3:12cv638 (WWE),
2012 WL 5818862 (D. Conn. Nov. 15, 2012) .........................................................25

*Chambers v. Time Warner, Inc.*, 282 F. 3d 147 (2d Cir. 2002) .....................................................4

*Citadel Equity Fund Ltd. v. Aquila, Inc.*, 168 Fed. Appx. 474 (2d Cir. 2006) ...............................6

*City of Syracuse v. Loomis Armored US, LLC*, 900 F. Supp. 2d 274
  (N.D.N.Y. 2012) ...............................................................................27

*Coffman v. Breeze Corp.*, 323 U.S. 316 (1945) ....................................31

*Conn. Light & Power Co. v. Paradigm Health Ctr. Of Torrington, LLC*,
  No. NNHCV146044661S, 2014 WL 4746841
  (Conn. Super. Ct. Aug. 18, 2014) ........................................................33

*DeGeer v. Gillis*, 707 F. Supp. 2d 784 (N.D. Ill. 2010)...........................23

*DelMonaco v. Albert Kemperle, Inc.*, No. NNHCV146045251S,
  2014 WL 7525518 (Conn. Super. Ct. Nov. 26, 2014)............................33

*DiMuro v. Clinique Labs., LLC*, 572 Fed. Appx. 27 (2d Cir. 2014)................................1

*Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173 (S.D.N.Y. 2006) ..........8

*Douglas v. Stamco*, 363 Fed. Appx. 100 (2d Cir. 2010)..........................29

*Estate of Joe Brown v. ARC Music Grp.*, 523 Fed. Appx. 407 (7th Cir. 2013)............31

*Excell v. City of N.Y.*, No. 12 Civ. 2874(BMC), 2012 WL 2675013
  (E.D.N.Y. July 5, 2012) ........................................................................8

*F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958 (9th Cir. 2010)..........15, 16, 17

*Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109 (2d Cir 2004) ...................31

*FCM Grp., Inc. v. Miller*, 300 Conn. 774, 17 A.3d 40 (2011)......................14

*Fellows v. Martin*, 217 Conn. 57, 584 A.2d 458 (1991)............................30

*Ferber v. Travelers Corp.*, 785 F. Supp. 1101 (D. Conn. 1991) ..................6

*Fraiser v. Stanley Black & Decker, Inc.*, 109 F. Supp. 3d 498 (D. Conn. 2015) .........34

*Greystone Cmty. Reinvestment Ass'n v. Berean Capital, Inc.*, 638 F. Supp. 2d 278
  (D. Conn. 2009) ...................................................................................26

*Harbour Pointe, LLC v. Harbour Landing Condominium Assn., Inc.*,
  300 Conn. 254, 14 A.3d 284 (2011) ....................................................13

*Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 761 A.2d 1268 (2000).......... 30-31

*IN Energy Solutions, Inc. v. Realgy, LLC*, 114 Conn. App. 262, 969 A.2d 807
  (2009)............................................................................................ 31-32

*In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726 (2d Cir. 1993) ............30

*In re Trilegiant Corp.*, 11 F. Supp. 3d 82 (D. Conn. 2014) .................................................... 34-35

*Intersport, Inc. v. Nat'l Collegiate Athletic Assoc.*, 885 N.E.2d 532
    (Ill. App. Ct. 2008) ................................................................................................ 18-19

*J&N Elec., Inc. v. Notkins*, No. CV085020144, 2009 WL 1607591
    (Conn. Super. Ct. May 20, 2009) ................................................................................ 35

*Jackson v. R.G. Whipple, Inc.*, 225 Conn. 705, 627 A.2d 374 (1993) ........................................... 32

*Kane v. Fed. Express Corp.*, No. CV990078971S, 2001 WL 1178350
    (Conn. Super. Ct. Aug. 28, 2001) ................................................................................ 17

*Kelly v. Noble Env't Power, LLC*, No. CV085005444, 2009 WL 3087217
    (Conn. Super. Ct. Sept. 2, 2009) ................................................................................. 34

*Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013) ................................................... 19

*LaVallee v. Capital Elec. Constr., LLC*, No. CV020512659S, 2004 WL 870667
    (Conn. Super. Ct. Mar. 1, 2004) .................................................................................. 34

*Leichter v. Lebanon Bd. of Edu.*, 917 F. Supp. 2d 177 (D. Conn. 2013) ...................................... 13

*Lockwood v. John J. Carta Jr., LLC*, No. CV106001656, 2011 WL 4716294
    (Conn. Super. Ct. Sept. 20, 2011) ............................................................................... 33

*Lumbermens Mut. Cas. Co. v. Dillon Co.*, 9 Fed. Appx. 81 (2d Cir. 2001) ............................. 26-27

*Magnoni v. Smith & Laquercia*, 483 Fed. Appx. 613 (2d Cir. 2012) .............................................. 8

*Malmsteen v. Universal Music Grp., Inc.*, 940 F. Supp. 2d 123 (S.D.N.Y. 2013) ................. 18, 19

*Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of
    Contemporary Dance, Inc.*, 153 F. Supp. 2d 512 (S.D.N.Y. 2001) ........................................ 23

*Marvel Enters., Inc. v. World Wrestling Federation Entm't, Inc.*, 610 S.E.2d 583
    (Ga. App. 2005) ...................................................................................................... 28

*McCoy v. Comm'r of Pub. Safety*, 300 Conn. 144, 12 A.3d 948 (2011) ....................................... 18

*MDY Indus., LLC v. Blizzard Entm't, Inc.*, No. CV-06-2555-PHX-DGC,
    2008 WL 2757357 (D. Ariz. July 14, 2008) ................................................................... 17

*Meaney v. Conn. Hosp. Ass'n, Inc.*, 250 Conn. 500, 735 A.2d 813 (1999) ................................... 35

*Metro. Enter. Corp. v. United Techs. Int'l., Corp.*, No. 3:03CV1685 (JBA),
    2004 WL 1497545 (D. Conn. June 28, 2004) ................................................................. 34

*MPEG LA, L.L.C. v. Toshiba Am. Info. Sys., Inc.*, No. 15-CV-3997 (JMF),
   2015 WL 6685523 (S.D.N.Y. Oct. 29, 2015) ........................................................26

*Musselman v. Jasgur*, 446 B.R. 572 (M.D. Fla. Bankr. 2011) ......................................26

*N. Am. Technical Servs. Inc. v. V.J. Techs., Inc.*, No. 10 CV 1384 (AWT),
   2011 WL 4538069 (D. Conn. Sept. 29, 2011) ..........................................................35

*Nat'l Sur. Corp. v. Prairieland Constr., Inc.*, 354 F. Supp. 2d 1032
   (E.D. Mo. 2004) ........................................................................................................23

*Nation-Bailey v. Bailey*, 316 Conn. 182, 112 A.3d 144 (2015) ..............................12, 13

*Northrop v. U.S.*, Civil Action No. 3:07-CV-20 (JCH), 2008 WL 4447101
   (D. Conn. Aug. 28, 2008) ........................................................................................ 7-8

*OBG Technical Servs. v. Northrop Grumman Space & Mission Sys. Corp.*,
   503 F. Supp. 2d 490 (D. Conn. 2007) ......................................................................12

*Omni Corp. v. Sonitrol Corp.*, 303 Fed. Appx. 908 (2d Cir. 2008) ..............................31

*Perry v. Perry*, 156 Conn. App. 587, 113 A.3d 132 (2015) .........................................14

*Pirrotti v. Respironics, Inc.*, No. 3:11-CV-00439, 2013 WL 321772
   (D. Conn. Jan. 28, 2013) ..........................................................................................28

*Priority Sales Mgmt., Inc. v. Carla's Pasta, Inc.*, No. 3:10-cv-1918(CFD),
   2011 WL 3819748 (D. Conn. Aug. 26, 2011) ....................................................31, 32

*Ray v. ESPN, Inc.*, 783 F.3d 1140 (8th Cir. 2015) .......................................................36

*Reinhardt v. Wal-Mart Stores, Inc.*, 547 F. Supp. 2d 346 (S.D.N.Y. 2008) ................12

*Ricciardello v. J.W. Gant & Co.*, 717 F. Supp. 56 (D. Conn. 1989) ............................28

*Ringgold v. Black Entm't TV, Inc.*, 126 F.3d 70 (2d Cir. 1997) ............................. 29-30

*Robbins v. Physicians for Women's Health, LLC*, 311 Conn. 707, 90 A.3d 925
   (2014) ........................................................................................................................27

*Rothstein v. Am. Int'l Grp., Inc.*, 837 F.3d 195 (2d Cir. 2016) ....................................18

*Sevits v. McKiernan-Terry Corp.*, 264 F. Supp. 810 (S.D.N.Y. 1966) ........................25

*Shehu, LLC v. Adams*, No. CV1360177105, 2014 WL 567832
   (Conn. Super. Ct. Jan. 17, 2014) .............................................................................32

*Singer v. Priceline Grp., Inc.*, No. 15-cv-1090(VAB), 2016 WL 3976539
   (D. Conn. July 22, 2016) ..........................................................................................12

*Somerson v. McMahon*, 956 F. Supp. 2d 1345 (N. D. Ga. 2012) ............................................ 36-37

*St. Bernard Sch. of Montville, Inc. v. Bank of Am.*, 312 Conn. 811, 95 A.3d 1063
    (2014) ...................................................................................................................................30

*Suffield Dev. Assoc. Ltd. P'ship v. Nat'l Loan Investors, L.P.*, 97 Conn. App. 541,
    905 A.2d 1214 (2006) ..........................................................................................................21

*Sulton v. Wright*, 265 F. Supp. 2d 292 (S.D.N.Y. 2003) ..................................................27

*Tallmadge Bros. v. Iroquois Gas Transmission Sys., L.P.*, 252 Conn. 479,
    746 A.2d 1277 (2000) ..........................................................................................................13

*Town of Stratford v. Jacobelli*, 317 Conn. 863, 120 A.3d 500 (2015) ...........................18

*Umbach v. Carrington Inv. Partners*, No. 3:08 CV 484 (EBB), 2009 WL 413346
    (D. Conn. Feb. 18, 2009) ......................................................................................................30

*United Components, Inc. v. Wdowiak*, 239 Conn. 259, 684 A.2d 693 (1996)..............................33

*Welch v. Stonybrook Gardens Coop., Inc.*, 158 Conn. App. 185, 118 A.3d 675
    (2015) ..............................................................................................................13, 21, 22

*William Raveis Real Estate v. Cendant Mobility Corp.*, No. CV054002709S,
    2005 WL 3623815 (Conn. Super. Ct. Dec. 6, 2005) ........................................... 35-36

*Woodbury v. Johnson*, No. 3:13-CV-912(JCH), 2014 WL 2871583
    (D. Conn. June 23, 2014) ......................................................................................................12

*Young v. Fellows*, No. CV040409091S, 2004 WL 2397192
    (Conn. Super. Ct. Sept. 24, 2004) ........................................................................................14

**Statutes**

8 Del. C. § 259 .....................................................................................................................25

17 U.S.C. § 106......................................................................................................................16, 20

17 U.S.C. § 109......................................................................................................................15, 19

