**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MARCUS BAGWELL and SCOTT LEVY, individually and on behalf of all others similarly situated, | : : : | |
| Plaintiffs, | : | CIVIL ACTION NO. 3:16–cv–1350 (JCH) |
| | : | |
| v. | : | |
| | : | MAY 5, 2017 |
| WORLD WRESTLING ENTERTAINMENT, INC. et al., | : : | |
| Defendants. | : | |

**RULING RE: DEFENDANT'S MOTION TO DISMISS (DOC. NO. 44)**

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................ 2

II.  FACTS ............................................................................................................... 4

  A.  Background ..................................................................................................... 4

  B.  Plaintiffs' Booking Contracts ......................................................................... 6

III. LEGAL STANDARD........................................................................................... 8

IV.  DISCUSSION .................................................................................................... 8

  A.  Bagwell's Claims against WCW, Inc. ............................................................. 9

  B.  Count I: Failure to Pay Royalties on WWE Network Proceeds .................... 11

    1.  "Direct Sale" ............................................................................................. 13

    2.  "Video Product"......................................................................................... 16

    3.  Conformity of Plaintiffs' Interpretation with Other Provisions of the Booking Contracts...................................................................................................... 20

    4.  Merger Doctrine ........................................................................................ 22

  C.  Counts IV and VIII: Breach of Contract Claims............................................ 23

  D.  Count VII: Successor Liability ...................................................................... 25

  E.  Counts V and VI: Declaratory Judgments.................................................... 27

  F.  Preemption of Non-Contractual State Law Claims ...................................... 28

  G.  Count II: Breach of Fiduciary Duty .............................................................. 31

  H.  Count III: CUTPA Violations ........................................................................ 33

  I.   Count IX: Unjust Enrichment ....................................................................... 37

V.  CONCLUSION................................................................................................... 39

## I.   INTRODUCTION

Plaintiff Marcus Bagwell ("Bagwell") began this case on August 9, 2016, by filing both a class action complaint against defendant World Wrestling Entertainment, Inc. ("WWE"), see generally Class Action Compl. (Doc. No. 1), and a Motion for Class Certification, see generally Mot. for Class Certification (Doc. No. 2).  In September 2016, Bagwell filed a Motion to Amend Complaint, see generally Mot. to Amend Compl. (Doc. No. 11), and an Amended Motion for Class Certification, see generally Am. Mot. for Class Certification (Doc. No. 12).  WWE opposed the Motion to Amend.  See generally Def.'s Mem. of Law in Opp'n to Pl.'s Mot. to Amend Compl. (Doc. No. 15).  However, the court granted the Motion to Amend and directed Bagwell to docket the Amended Complaint.  See Minute Entry (Doc. No. 37).  Notably, the Amended Complaint included an additional plaintiff—Scott Levy ("Levy" and, with Bagwell, "plaintiffs")—and defendant—WCW, Inc. (with WWE, "defendants").  See First Am. Class Action Compl. ("FAC") (Doc. No. 35) at 1.  The parties subsequently filed a Joint Stipulation, whereby plaintiffs withdrew their pending Motions for Class Certification (Doc. Nos. 2 & 12), in anticipation of defendants filing a Motion to Dismiss the FAC.  See Joint Stipulation & Notice of Withdrawal of Mots. (Doc. No. 41) at 1.

The FAC contains nine counts.  Count I alleges breach of contract, stemming from WWE's refusal to pay royalties on money derived from the WWE Network.  See FAC ¶¶ 112–20.  Count II alleges a breach of fiduciary duty, grounded in the same failure to pay royalties.  See id. ¶¶ 121–26.  Count III claims that WWE violated the Connecticut Unfair Trade Practices Act ("CUTPA").  See id. ¶¶ 127–33.  Count IV asserts another breach of contract claim, this one stemming from WWE's failure to pay

royalties within ninety days of the end of each fiscal quarter.  See id. ¶¶ 134–41.

Counts V and VI both seek declaratory relief, the first asking for a declaration that the

WWE Network qualifies as a "WCW Video Product" and a "WWF Video Product" under

the relevant contracts, and the latter for a declaration that Bagwell is paid royalties

because of his 2001 contract with a WWE-affiliated entity.  See ¶¶ 142–45.  Next,

Count VII alleges that WWE is liable for the "debts and liabilities" of World

Championship Wrestling, Inc.  See id. ¶¶ 150–53.  Count VIII asserts a third claim for

breach of contract, arising out of WWE's refusal to allow Bagwell to examine WWE's

books and records.  See id. ¶¶ 150–53.  Last, Count IX claims that WWE has been

unjustly enriched.  See id. ¶¶ 154–57.

Shortly after plaintiffs filed the FAC, WWE filed the Motion to Dismiss that is now

pending before the court.  See generally Def. World Wrestling Entm't, Inc.'s Mot. to

Dismiss First Am. Compl. ("Motion") (Doc. No. 44).  Plaintiffs opposed the Motion, see

generally Pls.' Answering Br. In Opp'n To Def. WWE's 12(b)(6) Mot. to Dismiss Pls.'

Am. Compl. ("Opp'n") (Doc. No. 46), and WWE replied in a timely manner, see

generally Def. WWE's Reply in Further Supp. of Mot. to Dismiss Am. Compl. ("Reply")

(Doc. No. 47).

For the reasons set forth below, the Motion is **GRANTED IN PART AND**

**DENIED IN PART**.

## II.   FACTS[1]

### A.   Background

Bagwell and Levy were professional wrestlers for just over a decade, beginning

in the early 1990s.  See FAC ¶¶ 8–9.  For varying lengths of time, plaintiffs worked for

World Championship Wrestling, Inc. ("WCWI"), a subsidiary of Turner Broadcast

System, Inc.[2]  See id.  In 2001, "WWE announced the acquisition" of WCWI, including

the rights to the name "WCW," copyrights in WCWI's video library, and certain WCW

performer contracts.  See id. ¶ 30.[3]

In June 2000, Levy entered into a "Booking Contract" with WWE.[4]  The language

in that contract—set forth below, see infra Part II.B—is at issue in this case.  However,

in January 2003, Levy and WWE agreed to an "Early Contract Release."  See FAC

¶ 24.  That agreement terminated the June 2000 Booking Contract and any prior

---

[1] When adjudicating a motion to dismiss pursuant to Rule 12(b)(6), the court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in the plaintiff's favor."  Crawford v. Cuomo, 796 F.3d 252, 256 (2d Cir. 2015) (citing Johnson v. Priceline.com, Inc., 711 F.3d 271, 275 (2d Cir. 2013)). The court may consider the facts "as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007).  This description of the facts is limited to those necessary to rule on the pending Motion.

[2] In this Ruling, the court will refer to the legal entity World Championship Wrestling, Inc. as "WCWI."  This nomenclature is intended to differentiate WCWI from defendant WCW, Inc., a subsidiary of WWE, and from WCW, the trademark.  See Def. WWE's Mem. of Law in Supp. of Mot. to Dismiss Am. Compl. ("Mem. in Supp.") (Doc. No. 45) at 2.

[3] The FAC is somewhat unclear as to: (1) whether WWE or WCW, Inc. purchased the relevant assets from WCWI; and (2) whether WWE and/or WCW, Inc. purchased WCWI in its entirety, or only certain WCWI assets.  Compare FAC ¶ 30 ("WWE announced the acquisition of World Championship Wrestling, Inc."), with Mem. in Supp. at 2–3 (stating that WCWI "sold certain of its assets . . . to a subsidiary of WWE [WCW, Inc.] formed for the acquisition").

[4] To be precise, the counterparty to Levy's contract was "World Wrestling Federation Entertainment, Inc." ("WWF"), which, in 2002, changed its name to WWE.  See FAC ¶ 11.  For convenience, and because there does not appear to be any dispute on this point, the court will refer to the contracting party by its current name, WWE.

agreements between Levy and WWE, but exempted from termination WWE's royalty obligations to Levy.  See id. ¶¶ 24–29.

Similarly, Bagwell entered into a Booking Contract with WCW, Inc. in June 2001. See id. ¶ 34.  That contract—which contains almost identical language, in relevant part, to Levy's Booking Contract with WWE, see infra Part II.B—is the subject of this law suit. In August of 2001, Bagwell and WCW, Inc. terminated their prior contractual relationship, with the exception of any royalty obligations owed by WCW, Inc. to Bagwell.  See FAC ¶¶ 54–59.

On February 24, 2014, WWE launched the World Wrestling Entertainment Network ("WWE Network").  Id. ¶ 60.  The WWE Network makes certain video content available on-demand to subscribers who pay a monthly subscription fee of $9.99.  See id. ¶¶ 62–63.  This "Netflix of WWE content," id. ¶ 60, had 1.82 million subscribers as of April 2016, id. ¶ 64.  The WWE Network makes WCW content available to subscribers, but WWE pays neither Levy nor Bagwell any royalties on its proceeds from the WWE Network.  See id. ¶ 65.