CONN. GEN. STAT. § 42a-2-106 ..........................................................................................14, 17

**Other Authorities**

Fed. R. Civ. P. 12 ..............................................................................................................8, 12, 27

## I.        <u>INTRODUCTION</u>

Plaintiffs' First Amended Complaint ("FAC") is the third attempt by Plaintiffs' counsel to burden the right of World Wrestling Entertainment, Inc. ("WWE") to make its vast library of copyrighted works available for viewing, but not sale, on the WWE Network.  The WWE Network is "a 24/7 direct to consumer video streaming network (like a Netflix of WWE content)" owned and controlled by WWE.  *See* FAC ¶ 60.  It is undisputed that WWE exclusively owns all copyrights in the works created by it that are available for viewing on the WWE Network, and Plaintiffs concede that WWE also owns the copyrighted works of a former competitor, World Championship Wrestling, Inc., which are available for viewing on the WWE Network as well.  *See id.* at ¶¶ 30, 53.  Unable to assert rights in the copyrighted works themselves, all three iterations of the complaints filed by Plaintiffs' counsel have concocted contract-based claims by former wrestlers solicited to be the vehicle for class action litigation. The contract claims attempt to avoid the copyright preemption applicable to the common law claims otherwise asserted in the FAC.  The contract-based claims are contrary to the plain and unambiguous terms of the governing contracts and well established canons of contract interpretation under Connecticut law.  Despite previously acknowledging that common law claims are preempted, Plaintiffs nevertheless also assert common law claims seeking a cut of the subscription fees paid by subscribers to the WWE Network.  Those claims are in law preempted and defective anyway.  After three unsuccessful attempts to state cognizable claims, Plaintiffs' FAC should be dismissed in its entirety with prejudice.  *See DiMuro v. Clinique Labs., LLC*, 572 Fed. Appx. 27, 33 (2d Cir. 2014) ("Plaintiffs are 'not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.'") (citations omitted).

## II.    BACKGROUND

### A.    The Serial Complaints Against WWE Seeking to Burden WWE's Copyrights

On April 6, 2016, Plaintiffs' counsel filed the first putative class action complaint seeking royalties on behalf of a former WWE wrestler named Rene Goguen because works depicting his performances for WWE were displayed on the WWE Network. *See Goguen v. World Wrestling Entertainment, Inc*., Case No. 3:16-cv-00542-SRU (D. Conn.).  WWE's counsel immediately notified Plaintiffs' lead counsel that Goguen had signed a release with WWE that prohibited the claims, and provided the release to Plaintiffs' counsel for their independent confirmation. Plaintiffs voluntarily withdrew the complaint on April 11, 2016.

Four months later, on August 9, 2016, the same Plaintiffs' counsel filed this putative class action complaint against WWE on behalf of Plaintiff Marcus Bagwell.  Bagwell's original complaint was constructed entirely on transparently incorrect and false allegations, namely, that Bagwell had been employed by WWE as a professional wrestler from 1991 to 2001 and that two entirely different and unrelated corporations, World Championship Wrestling, Inc. ("WCWI") and WCW, Inc., were the same corporation. *See* Dkt. 1 ¶¶ 13, 66. [1]  In reality, and as evidenced by the very exhibits attached to the original complaint, Bagwell never had any contract with WWE.  Instead, he performed most of his career pursuant to a Booking Contract and a Merchandising Agreement with the entirely different entity WCWI, which was affiliated with Turner Broadcasting System, Inc. WCWI was a competitor of WWE until March 2001 when it ceased operation and sold certain of its assets, including the trademark "WCW" and its

---

[1] In this brief, the legal entity World Championship Wrestling, Inc. will be referred to as "WCWI." "WCW" shall mean not any corporation, but rather the trademark formerly used by WCWI in the promotion of its brand.  The "WCW" trademark, together with the copyrighted video library owned by WCWI, was acquired by WCW, Inc., a subsidiary of WWE.  This distinct legal entity will be referred to as "WCW, Inc." so as to distinguish it from WCWI, the corporate entity, and WCW, the trademark.

2

copyrighted video archives to a subsidiary of WWE formed for the acquisition.  After his career

with WCWI ended, Bagwell entered into a contract with that acquisition vehicle, WCW, Inc.,

effective June 4, 2001, which lasted only a short time.  *See id.* at Exs. 2 & 7.  Bagwell's contract

with WCW, Inc. was terminated by mutual agreement on or about August 7, 2001.[2]  *Id.* at Ex. 7.

In light of the problematical aspects of the original complaint, and because it was the second

improper lawsuit brought by the same class action lawyers, WWE served Plaintiffs' counsel with

a formal and comprehensive Rule 11 motion on August 17, 2016.  On August 25, 2016,

Plaintiffs' lead counsel responded, "Thank you for bringing these matters to our attention.  We

expect to be filing an amended complaint shortly, which should address all of the issues you've

raised."

Plaintiffs then filed a "Motion to Amend Complaint" (Dkt. 11) with the proposed FAC on

September 7, 2016.[3]  The FAC added Plaintiff Scott Levy as a plaintiff and WCW, Inc. as a

defendant.  For his part, Bagwell claims in the FAC that his short-lived contract with WCW, Inc.

gives him a right to royalties for the display of the copyrighted works created by WCWI which

were purchased by WCW, Inc. and which are now displayed on the WWE Network.  He does so

even though he admits he was never entitled to such royalties under his contracts with WCWI,

and despite the absence of any such promise in his brief contract with WCW, Inc.  Like Bagwell,

Levy also previously performed for WCWI.  Unlike Bagwell, Levy also had contracts with

---

[2] After acquiring certain of the assets of WCWI, including the trademark "WCW", WWE hoped to attempt to revive the WCW brand as a separate brand from WWE, albeit one owned and operated by its subsidiary, WCW, Inc.  The brand was too damaged, however, and the plan was abandoned and contracts entered into between WCW, Inc. and some former performers for WCWI like Bagwell were terminated. *See* Dkt. 1, Ex. 7.  The footage of WCWI, however, remained a valuable asset regarding the history of professional wrestling, and those copyrighted works are available for viewing on the WWE Network.

[3] The Court granted Plaintiffs' Motion to Amend on November 4, 2016.  *See* Dkt. 37.

WWE.[4]  Levy claims that his contract with WWE contractually entitles him to be paid royalties

on both the WCWI created works and the WWE created works in which he appears that are

displayed on the WWE Network.  Like Bagwell, he makes such a claim regarding the WCWI

works even though he also had no contract with WCWI which paid him such royalties, and no

contract with WWE which ever promised him royalties for the WCWI works.  None of the

WCWI contracts ever provided for royalty payments under any circumstances.  *See* FAC, Ex. 14

(Bagwell); Ex. A (Levy).[5]

As will be demonstrated, the claims of Bagwell and Levy remain defective, because

neither had <u>any</u> contract with <u>any</u> entity that entitled him to royalties on copyrighted works

owned by WWE, whether purchased from WCWI or produced originally by WWE, which are

made available to be viewed, but not sold, on the WWE Network.

**B.**     **WWE Exclusively Owns the Copyrighted Works Depicting Plaintiffs' Performances**
          **and the Contracts With Plaintiffs Govern Royalty Rights**

Paragraph 2.3 of Levy's August 27, 2000 Booking Contract with WWE, and Bagwell's

2001 Booking Contract with WCW, Inc. both provide that their "appearance, performance and

work product in any or all of the Events and/or Programs shall be deemed work for hire; and

notwithstanding the termination of this Agreement, PROMOTER shall own, in perpetuity, all

---

[4] Levy's last contract with WWE was effective August 27, 2000 and contains an explicit merger clause whereby all prior understandings and agreements between the parties to that contract are merged into that contract, which then constitutes "the entire understanding of the parties with respect to the subject matter hereof."  *See* FAC, Ex. 3 at ¶ 3.2.  Thus, Levy's contractual claims against WWE arising from contracts between Levy and WWE are governed by that contract, since he, unlike Bagwell, had prior contracts with WWE and the merger doctrine only applies to contracts between the same parties.  *See infra* Section III.B.2.d.  WWE utilizes Levy's 2000 contract to demonstrate that he has no right to royalties for the display of copyrighted work on the WWE Network.

[5] Although Plaintiffs attached Bagwell's Merchandising Agreement with WCWI to the FAC, Levy's Merchandising Agreement with WCWI was not attached.  Nevertheless, it is integral to the FAC and the Court may consider it on a motion to dismiss.  *See Chambers v. Time Warner, Inc.*, 282 F. 3d 147, 153-54 (2d Cir. 2002) (The court may consider documents that are "'integral' to the complaint.").

Programs and all of the rights, results, products and proceeds in and to, or derived from the
Events and Programs . . . and PROMOTER may obtain copyright and/or trademark and/or any
other legal protection therefor."  FAC, Ex. 3 ¶ 2.3, Ex. 13 ¶ 2.3.  Paragraph 2.5 of their Booking
Contracts similarly provided that "[a]ll Works and WRESTLER's contributions thereto shall
belong solely and exclusively to PROMOTER in perpetuity notwithstanding any termination of
this Agreement."  *Id.* at Ex. 3 ¶ 2.5, Ex. 13 ¶ 2.5.  Paragraph 2.2 further provided:

> [n]otwithstanding the termination of this Agreement for any reason, and
> notwithstanding any other provision of this Agreement, PROMOTER shall have
> the right to produce, reproduce, reissue, manipulate, reconfigure, license,
> manufacture, record, perform, exhibit, broadcast, televise by any form of
> television (including without limitation, free, cable, pay cable, closed circuit and
> pay-per-view television), transmit, publish, copy, reconfigure, compile, print,
> reprint, vend, sell, distribute and use via any other medium now known or
> hereinafter discovered, and to authorize others to do so, the Programs, in
> perpetuity, in any manner or media and by any art, method or device, now known
> or hereinafter discovered (including without limitation, by means of videodisc,
> videocassette, optical, electrical and/or digital compilations, theatrical motion
> picture and/or non-theatrical motion picture).

*Id.* at Ex. 3 ¶ 2.2, Ex. 13 ¶ 2.2.  Under these provisions of the Booking Contracts, WWE and
WCW, Inc. have the absolute right to exploit their copyrighted works depicting any
performances of Levy rendered to WWE or performances by Bagwell for WCW, Inc. in any
manner or media.  After expressly acknowledging the broad rights of copyright ownership of
WWE and/or WCW, Inc., the contracts with Bagwell and Levy then spell out the precise
circumstances when a royalty would be paid as well as the royalty formula.  Those royalty rights
are triggered when WCW, Inc. or WWE directly sells discrete specific CDs, DVDs or a like
physical object embodying specific WWE or WCW, Inc. pay-per-views or non-pay-per-view
events in which Plaintiffs performed.  Neither contract contains a royalty obligation if WCW,
Inc. or WWE exploits copyrighted works purchased from other parties, such as WCWI, nor did
either of Plaintiffs' contracts with WCWI provide for such royalties.