WWE has paid both Levy and Bagwell royalties for physical copies of WCWI- and/or WWE-produced content.  See id., Ex. 10 at 1 (Bagwell); id., Ex. 8 at 1 (Levy). Although Bagwell and Levy have sporadically received these royalties from WWE, see id. ¶¶ 74, 83, WWE has failed to pay them within ninety days following the end of certain financial quarters, see id. ¶¶ 77, 83.  Bagwell engaged a certified public accountant to examine WCW, Inc.'s and/or WWE's books, in an effort to verify the accuracy of royalty payments.  See id. ¶ 88.  In August 2016, Bagwell's request to audit WWE's records

was denied.  See id. ¶¶ 90–92.  In light of WWE's denial of Bagwell's request, Levy has

not attempted to audit WWE's books.  See id. ¶ 98.

> B.    Plaintiffs' Booking Contracts

Section 7 of plaintiffs' Booking Contracts addresses "PAYMENTS/ROYALTIES."

See id., Ex. 3 at 7; id., Ex. 13 at 6.  More specifically, plaintiffs' claims to royalties

derived from the WWE Network are based on Paragraph 7.5 and its various

subsections.  See, e.g., id. ¶¶ 10–22.  Paragraph 7.5(c) of Bagwell's Booking

Agreement provides as follows:

> (i)  Royalties/Pay-Per-View Videos Sold By WCW: WCW shall allocate five
> percent (5%) of the Net Receipts paid to WCW with respect to the direct sale by
> WCW of WCW Pay-Per-Views to a talent royalty pool.  Thereafter, WCW shall
> pro-rate payment to WRESTLER and all other talent appearing in such WCW
> Pay-Per-Views in the same proportion as was the compensation paid to
> WRESTLER for his appearances in the pay-per-views to the total amount paid to
> all talent for their appearances on the pay-per-views.  For purposes of
> paragraphs 7.5(c)(i) and 7.5(c)(ii), Net Receipts shall mean the gross amount
> received by WCW for the WCW Pay-Per-Views.
>
> (ii)  In the event that the WCW Video Product is a compilation or derivative work
> of multiple individual WCW Pay-Per-Views in their entirety, such as a collection
> of videos, e.g., a Wrestlemania box set, payment to WRESTLER shall be
> calculated as follows: five percent (5%) of the Net Receipts paid to WCW shall
> comprise the talent royalty pool, which shall first be pro-rated based on the
> number of individual videos in the compilation, and then the payment to
> WRESTLER for each video shall be consistent with the royalty payment to the
> WRESTLER at the time each individual video was first released.

Id., Ex. 13 ¶ 7.5(c).  "WCW," as used in Bagwell's Booking Contract, referred to WCW,

Inc.  See id., Ex. 13 at 1.  Paragraph 7.5(c) of Levy's Booking Contract is identical,

except that the words "Promoter" or "WWF" appear in place of "WCW."  See id., Ex. 3

¶ 7.5(c).  Levy's Booking Contract uses the terms "Promoter" and "WWF"

interchangeably.  See id., Ex. 3 at 1.

Similarly, Paragraph 7.5(d) sets out the method for calculating royalties on non-pay-per-view videos.  It reads:

> Royalties/Non Pay-Per-View Videos Sold By WCW: WCW shall allocate five percent (5%) of the Net Receipts paid to WCW with respect to the direct sale by WCW of all other WCW Video Products other than those set forth in paragraphs 7.5(c)(i) and 7.5(c)(ii) above, to a talent royalty pool, from which WCW shall pay WRESTLER and all other talent appearing in such WCW Video Products pro-rata among WRESTLER and all other talent so featured.  For purposes of this paragraph 7.5(d), Net Receipts shall mean the gross amount received by WCW for the WCW Video Products.  Notwithstanding the foregoing, if WRESTLER is deemed to be the "featured performer" as determined by WCW in its sole discretion, WRESTLER shall receive a bonus of an additional five percent (5%) of WCW's Net Receipts up to the sale of the first one hundred fifty thousand (150,000) units.  Once sales exceed 150,000, WRESTLER as a featured performer shall receive ten percent (10%) of WCW's Net Receipts on all units sold, including the first 150,000 units.  For example, the featured performer in the video entitled "Cause Stone Cold Said So" is "Stone Cold Steve Austin".  If WRESTLER is part of a group that is determined to be the "featured performer", WRESTLER shall share pro-rata with each and every member of the group in any bonus monies that may be due in connection with such WCW Video Products.

Id., Ex. 13 ¶ 7.5(d).  Again, Paragraph 7.5(d) of Levy's contract substitutes "Promoter" or "WWF" for "WCW."  See id., Ex 3 ¶ 7.5(d).

The terms "WCW Video Products" and "WWF Video Products" are defined in Bagwell's and Levy's Booking Contracts to mean "video cassettes, videodiscs, CD ROM, or other technology, including technology not yet created."  FAC, Ex. 3 ¶ 7.5(a)(i); id., Ex. 13 ¶ 7.5(a)(i).

Section 7 also provides details about the timeliness with which royalty payments are to be made and the remedies aggrieved wrestlers must pursue before bringing suit. Within ninety days after the end of each fiscal quarter, WWE must "prepare and send statements as to royalties payable [ ] to WRESTLER . . . ."  Id., Ex. 3 ¶ 7.12(a); id., Ex. 13 ¶ 7.12(a).  WWE must maintain "books of account related to the payment of

royalties" that wrestlers may audit at their sole expense for the purpose of ensuring WWE's compliance with its royalty obligations.  See id., Ex. 3 ¶ 7.12(b); id., Ex. 13 ¶ 7.12(b).  The Booking Contracts mandate that wrestlers pursue their right to audit WWE's books, before instituting suit to collect royalty payments that are alleged to be wrongfully withheld.  See id., Ex. 3 ¶ 7.12(d); id., Ex. 13 ¶ 7.12(d).

The Booking Contracts specify that they shall be "governed by and interpreted in accordance with the laws of the State of Connecticut . . . ."  Id., Ex. 3 ¶ 13.7; id., Ex. 13 ¶ 13.7.

## III.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  In re Actos End-Payor Antitrust Litig., 848 F.3d 89, 97 (2d Cir. 2017) (quotation marks omitted) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  Motions to dismiss require the court to "consider the legal sufficiency of the complaint, taking its factual allegations to be true and drawing all reasonable inferences in the plaintiff's favor."  Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009) (citing City of New York v. Beretta U.S.A. Corp., 524 F.3d 384, 392 (2d Cir. 2008)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  In re Actos End-Payor Antitrust Litig., 848 F.3d at 97 (quoting Iqbal, 556 U.S. at 678).

## IV.   DISCUSSION

WWE suggests that the court should dismiss the FAC "in its entirety with prejudice."  See Def. WWE's Mem. of Law in Supp. of Mot. to Dismiss Am. Compl.

("Mem. in Supp.") (Doc. No. 45) at 1 (citing <u>DiMuro v. Clinique Labs., LLC</u>, 572 F. App'x 27, 33 (2d Cir. 2014) (summary order)).  This invitation is grounded, primarily, in WWE's contention that plaintiffs' Booking Contracts do not entitle them to royalties, so Count I and several other claims that depend on WWE's obligation to pay royalties fail to plausibly state claims for relief.  <u>See, e.g.</u>, <u>id.</u> at 12–22 (Count I), 29 (Counts IV & VIII), 30 (Counts II, V, & VI).  WWE also offers several justifications for dismissing the non-contract claims.  <u>See, e.g.</u>, <u>id.</u> at 31 (Count III), 35 (Count IX).

Unsurprisingly, plaintiffs argue that "WWE's legal challenges are . . . literally without merit."  Opp'n at 9.  They claim that they have "amply and sufficiently pled plausible claims for relief" and criticize WWE for focusing on "a myriad of minutia, and concocted facts, never dealing with the actual claim."  <u>See id.</u> at 1.

In ruling on the pending Motion, the court will generally address the arguments for dismissal in the order they were raised by WWE and opposed by plaintiffs.  <u>Compare</u> Mem. in Supp. at i ("Table of Contents"), <u>with</u> Opp'n at i ("Table Of Contents").

A.    <u>Bagwell's Claims against WCW, Inc.</u>

Before addressing the heart of WWE's Motion to Dismiss, there is a preliminary question of whether WCW, Inc. is a proper party in this litigation.  WWE notes that WCW, Inc. no longer exists and "consequently lacks the capacity to be sued."  <u>See</u> Mem. in Supp. at 24–25.  Moreover, WCW, Inc. has not been served.  <u>Id.</u> at 25 n.13.  Plaintiffs do not respond directly to this argument.  <u>See generally</u> Opp'n at 16–19 (discussing merger doctrine and successor liability, but not propriety of including WCW, Inc. as defendant).

9

Pursuant to Federal Rule of Civil Procedure 17(b)(2), the capacity of a corporation to sue or to be sued is determined "by the law under which it was organized."  WCW, Inc. was a Delaware corporation.  FAC ¶ 3.  Therefore, its capacity to be sued is determined by Delaware law.

Plaintiffs note that WCW, Inc. was previously listed as a subsidiary of WWE on the latter's 10-K filing, but no longer is.  See FAC ¶ 8 n.1.  They further allege that WWE owned all the stock of WCW, Inc., see id. ¶ 32(i), that WWE has recently paid Bagwell royalties on WCW works, see id. ¶ 32(iii)(a), and that WCW, Inc. may be insolvent, see id. ¶ 32(v).  WWE clarifies the situation, noting that "WCW, Inc. was the non-surviving corporation of a merger that occurred on or about August 30, 2011."  Mem. in Supp. at 25 (citing Mem. in Supp., Ex. E, WCW, Inc.'s corporate filing information with Delaware Department of State).[5]  Indeed, an electronic printout of WCW, Inc.'s filing history with the Delaware Department of State describes the corporation's most recent filing as indicating "Merger; Non-Survivor."  See id., Ex. E at 1.