Bagwell concedes that he did not provide any services under his WCW, Inc. Booking Contract that entitled him to royalties under that contract. *See* FAC ¶ 32(iii)(a).  Quite frankly, for the reasons set forth herein, that admission establishes that Bagwell has no right to any royalties, period.  Levy concedes that WWE has paid him royalties under the circumstances actually specified in his contract ─ when WWE directly sells a CD or DVD which contains a performance he rendered to WWE. *See* FAC ¶ 22 & Ex. 8.  Despite Plaintiffs' legal gymnastics, they simply are not entitled to royalties on the WWE Network under the plain language of their Booking Contracts.  A brief description of the WWE Network is necessary for the Court to fully appreciate the fallacy of Plaintiffs' claims, followed by an examination of the specific contract provisions which defeat their claims.

**C.**     **WWE Network Is a New Model for the Distribution of WWE Copyrighted Works**

On January 9, 2014, WWE announced a new business model for the distribution of the copyrighted content produced and/or owned by the WWE.  The WWE Network is "a 24/7 direct to consumer video streaming network (like a Netflix of WWE content)."  Subscribers can access the Network for a fee of $9.99 per month.  FAC ¶ 62; Ex. B.[6]  The WWE Network is available on desktops and laptops via WWE's website, www.wwe.com, and through the WWE App on smartphones, gaming consoles, smart TVs and other streaming devices. *See* Ex. B.  The WWE Network allows WWE to "transform and reimagine how [it] deliver[s] [its] premium live content and 24/7 programming directly to [its] fans around the world." *See id.*  The WWE Network offers subscribers two simultaneously-available ways of streaming content: (1) 24/7 scheduled

---

[6] A court can take judicial notice of filings with the Securities and Exchange Commission on a motion to dismiss. *See Citadel Equity Fund Ltd. v. Aquila, Inc.*, 168 Fed. Appx. 474, 475-76 (2d Cir. 2006) (affirming district court's judicial notice of an SEC filing); *Ferber v. Travelers Corp.*, 785 F. Supp. 1101, 1103 n.6 (D. Conn. 1991) ("The court may take judicial notice . . . of the contents of relevant public disclosure documents required by law to be filed, and actually filed, with the Securities and Exchange Commission.").

programming that includes WWE's 12-16 annual live pay-per-view events, original programming, reality shows, and documentaries; and (2) an on-demand library of matches, both those produced by WWE and copyrighted works acquired from other historical wrestling promotions, such as the works of WCWI.  *See* FAC ¶ 63; Ex. B.  Prior to the launch of the WWE Network, WWE's pay-per-view programs could only be viewed live by purchasing pay-per-view access through third-party cable systems or satellite providers (like DirecTV) by paying a fee for each event, which often exceeded $50.  Each individual event could also be purchased on DVD, after the fact.  Now, all 12-16 pay-per-view events per year, including Wrestlemania, can be seen on the WWE Network by subscribers who pay $9.99 a month for unlimited access.  *See id.*  While WWE still produces original television programming on the USA Network, WWE's substantial investment in the WWE Network has enabled WWE to exploit its copyrighted works in transformative ways beyond traditional cable or satellite television.

In addition to the pay-per-views and other original programming seen only on the WWE Network, the WWE Network also provides a digital outlet for WWE's vast archival library of copyrighted works which it has created or acquired in the decades of its existence.  Through the years, WWE has also purchased the copyrighted works of other wrestling organizations that are now defunct, bankrupt, or otherwise no longer in business.  Those copyrighted works include the video libraries of Extreme Championship Wrestling ("ECW"), which WWE purchased free and clear of all claims from the Trustee in the bankruptcy of the company that owned ECW in a sale approved by the U.S. Bankruptcy Court for the Southern District of New York in June 2003 (Ex. C),[7] and of WCWI, assets of which were purchased from a Turner Broadcasting System, Inc.-

---

[7] A court can take judicial notice of prior court rulings on a motion to dismiss.  *See Northrop v. U.S.*, Civil Action No. 3:07-CV-20 (JCH), 2008 WL 4447101, at *1 (D. Conn. Aug. 28, 2008) ("a court may permissibly take judicial notice of certain public records, such as the content of prior court decisions, even

affiliated company in March 2001.  By these investments, WWE acquired the video libraries and associated copyrights of all historical ECW and WCWI television programs and pay-per-view events.

In exchange for a monthly fee, subscribers can view, but not download or otherwise buy to own, the original programs and thousands of hours of video-on-demand content.  The WWE Network's "Terms and Conditions of Use" make clear that "[n]o materials from the [WWE Network] may be copied, reproduced, republished, uploaded, posted, transmitted or distributed in any way without the express written permission of WWE."  Ex. D.[8]  The "Terms and Conditions of Use" similarly provide that the "WWE Network is a streaming service . . . . WWE content is streamed over the internet, not downloaded."  *Id.*

In sum, subscribers are merely able to view content on the WWE Network in exchange for their monthly fee, but not to acquire any tangible interests nor buy any of it to own.  As demonstrated in the next section, the absence of a direct sale of any of the works is fatal to Plaintiffs' claims.

**D.**     **Plaintiffs Are Not Entitled to Royalties on the WWE Network**

Bagwell contends he is entitled to royalties because WCWI pay-per-views in which he performed are among the content that can be viewed on the WWE Network.  He bases the claim

---

when those public records have not been referenced by the Complaint."); *Excell v. City of N.Y.*, No. 12 Civ. 2874(BMC), 2012 WL 2675013, at *3 (E.D.N.Y. July 5, 2012) ("When deciding a Rule 12(b)(6) motion, a court may consider matters of public record . . . and in particular may take judicial notice of prior court decisions.").

[8] Plaintiffs' claims for royalties related to the WWE Network made the Terms of Use associated with that service integral to the FAC.  A court can take judicial notice of information contained on a corporate website on a motion to dismiss.  *See Magnoni v. Smith & Laquercia*, 483 Fed. Appx. 613, 616 (2d Cir. 2012) (holding it was proper for district court to take judicial notice of information contained on corporate website); *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) ("For purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'") (citation omitted).

on Paragraph 7.5(c)(i) of his contract with WCW, Inc. which provides as follows:

> (c)    (i)  Royalties/Pay-Per-View Videos Sold By WCW:  WCW shall allocate five percent (5%) of the Net Receipts paid to WCW with respect to the <u>direct sale</u> by WCW of WCW Pay-Per-Views to a talent royalty pool.  Thereafter, WCW shall pro-rate payment to WRESTLER and all other talent appearing in such WCW Pay-Per-Views in the same proportion as was the compensation paid to WRESTLER for his appearances in the pay-per-views to the total amount paid to all talent for their appearances on the pay-per-views.  For purposes of paragraphs 7.5(c)(i) and 7.5(c)(ii), Net Receipts shall mean the gross amount received by WCW for the WCW Pay-Per-Views.

FAC, Ex. 13 ¶ 7.5(c)(i) (emphasis added).  Significantly, "WCW," as used in the above section, means and is defined in the header of the contract as WCW, Inc., not WCWI.  Thus, on its face, Paragraph 7.5(c)(i) promises only to pay Bagwell royalties on any video of a WCW, Inc. pay-per-view directly sold by WCW, Inc., and is completely silent regarding WCWI.  Significantly, Bagwell admits that he never appeared in any WCW, Inc. pay-per-view and that he never performed in a royalty-bearing event while under contract to WCW, Inc.  *See* FAC ¶ 32(iii)(a).

Levy bases his claim for royalties on both the past WCWI pay-per-views and WWE pay-per-views which can be viewed on the WWE Network on nearly identical language in Paragraph 7.5(c)(i) of his August 27, 2000 contract with WWE, which differs only in that the word "Promoter" takes the place of "WCW."[9]  *See* FAC, Ex. 3 ¶ 7.5(c)(i).  Levy's contract, therefore, also does no more than promise royalties on WWE created works containing Levy's performances which are directly sold.  Paragraph 7.5(c)(ii) of their respective contracts is substantially similar to Paragraph 7.5(c)(i), except that it applies to "a compilation or derivative work of multiple individual [WCW, Inc. or WWE] Pay-Per-Views in their entirety, such as a collection of videos, e.g., a Wrestlemania box set."  FAC, Ex. 3 ¶ 7.5(c)(ii), Ex. 13 ¶ 7.5(c)(ii).

Paragraph 7.5(d) of their respective contracts deals with royalties due on sales of non-

---

[9] "Promoter" is defined in the header of Levy's 2000 contract to be World Wrestling Federation Entertainment, Inc., a predecessor of WWE and for all purposes relevant hereto the same entity as WWE.

pay-per-view videos in similar fashion, and also require a "direct sale", as follows:

> (d)     Royalties/Non Pay-Per-View Videos Sold By Promoter:  PROMOTER shall allocate five percent (5%) of the Net Receipts paid to PROMOTER with respect to the <u>direct sale</u> by PROMOTER of all other WWF Video Products other than those set forth in paragraphs 7.5(c)(i) and 7.5(c)(ii) above, to a talent royalty pool, from which PROMOTER shall pay WRESTLER and all other talent appearing in such WWF Video Products pro-rata among WRESTLER and all other talent so featured.  For purposes of this paragraph 7.5(d), Net Receipts shall mean the gross amount received by PROMOTER for the WWF Video Products.  Notwithstanding the foregoing, if WRESTLER is deemed to be the "featured performer" as determined by PROMOTER in its sole discretion, WRESTLER shall receive a bonus of an additional five percent (5%) of … Net Receipts <u>up to the sale</u> of the first one hundred fifty thousand (150,000) units.  Once <u>sales</u> exceed 150,000, WRESTLER as a featured performer shall receive ten percent (10%) of … Net Receipts on all units <u>sold</u>, including the first 150,000 units. . . .

FAC, Ex. 3 ¶ 7.5(d), Ex. 13 ¶ 7.5(d) (emphasis added). "WWF Video Products" is defined in

Paragraph 7.5(a) of Levy's 2000 contract to mean "video cassettes, videodiscs, CD ROM, or

other technology, including technology not yet created," and "WCW Video Products" is defined

the same way in Bagwell's 2001 contract with WCW, Inc.  FAC, Ex. 3 ¶ 7.5(a), Ex. 13 ¶ 7.5(a).

Given this plain language, Plaintiffs concede that "[o]nly direct sales of pay-per-views

and non pay-per-views of [WWF/WCW] Video Products are entitled to royalties."  *See* Form

26(f) of the Parties' Planning Meeting, Dkt. 36 at 3.  Ignoring the admission that a "direct sale"

is the requisite trigger for a royalty obligation under both 7.5(c) and (d), Plaintiffs focus on the

irrelevant argument that streaming video is "other technology and/or technology not yet

created" under 7.5(a) at the time they signed their Booking Contracts with WWE/WCW, Inc.

*See* FAC at ¶ 19 (Levy), ¶ 50 (Bagwell), ¶ 119 (alleging breach for failure to pay "royalties

from WCW-WWE's and WWF's sales of the WWE Network (a WCW Video Product and

WWF Video Product) featuring Plaintiffs in Pay-Per-Views and Non Pay-Per Views").