Section 259(a) of title 8 of the Delaware Code makes clear that, when one or more corporations merge into another corporation, "such constituent corporations . . . shall cease . . . ."  Given the merger of WCW, Inc. into WWE and WCW, Inc.'s status as the non-surviving corporation, WCW, Inc. no longer exists.  As such, pursuant to Delaware law and the Federal Rules of Civil Procedure, it cannot be served with process and thus lacks the capacity to be sued.  Indeed, WCW, Inc. has not been

---

[5] In ruling on a Motion to Dismiss, the court may take judicial notice of corporate filings with the Delaware Secretary of State.  See Cayo v. Stop & Shop Supermarket Co., No. 3:12–cv–638 (WEE), 2012 WL 5818862, at *1 (D. Conn. Nov. 15, 2012) (citing Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991)).

served well more than 90 days from the filing of the FAC, a failure to which WWE has called plaintiffs' attention and one that plaintiffs have still not remedied.  See Fed. R. Civ. P. 4(m); Gooden v. Dep't of Corrs., No. 3:09–cv–2063 (RNC), 2010 WL 4974037, at *1 (D. Conn. Dec. 2, 2010) (discussing court's obligation to dismiss claims pursuant to Rule 4(m)).  Therefore, both because WCW, Inc. lacks the capacity to be sued and because it has not been served, it is dismissed as a defendant.

One additional point is worthy of note.  WWE suggests in a footnote that "Bagwell cannot assert a breach of contract claim against WWE for payment of royalties because he was not a party to any contract with WWE."  Mem. in Supp. at 14 n.10 (citing FCM Grp., Inc. v. Miller, 300 Conn. 774, 797–98 (2011)).  If such a proposition were correct, it is hard to imagine it would be relegated to a footnote.  Indeed, whether Delaware or Connecticut law governs the issue, WWE—as the surviving corporation in its merger with WCW, Inc.—succeeds to the liabilities, if any, of WCW, Inc.  8 Del. C. § 259(a) (providing that surviving corporation is subject to "all the restrictions, disabilities and duties of each [ ] corporation[ ] so merged or consolidated"); Conn. Gen. Stat. § 33-820(a)(3) ("All liabilities of each corporation that is merged into the survivor are vested in the survivor . . . .").[6]

B.    Count I: Failure to Pay Royalties on WWE Network Proceeds

As noted above, the centerpiece of plaintiffs' FAC is their claim that WWE owes them royalties from the money it receives from the WWE Network.  See generally FAC ¶¶ 112–20.  WWE offers four, related arguments for dismissal of Count I: (1) streaming

---

[6] Similarly, WWE's refutation of the veil piercing claims, see Mem. in Supp. at 26 n.15, is irrelevant: as the surviving corporation of the merger between WCW, Inc. and WWE, WWE succeeded to WCW, Inc.'s liabilities without resort to veil piercing.

content on the WWE Network to subscribers does not constitute a "direct sale" such that the royalty provisions are triggered, see Mem. in Supp. at 14–17; (2) content on the WWE Network does not qualify as a "Video Product" within the meaning of the Booking Contracts, see id. at 17–19; (3) interpreting the royalty provisions the way plaintiffs suggest would render the Booking Contracts unworkable and internally incoherent, see id. at 20–22; and (4) plaintiffs cannot invoke the contractual merger doctrine to create a right to royalties, see id. at 22–24.  Plaintiffs have responded to each of these arguments, disputing them in turn.  See generally Opp'n at 9–18.

The parties agree on the relevant standards that guide the court's consideration of WWE's arguments for dismissal of Count I.  "At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous."  Orchard Hill Master Fund Ltd. v. SBA Comm'cns Corp., 830 F.3d 152, 156 (2d Cir. 2016) (citing Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y., 375 F.3d 168, 178 (2d Cir. 2004)); see also Mem. in Supp. at 12; Opp'n at 8.  The parties further agree that "[w]hether or not a writing is ambiguous is a question of law to be resolved by the courts" and that "[w]hen the language [of a contract] is clear and unambiguous . . . the contract must be given effect according to its terms, and the determination of the parties' intent is a question of law."  See Mem. in Supp. at 12 (quoting Singer v. Priceline Grp., Inc., No. 15-cv-1090 (VAB), 2016 WL 3976539, at *5 (D. Conn. July 22, 2016)); Opp'n at 8 (quoting identical portions of Singer).

Thus, as to the contract interpretation questions raised by WWE's Motion, the question becomes whether or not invocation of the terms "direct sale" and "Video Product," as they are defined and used in the contracts, forecloses plaintiffs' breach of

contract claims.  Plaintiffs and WWE each contend that the contract unambiguously

compels their favored reading of its terms.[7]  See Mem. in Supp. at 13; Opp'n at 9; Reply

at 1.  The court will address each provision in turn.

> 1. "Direct Sale"

The contractual provisions that plaintiffs cite in their claim for royalties require

royalty payments on money derived from "the direct sale" of pay-per-view or non-pay-

per-view videos.  See FAC, Ex. 3 ¶¶ 7.5(c)(i)–(ii), (d); id., Ex. 13 ¶¶ 7.5(c)(i)–(ii), (d).

The parties agree that "[o]nly direct sales of pay-per views [sic] and non-pay per views

[sic] of WWF Video Products are entitled to royalties."  Form 26(f) Report of Parties'

Planning Meeting (Doc. No. 36) at 3; see Mem. in Supp. at 14 ("The royalty trigger is a

'direct sale' of either a pay-per-view video or a non-pay-per-view video.").  WWE

contends that the term "sale" unambiguously requires "the transfer of ownership of and

title to property from one person to another."  Mem. in Supp. at 14 (quoting Perry v.

Perry, 156 Conn. App. 587, 594 (2015)).  The WWE Network could not qualify as a

"sale," it is suggested by WWE, because the WWE Network indisputably does not

convey ownership of the videos streamed on it.  See id.  Plaintiffs challenge WWE's

attempts to narrowly cabin the definition of a "sale," instead offering that "WWE sells a

limited right to its [pay-per-view videos] and [non-pay-per-view videos] featuring

[p]laintiffs on the WWE Network . . . ."  See Opp'n at 10.

---

[7] Given this contention, it is puzzling that plaintiffs subsequently suggest—in a single sentence—that "whether streaming is a sale or not is a question of fact for the trier of fact."  See Opp'n at 9 (citing 19 Recordings Ltd. v. Sony Music Entm't, No. 14–cv–1056 (RA), 2016 WL 5408167, at *4 (S.D.N.Y. Sept. 28, 2016)).

Ultimately, the court concludes that neither party's proffered interpretation is foreclosed by the contract's plain language.  Black's Law Dictionary defines "sale" as, in relevant part, "[t]he transfer of property or title for a price."  Sale, Black's Law Dictionary (10th ed. 2014).  "Transfer" is, in turn, defined broadly to "embrace[ ] every method— direct or indirect, absolute or conditional, voluntary or involuntary—of disposing of or parting with property or with an interest in property . . . ."  Transfer, Black's Law Dictionary (10th ed. 2014).  The nature of the interest—if any—that WWE Network subscribers have in the videos available through the streaming service is at this point unclear.  Cf. License, Black's Law Dictionary (10th ed. 2014) ("A permission, [usually] revocable, to commit some act that would otherwise be unlawful . . . ."); Mem. in Supp. at 20 ("[T]he WWE Network does not provide a right of ownership in a physical medium, but a license to view streaming content . . . ."); Reply at 3 (claiming plaintiffs "creat[ed] [ ] a legal fiction ('special, limited interest or right') that does not exist under copyright law").  Regardless, given the breadth of the definitions set forth immediately above, there is at least ambiguity as to whether the term "sale" in the Booking Contract should be read similarly broadly to cover the streaming of videos to WWE Network subscribers, even absent a transfer of title.

The cases cited by WWE do not mandate a conclusion to the contrary.  Several of those cases relate to the disposition of real property.  See Mem. in Supp. at 14 (citing Perry v. Perry, 156 Conn. App. 587, 594 (2015) (interpreting requirement in judgment of dissolution of marriage that marital residence be "sold"); Anthracite Capital, Inc. v. Maguire Partners-555 W. 5th Mezzanine, LLC, 165 F. App'x 875, 877 (2d Cir. 2005) (summary order) (interpreting "sale" in Loan Agreement secured by real property);

Young v. Fellows, No. CV040409091S, 2004 WL 2397192, at *3 (Conn. Super. Ct. Sept. 24, 2004) (interpreting "sale" in mortgage contract)). These cases—which involve interpretations of the term "sale" in contexts quite different than the one at issue here— are of limited utility in interpreting that word in the Booking Contracts.