Even if Plaintiffs were correct concerning the meaning of 7.5(a), which they are not, for

reasons explained in Section III.B.2.b below, Plaintiffs' theory ignores the plain meaning of the

unambiguous terms of their Booking Contracts, which must be read as a whole.  Given their admission that only "direct sales" are entitled to royalties, it is a pure question of law for the Court to decide whether streaming video is a direct sale or not.  In that regard, the key issue is not whether streaming video is "other technology and/or technology not yet created" but instead whether it is a technology by which a <u>direct sale</u> is made of a WCW, Inc. or WWE pay-per-view or non-pay-per-view video.  In law and in fact, there is no sale at all.  <u>First</u>, the streaming of content to subscribers on the WWE Network is not a "direct sale" of a "Video Product" because subscribers can only view, not buy, any of the content on the WWE Network.  Subscribers do not acquire title or ownership of any content.  <u>Second</u>, Plaintiffs are also incorrect to contend that the definition in Paragraph 7.5(a) covers the streaming of video content on the WWE Network.  The specific description of the items that constitute "Video Products" preceding the "other technology" clause, specifically "videocassettes, videodiscs, CD-Rom," makes clear that clause refers to tangible products using technology which a consumer can buy to own the content.  FAC, Ex. 3 ¶ 7.5(a)(i), Ex. 13 ¶ 7.5(a)(i).  The fact that streaming video content on the WWE Network is not captured in a physical medium is of well-recognized significance under copyright law, including its first-sale doctrine.  <u>Third</u>, Plaintiffs' claimed construction renders other relevant provisions of the Booking Contracts absurd, contrary to canons of construction designed to avoid absurd results.  Specifically, calculations necessary to the royalty calculation which are straightforward when confined to "direct sales" are impossible to apply to a streaming network.  Lastly, Plaintiffs are not entitled to royalties on any works acquired from WCWI because neither had a contract with WCWI that entitled them to royalties; WWE did not assume such contracts regardless; and there is no merger doctrine applicable to contracts with different entities.

All of Plaintiffs' non-contractual claims are dependent on their flawed WWE Network royalty claim.  Those claims should be dismissed on that basis, and are preempted in any event.

## III.    ARGUMENT

### A.    Standard of Review

As the Court is well-familiar, a case should be "dismissed under Rule 12(b)(6) if the complaint fails to allege facts sufficient 'to state a claim for relief that is plausible on its face.'" *Woodbury v. Johnson*, No. 3:13-CV-912(JCH), 2014 WL 2871583, at *2 (D. Conn. June 23, 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).  "Because 'interpretation of a contract is generally a question of law,' it is 'suitable for disposition on a motion to dismiss.'"  *Reinhardt v. Wal-Mart Stores, Inc.*, 547 F. Supp. 2d 346, 353 (S.D.N.Y. 2008) (quoting *OBG Technical Servs. v. Northrop Grumman Space & Mission Sys. Corp.*, 503 F. Supp. 2d 490, 514 (D. Conn. 2007) (citation omitted)); *see also Singer v. Priceline Grp., Inc.*, No. 15-cv-1090(VAB), 2016 WL 3976539, at *5 (D. Conn. July 22, 2016) (dismissing breach of contract claim).

### B.    Plaintiffs' Breach of Contract Claims for Non-Payment of Royalties on the WWE Network Must Be Dismissed Under the Plain Language of the Booking Contracts

#### 1.    The Court Can and Should Construe the Booking Contracts as a Matter of Law on WWE's Motion to Dismiss

On a motion to dismiss, a court may dismiss a breach of contract claim "if the terms of the contract are unambiguous."  *Singer*, 2016 WL 3976539, at *5.  "Whether or not a writing is ambiguous is a question of law to be resolved by the courts."  *Id.*  "When the language [of a contract] is clear and unambiguous . . . the contract must be given effect according to its terms, and the determination of the parties' intent is a question of law."  *Id.* (quoting *Nation-Bailey v. Bailey*, 316 Conn. 182, 192 (2015)); *see also Batchelar v. Interactive Brokers, LLC*, No. 3:15-CV-01836(VLB), 2016 WL 5661980, at *3 (D. Conn. Sept. 28, 2016) ("[T]he interpretation and

construction of a written contract present only questions of law, within the province of the court . . . so long as the contract is unambiguous and the intent of the parties can be determined from the agreement's face.") (citation omitted).  "[A] contract is unambiguous when its language is clear and conveys a definite and precise intent . . . . The court will not torture words to impart ambiguity . . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . . [A]ny ambiguity in a contract must emanate from the language used by the parties." *Welch v. Stonybrook Gardens Coop., Inc.,* 158 Conn. App. 185, 197-98 (2015) (quoting *Harbour Pointe, LLC v. Harbour Landing Condominium Assn., Inc.*, 300 Conn. 254, 260-61 (2011)).

"[T]he language used [in a contract] must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." *Nation-Bailey*, 316 Conn. at 192.  When "giving meaning to the terms of a contract, the court should construe the agreement as a whole, and its relevant provisions are to be considered together." *Leichter v. Lebanon Bd. of Edu.*, 917 F. Supp. 2d 177, 185 (D. Conn. 2013).  "[E]very provision must be given effect if it is possible to do so." *Welch*, 158 Conn. App. at 198 (quoting *Harbour Pointe*, 300 Conn. at 261).  "Especially in the context of commercial contracts, [courts] assume that definite contract language is the best indication of the result anticipated by the parties in their contractual arrangements." *Tallmadge Bros. v. Iroquois Gas Transmission Sys., L.P.*, 252 Conn. 479, 500 (2000).

## 2. Plaintiffs Are Not Entitled to Royalties on the WWE Network Under the Plain Language of Their Respective Booking Contracts

Plaintiffs are not entitled to royalties on the WWE Network based on a plain language interpretation of the clear and unambiguous terms of their Booking Contracts with WCW, Inc. in

the case of Bagwell and with WWE in the case of Levy.[10]  Indeed, Plaintiffs agree that a direct

sale is needed to trigger a royalty obligation under the contracts at issue.  Thus, a pure question

of law exists for the Court to answer ─ is the streaming of video content only for viewing a

"direct sale" of the content being streamed?

<div align="center">a.      <strong><u>Streaming on the WWE Network Does Not Constitute a "Direct Sale"</u></strong></div>

Plaintiffs erroneously focus their argument on the "other technology" clause in the

definition of "Video Products" in Paragraph 7.5(a) because they cannot demonstrate that the key

language defining the royalty trigger in Paragraphs 7(c) and (d) of their contracts is satisfied

here.  The royalty trigger is a "direct sale" of either a pay-per-view video or a non-pay-per-view

video.  Under Connecticut law, "[t]he plain meaning of the word 'sale' indicates that a 'sale'

involves the transfer of ownership of and title to property from one person to another."  *Perry v.

Perry*, 156 Conn. App. 587, 594 (2015) (citing Merriam-Webster's Collegiate Dictionary (11th

ed. 2003)); *see also* Conn. Gen. Stat. § 42a-2-106 ("A 'sale' consists in the passing of title from

the seller to the buyer for a price"); *Anthracite Capital, Inc. v. Maguire Partners-555 W. 5th

Mezzanine, LLC*, 165 Fed. Appx. 875, 877 (2d Cir. 2005) ("the ordinary meaning of th[e] term

[sale] is 'the transfer of property or title for money or other consideration.'"); *Young v. Fellows*,

No. CV040409091S, 2004 WL 2397192, at *3 (Conn. Super. Ct. Sept. 24, 2004) (citing Black's

Law Dictionary in finding "[t]he term 'sale' thus conveys a clear and definite meaning which is

easily found in any law dictionary, to wit, to transfer the property for a sum of money or its

equivalent"); *Bobryk v. Lincoln Amusements, Inc.*, No. CV950547084S, 1996 WL 24566, at *3

(Conn. Super. Ct. Jan. 5, 1996) (finding "meaning[] [of sale] in our law [is] well understood" and

"Connecticut's common-law understanding [is] that, "A sale implies ownership in the thing sold

---

[10] Bagwell cannot assert a breach of contract claim against WWE for payment of royalties because he was not a party to any contract with WWE.  *See FCM Grp., Inc. v. Miller*, 300 Conn. 774, 797-98 (2011).

<div align="center">14</div>

and a transfer of that ownership to another . . . It involves the passing of titles.") (citation and internal quotations omitted).

Courts have interpreted the term "sale" similarly in the context of copyrighted works, like the WCWI and WWE pay-per-view and non pay-per-view programs at issue here. Specifically, "a 'sale' of a [copyrighted] work may either be a transfer in title of an individual copy of a work, or a sale of all exclusive intellectual property rights in a work." *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958, 964-65 (9th Cir. 2010). Thus, when WWE sells a DVD of a WWE pay-per-view event to a consumer, the consumer obtains title to that physical copy and has the right under the Copyright Act's first-sale doctrine to re-sell or otherwise dispose of that particular copy. *See id.*; *see also* 17 U.S.C. § 109. Under Section 7.5 of the Booking Contracts, such a transaction would be a "direct sale" of a "Video Product" (i.e., the DVD), and the FAC concedes that WWE has paid royalties to Levy on such sales. *See* FAC ¶ 22 & Ex. 8.

The streaming of WWE pay-per-view and non pay-per-view programs on the WWE Network, in contrast, does not involve the transfer of title or property. Plaintiffs concede the WWE Network is a consumer video <u>streaming</u> network. *See id.* at ¶ 60. For a monthly fee, subscribers can connect to the Internet and do nothing more than view the available content, but they cannot buy it to own. *See* Exs. B, D. Subscribers are not permitted (or able) to download any of the streaming content onto their computers or other electronic devices. *See* Ex. D. Thus, unlike those who purchase a videocassette, CD, DVD or other physical product containing a given pay-per-view, subscribers to the WWE Network are not sold and cannot buy a copy of that or any pay-per-view by watching it on the Network. Unlike the purchaser of a DVD, a consumer who ends his subscription to the WWE Network cannot view the video again. And also unlike the purchaser of a DVD, the WWE Network subscription fee does not entitle subscribers to sell

15

or dispose of any content streamed on the WWE Network.  *See Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 652, 655-56 (S.D.N.Y. 2013) (finding streaming is a "performance" of a work under 17 U.S.C. § 106(4) and not subject to the first sale doctrine).  Subscribers to the WWE Network simply do not obtain title to, or any rights in, WWE's copyrighted works streamed on the WWE Network.  Because WWE does not transfer title to subscribers, nor grant exclusive intellectual property rights to the pay-per-view or non pay-per-view events streamed on the WWE Network, as a matter of law there is no "direct sale" under Paragraph 7.5 of the Booking Contracts.

Significantly, in a pertinent decision involving the royalty rates to be paid on permanent digital downloads through Apple's iTunes store, the Ninth Circuit rejected a similar attempt to stretch the definition of "sale" beyond its ordinary meaning.  *See F.B.T. Prods.*, 621 F.3d at 965-66.  In *F.B.T.*, the plaintiff entered into a contract with the defendant by which it sold its rights to certain master recordings to defendant in exchange for royalty payments.  *See id.* at 961-62.  Defendants agreed to pay a variable royalty rate, with one lower rate for records "sold" in the United States and a different higher royalty rate for licensing the master recordings to third parties.  *See id.*  Defendants then entered into an agreement with Apple by which it granted Apple the right to use the master recordings to produce and sell permanent digital downloads through its iTunes store.  *Id.*  Plaintiff sued defendants for breach of contract after learning that defendants were paying plaintiff the lower royalty rate as if the digital downloads were "sales" rather than a license to Apple.