WWE also points the court to the definition of a "sale" in Connecticut's codification of the Uniform Commercial Code, see Mem. in Supp. at 15 (citing Conn. Gen. Stat. § 42a-2-106), and to a case relying in relevant part on that definition, see id. (citing Bobryk v. Lincoln Amusements, Inc., No. CV950547084S, 1996 WL 24566, at *3 (Conn. Super. Ct. Jan. 5, 1996)). However, this definition of "sale" is applicable only to those "movable and tangible" things that qualify as "goods" within the meaning of the U.C.C. See Kane v. Fed. Express Corp., No. CV990078971S, 2001 WL 1178350, at *2–3 (discussing Conn. Gen. Stat. § 42a-2-105(1)). The WWE Network is neither movable nor tangible, and thus does not qualify as a "good" under the U.C.C. These definitions, then, are also of limited usefulness in interpreting the Booking Contracts.

Nor is the Ninth Circuit's analysis in F.B.T. Productions, LLC v. Aftermath Records, 621 F.3d 958 (9th Cir. 2010), persuasive authority in this case. Plaintiffs correctly point out that—contrary to what is suggested by the Memorandum in Support, see Mem. in Supp. at 16–17—the court's discussion of federal copyright law was only "secondary persuasive support" for its interpretation of the contract, see Opp'n at 12 (citing F.B.T. Prods., 621 F.3d at 965). In F.B.T. Productions, the court first determined that the plain language of the contract compelled a conclusion that the relevant agreements between the defendant and third parties qualified as licenses, rather than

sales.  See F.B.T. Prods., 621 F.3d at 964.  Only then did the court buttress its

conclusion by reference to federal copyright law.  See id. at 964–66.

In any event, there can be little doubt that WWE is selling something to

subscribers to the WWE Network.  WWE understandably avoids using the word "sale"—

or any variation thereof—in describing its interaction with WWE Network customers.

Put colloquially, however, WWE sells subscriptions to the WWE Network, enabling

subscribers to view content (both pay-per-view and non-pay-per-view videos) to which

they would not otherwise have access.  Nothing in the Booking Contract, copyright law,

or any portion of Connecticut state law so limits the term "direct sale" as to

unambiguously foreclose plaintiffs' claims.  That being the case, WWE's arguments for

dismissal that are grounded in the argument that "direct sale" does not—as a matter of

law—cover the provision of streaming video on the WWE Network are not persuasive.

2.      "Video Product"

Next, WWE argues that streaming video on the WWE Network does not qualify

as a "Video Product," as that term is defined in the Booking Contracts.  See generally

Mem. in Supp. at 17–20.  The Booking Contracts define "WWF Video Products" and

"WCW Video Products"—the relevant royalty triggers, see FAC, Ex. 3 ¶¶ 7.5(c)(i)–(ii),

(d); id., Ex. 13 ¶¶ 7.5(c)(i)–(ii), (d)—identically, to mean "video cassettes, videodiscs,

CD ROM, or other technology, including technology not yet created . . . ," see id., Ex. 3

¶ 7.5(a)(i); id., Ex. 13 ¶ 7.5(a)(i).  According to WWE, "other technology, including

technology not yet created," encompasses only "physical 'Video Products' . . . which are

tangible products which can be bought to own . . . ."  See Mem. in Supp. at 18.  Much

as they disputed WWE's attempts to narrow the definition of "direct sale," plaintiffs

object to "WWE's assertion that ejusdem generis confines 'other technology, including technology not yet created' to similar physical products enumerated in the definition of 'Video Products' . . . ."  Opp'n at 12.

The court is unpersuaded by WWE's argument that the final clause in the definition of "Video Products" refers unambiguously and exclusively to physical objects. WWE correctly notes that the Connecticut Supreme Court has utilized the ejusdem generis rule of construction in interpreting contract provisions.  See Mem. in Supp. at 18 (citing 24 Leggett St. Ltd. P'ship v. Beacon Indus., Inc., 239 Conn. 284, 297–98 (1996)). "The principle of ejusdem generis applies when '(1) the [clause] contains an enumeration of specific words; (2) the members of the enumeration suggest a specific class; (3) the class is not exhausted by the enumeration; (4) a general reference [supplements] the enumeration . . . and (5) there is [no] clearly manifested intent that the general term be given a broader meaning than the doctrine requires.'"  24 Leggett St. Ltd. P'ship, 239 Conn. at 297 (quoting 2A J. Sutherland, Statutory Construction § 47.18 (5th ed. 1992)).  Here, the term that plaintiffs suggest covers the WWE Network is the catchall "other technology, including technology not yet created" that follows certain specifically enumerated physical products.

In response, WWE contends that the salient characteristic of the enumerated technologies is that they make pay-per-view and non-pay-per-view videos available in tangible, physical form.  See Mem. in Supp. at 18.  Yet it is at least as likely that the relevant commonality is that each of the enumerated technologies allows purchasers to watch the videos on-demand, whenever they want.  Indeed, the breadth of the catchall provision in the definition of "Video Products" counsels against an overly restrictive

reading.  Subscribers to the WWE Network, like purchasers of "video cassettes, videodiscs, [and] CD ROM," are able to call up the videos they want to watch whenever they want to watch them.  Though WWE's reading of the final clause is plausible, its interpretation is not so obviously correct as to unambiguously foreclose plaintiffs' suggestion that the WWE Network and/or the videos made available thereon qualify as "Video Products."

None of the arguments or cases cited by WWE undermine the court's conclusion. First, WWE mischaracterizes the Illinois Appeals Court case to which it points the court. See Mem. in Supp. at 18–19 (citing Intersport, Inc. v. Nat'l Collegiate Athletic Assoc., 885 N.E.2d 532, 541–42 (Ill. App. Ct. 2008)).  In that case, the court said that "combin[ing] [the term 'video'] with other words [ ] indicate[s] more specific uses of recorded visual content that can be displayed for a viewer . . . ," Intersport, 885 N.E.2d at 541, but not that such content "requires storage in a tangible form," Mem. in Supp. at 19.  Accurately described, the proposition articulated in Intersport has little significance in this case: it seems beyond dispute that the content streamed over the WWE Network is "recorded visual content."

Second, WWE cites Malmsteen v. Universal Music Group, Inc., 940 F. Supp. 2d 123 (S.D.N.Y. 2013) in support of its arguments for limiting the definition of "Video Products."  See Mem. in Supp. at 18–19.  The court's ruling there—on a Motion for Summary Judgment, not a Motion to Dismiss, see 940 F. Supp. 2d at 125—applied the ejusdem generis principle of contract interpretation to limit the means of music distribution that would qualify as "other methods," id. at 133.  However, more relevant to the instant case—yet omitted from WWE's description of Malmsteem—the court

interpreted "[t]he phrase '[a]ny device now or hereafter known on or by which sound may be recorded and reproduced' [as] manifest[ing] the clear intent of the contracting parties that the definition of Record encompass as-yet-undeveloped technologies." See id. at 132 (citations omitted).  Indeed, that "broad definition evince[d] a practical recognition of the constantly evolving nature of music recording technology."  Id. Similarly, WWE's and the plaintiffs' use of broad phraseology in defining technologies to be covered by the royalty provisions strongly suggests that, at the very least, there remains ambiguity as to whether streaming videos on the WWE Network qualifies as a Video Product.

WWE's references to federal copyright law in the section of its Memorandum discussing the definition of "Video Products" speak more to the definition of "direct sale," discussed above.  See Mem. in Supp. at 19 (referencing first sale doctrine's inapplicability to those who lease certain copyrighted works).  The principles of copyright law to which WWE points the court may well be relevant to the contracting parties' understanding of the terms, but fall far short of rendering the term "other technology, including technology not yet created" unambiguous.

Last, the court is not persuaded by WWE's suggestion—raised for the first time in its Reply—that sporadic references to the Internet elsewhere in the Booking Contracts forecloses inclusion of streaming videos in the definition of "Video Products."  See Reply at 4–5.  The contract would be nonsensical if "Internet" were included in Paragraph 7.5(a)'s definition of "Video Products," as it does not appear there has yet been any effort by WWE to effectuate "direct sale[s]" of the Internet.  Rather, plaintiffs' argument is that streaming video—a means of video distribution that relies on the

Internet, see generally FAC ¶¶ 60–65—qualifies as a "Video Product."  The language defining "Video Products" is not restrictive to the point of rendering such an argument unambiguously meritless.  Therefore, the expressio unius canon that WWE urges the court to embrace, see Reply at 4–5, is not useful here.

For the reasons set forth in detail above, WWE's Motion to Dismiss certain of plaintiffs' claims because they rely on a reading of "Video Products" that includes the WWE Network's streaming videos is denied.

### 3.   Conformity of Plaintiffs' Interpretation with Other Provisions of the Booking Contracts

WWE next argues that plaintiffs' interpretation of the Booking Contracts would "render[ ] other relevant provisions of the Booking Contracts impossible to apply and would lead to an absurd result."  Mem. in Supp. at 20.  In response, plaintiffs assert that calculating WWE's royalty obligations "is purely a mathematical issue that can be determined by experts and this court at a later time."  Opp'n at 16.