Interpreting the language of the contract as a matter of law, the Ninth Circuit first held as noted above that the ordinary meaning of "sale," as informed by federal copyright law, is "a transfer in title of an individual copy of a work, or a sale of all exclusive intellectual property

rights in a work." *Id.* at 964-65.  The court then applied that definition to the defendant's agreement with Apple and held that because Apple "did not obtain title to the digital files" but only had permission to use the master recordings for a limited purpose (i.e., to create and distribute permanent downloads in exchange for a periodic payment), defendant "did not 'sell' anything" to Apple.  *Id.* ("permitting third parties to use . . . sound recordings to produce and sell permanent [digital] downloads and mastertones" are not sales).  The Ninth Circuit's decision also is in accord with Connecticut's application of the Uniform Commercial Code, under which a license to reproduce a plaintiff's copyrighted work "cannot be characterized as a sale because it does not contemplate the passage of title from the plaintiff to the defendant."  *Kane v. Fed. Express Corp.*, No. CV990078971S, 2001 WL 1178350, at *2 (Conn. Super. Ct. Aug. 28, 2001) (citing C.G.S. § 42a-2-106); *see also MDY Indus., LLC v. Blizzard Entm't, Inc.*, No. CV-06-2555-PHX-DGC, 2008 WL 2757357, at *8 (D. Ariz. July 14, 2008) ("the transactions between Blizzard and persons who acquire copies of its game client software are licenses, not sales").

The Ninth Circuit's analysis applies with even greater force here because subscribers of the WWE Network are prohibited from downloading, reproducing or distributing any of the streamed content.  *See* Ex. D.  As such, subscribers to the WWE Network do not obtain anything permanent — not even a permanent copy of a digital download — from viewing content available for streaming on the WWE Network.  A subscription to the WWE Network, therefore, is even less of a "sale" than the transaction in *F.B.T.* found not to be a sale.  Without more, Plaintiffs' claims fail.  But there are additional reasons which bolster that conclusion.

### b.       Content on the WWE Network Is Not a "Video Product"

Plaintiffs' claims for royalties on the WWE Network also fail because streaming WWE content on the WWE Network is simply not a "Video Product" as defined in the Booking

Contracts, and the "other technology" language relied upon by Plaintiffs does not change that conclusion. The term "Video Products" is defined in the Booking Contracts to mean "video cassettes, videodiscs, CD ROM, or *other technology, including technology not yet created*." *See* FAC ¶¶ 18, 49, 61 (quoting Paragraph 7.5(a)(i)) (emphasis in original). Under the well-established rule of construction of *ejusdem generis*, "where a particular enumeration is followed by general descriptive words, the latter will be understood as limited in their scope to . . . things of the same general kind or character as those specified in the particular enumeration." *Town of Stratford v. Jacobelli*, 317 Conn. 863, 871-72 (2015); s*ee also 24 Leggett St. Ltd. P'Ship v. Beacon Indus., Inc.*, 239 Conn. 284, 297-98 (1996) (applying *ejusdem generis* to contract interpretation). Paragraph 7.5(a)(i) of the Booking Contracts is subject to the *ejusdem generis* rule of construction because it specifies enumerated types of physical "Video Products", all of which are tangible products which can be bought to own — video cassettes, videodiscs and CD ROMs. Those specific products are followed by the general descriptive words "or other technology, including technology not yet created," which must therefore by construed to refer to similar physical objects. *See Malmsteen v. Universal Music Grp., Inc.*, 940 F. Supp. 2d 123, 133 (S.D.N.Y. 2013) ("when a general phrase, such as 'or other methods,' follows a list of specific terms, the general phrase must be interpreted to refer to items of the same ilk as those specifically listed").[11] The three specific "Video Products" enumerated in Paragraph 7.5 are all physical products which contain specific content that consumers can buy and own. *See Intersport, Inc. v. Nat'l Collegiate Athletic Assoc.*, 885 N.E.2d 532, 541-42 (Ill. App. Ct. 2008)

---

[11] This construction is further supported by the analogous doctrine of *noscitur a sociis*. *See also McCoy v. Comm'r of Pub. Safety*, 300 Conn. 144, 159 (2011) ("Where a provision contains two or more words grouped together, we often examine a particular word's relationship to the associated words and phrases to determine its meaning pursuant to the canon of construction noscitur a sociis."); *Rothstein v. Am. Int'l Grp., Inc.*, 837 F.3d 195, 210 (2d Cir. 2016) (observing "we often interpret a word 'by the company it keeps (the doctrine of *noscitur a sociis*)'") (citation omitted).

(combining the term "video" with other words, such as videocassette or videotape, indicates a specific "use[] of recorded visual content" that requires storage in a tangible form). Thus, under the principle of *ejusdem generis*, the phrase "other technology, including technology not yet created" would include, for example, a Blu-Ray disc which was not available when Plaintiffs entered into the Booking Contracts, but like videocassettes, videodiscs or CD ROMs is a physical product in a tangible form that can be bought to own by a consumer for a specific price per unit. WWE continues to sell such physical products, on which Levy admits he has been paid royalties. *See* FAC ¶ 22 & Ex. 8.

Plaintiffs' attempt to expand the definition of "Video Products" to include streaming video on the WWE Network renders the definition limitless. *See Malmsteen*, 940 F. Supp. 2d at 132-33 (rejecting argument that digital downloads were encompassed within "other methods" of distribution under the contract because contract identified "direct mail, mail order, or in conjunction with TV advertising" as specific means of distribution, digital downloads were not similar to those means of distribution and construing them as such would improperly render the phrase "other methods" limitless).

The distinction between a sale of a video product and the non-sale distribution of copyrighted materials reflects a well-established construct under the law of copyright. Copyright law recognizes the first-sale doctrine, pursuant to which a copyright owner who transfers ownership of a physical medium embodying a copyrighted work loses control over further distribution of that medium. *See* 17 U.S.C. § 109(a); *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1361 (2013). In contrast, a copyright owner who distributes a copyrighted work by other means does not. *See Kirtsaeng*, 133 S. Ct. at 1361 (observing first-sale doctrine does not apply to movie theater owners who obtain copies of movies by lease, rather than sale). Of

19

particular significance to this case, the first-sale doctrine does not apply in the case of streaming media. *See Capitol Records*, 934 F. Supp. 2d at 652, 655-56 (concluding streaming is a "performance" of a work under 17 U.S.C. § 106(4) and not subject to the first-sale doctrine). Because the WWE Network does not provide a right of ownership in a physical medium, but a license to view streaming content to which the first-sale doctrine does not apply, network programs do not meet the contractual definition of "Video Product."

> ### c.  Plaintiffs' Construction Conflicts with Other Provisions of the Booking Contract and Would Lead to an Absurd Result

Contrary to other canons of construction, Plaintiffs' construction of the royalty provisions renders other relevant provisions of the Booking Contracts impossible to apply and would lead to an absurd result. The contracts at issue not only specify that the royalty trigger is a direct sale of a physical product containing specifically identifiable programs, but also set forth the specific formula to calculate the royalty due when there has been a direct sale of such a physical product. It is not possible, however, to perform those calculations for content streamed on the WWE Network. The provisions regarding the calculation of royalty payments do not apply in the context of a subscription service like the WWE Network in which subscribers pay a monthly fee to access a broad range of content rather than outright purchase a copy of a particular program to own and keep. Indeed, a subscriber to the Network in any given month may never view a single match of either Plaintiff, and quite frankly probably does not.

Under the respective contracts, the first step in the royalty calculation is the creation of a talent royalty pool based on 5% of the "Net Receipts" paid to either WCW, Inc. or WWE when there has been a direct sale of one of their pay-per-view or non-pay-per-view videos. *See* FAC, Ex. 3 ¶¶ 7.5(c)(i) & (d), Ex. 13 ¶¶ 7.5(c)(i) & (d). Because there is no "direct sale" of either on the WWE Network, this first step cannot even be performed. Plaintiffs appear to suggest that the

entire annual gross revenue of the WWE Network ($159.4 million in 2015) is the "Net Receipts" for purposes of the first step in the calculation.  *See* FAC ¶¶ 14, 17, 44 & 48.  That revenue stream, however, is all subscription fees, and not one penny of it comes from the direct sale of a video product in which either Plaintiff appeared.  Such a preposterous construction of the Booking Contract and associated windfall would violate the canon that courts "will not construe a contract's language in such a way that it would lead to an absurd result."  *Welch*, 158 Conn. App. at 198; *see also Suffield Dev. Assoc. Ltd. P'ship v. Nat'l Loan Investors, L.P.*, 97 Conn. App. 541, 560 (2006) ("A court should avoid reading a contract in a way that renders it illogical").

Moreover, Plaintiffs' claims for royalties on WCWI pay-per-view events actually go beyond an absurd construction, and would be impossible to calculate under the contractual royalty formula.  If the WCW, Inc. or WWE contracts at issue were construed to obligate WWE to pay royalties for making available past WCWI pay-per-views on the WWE Network, the second step of the royalty calculation under Paragraph 7.5(c)(i) is that payment is to be made from the 5% talent pool pro-rated in the same proportion as was the compensation paid to the wrestler for his appearance to the total of all talent appearing in that pay-per-view.  *See* FAC, Ex. 3 ¶ 7.5(c)(i), Ex. 13 ¶ 7.5(c)(i).  When confined to its intended meaning involving the direct sale by WWE of a WWE produced event in a CD or DVD, the overall calculation can be done easily because WWE knows both the Net Receipts paid to it for the sale of the CD or DVD embodying that performance and the amounts paid to each performer in the underlying event promoted by WWE.  Thus, it can do the pro-rata calculation with ease.  If the Net Receipts were a million dollars, the royalty pool created by the first step is 5% of that amount, or $50,000.  If there were 20 performers in the event paid an aggregate of two million dollars, and a given performer was

21

paid $60,000 for the event, his or her pro-rata share would be 3.0% of the $50,000 royalty pool, or $1,500.  This formula becomes impossible with respect to WCWI pay-per-views because neither WCW, Inc. nor WWE knows what Plaintiffs or other performers were paid by WCWI for performing in its pay-per-views, and thus cannot calculate the pro-rata share any performer would be paid.  The impossibility of the calculation is strong evidence of the absence of any intent to pay royalties when there was no direct sale of a specific program created by WWE.

Other provisions further demonstrate the intent of the contracts.  Paragraph 7.5(d) of the Booking Contracts provides that WWE talent may receive additional royalties from sales of Video Products contingent upon the number of relevant "units" sold.  *See* FAC, Exs. 3 & 13 at § 7.5(d).  Because there are no units sold of pay-per-view and non pay-view events streamed through the WWE Network, the additional royalties provision of Paragraph 7.5(d) would be rendered meaningless under Plaintiffs' interpretation of "Video Products" in violation of the canons of construction.  *See Welch*, 158 Conn. App. at 198 ("every provision must be given effect if it is possible to do so") (citation omitted).