WWE rightly points out that courts in Connecticut "will not construe a contract's language in such a way that it would lead to an absurd result."  Mem. in Supp. at 21 (quoting Welch v. Stonybrook Gardens Co-Op., Inc., 158 Conn. App. 185, 198 (2015)).  Plaintiffs appear to subtly misunderstand WWE's argument, which addresses the proper way to interpret the contract as a cohesive whole, rather than the proper amount of damages.  Compare Opp'n at 14–16 (discussing cases in which calculating breach of contract damages was difficult), with Reply at 5 ("WWE argued that the impossibility of, and absurd results from, applying Plaintiffs' construction of the royalty provisions demonstrates its implausibility." (emphasis added)).  Because WWE's argument, though

indirectly related to questions regarding the magnitude of its royalty obligations, addresses the proper interpretation of the Booking Contracts, it is not premature.

However, the court does not believe, at least at this stage of the litigation, that giving effect to plaintiffs' interpretation of the royalty provisions would lead to an absurd result. There are likely several plausible ways to calculate the royalty payments plaintiffs demand. For example, it might be that the proper way to perform the royalty calculation is to determine the number of times a specific video on the WWE Network is viewed as compared to the total number of video views, divide the gross sales derived from the WWE Network in that proportion, and create the talent royalty pool to be paid to the wrestlers appearing in the specific video from 5% of that value. Cf. Opp'n at 14, 16 (characterizing "calculat[ion] [of] how much of the $159.4 million [in WWE Network gross sales] is subject to the '5% of net receipts'" as "purely a mathematical issue"). To be clear, the court is not holding here that a particular method of calculating any royalty obligation on the part of WWE is the correct way, but rather offers a plausible method to show that plaintiffs' interpretation of the Booking Contracts does not appear to render them unworkable.

WWE's alternative contention that it would be unable to calculate royalty obligations from pay-per-view and non-pay-per-view videos originally created by WCWI, see Mem. in Supp. at 22, is belied by the fact that it has apparently paid royalties to Bagwell in the past, see FAC, Ex. 10 at 1. Although WWE suggests that it "erroneously paid Bagwell royalties on certain WWE video works," see Reply at 6, the facts set forth in the FAC and exhibits attached to it plausibly suggest that WWE has some way of calculating royalties derived from WCWI works. At any rate, WWE's unsupported

21

assertion—in the context of a Motion to Dismiss—that it does not know what WCWI wrestlers were paid does not unambiguously suggest that plaintiffs' interpretations would render the royalty provisions entirely unworkable.

Therefore, notwithstanding WWE's arguments to the contrary, it does not appear that a determination that plaintiffs are entitled to WWE Network royalties would lead to an absurd result.

### 4.   Merger Doctrine

Last, the court turns to WWE's argument against applying the merger doctrine to create a royalty obligation on the part of WWE.  The FAC extensively discusses the merger doctrine, see FAC ¶¶ 36–41, which WWE asserts does not apply for several reasons, see Mem. in Supp. at 22–24.  Much of plaintiffs' Opposition does not address the substantive legal arguments in the corresponding section of WWE's Memorandum. See generally Opp'n at 16–18.  WWE repeatedly accuses plaintiffs of misleading the court on this point by way of "legal sleight of hand," Mem. in Supp. at 22, "legal alchemy," and "sophistry," Reply at 6.

The court, however, need not decide whether the merger doctrine applies in this case, as it is unclear why the parties resort to the merger doctrine at all.  The parties fully agree that Bagwell's original contract with WCWI did not entitle him to royalties. See Mem. in Supp. at 27; Opp'n at 17.  The question, then, is whether the Booking Contract created a new entitlement to royalties.  WWE repeatedly states that Bagwell's contract with WCW, Inc. "only obligated WCW, Inc. to pay royalties specified therein on works created by WCW, Inc. . . . ."  Mem. in Supp. at 24.  This conclusory assertion

comes without citation to any provision of the FAC or the Booking Contract.[8]  The gravamen of Bagwell's FAC is exactly the opposite: that WWE <u>does</u> owe royalties on WCWI-produced videos.

WWE has not directed the court's attention to any provision of the Booking Contract that explicitly limits the royalty entitlement only to money derived from videos <u>produced</u> by WWE or WCW, Inc.  If there was such a provision, WWE's argument would likely succeed.  However, there is not.  Further, plaintiffs allege that WWE's now-defunct subsidiary owned the rights to these videos, which—absent any limitation in the Booking Contracts of the sort WWE claims exists—plausibly qualify as WCW, Inc. and/or WWE "Video Products."  Notwithstanding the fact that plaintiffs' original contract with WCWI did not pay them royalties, there is no reason WWE could not subsequently contract with plaintiffs to pay royalties on WCW videos, precisely as plaintiffs have alleged.

With each argument for dismissal having been rejected, WWE's Motion to Dismiss Count I is denied.

### C.   <u>Counts IV and VIII: Breach of Contract Claims</u>

Next, the court addresses WWE's arguments that the court should dismiss Counts IV and VIII.  As noted above, <u>see</u> <u>supra</u> Part I, Count IV alleges that WWE has violated the Booking Contracts by failing to pay royalties within ninety days following the end of each fiscal quarter, <u>see</u> FAC ¶¶ 134–41, and Count VIII alleges that WWE further

---

[8] The citation that follows the end of the sentence quoted immediately above supports the final clause of the sentence, which notes that "Bagwell admits there were no such works created by WCW, Inc. that would entitle him to royalties."  Mem. in Supp. at 24 (citing FAC ¶ 32(iii)(a)).  Nothing in that paragraph of the FAC supports an assertion that WCW, Inc. would only pay royalties on money derived from content that WCW, Inc. produced.

breached the Booking Contract by preventing Bagwell from auditing WWE's books, see id. ¶¶ 150–53.

WWE argues that Counts IV and VIII should be dismissed because Bagwell did not have a contract that entitled him to royalties, a necessary prerequisite for auditing WWE's books, and because Levy did not "satisfy the conditions precedent for filing a claim for royalties under the terms of his Booking Contract or to exhaust the remedies set forth in his Booking Contract prior to bringing such a claim."  See Mem. in Supp. at 29.  Plaintiffs counter that the claims should not be dismissed: Bagwell notes that he has been paid royalties previously, though often not within ninety days following the end of the fiscal quarter, and so has a right to examine WWE's books; Levy concedes that he has not fulfilled the contractual prerequisites, but suggests that failure should be excused, given Bagwell's lack of success.  See Opp'n at 19–23.

First, insofar as WWE's Motion to Dismiss urges dismissal of Count IV's claim on behalf of Bagwell, it is denied, as is the Motion to Dismiss Count VIII.  Given that the court denied WWE's Motion to Dismiss Count I, see supra Part IV.B, it is not clear at this stage of the litigation that Bagwell "was not contractually owed any royalties by either WCW, Inc. or WWE," see Mem. in Supp. at 29.  Indeed, Bagwell has plausibly alleged that he is owed royalties.  Because the court has already rejected the contention that the Booking Contract unambiguously forecloses plaintiffs' entitlement to royalties, WWE's argument for dismissal of Counts IV, as to Bagwell, and VIII—which relies almost exclusively on WWE's belief that Bagwell is not entitled to royalties of any kind—is rejected.

On the other hand, Levy does not dispute that he has not attempted to audit WWE's books, as required by Paragraph 7.12(d) of the Booking Contract.  <u>See</u> Opp'n at 23 ("WWE's lawyer's letter leaves no doubt that Plaintiff Levy's request to audit the same WWE royalty records . . . would be identically rejected.").  Levy's suggestion that any request to audit the royalty records would be fruitless is convincing.  To be sure, though WWE argues that Bagwell is not owed <u>any</u> royalties—and any royalties he has received are entirely in error, <u>see</u> Reply at 6—it does not make so broad an argument regarding Levy's entitlement to royalties.  While WWE clearly contends that Levy is not entitled to royalty payments from the WWE Network, <u>see</u> Mem. in Supp. at 13, it does not appear to dispute that his Booking Contract entitles him to some royalties, presumably from sales of WWE-produced content.[9]  Nevertheless, WWE's position with respect to Bagwell's audit request makes clear that it would not permit <u>anyone</u> to audit, at the very least, the portion of its books related to the WWE Network.  Those records being the records relevant to the claims asserted in the FAC, the court is unpersuaded by WWE's suggestion that Levy must make an attempt sure to be rejected.

Therefore, the Motion to Dismiss Count IV is denied, insofar as that count asserts claims on behalf of both Levy and Bagwell; the Motion to Dismiss Count VIII is also denied.

D.      <u>Count VII: Successor Liability</u>

Count VII alleges a successor liability claim against WWE, claiming that, because WWE "purchased the [WCWI] video library," it "is liable for the debts and liabilities of its

---

[9] Unlike Bagwell, it appears that Levy performed at royalty-bearing events produced by WWE. <u>See</u> FAC ¶ 9 (setting out Levy's employment history).

predecessor [WCWI], including the WCW video library, at least with regards to any and all royalty obligations to [p]laintiffs."  FAC ¶¶ 148–49.  WWE offers two reasons why this claim should be dismissed: first, plaintiffs do not allege that WCWI owed any royalty obligations to plaintiffs, and second, plaintiffs have not pleaded facts sufficient to bring this case within any of the exceptions to the general rule that asset purchases by a corporation do not render that corporation liable for the obligations of the corporation from which it made the purchase.  See Mem. in Supp. at 26–29.