### d.      Plaintiffs Cannot Use the Merger Doctrine to Create an Entitlement to Royalties on WCWI Video Works that Never Existed

There is yet another reason Plaintiffs' royalty claim for WCWI works displayed on the WWE Network fails.  Lacking any contract with anybody which ever promised them royalties for the exploitation of WCWI copyrighted works, Plaintiffs resort to a legal sleight of hand by advocating an incorrect application of the contractual merger doctrine.  Thus, Bagwell alleges that his Booking Contract with WCW, Inc. now also grants royalty rights regarding performances for WCWI and transforms his contract with WCWI from one which did not pay him royalties into a lucrative royalty stream.  *See* FAC, Ex. 14 ¶ 6(c).  His erroneous argument runs as follows:  The WCW, Inc. contract, which pays royalties only on direct sales of WCW,

Inc. video products, supersedes the provisions of the WCWI contract, which pays no royalties at all, by virtue of a merger clause contained in the WCW, Inc. contract.  The WCWI contract is then ignored, and the WCW, Inc. contract magically creates an obligation to pay royalties on WCWI works streamed on the WWE Network even though WCWI works are not WCW, Inc. Video Products and there is no mention of WCWI in the WCW, Inc. contract.  Not only is there no direct sale, as previously demonstrated, but there is also no merger in the first place.  It is well-settled law — admitted and then ignored by the FAC (¶ 39) — that merger clauses only apply to contracts between the same parties.  *See DeGeer v. Gillis*, 707 F. Supp. 2d 784, 792-93 (N.D. Ill. 2010) (collecting cases); *Nat'l Sur. Corp. v. Prairieland Constr., Inc.*, 354 F. Supp. 2d 1032, 1038 (E.D. Mo. 2004); *Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 153 F. Supp. 2d 512, 524 (S.D.N.Y. 2001).  The contract Bagwell signed with WCWI and the later Booking Contract he signed with WCW, Inc. plainly are not contracts between the same parties.  WCWI was a Turner-affiliated corporation with a principal place of business at One CNN Center, Atlanta, Georgia (FAC, Ex. 14), whereas WCW, Inc. was a WWE subsidiary with a principal place of business at 1241 East Main Street, Stamford, Connecticut.  *See id.* at Ex. 13.  Although not spelled out in detail, Plaintiffs appear to assert the analogous claim on behalf of Levy, but his contract with WCWI and the later Booking Contract he signed with WWE likewise are not contracts between the same parties.  Bagwell's and Levy's contracts with WCWI, therefore, cannot be merged into their Booking Contracts with WCW, Inc. and WWE, respectively.

Even assuming *arguendo* that the merger clause could apply to contracts involving different parties, it would not create any obligation on the part of WCW, Inc. or WWE to pay royalties on works previously created by WCWI in any event.  Bagwell's Booking Contract with

23

WCW, Inc. only obligated WCW, Inc. to pay royalties specified therein on works created by WCW, Inc., and Bagwell admits there were no such works created by WCW, Inc. that would entitle him to royalties.  *See* FAC ¶ 32(iii)(a).  Similarly, Levy's Booking Contract with WWE made clear that WWE was only obligated to pay the royalties specified therein on works created by WWE.  Nothing in those Booking Contracts promise or even mention the payment of royalties on works created by others, such as those created previously by WCWI.  Neither WWE nor any of its affiliates assumed any of WCWI's contractual obligations to Bagwell or Levy with respect to its video library which, as noted, never obligated WCWI to pay royalties in the first place.[12]  Accordingly, WCW, Inc. and WWE could not have breached any contract by not making royalty payments to them for displaying WCWI works on the WWE Network.

**C.    Plaintiffs' Breach of Contract Claims for Royalties on Streaming of WCWI Works on the WWE Network Must Be Dismissed for Additional Reasons**

Plaintiffs' claim that they are entitled to royalties on streaming of  works previously created by WCWI on the WWE Network fails for at least two other independent reasons:  (1) Bagwell's claims against WCW, Inc. must be dismissed because it no longer exists as an entity and therefore lacks the capacity to be sued; and (2) Plaintiffs have failed to plead facts sufficient to hold WWE liable for the debts and liabilities of WCWI under a theory of successor liability.

**1.    Bagwell's Claims Against WCW, Inc. Must Be Dismissed Because It No Longer Exists**

The Court must dismiss all claims asserted against WCW, Inc. because it no longer exists

---

[12] Oddly, Plaintiffs allege that "[a]s copyright owner of the WCW video library, WWE must honor Plaintiff Bagwell's prior existing contractual understandings in the WCW video library" and "Plaintiff's understandings attached to [sic] WCW video library do not extinguish with a copyright sale."  FAC ¶¶ 36 & 39.  There is no basis or authority for these naked and incorrect legal conclusions.  Moreover, Plaintiffs' "prior existing contractual understandings in the WCW video library" were that they would ***not*** receive royalties on use of those copyrighted works by WCWI.  *See id.* at Ex. 14 ¶ 6(c); Ex. A ¶ 6(c).

as an entity and consequently lacks the capacity to be sued.[13]  "[The] existence and the capacity

of a corporation to be sued are determined by the law of the state of incorporation."  *Sevits v.*

*McKiernan-Terry Corp.*, 264 F. Supp. 810, 811 (S.D.N.Y. 1966); *see also* Fed. R. Civ. P.

17(b)(2) (capacity to be sued is determined "for a corporation, by the law under which it was

organized").  WCW, Inc. was incorporated in Delaware (FAC ¶ 7).  Under Delaware law, it is

well-established that the non-surviving corporation in a merger ceases to exist and therefore

lacks the capacity to be sued.  *See* 8 Del. C. § 259(a) ("When any merger or consolidation shall

have become effective under this chapter, for all purposes of the laws of this State the separate

existence of all the constituent corporations, or of all such constituent corporations except the

one into which the other or others of such constituent corporations have been merged, as the case

may be, shall cease."); *Sevits*, 264 F. Supp. at 811-12 ("[U]nder Delaware law it is settled that

the separate corporate existence of a constituent corporation ceases upon merger and the

emerging corporation is the only corporation with the capacity to be sued and process cannot be

served on the constituent corporation.").

WCW, Inc. is not a proper defendant in this action because it no longer exists.  WCW,

Inc. was the non-surviving corporation of a merger that occurred on or about August 30, 2011.

*See* Ex. E.[14]  Because WCW, Inc. thereafter ceased to exist as a legal entity with the capacity to

be sued, all claims against it must be dismissed.  *See Sevits*, 264 F. Supp. at 811-12 (granting

motion to dismiss non-surviving corporation following a merger because it ceased to exist and

could not properly be served with process, the court could not have jurisdiction over it, and the

---

[13] In fact, no service has been made on WCW, Inc. and could not be made.

[14] The Court can take judicial notice of public records and corporate filings with the Delaware Secretary
of State's office on a motion to dismiss.  *See Cayo v. Stop & Shop Supermarket Co.*, No. 3:12cv638
(WWE), 2012 WL 5818862, at *1 (D. Conn. Nov. 15, 2012).

complaint could not state a claim against it); *MPEG LA, L.L.C. v. Toshiba Am. Info. Sys., Inc.*, No. 15-CV-3997 (JMF), 2015 WL 6685523, at *6 (S.D.N.Y. Oct. 29, 2015) (collecting cases under Delaware law holding that a company that "merges into another one ceases to exist and that claims brought against that company should be dismissed").[15]

### 2.   Plaintiffs Fail to State a Claim for Successor Liability

Plaintiffs cannot assert a successor liability claim against WWE based on their allegations that WWE "purchased the World Championship Wrestling, Inc. video library" and therefore is "liable for the debts and liabilities of its predecessor World Championship Wrestling, Inc.," including any alleged royalty obligations to Plaintiffs with respect to its video library.  FAC ¶¶ 147-49.  Fatally, Plaintiffs do not and cannot allege that WCWI owed any royalty obligations to Plaintiffs with respect to video products created by WCWI in which Plaintiffs appeared in the first instance.  Furthermore, Plaintiffs do not and cannot plead facts to establish <u>any</u> of the exceptions to the general rule that the mere purchase of assets of one corporation by another does not make the purchaser liable for the debts and liabilities of the seller.

### a.   Plaintiffs Fail to Plead the Liability of the Alleged Predecessor

As a threshold matter, Plaintiffs must plead that the alleged predecessor corporation (WCWI) is liable to them in order to claim that WWE is liable to them as its successor.[16]

---

[15] Because WCW, Inc. no longer exists, Bagwell also cannot pierce the corporate veil of WCW, Inc. and attempt to hold WWE liable for the purported obligations of WCW, Inc.  *See, e.g., Musselman v. Jasgur*, 446 B.R. 572, 589 (M.D. Fla. Bankr. 2011) (holding that plaintiff cannot pierce the corporate veil of an entity after it ceased to exist).

[16] "In a diversity action such as this one, a federal court must apply the choice of law rules of the forum state.  In Connecticut, the Court must select the local law of the state having the 'most significant relationship' to the occurrence and the parties to the dispute."  *Greystone Cmty. Reinvestment Ass'n v. Berean Capital, Inc.*, 638 F. Supp. 2d 278, 286 (D. Conn. 2009) (addressing choice of law applicable to successor liability claim).  While various different states' laws are potentially relevant to the entities and transactions at issue, there is no need to definitively resolve the choice of law issue for purposes of this Motion because the successor liability claim is not and cannot be pled adequately under the laws of any of these states.  *See Lumbermens Mut. Cas. Co. v. Dillon Co.*, 9 Fed. Appx. 81, 83 (2d Cir. 2001) (holding

"[S]uccessor liability does not create a new cause of action against the purchaser so much as it transfers the liability of the predecessor to the purchaser." *Robbins v. Physicians for Women's Health, LLC*, 311 Conn. 707, 716 (2014) (internal quotation marks omitted). "[T]he liability of a successor corporation is derivative in nature and the successor may be held liable for the conduct of its predecessor only to the same extent as the predecessor." *Id*. at 715; *see also City of Syracuse v. Loomis Armored US, LLC,* 900 F. Supp. 2d 274, 290 (N.D.N.Y. 2012) ("'[S]uccessor liability' is not a separate cause of action but merely a theory for imposing liability on a defendant based on the predecessor's conduct."). Here, Plaintiffs do not and cannot plead that WCWI had any obligation to pay them royalties for sales of video products that it created. Indeed, Plaintiffs' WCWI Merchandising Agreements expressly provide that WCWI does <u>not</u> owe royalty payments for sales of its video products. *See* FAC, Ex. 14 ¶ 6(c); Ex. A ¶ 6(c). In the original Complaint, Bagwell squarely admitted that when WWE acquired the video library of WCWI, sales of WCWI copyrighted works which included his performances were not subject to royalty payments because he had assigned his intellectual property rights to WCWI for other benefits, not video royalties.[17] *See* Dkt. 1 ¶ 42. The FAC states that Levy's royalty claim based on WCWI archival footage being placed on the WWE Network is on the same footing as Bagwell's, and Levy has not pled the existence of any contract with WCWI which paid him royalties at all. In fact, Levy's WCWI Merchandising Agreement, like Bagwell's WCWI

_____

that there is no need to perform a choice of law analysis unless there is an outcome determinative conflict between the applicable laws of the states with a potential interest in the case).