Plaintiffs' argument here is difficult to parse.  They appear to suggest that they have plausibly pled their successor liability claim against WWE for the liabilities of WCWI simply because Bagwell has received royalty payments from WCW, Inc. and/or WWE.  See Opp'n at 19.  Yet plaintiffs fail to engage with the legal arguments raised by defendants, specifically that "the liability of a successor corporation is derivative in nature and the successor may be held liable for the conduct of its predecessor only to the same extent as the predecessor."  See Mem. in Supp. at 27 (quoting Robbins v. Physicians for Women's Health, LLC, 311 Conn. 707, 715 (2014)).  Plaintiffs make clear elsewhere in their Opposition to WWE's Motion to Dismiss[10] and in the FAC[11] that WCWI did not owe any royalty obligations to Bagwell.

---

[10] See Opp'n at 17 ("In consideration for Bagwell assigning his intellectual property rights in the WCW video library to [WCWI], he was promised certain obligations from [WCWI], but royalty payments from WCW video library cassette tapes was not one of the obligations . . . .").

[11] See FAC ¶ 32(iii)(a) ("[A]ny royalties [Bagwell] receives must originate from [the] June 4, 2001 booking contract (Section 7.5(d)).");  id., Ex. 14 ¶ 6(c) (providing, in Merchandising Agreement between WCWI and Bagwell, that latter was not "entitled to any share of any revenues derived by [WCWI] from the sale or other exploitation of any of the Intellectual Property in connection with . . . the sale or licensing in any medium, market or form of videocassettes of any wrestling matches or other events sponsored by [WCWI]").

WWE's potential royalty obligations related to WCWI-produced videos do not stem from WCWI's initial liability, transferred to WWE by way of successor liability. Rather, any potential liability on the part of WWE would stem from the Booking Contracts entered into by plaintiffs and WWE or WCW, Inc.  See id. ¶ 32(iii)(a).  The fact that Bagwell has received some royalty payouts from WWE does not render plaintiffs' successor liability claims plausible, in the face of a lack of any dispute that plaintiffs' WCWI contracts did not entitle them to royalties.

The Motion to Dismiss Count VII is granted.

E.      Counts V and VI: Declaratory Judgments

In Count V, plaintiffs demand a declaratory judgment that "the WWE Network is both a 'WCW Video Product' and 'WWF Video Product' because an internet streaming WWE Network is 'other technology or technology not yet created,' as defined in both [p]laintiffs' Booking Contracts."  FAC ¶ 143.  Relatedly, Count VI puts forth a claim for "a declaration that [WCW, Inc.] and/or WWE pays Plaintiff Bagwell WCW video library royalties because of his June 4, 2001 Booking Contract (Section 13.2 'Merger Clause')."  Id. ¶ 145.  WWE argues for dismissal of these two counts because "a declaratory judgment is a remedy and not a cause of action," and because "the request for a declaratory judgment is unnecessary and duplicative of [p]laintiffs' breach of contract claims."  Mem. in Supp. at 30 (citations omitted).  Plaintiffs do not contest these points in their Opposition.

When a plaintiff "fail[s] to rebut, or address in any way, the defendants' argument against [certain] claims, the [c]ourt deems those claims . . . abandoned."  Thomas v. Conn. Dep't of Corr., No. 3:14–cv–714 (DJS), 2015 WL 3970833, at *3 (D. Conn.

June 30, 2015); see also Dupee v. Klaff's, Inc., 462 F. Supp. 2d 233, 242 (D. Conn. 2006); Lahoud v. Countrywide Bank FSB, No. 3:07–cv–1616 (DJS), 2012 WL 1067391, at *5 (D. Conn. Mar. 30, 2012).  Dismissal of these claims is therefore appropriate.

Moreover, the legal contentions undergirding these claims do not appear susceptible to effective resolution by declaratory judgment.  Counts V and VI seek declaratory judgments that are largely or entirely duplicative of plaintiffs' breach of contract claim articulated in Count I.  WWE clearly identified this apparent shortcoming in its Memorandum in Support of its Motion to Dismiss.  See Mem. in Supp. at 30. Plaintiffs failed to respond.  Because "[t]he declaratory judgment requested by Plaintiff would primarily amount to a finding of breach of contract . . . the court has ample reason to decline the request for declaratory judgment given the [ ] overlapping charges brought by Plaintiff."  Umbach v. Carrington Inv. Partners, No. 3:08–cv–484 (EBB), 2009 WL 413346, at *4 (D. Conn. Feb. 18, 2009).

For the foregoing reasons, the Motion to Dismiss Counts V and VI is granted.

F.    Preemption of Non-Contractual State Law Claims

Before discussing WWE's specific arguments for dismissal of the non-contractual state law claims, the court will address WWE's suggestion that those claims are preempted by federal copyright law.  WWE asserts that "a plaintiff's assertion of state law claims against a defendant's mere reproduction, distribution, or display of a performance by the plaintiff captured on film is preempted by federal copyright law." Mem. in Supp. at 36 (citations omitted).  WWE believes that, because plaintiffs' royalty claims fail, "all other common law claims present a garden variety preemption issue

28

governed by the controlling law cited [in its Memorandum]." See id. at 37.  Plaintiffs object to the dismissal of the counts at issue in WWE's argument.  See Opp'n at 35–36.

"The Copyright Act exclusively governs a claim when: (1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act under 17 U.S.C. §§ 102 and 103, and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106." Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 305 (2d Cir. 2004).  To qualify under the second prong of this test—the "general scope requirement," see id.— the state law claim "must involve acts of reproduction, adaptation, performance, distribution or display" and "must not include any extra elements that make it qualitatively different from a copyright infringement claim," id. (citations omitted).  The Second Circuit "take[s] a restrictive view of what extra elements transform an otherwise equivalent claim into one that is qualitatively different from a copyright infringement claim." Id. at 306.

There is no dispute that the works streamed on the WWE Network are copyrighted.  See Opp'n at 35.  Thus, they satisfy the first prong of the test outlined immediately above.

The cases WWE cites—all from outside the Second Circuit—merely support the unremarkable proposition that state law claims purporting to impose liability for the reproduction, distribution, or display of copyrighted works are preempted.  See Ray v. ESPN, Inc., 783 F.3d 1140, 1144 (8th Cir. 2015); Somerson v. McMahon, 956 F. Supp. 2d 1345, 1355 (N.D. Ga. 2012); Blood v. Titan Sports, Inc., No. 3:94–cv–307–P, 1997 U.S. Dist. LEXIS 24485, at *33 (W.D.N.C. May 13, 1997).  Moreover, as noted

above, the court has denied WWE's Motion to Dismiss the breach of contract claims,

undermining one of WWE's arguments for dismissal of these other claims. See Mem. in

Supp. at 37 ("Because [p]laintiffs' breach of contract claims fail for the reasons

discussed herein, all other common law claims present a garden variety preemption

issue governed by the controlling law cited above." (emphasis added)).

Plaintiffs' claims for breach of fiduciary duty and for CUTPA violations are not

preempted by the Copyright Act.  Notwithstanding the Second Circuit's narrow view of

what "extra elements" qualify, each claim has an element that renders it qualitatively

different from a copyright infringement claim.  As for the breach of fiduciary duty claim,

"the fact that the[ ] claim[ ] require[s] a finding that there was a breach of fiduciary duty

to begin with adds an extra element that makes the claim qualitatively different from a

claim of copyright infringement."  Briarpatch Ltd., L.P., 373 F.3d at 307 (citing Computer

Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 717 (2d Cir. 1992)).  Second, other courts

in this district have concluded that "CUTPA does not create rights equivalent to those

established by the Copyright Act."  Broadway Theatre Corp. v. Buena Vista Pictures

Distribution, No. 3:00–cv–706 (SRU), 2002 WL 32502100, at *6 (D. Conn. Sept. 19,

2002).  Even if certain CUTPA claims might be grounded in conduct also covered by the

Copyright Act, plaintiffs' claims here are not.  The misconduct put forth in plaintiffs'

CUTPA claim is WWE's "failing to account for millions of dollars in owed WWE Network

royalties and [ ] to pay royalties due within 90 days following the end of the quarter,"

FAC ¶ 128, as well as its "repeated misrepresent[ations] to [p]laintiffs . . . [of] the

amounts rightfully owed to them (including nonpayment of royalties within 90 days)," id.

¶ 129.  None of this alleged misconduct relates to the production or distribution of copyrighted works.

Last, the court declines to dismiss Count IX, for unjust enrichment, as preempted by Copyright Law.  Plaintiffs represent that their unjust enrichment claim "fall[s] outside the scope of copyright because the claim is not that WWE wrongfully distributed the videos; it is different, that WWE wrongfully retained monies not belonging to them by failing to pay WWE Network royalties to [p]laintiffs and withholding royalty payments owed longer than 90 days following the end of the fiscal quarter."  Opp'n at 36. Ultimately, however, the court need not and does not decide whether this unjust enrichment claim is preempted, as it is subject to dismissal on other grounds.  See infra Part IV.I.

G.    Count II: Breach of Fiduciary Duty

WWE argues that plaintiffs' claim for breach of fiduciary duty necessarily fails because of the invalidity of plaintiffs' breach of contract claim, and that the arms-length business relationship memorialized in the Booking Contracts does not give rise to fiduciary duties.  See Mem. in Supp. at 30–31.  Plaintiffs respond that "WWE's royalty accounting arrangement with [p]laintiffs created a fiduciary relationship, obligating WWE to honestly account it."  Opp'n at 24 (citing Mankert v. Elmatco Prods., Inc., 84 Conn. App. 456, 461–62 (2004)).