[17] Such judicial admissions are binding on a plaintiff in adjudicating a motion to dismiss an amended complaint. *See Austin v. Ford Models, Inc.*, 149 F.3d 148, 155 (2d Cir. 1998) (stating that the plaintiff could not "erase" admissions in a prior complaint by omitting them from an amended complaint); *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 707 (2d Cir. 1989) ("The amendment of a pleading does not make it any the less an admission of the party."); *Sulton v. Wright*, 265 F. Supp. 2d 292, 295 (S.D.N.Y. 2003) ("Admissions in earlier complaints remain binding when a plaintiff files subsequent pleadings. As such, the Court may consider them on a motion to dismiss under Rule 12(b)(6).") (internal citation omitted).

Merchandising Agreement, expressly provides that he was <u>not</u> entitled to such royalties. *See* Ex. A. Because WCWI was not liable to either Plaintiff for royalty obligations, WWE cannot be liable for such obligations as an alleged successor corporation.

      **b.**     <u>**Plaintiffs Fail to Adequately Plead Successor Liability Against WWE**</u>

"[T]he mere purchase of assets by a second company, even the purchase of all such assets, does not in and of itself make the purchasing corporation liable as a successor." *Pirrotti v. Respironics, Inc.*, No. 3:11-CV-00439, 2013 WL 321772, at *7 (D. Conn. Jan. 28, 2013) (Hall, J.). Courts have recognized four limited exceptions to the general rule of non-liability where (1) the purchaser expressly or impliedly agreed to assume the debts and liabilities of the seller; (2) there is a merger or *de facto* merger of the two corporations; (3) the purchaser is a "mere continuation" of the selling corporation, or (4) the transaction was entered into for the fraudulent purpose of escaping liability. *See Ricciardello v. J.W. Gant & Co.*, 717 F. Supp. 56, 57-58 (D. Conn. 1989). Plaintiffs fail to plead facts establishing any of these exceptions here.

On the contrary, the Court of Appeals of Georgia previously reviewed the WCWI-WCW, Inc. transaction and found that WCWI merely "sold or assigned some of its assets to a wholly-owned subsidiary of WWE known as W. Acquisition Company. Those assets included most of its intellectual property rights . . . . The assigned intellectual property rights included the trade name World Championship Wrestling, so after the asset purchase [WCWI] changed its name to Universal Wrestling Corporation (Old WCW), and W. Acquisition Company changed its name to WCW, Inc. (New WCW)." *Marvel Enters., Inc. v. World Wrestling Federation Entm't, Inc.*, 610 S.E.2d 583, 586 (Ga. App. 2005). The Georgia Secretary of State's records confirm that Universal Wrestling Corporation remains an active corporation with its principal office at One CNN Center, Atlanta, Georgia. *See* Ex. F. Further, Plaintiffs' Connecticut-based counsel

28

admitted in a complaint he recently filed in a different case that "[t]he WCW owned by AOL Time Warner subsequently changed its name to Universal Wrestling Corporation and ceased operating as a professional wrestling entertainment entity, existing solely to oversee existing contractual obligations and legal disputes." *Laurinaitis v. World Wrestling Entm't, Inc.*, No. 3:15-cv-01074-VLB, Dkt. 252 at ¶ 583 n.82. Because WCWI indisputably continued to exist after the transaction with WCW, Inc., Plaintiffs cannot plead facts to plausibly allege successor liability against WWE and that claim must be dismissed with prejudice. *See Douglas v. Stamco*, 363 Fed. Appx. 100, 102 (2d Cir. 2010) (granting motion to dismiss without leave to replead where plaintiff could not plead facts demonstrating any exception to general rule of non-liability).

## D.    Counts IV and VIII Alleging Breach of Contract Fail

Count IV alleges that WWE failed to pay royalties to Plaintiffs within 90 days following the end of quarter and Count VIII alleges that Bagwell was not permitted to examine WWE's books and records regarding Network revenues. Both claims must be dismissed as to Bagwell because, as demonstrated herein, he was not contractually owed any royalties by either WCW, Inc. or WWE and thus there was no contractual right to examine WWE's books and records in the first place. Count IV must be dismissed as to Levy as well because he failed to satisfy the conditions precedent for filing a claim for royalties under the terms of his Booking Contract or to exhaust the remedies set forth in his Booking Contract prior to bringing such a claim. *See* FAC, Ex. 3 ¶¶ 7.12(b), (d). Furthermore, his claim is actually for interest on a nominal amount in a single quarter and is *de minimis*.[18] *See Ringgold v. Black Entm't TV, Inc.*, 126 F.3d 70, 74 (2d

---

[18] For the Court's information, the relevant background of this claim is as follows. Despite knowing that WWE had retained counsel regarding the WWE Network royalty claim when the *Goguen* case was filed and then dismissed, Attorney Peterson thereafter directly called the WWE employee who does royalty

Cir. 1997); *Fellows v. Martin*, 217 Conn. 57, 68 (1991).

**E.      Plaintiffs' Declaratory Judgment Counts Must Be Dismissed**

Counts V and VI must be dismissed because a declaratory judgment is a remedy and not

a cause of action.  See *In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993).

In addition, the request for a declaratory judgment is unnecessary and duplicative of Plaintiffs'

breach of contract claims.  *See Umbach v. Carrington Inv. Partners*, No. 3:08 CV 484 (EBB),

2009 WL 413346, at *4 (D. Conn. Feb. 18, 2009) (finding declaratory judgment did not "serve[]

a useful purpose or [was] the best way to finalize the controversy" where plaintiff alleged

overlapping substantive causes of action).

**F.      Plaintiffs' Non-Contractual State Law Counts Are Dependent on the Flawed WWE
Network Royalty Claim and Therefore Should Be Dismissed as Well**

**1.      Plaintiffs' Breach of Fiduciary Duty Claim (Count II) Should Be Dismissed**

Plaintiffs' attempt to multiply their invalid breach of contract claim into a tort for breach

of fiduciary duty based on the same underlying conduct.  Because Plaintiffs' breach of contract

claim fails for the reasons described at length above, Plaintiffs' breach of fiduciary duty claim

necessarily fails with it.  The breach of fiduciary duty claim fails for the additional reason that

Plaintiffs' Booking Contracts reflect an arms-length business relationship.  Indeed, Bagwell's

contract indicates in the "Notices" section that he was represented by counsel (Brad Small, Esq.)

in the negotiation of his contract.  FAC, Ex. 13 ¶ 13.6.  Such an arms-length business

relationship does not give rise to fiduciary duties as a matter of law.  *See St. Bernard Sch. of

Montville, Inc. v. Bank of Am.,* 312 Conn. 811, 836 (2014); *Hi-Ho Tower, Inc. v. Com-Tronics,*

---

accounting regarding Bagwell.  During that conversation, the WWE employee advised Attorney Peterson
that his practice is to accrue royalties for a given talent until the amount reaches $50, at which point all
accrued sums are paid.  Thus, Levy's claim in reality is for nothing more than the underlined interest on less than $50
withheld until the sum reached $50.

*Inc.*, 255 Conn. 20, 39 (2000); *see also Coffman v. Breeze Corp.*, 323 U.S. 316, 323 (1945) (no

fiduciary relationship created by alleged royalty obligation); *Estate of Joe Brown v. ARC Music

Grp.*, 523 Fed. Appx. 407, 410 (7th Cir. 2013) (same).

> ### 2.   Plaintiffs' CUTPA Claim (Count III) Should Be Dismissed
>
> #### a.   A Breach of Contract Claim Is Not a CUTPA Violation

A mere breach of contract claim is insufficient to establish a CUTPA violation, especially

when the CUTPA count simply incorporates the breach of contract claim and does not set forth

how or in what respect the defendant's activities are either immoral, unethical, unscrupulous or

offensive to public policy.  *See Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1038-

39 (2d Cir. 1995) ("a simple contract breach is not sufficient to establish a violation of CUTPA")

(internal quotation marks and citation omitted); *Omni Corp. v. Sonitrol Corp.*, 303 Fed. Appx.

908, 910 (2d Cir. 2008) ("[T]o pursue a CUTPA claim, [the plaintiff] must demonstrate

aggravating circumstances beyond a simple breach of contract."); *Fabri v. United Techs. Int'l,

Inc.*, 387 F.3d 109, 122 n.3 (2d Cir 2004) (stating that the Second Circuit has held that "a simple

breach of contract does not violate CUTPA and that the plaintiff must show aggravating

circumstances"); *Priority Sales Mgmt., Inc. v. Carla's Pasta, Inc.*, No. 3:10-cv-1918(CFD), 2011

WL 3819748, at *3 (D. Conn. Aug. 26, 2011) (granting motion to dismiss CUTPA claim because

the claim was nothing more than a "simple breach of contract" claim and plaintiff failed to

explain how defendant's conduct violated public policy or was unfair or deceptive); *Aztec

Energy Partners, Inc. v. Sensor Switch, Inc.*, 531 F. Supp. 2d 226, 232 (D. Conn. 2007) (a simple

breach of contract "does not offend traditional notions of fairness," "cannot be described as

'immoral, unethical, oppressive, or unscrupulous,'" and does not constitute a CUTPA violation)

(citation omitted); *IN Energy Solutions, Inc. v. Realgy, LLC*, 114 Conn. App. 262, 274-75 (2009)

(affirming trial court's finding of no CUTPA violation even though plaintiff "may have established a claim for breach of contract by showing that [defendant] did not pay commissions due" because "a simple breach of contract does not amount to a violation of CUTPA in the absence of substantial aggravating circumstances.").

Here, Plaintiffs merely incorporate the breach of contract claim into the CUTPA count and then label WWE's failure to pay royalties for the WWE Network as "immoral, oppressive, [and] unscrupulous."  Such conclusory recitation of the elements of a CUTPA action without factual allegations to support them is insufficient to state a claim. *See Priority Sales Mgmt.,* 2011 WL 3819748, at *3 ("Courts have held that merely stating that the defendant's conduct violates public policy or is unfair and/or deceptive is not sufficient to sustain a CUTPA claim.") (internal quotation marks and citations omitted).

### b.   Plaintiffs Lack a Relationship With WWE Within the Scope of CUTPA

Plaintiffs also lack a relationship with WWE within the scope of CUTPA.  The Connecticut Supreme Court has recognized, "it strains credulity to conclude that CUTPA is so formless as to provide redress to any person, for any ascertainable harm, caused by any person in the conduct of any 'trade' or 'commerce.'"  *Jackson v. R.G. Whipple, Inc.*, 225 Conn. 705, 725-26 (1993).  When the plaintiff is not a consumer and the parties are not direct competitors, the plaintiff "must have some type of commercial relationship with the alleged wrongdoer — commercial relationship not being so much a business relationship but some kind of relationship in the marketplace so that the particular acts of wrongdoing alleged will interfere with fair and open competition in that particular marketplace."  *Shehu, LLC v. Adams*, No. CV1360177105, 2014 WL 567832, at *3 (Conn. Super. Ct. Jan. 17, 2014).