"It is well settled that 'a fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other.'" Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 38 (2000) (quoting Konover Dev.

Corp. v. Zeller, 228 Conn. 206, 219 (1994)).  "The superior position of the fiduciary or dominant party affords him great opportunity for abuse of the confidence reposed in him."  Saint Bernard Sch. of Montville, Inc. v. Bank of Am., 312 Conn. 811, 835 (2014) (quoting Dunham v. Dunham, 204 Conn. 303, 322 (1987)).  "Fiduciaries appear in a variety of forms, including agents, partners, lawyers, directors, trustees, executors, receivers, bailees and guardians."  Id. at 836 (quoting Konover Dev. Corp., 228 Conn. at 222).  "[A] mere contractual relationship does not create a fiduciary or confidential relationship."  Id. (citing Fichera v. Mine Hill Corp., 207 Conn. 204, 210 (1988)).

Plaintiffs' argument here is that WWE's fiduciary duty arose not in the context of the negotiations over the Booking Contracts—when the parties may well have been negotiating at arm's length, see Mem. in Supp. at 30 (noting that Bagwell was represented by counsel when negotiating his Booking Contract)—but rather after the contract was consummated, when WWE was obligated to remit royalty payments to plaintiffs, see Opp'n at 24.  That being the crux of plaintiffs' claim, the court concludes that plaintiffs have plausibly pled a fiduciary relationship with regard to WWE's alleged royalty payment and accounting obligations.  Plaintiffs plausibly allege that WWE had a "great opportunity for abuse of the confidence reposed in" it, see Saint Bernard Sch. of Montville, Inc., 312 Conn. at 836, when it collected and retained proceeds from direct sales of its video products, before informing plaintiffs of their entitlement to royalties. This is more than a "mere contractual relationship": plaintiffs relied on the accuracy of the royalty statements they received from WWE, with little means of regularly verifying WWE's compliance with the Booking Contracts.

WWE's efforts to distinguish <u>Mankert v. Elmatco Products, Inc.</u>, 84 Conn. App. 456 (2004), are unconvincing.  There, the court concluded that the financial arrangement between the plaintiff and defendant—whereby defendant withheld plaintiff's share of commissions he earned by selling defendant's products and applied that money toward a debt owed by plaintiff to defendant—created a fiduciary relationship.  84 Conn. App. at 461.  Contrary to WWE's attempts to differentiate <u>Mankert</u>, <u>see</u> Reply at 8, the facts in that case are similar to those here.

None of the cases cited in the relevant portion of WWE's Reply, <u>see</u> Reply at 7–8—drafted with the benefit of plaintiffs' clarification of the basis for their fiduciary duty claim, <u>see</u> Opp'n 24—applies Connecticut law.  <u>See, e.g.</u>, <u>Infinite Machs., LLC v. Hasbro, Inc.</u>, No. 3:07–cv–675 (PCD), 2009 WL 2253212, at *3 (D. Conn. July 27, 2009) ("Plaintiffs and Defendant agree that Rhode Island law governs the Agreement.").

Therefore, contrary to WWE's contention, plaintiffs have plausibly alleged a fiduciary relationship.  The Motion to Dismiss Count II is denied.

H.      Count III: CUTPA Violations

WWE offers three grounds on which it suggests the court should dismiss plaintiffs' CUTPA claims: (1) that a breach of contract, without more, does not establish a CUTPA violation, <u>see</u> Mem. in Supp. at 31–32; (2) that plaintiffs' relationship with WWE does not fall within the scope of CUTPA, <u>see</u> <u>id.</u> at 32–34; and (3) that plaintiffs lack standing to pursue a nationwide CUTPA claim, <u>see</u> <u>id.</u> at 34–35.  Again, plaintiffs oppose each of WWE's arguments.  <u>See</u> Opp'n at 24–30, 37–38.

The test for determining whether allegedly improper conduct violates CUTPA is well-established:

> In determining whether a practice violates CUTPA [the Connecticut Supreme Court has] adopted the criteria set out in the cigarette rule . . . for determining when a practice is unfair: (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors or other businesspersons.

Artie's Auto Body, Inc. v. Hartford Fire Ins. Co., 317 Conn. 602, 609 n.9 (2015) (quoting

Harris v. Bradley Mem'l Hosp. & Health Ctr., Inc., 296 Conn. 315, 350–51 (2010)).[12]

The dispute here is whether WWE's alleged conduct is "immoral, unethical, oppressive, or unscrupulous."  See Mem. in Supp. at 31–32; Opp'n at 24–26; Reply at 8.

Before it will be cognizable under CUTPA, a plaintiff's breach of contract claim must be coupled with "aggravating circumstances."  See Ulbrich v. Groth, 310 Conn. 375, 411–413 (2013).  Plaintiffs must plead factual allegations, apart from conclusory allegations, that defendants' conduct runs afoul of CUTPA, sufficient for the court to draw the reasonable inference that the conduct qualifies as "immoral, unethical, oppressive, or unscrupulous."  See Priority Sales Mgmt., Inc. v. Carla's Pasta, Inc., No. 3:10–cv–1918 (CFD), 2011 WL 3819748, at *3 (D. Conn. Aug. 26, 2011) ("Courts have held that merely stating that the defendant's conduct violates public policy or is unfair and/or deceptive is not sufficient to sustain a CUTPA claim." (quotation marks and citations omitted)); see also Opp'n at 25 (quoting Princeton Capital Fin. Co. v.

---

[12] Though there has been some question as to the continued applicability of the cigarette rule in CUTPA cases, see Artie's Auto Body, 317 Conn. at 622 n.13, the Connecticut Supreme Court has not yet abandoned the rule, see U.S. Bank, Nat'l Ass'n v. Kosciusko, LLICV136008646S, 2016 WL 8488878, at *10 n.8 (Conn. Super. Ct. Nov. 8, 2016) ("[O]ur Supreme Court has declined to abandon the cigarette rule in favor of the Federal Trade Commission's substantial unjustified injury test." (citing Artie's Auto Body, 317 Conn. at 622 n.13)), and lower courts continue to cite the cigarette rule as good law, see Papallo v. Lefebvre, -- A.3d --, 2017 WL 1507408, at *9 (Conn. App. Ct. Apr. 25, 2017).

Webster Bank, No. CV990590676S, 2002 WL 241444, at *4 (Conn. Super. Ct. Feb. 4, 2002)).

Turning to WWE's first argument for dismissal of the CUTPA claim—that "[a] mere breach of contract claim is insufficient to establish a CUTPA violation," see Mem. in Supp. at 31—the court does not believe that WWE has accurately characterized plaintiffs' argument.  Notwithstanding their colorful language,[13] plaintiffs allege not a "mere breach of contract," but rather a repeated and systematic failure to accurately pay and account for royalties, as well as a resulting breach of fiduciary duty.  See FAC ¶¶ 127–129 (alleging "bad faith and [ ] breach of fiduciary duties . . . by failing to account for millions of dollars in owed WWE Network royalties and fail[ing] to pay royalties due within 90 days following the end of the quarter," as well as related "misrepresent[ations]").  They allege aggravating circumstances well beyond "defendant's failure to deliver on a promise to pay."  Cap Maintenance Sols., LLC v. Wallingford Autopark, Inc., No. CV166060392S, 2016 WL 5798834, at *5 (Conn. Super. Ct. Sept. 6, 2016).  As such, plaintiffs' CUTPA claim is not subject to dismissal on the grounds that they have only alleged a simple breach of contract.

WWE also argues that plaintiffs' CUTPA claims must be dismissed because they lacked a commercial relationship within the scope of CUTPA, see Mem. in Supp. at 32–34, because "CUTPA does not apply to an injury within the zone of the employment relationship . . . ," Reply at 9.  As a preliminary matter, plaintiffs' Booking Contracts explicitly identify them as independent contractors, see FAC, Ex. 3 ¶ 13.1; id., Ex. 13

---

[13] See Opp'n at 25 ("WWE's argument that WWE's conduct does not rise (or stoop) to [CUTPA's] prohibited level of immoral, unethical, oppressive, unscrupulous, or offensive to public policy [sic], is little more than its unsupported declaration that repeatedly stiffing the wrestlers should be benignly viewed.").

¶ 13.1, rather than as employees.  In part because the Connecticut Supreme Court has often "stated that CUTPA is remedial in nature and must be liberally construed in favor of those whom the legislature intended to benefit," see Fairchild Heights Residents Ass'n, Inc. v. Fairchild Heights, Inc., 310 Conn. 797, 817 (2014) (quotation marks and citations omitted), "Connecticut courts have differentiated principal/agent and independent contractor relationships from employer/employee relationships, and have held that they may fall within the ambit of CUTPA's 'trade or commerce' requirement," Nygren v. Greater N.Y. Mut. Ins. Co., No. 3:07–cv–462 (DJS), 2007 WL 4105327, at *3 (D. Conn. Nov. 16, 2007) (collecting state cases).