Applying these principles, Connecticut courts have repeatedly held that "[a]n

32

employment relationship does not constitute trade or commerce for purposes of CUTPA" and thus, "if the ultimate injury for which redress is sought occurs within the zone of the employment relationship, a claim under CUTPA will not lie." *DelMonaco v. Albert Kemperle, Inc.,* No. NNHCV146045251S, 2014 WL 7525518, at *4 (Conn. Super. Ct. Nov. 26, 2014) (citations omitted); *United Components, Inc. v. Wdowiak*, 239 Conn. 259, 264-65 (1996) (affirming trial court's finding that plaintiff had no viable CUTPA claims where the claim involved conduct relating to an employer-employee relationship and did not rise to the level of trade or commerce cognizable under CUTPA). An alleged injury occurs within the "zone of the employment relationship" when the alleged misconduct "affected a term or condition of employment." *DelMonaco*, 2014 WL 7525518, at *4 (striking CUTPA claim based on claim that enforcement of non-compete agreement was illegal restraint on trade). These principles apply with the same force to an independent contractor relationship, as existed here. *See Lockwood v. John J. Carta Jr., LLC*, No. CV106001656, 2011 WL 4716294, at *2 (Conn. Super. Ct. Sept. 20, 2011) ("While plaintiff was technically an independent contractor rather than an employee, to find that the parties' relationship is governed by CUTPA is to extend the Act's reach into as yet uncharted territory, a step the court is unwilling to take.").

In particular, courts have uniformly rejected CUTPA claims predicated on a defendant's alleged failure to pay for services provided by a plaintiff, whether as an employee or independent contractor. *See Conn. Light & Power Co. v. Paradigm Health Ctr. Of Torrington, LLC*, No. NNHCV146044661S, 2014 WL 4746841, at *3-4 (Conn. Super. Ct. Aug. 18, 2014) (granting motion to strike CUTPA claim premised on failure to pay for services provided); *Lockwood*, 2011 WL 4716294, at *2 (denying claims under CUTPA for unpaid invoices for services provided by independent contractor); *Buying Triangle, LLC v. Hartford Fire Ins. Co.*, No.

33

CV106015469S, 2011 WL 3483469, at *4-5 (Conn. Super. Ct. July 7, 2011) (failure to pay outside contractor for professional services "which would aid the defendant in the conduct of its primary business, but cannot be defined as more than incidental to that business" does not state a basis of a CUTPA claim); *Kelly v. Noble Env't Power, LLC*, No. CV085005444, 2009 WL 3087217, at *7-9 (Conn. Super. Ct. Sept. 2, 2009) (striking CUTPA claim by independent contractor based on failure to pay for services because such behavior was not "out of the realm of the employment context and into the realm of anti-competitive behavior covered by CUTPA" and because the alleged behavior was incidental to defendants' primary trade or commerce); *LaVallee v. Capital Elec. Constr., LLC*, No. CV020512659S, 2004 WL 870667, at *2 (Conn. Super. Ct. Mar. 1, 2004) (no CUTPA claim based on failure to pay commissions to independent contractor because there was no competitive injury).  The mere failure to pay royalties would not be a CUTPA violation even if such royalties were due.  There is obviously no CUTPA violation for not paying Network royalties when none were due in the first place.

### c.    Plaintiffs Lack Standing to Pursue a Nationwide CUTPA Claim

Pursuant to C.G.S. Section 42-110g(b), a person may bring a CUTPA class action only "on behalf of themselves and other persons similarly situated who are residents of [Connecticut] or injured in [Connecticut] . . . ."  This Court has held that if the lead plaintiff is not a resident of Connecticut, he "may not bring a class action because [he] could not be representative of class members with the statutorily required in-state residency or injury characteristics."  *Fraiser v. Stanley Black & Decker, Inc.*, 109 F. Supp. 3d 498, 505 (D. Conn. 2015) (quoting *Metro. Enter. Corp. v. United Techs. Int'l., Corp.*, No. 3:03CV1685 (JBA), 2004 WL 1497545, at *4 (D. Conn. June 28, 2004)); *see also In re Trilegiant Corp.*, 11 F. Supp. 3d 82, 112-19 (D. Conn. 2014) (granting motion to strike CUTPA nationwide class action allegation where named plaintiffs

34

were not Connecticut residents and were not injured in Connecticut).  Because Plaintiffs

admittedly are both residents of Georgia, their CUTPA claims fail.

>    **3.**  **Plaintiffs Cannot Assert an Unjust Enrichment Claim (Count IX) Based on Incorporated Allegations of an Express Contract**

"To state a claim of unjust enrichment, a plaintiff must show (1) defendant was benefited,

(2) defendant unjustly failed to pay plaintiff for the benefits, and (3) the failure to pay was to

plaintiff's detriment.  Additionally, lack of a remedy under the contract is a precondition for

recovery based on unjust enrichment."  *Alliance Grp. Servs., Inc. v. Grassi & Co.*, 406 F. Supp.

2d 157, 166 (D. Conn. 2005) (internal citation omitted).  Plaintiffs' unjust enrichment fails to

state a cognizable claim.

Under Connecticut law, a claim for unjust enrichment cannot stand where there is an

express contract between the parties to the lawsuit which covers the same subject-matter that

forms the basis for the unjust enrichment claim.  *Meaney v. Conn. Hosp. Ass'n, Inc.*, 250 Conn.

500, 517-18 (1999) (no unjust enrichment claim against employer for failure to pay certain

compensation when there existed express employment contract); *Alstom Power, Inc. v. Schwing

Am., Inc.*, No. 3:04cv1311 (JBA), 2006 WL 2642412, at *5 (D. Conn. Sept. 14, 2006) ("where

an express contract exists, restitution for unjust enrichment, a quasi contractual remedy, is

unavailable"); *Alliance Grp. Servs.*, 406 F. Supp. 2d at 166 ("The quasi-contractual remedy of

unjust enrichment is only available when no express contractual obligation exists.").[19]  Here,

---

[19] Paragraph 154 of the unjust enrichment count "incorporate[s] by reference each and every prior and subsequent allegation as though fully set forth at this point," including the paragraphs conceding Plaintiffs' entry into the Booking Contracts.  An unjust enrichment claim must be dismissed where a plaintiff incorporates allegations of an express contract between the parties.  *See N. Am. Technical Servs. Inc. v. V.J. Techs., Inc.*, No. 10 CV 1384 (AWT), 2011 WL 4538069, at *5-6 (D. Conn. Sept. 29, 2011) ("Because lack of an express contract is a precondition to recovery based on unjust enrichment, allegations to the contrary incorporated into the count require dismissal"); *J&N Elec., Inc. v. Notkins*, No. CV085020144, 2009 WL 1607591, at *1-2 (Conn. Super. Ct. May 20, 2009) (striking unjust enrichment count that incorporated allegations of an express contract); *William Raveis Real Estate v. Cendant*

there is no question that the subject matter of Plaintiffs' entitlement to royalties on the exploitation of WWE's owned copyrighted works is covered by contract.  Indeed, both Plaintiffs claim contractual entitlement, albeit erroneously.  There can be, therefore, no unjust enrichment claim.  Moreover, if one set aside the contracts, Plaintiffs would have no claim to payment at all; there is no requirement that a performer be paid for the sale of copyrighted works in which his performance is embodied.  Indeed, Plaintiffs' contracts with WCWI expressly reflected that no royalties would be due for the exploitation of those works.  Because there is no basis for any allegation that WWE or WCW, Inc. was <u>unjustly</u> enriched, but for Plaintiffs' contention that royalties were due under their Booking Contracts, the unjust enrichment claim cannot succeed.

### 4. All of Bagwell's Non-Contractual State Law Claims Are Preempted by Copyright Law

It is well-established that a plaintiff's assertion of state law claims against a defendant's mere reproduction, distribution, or display of a performance by the plaintiff captured on film is preempted by federal copyright law.  *See Ray v. ESPN, Inc.*, 783 F.3d 1140, 1142-44 (8th Cir. 2015) ("[T]he crux of Ray's case is that ESPN re-telecast Ray's filmed performances.  Thus, because Ray's state-law rights have been 'infringed by the mere act of reproduction, performance, distribution or display' of his performances, his state-law rights are equivalent to the exclusive rights 'within the general scope of copyright.'") (citations omitted); *Somerson v. McMahon*, 956 F. Supp. 2d 1345, 1355 (N. D. Ga. 2012) (dismissing state-law claims as preempted because "plaintiff's complaints are based on WWE reproducing the video recordings depicting him, preparing derivative works based on the video recordings of him, and distributing

---

*Mobility Corp.*, No. CV054002709S, 2005 WL 3623815, at *3 (Conn. Super. Ct. Dec. 6, 2005) ("In short, the plaintiff may plead unjust enrichment in the alternative, but this is not accomplished by incorporating into this count all the allegations of an express contract.  Such a complaint does not involve alternative pleading, but involves legally inconsistent pleading.").

copies of these video recordings to the public, all of which are encompassed by copyright law.");
*Blood v. Titan Sports, Inc.*, No. 3:94CV307-P, 1997 U.S. Dist. LEXIS 24485 (W.D.N.C. May
13, 1997) (granting WWE summary judgment because state law claims were preempted by
copyright law governing videocassette tapes at issue).

The original Complaint demonstrated that Plaintiffs are acutely aware that their attempt
to burden WWE's exploitation of its copyrighted works conflicts with the copyright preemption
doctrine.  Indeed, that Complaint specifically noted that the prior lawsuits by wrestlers against
WWE and ESPN seeking royalties were not successful due to preemption.  *See* Dkt. 1 ¶ 50.  It
further admitted that WWE "owns the right to WCW copyrighted works featuring Plaintiff's
intellectual property" (*Id.* ¶ 53), but contended that WWE's rights are subject to the concocted
contract based royalty arguments debunked above.  Because Plaintiffs' breach of contract claims
fail for the reasons discussed herein, all other common law claims present a garden variety
preemption issue governed by the controlling law cited above.

## IV.    CONCLUSION

Plaintiffs' FAC should be dismissed in its entirety with prejudice, and WWE awarded its
attorneys' fees and costs under the Copyright Act.

<div style="margin-left:40%">

DEFENDANT WORLD WRESTLING
ENTERTAINMENT, INC.,

By:   _/s/  Jerry S. McDevitt_____
    Jerry S. McDevitt (pro hac vice)
    Curtis B. Krasik (pro hac vice)
    K&L GATES LLP
    K&L Gates Center
    210 Sixth Avenue
    Pittsburgh, PA 15222
    Phone: (412) 355-6500
    Fax: (412) 355-6501
    Email: jerry.mcdevitt@klgates.com
    Email: curtis.krasik@klgates.com

</div>

Jonathan B. Tropp (ct11295)
Jeffrey P. Mueller (ct27870)
DAY PITNEY LLP
242 Trumbull Street
Hartford, CT 06103
Phone: (860) 275-0100
Fax: (860) 275-0343
Email: jbtropp@daypitney.com
Email: jmueller@daypitney.com

Its Attorneys.


## CERTIFICATION

I hereby certify that on December 2, 2016 a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

 _/s/ *Jeffrey P. Mueller*_____