Contrary to WWE's contentions, it is not at all apparent that the failure to pay royalties to plaintiffs falls within the "zone of the employment relationship," see Mem. in Supp. at 33; Reply at 9, such that it falls outside CUTPA's scope.  Nor is this a case in which plaintiff alleges "defendant's [ ] failure to pay for services provided by a plaintiff." See Mem. in Supp. at 33.  Though the alleged royalty obligation in this case derived from the wrestlers' Booking Contracts (which identified them as independent contractors), there is nothing about asserted royalty obligations that is intrinsically tied to an employment relationship.  For example, one of the cases to which WWE cites most often in the briefing on the pending Motion, F.B.T. Productions, LLC v. Aftermath Records, 621 F.3d 958 (9th Cir. 2010), addressed a claim for royalties between two corporate entities.  See 621 F.3d at 961.  At this point in the litigation, given the prevalence of royalty obligations outside of employment relationships and plaintiffs' factual allegations dismissal of the CUTPA claim, for failure to allege wrongdoing that

"interfere[s] with fair and open competition," Reply at 8 (quoting Mem. in Supp. at 32), is not appropriate.

Third, the court briefly addresses WWE's third argument regarding plaintiffs' CUTPA claim, namely that they cannot bring a class action CUTPA claim "[b]ecause [p]laintiffs admittedly are both residents of Georgia." See Mem. in Supp. at 34–35. Though this argument is styled as a justification for dismissal of plaintiffs' CUTPA claims, the court believes the argument is best addressed on any forthcoming Motion for Class Certification. WWE appears not to dispute that plaintiffs can bring CUTPA claims on their own behalf. That being the case, this argument is best addressed after review of a fully-briefed Motion for Class Certification.

In sum, the Motion to Dismiss Count III is denied.

I.      Count IX: Unjust Enrichment

Last, the court turns to WWE's arguments for dismissal of plaintiffs' unjust enrichment claim. WWE urges dismissal for several reasons: (1) because no claim for unjust enrichment may lie where there is an express contract between the parties that covers the same subject matter as the unjust enrichment claim; (2) because if there was no contract between the parties, plaintiffs are not otherwise entitled to royalties for the sale of copyrighted works; and (3) because plaintiffs incorporated allegations as to the enforceability and validity of an express contract between the parties, with which the unjust enrichment claim is legally inconsistent. See Mem. in Supp. at 35–36. Plaintiffs disagree, but primarily offer large block quotes rather than addressing the specifics of this case. See Opp'n at 30–34. It appears that plaintiffs suggest their unjust enrichment claim is solely an alternative means of relief, "[i]f, as WWE asserts, no

royalty claims exist under [p]laintiffs' Booking Contracts for these monies . . . ." Opp'n at 31.

"It is often said that an express contract between the parties precludes recognition of an implied-in-law contract governing the same subject matter." Meaney v. Conn. Hosp. Ass'n, Inc., 250 Conn. 500, 517–18 (1999) (quoting 1 E. Farnsworth, Contracts § 2.20 (2d ed. 1998)). "Parties who have entered into controlling express contracts are bound by such contracts to the exclusion of inconsistent implied contract obligations. Proof of a contract enforceable at law precludes the equitable remedy of unjust enrichment." Lieberman v. Emigrant Mortg. Co., 436 F. Supp. 2d 357, 366 (D. Conn. 2006) (quoting Polverari v. Peatt, 29 Conn. App. 191, 199 (1992)). "Where parties have an express contract which delineates the rights and obligations with respect to services to be provided and the compensation to be paid therefor, unjust enrichment does not lie." Levy v. World Wrestling Entm't, Inc., No. 3:08–cv–1289 (PCD), 2009 WL 455258, at *3 (D. Conn. 2009) (citations omitted).

Here, plaintiffs' claim appears to be that "if no valid contractual provision entitles [p]laintiffs to recover," then an unjust enrichment claim may provide a remedy. See Opp'n at 30–31 (emphasis added). This argument misconceives the nature of an unjust enrichment claim: as noted directly above, "[p]roof of a contract enforceable at law precludes the equitable remedy of unjust enrichment." Lieberman, 436 F. Supp. 2d at 366. In this case, plaintiffs do not appear to dispute the existence, validity, and enforceability of their Booking Contracts. That being the case, plaintiffs have no claim for unjust enrichment for failure to pay royalties, even if the Booking Contracts do not contain a contractual right to royalties. So long as those contracts are valid and

enforceable, an unjust enrichment claim aimed at the same subject matter is not

cognizable.[14]

This is not to say that an unjust enrichment claim could not be pled in the

alternative.  See Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or

defenses as it has, regardless of consistency.").  However, such a claim would need to

allege that if, for any reason, the Booking Contracts are unenforceable, then plaintiffs

are entitled to royalty payments.  Clearly, the FAC includes no plausible allegations to

that effect.[15]

WWE's Motion to Dismiss Count IX is granted.[16]

## V.   CONCLUSION

For the reasons set forth above, the Motion to Dismiss (Doc. No. 44) is

**GRANTED IN PART AND DENIED IN PART**.  All claims against WCW, Inc. are

dismissed.  Counts V and VI, for declaratory relief, are dismissed because plaintiffs

---

[14] Plaintiff quotes the portion of Agerbrink v. Model Services LLC, 196 F. Supp. 3d 412 (S.D.N.Y. 2016), explaining that "[i]f no valid contractual provision entitles Defendants to seize Agerbrink's earnings, then those earnings rightly still belong to her."  See Opp'n at 31 (quoting Agerbrink, 196 F. Supp. 3d at 416–17).  That case actually supports this court's discussion above, as the plaintiff's unjust enrichment claim in Agerbrink rested on an argument "that the relevant contract provision is invalid, [and so] her [unjust enrichment] claim is not barred by the contract."  See Agerbrink, 196 F. Supp. 3d at 416. Here, by contrast, there is no argument that any provision of the Booking Contracts is invalid; instead, plaintiffs suggest their unjust enrichment claim is permissible if the enforceable Booking Contracts, which clearly govern plaintiffs' relationship with WWE, fail to provide for royalties.  Opp'n at 31.  That argument is foreclosed for the reasons discussed above.

[15] The court expresses no view on whether an unjust enrichment claim that otherwise comported with the court's discussion immediately above would nonetheless be preempted by federal copyright law. See Mem. in Supp. at 36–37.

[16] If plaintiffs choose to replead this claim, they may wish, to ensure clarity, to keep any inconsistent pleading to a minimum.  See FAC ¶ 154 ("incorporate[ing] by reference [in unjust enrichment claim] each and every prior and subsequent allegation as though fully set forth at this point"); id. ¶ 114 (alleging that Booking Contracts are "binding and enforceable contracts"); N. Am. Tech. Servs., Inc. v. V.J. Techs., Inc., No. 3:10–cv–1384 (AWT), 2011 WL 4538069, at *6 (D. Conn. Sept. 29, 2011) ("Because lack of an express contract is a precondition to recovery based on unjust enrichment, allegations to the contrary incorporated into the count require dismissal.").

have failed to oppose WWE's arguments for dismissal and because declaratory relief appears duplicative of the breach of contract claims.  Plaintiffs may seek declaratory relief as a remedy, rather than as a freestanding cause of action.  Count VII is dismissed because plaintiffs' contracts with WCWI did not entitle them to royalties.  Last, Count IX is dismissed because unjust enrichment claims are not cognizable where an express contract governs the subject matter undergirding the unjust enrichment claim.

The Motion to Dismiss Counts I, II, III, IV, and VIII is denied.

Plaintiffs have requested leave to file a second amended complaint if the court grants WWE's Motion to Dismiss in any part.  See Opp'n at 38.  As indicated above, the court grants the Motion in part and now must decide whether to grant leave to amend.  Federal Rule of Civil Procedure 15(a)(2) makes clear that "[t]he court should freely give leave [to amend] when justice so requires."  "It is within the sound discretion of the district court to grant or deny leave to amend."  WC Capital Mgmt., LLC v. UBS Sec., LLC, 711 F.3d 322, 334 (2d Cir. 2013) (quoting Wilson v. Merrill Lynch & Co., 671 F.3d 120, 139 (2d Cir. 2011)).

The court is mindful that plaintiffs have already amended their complaint once, see generally Compl. (Doc. No. 1); FAC (Doc. No. 35), and notes that plaintiffs have offered virtually no specifics as to what they might add or alter in a second amended complaint.[17]  Nevertheless, the court believes it to be in the interest of justice to grant plaintiffs leave to file a second amended complaint.  Plaintiffs are advised that the court is extremely unlikely to grant further leave to amend.  Both plaintiffs and WWE should

---

[17] One might hope such allegations would have been included in the FAC.

bear this Ruling in mind, to the extent it is relevant, as they prepare future filings in this case.

If they choose to file a second amended complaint, plaintiffs are directed to do so within 14 days from the entry of this Ruling.  In the event plaintiffs file a second amended complaint, WWE shall answer or file a responsive pleading within 14 days from the docketing of the second amended complaint.  If plaintiffs do not choose to amend the FAC, the parties are ordered to confer and to propose a scheduling order to the court within 21 days from the entry of this Ruling.  That proposal should include, but not be limited to, for example, a class discovery timeline and a briefing schedule for any Motion for Class Certification.

There will be no extensions of any of these deadlines.

**SO ORDERED.**

Dated at New Haven, Connecticut this 5th day of May, 2017.


　/s/ Janet C. Hall　　　　　
Janet C. Hall
United States District Judge