## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Marcus Bagwell and Scott Levy, | : | |
| individually and on behalf of all others | : | |
| similarly situated; | : | Civil Action No. |
| | : | 3:16-cv-01350-JCH |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | Hon. Janet C. Hall |
| World Wrestling Entertainment, Inc., | : | |
| | : | |
| Defendant. | : | |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Marcus Bagwell and Scott Levy, individually and on behalf of all others similarly situated, allege for their Class Action Complaint against defendant World Wrestling Entertainment, Inc. ("WWE") upon personal knowledge as to themselves and their own acts, and as to all other matters, upon information and belief, based upon *inter alia*, the investigation made by their attorneys, as follows:

## I.  NATURE OF THE ACTION

1.  Plaintiffs Marcus Bagwell and Scott Levy ("Plaintiffs") bring this action, on behalf of themselves and all similarly situated individuals, under similar form contracts, who have not received contractually owed royalty payments from WWE, including WCW, Inc.[1] (a former subsidiary of WWE that was the non-surviving corporation of a merger with WWE that occurred on or about August 30, 2011) for certain content that has been *sold (or in the alternative licensed)* by WWE on the

---

[1] For consistency and clarity, Plaintiffs refer to the legal entity World Championship Wrestling, Inc. as "WCWI."  This distinguishes WCWI from WCW, Inc., and from WCW, the trademark.

World Wrestling Entertainment Network ("WWE Network") and for the nonpayment of all categories of royalties due within 90 days following the end of the fiscal quarter.

## II.    JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), which provides for the original jurisdiction of the Federal Courts for any class action in which any member of the plaintiff class is a citizen of a state different from any Defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000.00, exclusive of interest and costs.

3.    Plaintiffs allege that the total claims of the individual members of the Plaintiff Class in this action are in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. §1332 (d)(2), (5).

4.    As set forth below, Plaintiffs are citizens of Georgia.

5.    WWE is a Delaware corporation, headquartered in Stamford, Connecticut.

6.    Diversity of citizenship exists under CAFA and supports subject matter jurisdiction under 28 U.S.C § 1332 (a)(1), (d)(2)(A).

7.    More than two-thirds of all the members of the proposed Plaintiff Class in the aggregate are citizens of a state other than Connecticut, where this action is originally being filed, and the total number of members of the proposed Plaintiff Class is greater than 100, pursuant to 28 U.S.C. §1332 (d)(5)(B).

8. This Court has personal jurisdiction over WWE pursuant to Plaintiff Levy's WWE Early Contract Release and Plaintiff Bagwell's WCW, Inc. Early Contract Release, from which the parties consent to personal jurisdiction in Connecticut for purposes of seeking legal relief arising from the WWE and WCW, Inc. early contract releases and WWE and WCW, Inc. booking contracts.

9. WCW, Inc. is not a defendant; WCW, Inc. was the non-surviving corporation of a merger with WWE that occurred on or about August 30, 2011.

10. WWE, as the surviving corporation in its merger with WCW, Inc., succeeds to WCW, Inc.'s liabilities.

11. Venue is proper pursuant to Plaintiff Levy's WWE Early Contract Release and Plaintiff Bagwell's WCW, Inc.'s  Early Contract Release, in which all parties consented to the United States District Court located in Bridgeport, Connecticut or the Judicial District Court of Stamford located in Stamford, Connecticut, as appropriate venue for purposes of Plaintiffs seeking legal relief arising from Plaintiff Levy's WWE Early Contract Release and Plaintiff Bagwell's WCW, Inc. Early Contract Release and both Plaintiffs' respective booking contracts.

### III.   PARTIES

12. Defendant WWE is a Delaware corporation with a principal place of business at 1241 East Main Street, Stamford, Connecticut. At all material times, WWE has organized, operated and promoted entertainment featuring professional wrestling personalities under the name "World Wrestling Entertainment", "World

Wrestling Federation Entertainment, Inc.", and "World Wrestling Federation." WWE is the successor to Titan Sports, Inc.

13.   WWE also owns the video library of World Championship Wrestling, Inc. ("WCWI") and HHG Corp. A/K/A Extreme Championship Wrestling ("ECW").

14.   Plaintiff Bagwell is a citizen of Georgia.

15.   He was employed as a professional wrestler by World Championship Wrestling, Inc. ("WCWI") (a wholly-owned subsidiary of Turner Broadcast System, Inc.) from roughly 1991 to 2001, and WCW Inc. (WWE's former subsidiary, which merged with WWE in 2001, WWE assumed all of WCW, Inc.'s liabilities) from June 2001 through August 2001.

16.   Plaintiff Levy is a citizen of Georgia.

17.   He was employed as a professional wrestler with World Championship Wrestling, Inc. ("WCWI") from 1992-1993, World Wrestling Federation (WWE) 1993-1994, ECW 1994-1997 and 1999-2000, WCWI 1997-1998, and World Wrestling Federation, Inc. (WWE) 2000-2003.

## IV.   FACTUAL ALLEGATIONS

### WWE Network

18.   On February 24, 2014, WWE launched the World Wrestling Entertainment Network ("WWE Network"), a 24/7 direct to consumer video streaming network (like a Netflix of WWE content), that is sold (or in the alternative licensed to sell) by WWE to consumers.

19.     WWE sells (or in the alternative licenses to sell) the WWE Network for $9.99 per month in more than 180 countries and territories.

20.     The WWE Network consists of all 12 WWE live monthly pay-per-view events, reality shows, and all WWE owned video libraries.

21.     WWE Network reported 1.56 million subscribers at the end of the Second Quarter 2016 (WWE reached a record 1.82 million total subscribers in April 2016).

22.     In 2016, a total of 294 million hours of content was purchased or licensed on the WWE Network (up 15% from 256 million in 2015).

23.     WWE's DVD and home video sales have massively declined since WWE placed almost all its video libraries it sold in DVD format onto the WWE Network, creating no incentive for consumers to purchase DVDs of the WWE video library, when they can purchase the entire WWE video library content for $9.99 per month.

24.     Plaintiffs have received no direct sales royalties (or in the alternative licensee sales royalties) from WWE Network sales.

**Plaintiff Levy**

Plaintiff Levy's June 30, 2000 Booking Contract

25.     On June 30, 2000, Plaintiff Levy signed a Booking Contract with World Wrestling Federation Entertainment, Inc. **EXHIBIT 1** (Plaintiff Levy's June 30, 2000 WWF Booking Contract).

26.     On May, 6, 2002, World Wrestling Federation Entertainment, Inc. changed their name to World Wrestling Entertainment, Inc.

27.    For convenience, Plaintiff Levy will refer to WWE as the counterparty to his June 30, 2000 Booking Contract.

<u>Levy's Direct Sales Royalties Owed</u>

28.    Plaintiff Levy's June 30, 2000 WWE Booking contract, Paragraph 7.4(a), defines  a "direct sale" as:

> . . . including ***without limitation***, at the arena, via mail order sales or directly on television, or via the Internet. . . (emphasis added).

29.    WWE directly sells WWF Video Products of Pay-Per-View Videos and Non-Pay-Per-View Videos via the World Wrestling Entertainment Network ("WWE Network"), without paying direct sales royalties.

30.    Paragraph 7.5 (a)(1) defines "WWF Video Products" as:

> "video cassettes, videodiscs, CD ROM, or <u>other technology, including technology not yet created.</u>"(emphasis added).

31.    WWF Video Products includes streaming videos on the WWE Network, because under Paragraph 7.5 (a)(1), streaming the WWE Network is "<u>other technology and/or technology not yet created</u>" at the time Plaintiff Levy signed his June 30, 2000 Booking Contract. **EXHIBIT 2** (Definition of "WWF Video Products" in Plaintiff Levy's June 30, 2000 WWF Booking Contract).

32.    Paragraph 7.5 (a)(i) defines Pay-Per-View Videos ("WWF PPVs") as "WWF Pay-Per-Views in their entirety." **EXHIBIT 3** (Definition of WWF PPVs in Plaintiff Levy's 2000 WWF Booking Contract).

33.    Paragraph 7.5 (b) and 7.5 (d) define Non-Pay-Per-View Videos ("Non WWF PPVs") as, "all other WWF Video Products, other than WWF Pay-

Per-Views in their entirety and a compilation or derivative work of multiple individual WWF Pay-Per-Views in their entirety." **EXHIBIT 4** (Definition of Non WWF PPVs in Plaintiff Levy's 2000 WWF Booking Contract).

34.     Paragraph 7.5(c)(i) requires WWE to pay direct sale royalties for WWF PPVs sold as WWF Video Products by WWE under the following circumstances:

> WWF shall allocate 5% of the Net Receipts paid to WWF with respect to the direct sale by WWF of WWF Pay-Per-Views to a talent royalty pool. Thereafter, WWF shall pro-rate payment to Plaintiff and all other talent appearing in such WWF Pay-Per-Views in the same proportion as was the compensation paid to Plaintiff for his appearances in the pay-per-views to the total amount paid to all talent for their appearances on the pay-per-views.

35.     Under paragraph 7.5 (c)(ii), WWE is also obligated to pay direct sales royalties for WWF PPVs sold by WWE when:

> The WWF Video Product is a compilation or derivative work of multiple individual WWF Pay-Per-Views in their entirety, such as a collection of videos, e.g., a WrestleMania box set, payment to Plaintiff shall be calculated as follows: 5% of the Net Receipts paid to WWF shall comprise the talent royalty pool, which shall first be pro-rated based on the number of individual videos in the compilation, and then the payment to Plaintiff for each video shall be consistent with the royalty payment to the Plaintiff at the time each individual video was first released.

36.     For paragraph 7.5 (c)(i) and (c)(ii) calculations (royalty amount owed for WWE's direct sales of WWF PPVs), Net Receipts means the _gross amount_ received by WWE for the WWF PPVs.

37.     In 2016, the WWE Network segment _grossed_ revenue of $180.9 million, up from $159.4 million in 2015, and $69.5 million in 2014, the WWE Network's maiden year. **EXHIBIT 5** (WWE's Fourth-Quarter 2016 Results).

38.     Paragraph 7.5 (d) requires WWE to pay direct sale royalties for Non WWF PPVs sold as WWF Video Products by WWE under the following circumstances:

> WWF shall allocate 5% of the Net Receipts paid to WWF with respect to the direct sale by Plaintiff of all other WWF Video Products other than those set forth in 7.5 (c)(i) and (c)(ii) above, to a talent royalty pool, from which WWF shall pay Plaintiff and all other talent appearing in such WWF Video Products pro-rata among Plaintiff and all other talent so featured.

39.     For paragraph 7.5 (d) calculations (royalty amount owed for WWE's direct sale of Non WWF PPVs), Net Receipts means:

> The _gross amount_ received by WWF for the WWF Video Products. Notwithstanding the foregoing, if Plaintiff is deemed to be the "featured performer" as determined by WWF in its sole discretion, Plaintiff shall receive a bonus of an additional 5% of WWF's Net Receipts up to the sale of the first 150,000 units. Once sales exceed 150,000, Plaintiff as a featured performer shall receive 10% of WWF's Net Receipts on all units sold, including the first 150,000 units. If Plaintiff is part of a group that is determined to be the "featured performer," Plaintiff shall share pro-rata with each and every member of the group in any bonus monies that may be due in connection with such WWF Video Products. (emphasis added)

40.     In 2016, the WWE Network segment _grossed_ revenue of $180.9 million, $159.4 million in 2015, and $69.5 million in 2014, the WWE Network's maiden year. **EXHIBIT 5** (WWE's Fourth-Quarter 2016 Results).

41.     For several years (February 2014- present), WWE directly sold "WWF Video Products" (streaming videos on WWE Network) of WWF PPVs and Non WWF PPVs featuring Plaintiff Levy without paying direct sale royalties to Plaintiff Levy.

<u>Plaintiff Levy's June 30, 2000 Booking Contract Licensee Sales Royalties</u>

42.     In the alternative, if WWE does not directly sell the WWE Network, Plaintiff Levy's June 30, 2000 WWF Booking Contract requires licensee royalties for any licensee's sale of the WWE Network.

43.     WWE lists WWE Network, LLC. as a subsidiary company.

44.     WWE licensed its copyrighted video libraries featuring Plaintiff Levy to WWE Network, LLC and/ or to other licensees WWE has failed to disclose to Plaintiff Levy.

45.     WWE Network, LLC. and/or other licensees sells "WWF Video Products" and "WCW Video Products" (WWE Network subscriptions) of WWF PPVs and Non WWF PPVs.

46.     Paragraph 7.5 (a) (i) and (ii) requires WWE to pay licensee royalties for WWF PPVs sold by licensees:

(i) PROMOTER shall allocate twenty-five percent (25%) of the Net Receipts paid to PROMOTER by licensees authorized to reproduce and sell video cassettes, videodiscs, CD ROM, or other technology, including technology not yet created (hereinafter referred to as "WWF Video Products"), of WWF pay-per-views in their entirety ("WWF Pay-Per-Views") o a talent royalty pool. Thereafter, PROMOTER shall pro-rate payment to WRESTLER and all other talent appearing in such WWF Pay-Per-Views in the same proportion as was the compensation paid to WRESTLER for his appearances in the pay-per-views to the total amount paid to all talent for their appearances in the pay-per-view. For purposes of paragraphs 7.5(a) (i) and 7.5(a)(ii), Net Receipts shall mean the gross amount received by PROMOTOER from the licensees for the WWF Pay-Per-Views less any and all costs incurred by PROMOTER to produce and/or distribute such WWF Pay-Per-Views.

(ii) In the event that the WWF Video Products are a compilation or derivative work of multiple individual WWF Pay-Per-Views in their entirety, such as a collection of videos, e.g., a Wrestlemania box set, payment to WRESTLER shall be calculated as follows: twenty-five percent (25%) of the Net Receipts paid to PROMORTER by licensees

9

shall comprise the talent royalty pool, which shall first be pro-rata based on the number of individual videos in the compilation, and then the payment to WRESTLER for each video shall be consistent with the royalty payment to the WRESTLER at the time that each individual was first released.

47.     Paragraph 7.5(b) also requires WWE to pay royalties for Non WWF PPVs sold by licensees:

PROMOTER shall allocate twenty-five percent (25%) of the Net Receipts paid to PROMOTER by licensees authorized to reproduce and sell all other WWF Video Products, other than those set forth in paragraphs 7.5(a)(i) and 7.5(a)(ii) above, to a talent royalty pool, from which PROMOTER shall pay WRESTLER and all other talent so featured. For purposes of this paragraph 7.5(b), Net Receipts shall mean the gross amount received by PROMOTER for the WWF Video Products less any and all costs incurred by PROMOTER to produce and/or distribute such WWF Video Products.

48.     Plaintiff Levy's June 20, 2000 WWF Booking Contract, Paragraph 8.2 requires that WWE's marketing, distribution, and licensing shall be for the benefit of the wrestler:

PROMOTER shall bear the following costs in connection with the development and enhancement of the value of WRESTLER's performance hereunder and WRESTLER's standing in the professional wrestling community, all of which shall benefit WRESTLER:

(b)     In connection with the production, distribution, and exploitation of the Programs, PROMOTER shall bear all costs incurred in connection with such production, distribution, broadcast, transmission or other forms of mass media communication;

(c)     In connection with any product or service licensing activities and/or merchandising activities, PROMOTER shall bear all costs of negotiating, securing or otherwise obtaining the product or service licensing arrangements, including costs of agents, consultants, attorneys and others involved in making the product or service licensing activities; and PROMOTER shall bear all costs of creating, designing, developing, producing and marketing merchandise or services.  In order

10

to fulfill these obligations, PROMOTER may make any arrangements, contractual or otherwise, it deems appropriate to delegate, assign, or otherwise transfer its obligations.

49.    WWE has not marketed, distributed, and licensed for the benefit of Plaintiff Levy, by failing to pay correct royalty amounts.

50.    For several years (February 2014- present), WWE Network, LLC, and/or other undisclosed licensees, sold WWF Video Products (streaming videos on WWE Network) of WWF PPVs and Non WWF PPVs featuring Plaintiff Levy, without WWE paying licensee royalties to Plaintiff Levy.

<u>Levy's May 4, 1993 WWE Booking Contract Requires Licensee Sales Royalties</u>

51.    On May 4, 1993, Plaintiff Levy signed a Booking Contract with World Wrestling Federation[4]. **EXHIBIT 6** (Plaintiff Levy's May 4, 1993 WWF Booking Contract).

52.    Paragraph 7.6 of Plaintiff Levy's May 4, 1993 Booking Contract requires WWE to pay royalties for licensee's sales of "WWF Video Specials":

> In the event WRESTLER is a featured performer whose Intellectual Property and/or Name and Likeness are exploited with other wrestlers represented by PROMOTER in the videos made of Pay-Per-View Specials such as "Wrestlemania," "Royal Rumble," "Summerslam" and "Survivor Series" (hereinafter "WWF Video Specials"), PROMOTER shall allocate and prorate twenty-five percent (25%) of the "WWF Video Specials' Net Receipts" paid to PROMOTER by Licensee based upon the total amount paid to the wrestlers for the live event whose Intellectual Property and/or Name and Likeness are so exploited. WWF Video

---

[4] World Wrestling Federation changed its name to World Wrestling Federation Entertainment, Inc., and finally to World Wrestling Entertainment, Inc. Plaintiff references World Wrestling Federation as WWE.

Specials' Net Receipts mean the gross amount received by PROMOTER from its licensees less all costs, if any, incurred by PROMOTER to produce the applicable WWF Video Special.

53.     Paragraph 7.7 also requires WWE to pay royalties from licensees' sales

of "WWF Series":

> In the event WRESTLER is a featured performer whose Intellectual Property and/or Name and Likeness are exploited with other wrestlers represented by PROMOTOER, in non-pay-per=view video programs such as "Best of WWF" and "Saturday Night's Main Event" (hereinafter "WWF Series"), PROMOTER shall allocate and prorate twenty-five percent (25%) of the "WWF Series' Net Receipts" paid to PROMOTOER from its licensees based upon the number of wrestlers whose Intellectual Property and/or Name and Likeness are so exploited. WWF Series' Net Receipts mean the gross amount received by PROMOTER from its licensees less expenses, if any, incurred by PROMOTER in connection with production of the applicable WWF Series.

54.     Paragraph 7.8 requires WWE to pay royalties for licensees' sales

of "Video Products":

> In the event WRESTLER's Intellectual Property and/or Name and Likeness are featured exclusively (as described below) in videodiscs or cassettes (hereinafter "Video Products"), WRESTLER shall receive an amount equal to twelve and on-half percent (12- ½%) of the "Video Net Receipts" derived by PROMOTER for such exploitation. The remaining twelve and on-half percent (12-1/2%) royalty allocation will be prorated among the other wrestlers who appear incidentally on the Video Products abut who are not the featured WRESTLER. Video Net Receipts mean the gross amount received by PROMOTER from its licensees less all costs, if any, incurred by PROMOTER to produce the applicable Video Product.

> An Exclusive Feature shall mean that the WRESTLER is shown in each and every match on the Video Product. WRESTLER is entitled to the payment provided for above only for those Video Products which feature him/her exclusively, i.e., "Roddy Piper, or "Andre the Giant," or on those Video Products which feature a tag team or group to which WRESTLER belongs, i.e., the "Hart Foundation."  Relative to a tag team or group appearing on a Video Product, the remaining twelve and on-half percent

(12-1/2%) royalty will be prorated among the wrestlers according to the number of wrestlers in the featured group.

55.    Plaintiff Levy appears on the 1993  Survivor Series, which is a "WWF Video Special".

56.    Survivor Series 1993 has been sold by licensee WWE Network, LLC and/or other undisclosed licensees (streaming WWE Network sales), but Plaintiff Levy has received no licensee sales royalty payment from WWE.

57.    Plaintiff Levy also believes he appears on other "WWF Series" and "Video Products" sold by licensees that WWE has not paid licensee sales royalties for.

58.    Paragraph 7.11 (a) of Plaintiff Levy's 1993 Booking Contracted requires a written objection to WWE's royalty statement, this constitutes Plaintiff Levy's objection.

<u>Levy's ECW Performances Require Direct or Licensee Sales Royalties</u>

59.    Plaintiff Levy appears on the WWE owned ECW video library during the years 1994-1997 and 1999-2000.

60.    On June 17, 2003, the United States Bankruptcy Court, Southern District of New York entered a sale order, which approved WWE's asset purchase agreement from HHG Corporation A/K/A Extreme Championship Wrestling ("ECW").

61.    That order expressly provided that "the assets include, without limitation, copyright ownership of the entire ECW library of footage and no party,

including, without limitation, Tod Gordon or any affiliate, has any Claim against the ECW library."  (Case No. 01-B-11982 (Docket No. 102) United States Bankruptcy Court, Southern District of New York).

62.     To be clear, Plaintiff Levy is not asserting a claim against the ECW film library originating from any obligation other than Plaintiff Levy's June 20, 2000 WWE Booking Contract.

63.     Under Plaintiff Levy's June 20, 2000 WWF Booking Contract, once WWE purchased the ECW video library, it became subject to royalty payments for WWE's direct sales (or in the alternative WWE's licensees' sales) of "WWF Video Products" of WWF PPVs and Non WWF PPVs of the ECW video library featuring Plaintiff Levy because Levy's June 20, 2000 WWE Booking Contract does not limit Levy's royalty entitlements to only money derived from videos produced by WWE. Plaintiff Levy has not received any ECW royalty payments (direct sales (or in the alternative licensee sales)) from the WWE Network.

<u>Plaintiff Levy's WCW Performances on WWE Network</u>

64.     Under Plaintiff Levy's June 20, 2000 WWF Booking Contract, once WWE purchased the WCWI video library[5], it became subject to royalty payments for WWE's direct sales (or in the alternative WWE's licensees' sales) of "WWF Video Products" of WWF PPVs and Non WWF PPVs of the WCWI video library featuring Plaintiff Levy because Levy's June 20, 2000 WWE contract does not limit Levy's royalty entitlements to only money derived from videos produced by WWE.

---

[5] Described in detail in Plaintiff Bagwell's section.

65.     Plaintiff Levy has not received any WCWI royalties (direct or licensee sales) from the WWE Network.

<u>Plaintiff Levy's January 21, 2003 Early Release Contract</u>

66.     On January 21, 2003, Plaintiff Levy and WWE agreed to an Early Contract Release. **EXHIBIT 7** (Plaintiff Levy's January 21, 2003 WWE Early Contract Release).

67.     The Early Contract Release included releases from the June 30, 2000 WWE contract (the "Contract") and any prior contracts, amendments or modifications.

68.     Plaintiff Levy's Early Contract Release Paragraph 4. A. declares the agreement is:

> . . . a full and complete buyout of Levy's services under the Contract (June 30, 2000 WWF contract) *other than the obligation to pay Levy the royalties due to him pursuant to, and as determined by, the Contract (June 30, 2000 WWF Contract).* (emphasis added)

69.     As of January 21, 2003 (signing of the Early Contract Release), Plaintiff Levy's June 30, 2000 Booking Contract exists only to define WWE's royalty obligations owed to Plaintiff Levy.

70.     Paragraph 6 of the Early Contract Release declares Plaintiff Levy forfeits any claims in law or equity against WWE in the following circumstances:

> Levy acknowledges that *except as expressly set forth herein (obligation to continue to pay royalties pursuant to June 30, 2000 agreement),* no representations of any kind or character have been made to Levy by WWE or by an of WWE's agents, representatives or attorneys to induce the execution of this Release. In order for Levy to induce WWE to sign this Release, Levy hereby releases WWE its parent companies, affiliates, subsidiaries, successors, assigns, and its and their respective

15

officers, directors, employees, independent contractors, licensees, representatives and agents from any and all claims, liabilities and obligations whatsoever in law or equity (whether now known or hereinafter discovered) which Levy has or may ever have arising out of or in connection with the Contract (June 30, 2000). (emphasis added).

71.    As a *condition precedent* for Plaintiff Levy to "release WWE from any and all claims, liabilities and obligations whatsoever in law or equity, whether now known or hereinafter discovered," WWE must honor the representations (obligation to pay royalties pursuant to June 30, 2000 agreement) that induced Plaintiff Levy to sign the Early Release Contract.

72.    WWE breached its Early Contract Release with Plaintiff Levy by selling "WWF Video Products" (streaming videos on the WWE Network) of WWF PPVs and Non WWF PPVs (from WWE, WCW, and ECW video libraries) featuring Plaintiff Levy without paying any direct sale royalties to Plaintiff Levy (or in the alternative, licensee sales royalties). **EXHIBIT 8** (Plaintiff Levy's Second Quarter 2016 WWE Royalty Statement evidencing no royalties paid for WWE sale of "WWF PPVs and Non WWF PPV on WWE Network).

## **Plaintiff Bagwell**

### Plaintiff Bagwell's Direct Sale Royalties Owed

73.    On Friday, March 23, 2001, WWE's subsidiary, WCW, Inc., acquired the World Championship Wrestling, Inc. ("WCWI") trademark, together with the copyrighted WCWI video library (includes all WCWI PPVs and Non PPVs Plaintiff Bagwell appears on).

74.     WCW, Inc. was the non-surviving corporation of a merger that occurred between WWE and WCW, Inc. on or about August 30, 2011.

75.     WWE is the current owner of the WCWI video library.

76.     On June 4, 2001, Plaintiff Bagwell signed a Booking Contract with WCW, Inc.[6]   **EXHIBIT 9** (Plaintiff Bagwell's June 4, 2001 WCW, Inc. Booking Contract).

77.     Plaintiff Bagwell's June 4, 2001 Booking Contract, Section 7.4(a), defines what a "direct sale" is:

> . . . including ***without limitation***, at the arena, via mail order sales or directly on television, or via the Internet. . . (emphasis added).

78.     WWE directly sells WCW Video Products of Pay-Per-View Videos and Non-Pay-Per-View Videos via the WWE Network featuring Plaintiff Bagwell from his performances in the WCWI video library owned by WWE, without paying direct sales royalties.

79.     No provision of Plaintiff Bagwell's June 4, 2001 WCW, Inc. Booking Contract limit his direct sales royalty entitlement to only money derived from videos produced by WWE or WCW, Inc.

80.     Paragraph 7.5 (a)(i) defines "WCW Video Products" as:

> "video cassettes, videodiscs, CD ROM, or *other technology, including technology not yet created.*" (emphasis added)

81.     WCW Video Products includes streaming videos on the WWE Network because under Paragraph 7.5 (a)(i) streaming the WWE Network is "*other technology*

---

[6] "WCW", as used in Plaintiff Bagwell's Booking Contract, referred to WCW, Inc., which eventually merged into WWE. Plaintiff will reference WCW, Inc. as WWE.

*and/or technology not yet created*" at the time Plaintiff Bagwell signed his June 4, 2001 Booking Contract. **EXHIBIT 10** (Definition of "WCW Video Products" in Plaintiff Bagwell's June 4, 2001 WCW, Inc. Booking Contract).

82.     Paragraph 7.5 (a)(i) defines Pay-Per-View Videos ("WCW PPVs") as, "WCW Pay-Per-Views in their entirety." **EXHIBIT 11** (Definition of WCW PPVs in Plaintiff Bagwell's June 4, 2001 WCW, Inc. Booking Contract).

83.     Paragraph 7.5 (b) and 7.5 (d) define Non-Pay-Per-View Videos ("Non-WCW PPVs") as, "all other WCW Video Products, other than WCW Pay-Per-Views in their entirety and a compilation or derivative work of multiple individual WCW Pay-Per-Views in their entirety." **EXHIBIT 12** (Definition of Non WCW PPVs in Plaintiff Bagwell's June 4, 2001 WCW, Inc. Booking Contract).

84.     Paragraph 7.5(c)(i) requires WWE to pay direct royalties for WCW PPVs sold as WCW Video Products by WWE under the following circumstances:

> WCW shall allocate 5% of the Net Receipts paid to WCW with respect to the direct sale by WCW of WCW Pay-Per-Views to a talent royalty pool. Thereafter, WCW shall pro-rate payment to Plaintiff and all other talent appearing in such WCW Pay-Per-Views in the same proportion as was the compensation paid to Plaintiff for his appearances in the pay-per-views to the total amount paid to all talent for their appearances on the pay-per-views.

85.     Under Paragraph 7.5 (c)(ii), WWE is also obligated to pay direct sales royalties for WCW PPVs sold by WWE when:

> The WCW Video Product is a compilation or derivative work of multiple individual WCW Pay-Per-Views in their entirety, such as a collection of videos, e.g., a WrestleMania box set, payment to Plaintiff shall be calculated as follows: 5% of the Net Receipts paid to WCW shall comprise the talent royalty pool, which shall first be pro-rated based on the number of individual videos in the compilation, and then the

payment to Plaintiff for each video shall be consistent with the royalty payment to the Plaintiff at the time each individual video was first released.

86.    For paragraph 7.5 (c)(i) and (c)(ii) calculations (royalty amount owed for sales of Pay-Per-View Videos), Net Receipts means the _gross amount_ received by WWE for the WCW Pay-Per-Views.

87.    In 2016, WWE Network grossed $180.9 million, $159.4 million in 2015, and $69.5 million in 2014. **EXHIBIT 5** (WWE's Fourth-Quarter 2016 Results).

88.    Paragraph 7.5 (d) requires WWE to pay direct sale royalties for Non WCW PPVs sold as WCW Video Products by WWE under the following circumstances:

> WCW shall allocate 5% of the Net Receipts paid to WCW with respect to the direct sale by Plaintiff of _all other WCW Video Products other than those set forth in 7.5 (c)(i) and (c)(ii) above_, to a talent royalty pool, from which WCW shall pay Plaintiff and all other talent appearing in such WCW Video Products pro-rata among Plaintiff and all other talent so featured.

89.    For paragraph 7.5 (d) calculations (royalty amount owed for WWE's direct sale of WCW Non PPVs), Net Receipts means:

> The _gross amount_ received by WCW for the WCW Video Products. Notwithstanding the foregoing, if Plaintiff is deemed to be the "featured performer" as determined by WCW in its sole discretion, Plaintiff shall receive a bonus of an additional 5% of WCW's Net Receipts up to the sale of the first 150,000 units. Once sales exceed 150,000, Plaintiff as a featured performer shall receive 10% of WCW's Net Receipts on all units sold, including the first 150,000 units. If Plaintiff is part of a group that is determined to be the "featured performer," Plaintiff shall share pro-rata with each and every member of the group in any bonus monies that may be due in connection with such WCW Video Products.

90.     The WWE Network segment *grossed* revenue of $180.9 million in 2016, $159.4 million in 2015, and $69.5 million in 2014. **EXHIBIT 5** (WWE's Fourth-Quarter 2016 Results).

91.     For several years (February 2014- present), WWE directly sold "WCW Video Products" (streaming videos on WWE Network) of WCW PPVs and Non WCW PPVs (from the WCWI video library) without paying direct sale royalties to Plaintiff Bagwell.

<u>Plaintiff Bagwell's August 7, 2001 Early Release Contract</u>

92.     On August 7, 2001, Plaintiff Bagwell and WCW, Inc. agreed to an Early Contract Release. **EXHIBIT 13** (Plaintiff Bagwell's August 7, 2001 Early Contract Release with WCW, Inc.).

93.     The Early Contract Release included releases from the June 4, 2001 WCW, Inc. contract and any prior contracts, amendments or modifications.

94.     Plaintiff Bagwell's Early Contract Release Paragraph 4. A. declares the agreement is:

> . . . a full and complete buyout of Bagwell's services under the Contract (June 4, 2001 WCW contract) *other than the obligation to pay Bagwell the royalties due to him pursuant to, and as determined by, the Contract (June 4, 2001 WCW-WWE contract)*. (emphasis added).

95.     As of August 7, 2001 (signing of the Early Contract Release), Plaintiff Bagwell's June 4, 2001 WCW, Inc. Booking Contract exists only to define WWE's royalty obligations owed to Plaintiff Bagwell.

96.     Paragraph 6 of the Early Contract Release declares Plaintiff Bagwell forfeits any claims in law or equity against WCW, Inc. (WWE) in the following circumstances (emphasis added):

> Bagwell acknowledges that *except as expressly set forth herein (obligation to continue to pay royalties pursuant to June 4, 2001 agreement)*, no representations of any kind or character have been made to Bagwell by WCW or by an of WCW's agents, representatives or attorneys to induce the execution of this Release. In order for Bagwell to induce WCW to sign this Release, Bagwell hereby releases WCW, its parent companies, affiliates, subsidiaries, successors, assigns, and its and their respective officers, directors, employees, independent contractors, licensees, representatives and agents from any and all claims, liabilities and obligations whatsoever in law or equity (whether now known or hereinafter discovered) which Bagwell has or may ever have arising out of or in connection with the Contract (June 4, 2001).

97.     As a *condition precedent* for Plaintiff Bagwell to "release WCW, Inc. from any and all claims, liabilities and obligations whatsoever in law or equity, whether now known or hereinafter discovered," WWE must honor the representations (WWE's obligation to pay Plaintiff Bagwell royalties pursuant to June 4, 2001 booking agreement) that induced Plaintiff Bagwell to sign the Early Release Contract.

98.     WWE breached its Early Contract Release with Plaintiff Bagwell by selling "WCW Video Products" (streaming videos on the WWE Network) of WCW PPVs and Non WCW PPVs (Plaintiff Bagwell's performances in WCWI video library) without paying any direct sales royalties to Plaintiff Bagwell (or in the alternative, licensee sales royalties). **EXHIBIT 14** (Plaintiff Bagwell's First Quarter 2016 WWE Royalty Statement evidencing no royalties paid for WWE sale of WCW PPVs and Non WCW PPVs on WWE Network).

<u>Plaintiff Bagwell's June 4, 2001 Booking Contract Licensee Sales Royalties</u>

21

99.     In the alternative, if WWE does not directly sell the WWE Network, Plaintiff Bagwell's June 4, 2001 WCW, Inc. Booking Contract requires licensee royalties for any licensee's sale of the WWE Network.

100.    WWE lists WWE Network, LLC. as a subsidiary company

101.    WWE licensed its copyrighted video libraries featuring Plaintiff Bagwell to WWE Network, LLC. and/or to other licensees WWE has failed to disclose to Plaintiff Bagwell.

102.    Paragraph 7.5 (a) (i) and (ii) requires WWE to pay royalties for WCW PPVs sold by licensees:

> PROMOTER shall allocate twenty-five percent (25%) of the Net Receipts paid to PROMOTER by licensees authorized to reproduce and sell video cassettes, videodiscs, CD ROM, or other technology, including technology not yet created (hereinafter referred to as "WCW Video Products"), of WCW pay-per-views in their entirety ("WCW Pay-Per-Views") o a talent royalty pool. Thereafter, PROMOTER shall pro-rate payment to WRESTLER and all other talent appearing in such WCW Pay-Per-Views in the same proportion as was the compensation paid to WRESTLER for his appearances in the pay-per-views to the total amount paid to all talent for their appearances in the pay-per-view. For purposes of paragraphs 7.5(a)(i) and 7.5(a)(ii), Net Receipts shall mean the gross amount received by PROMOTOER from the licensees for the WCW Pay-Per-Views less any and all costs incurred by PROMOTER to produce and/or distribute such WCW Pay-Per-Views.
> (ii) In the event that the WCW Video Products are a compilation or derivative work of multiple individual WCW Pay-Per-Views in their entirety, such as a collection of videos, e.g., a Wrestlemania box set, payment to WRESTLER shall be calculated as follows: twenty-five percent (25%) of the Net Receipts paid to PROMORTER by licensees shall comprise the talent royalty pool, which shall first be pro-rata based on the number of individual videos in the compilation, and then the payment to WRESTLER for each video shall be consistent with the royalty payment to the WRESTLER at the time that each individual was first released.

103.   Paragraph 7.5(b) also requires WWE to pay royalties for Non WCW

PPVs sold by licensees:

> PROMOTER shall allocate twenty-five percent (25%) of the Net Receipts
> paid to PROMOTER by licensees authorized to reproduce and sell all
> other WCW Video Products, other than those set forth in paragraphs
> 7.5(a)(i) and 7.5(a)(ii) above, to a talent royalty pool, from which
> PROMOTER shall pay WRESTLER and all other talent so featured. For
> purposes of this paragraph 7.5(b), Net Receipts shall mean the gross
> amount received by PROMOTER for the WCW Video Products less any
> and all costs incurred by PROMOTER to produce and/or distribute such
> WCW Video Products.

104. Plaintiff Bagwell's June 4, 2001 WCW, Inc. Booking Contract,

Paragraph 8.2 requires that WWE's marketing, distribution, and licensing shall be

for the benefit of the wrestler:

> WCW shall bear the following costs in connection with the development
> and enhancement of the value of WRESTLER's performance hereunder
> and WRESTLER's standing in the professional wrestling community, all
> of which shall benefit WRESTLER:
>
> (b)   In connection with the production, distribution, and exploitation
> of the Programs, WCW shall bear all costs incurred in connection with
> such production, distribution, broadcast, transmission or other forms of
> mass media communication;
>
> (c)   In connection with any product or service licensing activities
> and/or merchandising activities, WCW shall bear all costs of
> negotiating, securing or otherwise obtaining the product or service
> licensing arrangements, including costs of agents, consultants,
> attorneys and others involved in making the product or service licensing
> activities; and WCW shall bear all costs of creating, designing
> developing, producing and marketing merchandise or services.  In order
> to fulfill these obligations, WCW may make any arrangements,
> contractual or otherwise, it deems appropriate to delegate, assign, or
> otherwise transfer its obligations.

105.   For several years (February 2014- present), WWE Network, LLC

sold, and/or other undisclosed licensees, sold WCW Video Products (streaming

videos on WWE Network) of WCW PPVs and Non WCW PPVs (of Plaintiff Bagwell in WCWI video library) without WWE paying licensee royalties to Plaintiff Bagwell.

WWE'S Failure To Pay Royalties Within 90 Days Following End Of The Quarter

106.    WWE appears to have a business scheme in place where WWE unilaterally chose an aggregate sum that must be reached before sending out royalty payments, even if that means sending royalty payments due to Plaintiffs in excess of 90 days following the end of the quarter, in breach of Plaintiffs' booking contracts.

107.    Plaintiffs' WWE Booking Contracts do not mention an aggregate sum that must be reached before royalty payments will be paid to them.

108.    WWE must pay royalty payments to Plaintiffs (even if $0.01) within 90 days following the end of the quarter.

      a.    Plaintiff Bagwell

109.    Under Section 7.12 (a) of Plaintiff Bagwell's Booking Contract:

*PROMOTER shall prepare and send statements as to royalties payable hereunder to WRESTLER within ninety (90) days following the end of each quarter,* based upon the royalties received and processed by PROMOTER in the previous quarter, together with payment of royalties, if any, earned by WRESTLER hereunder during such quarter-annual period, less advances and/or debits made by PROMOTER on WRESTLER's behalf. (emphasis added)

110.    WWE admits it did not pay Bagwell within 90 days following the end of certain quarters, as they create a royalty distinction between "Royalty Earned Current Quarter" and "Previously Unpaid Royalties Earned." **EXHIBIT 14** (Plaintiff Bagwell's

Summary of Royalty Earnings p.1, evidencing Current Quarter Royalty of $40.81 and
Previously Unpaid Royalties Earned $23.59)

111.    Plaintiff Bagwell's First Quarter 2016 Royalty statement evidences the
nonpayment of royalties within 90 days dating back to the Third Quarter 2012.
**EXHIBIT 14** (Plaintiff  Bagwell's First Quarter 2016 royalty statement with payments
from Third Quarter 2012).

112.    Third Quarter 2012 royalties were due to Plaintiff Bagwell 90 days
following the end of the Third Quarter 2012, not March 24, 2016.  (Even if the amount
due is $0.01, payment is due within 90 days following the end of the quarter).

113.    WWE also failed to pay royalties to Plaintiff Bagwell within 90 days for
the following quarters (list not exhaustive): Fourth Quarter 2012, First Quarter 2013,
Second Quarter 2013, Fourth Quarter 2013, Second Quarter 2014, Second Quarter
2015, and Third Quarter 2015. **EXHIBIT 14.**

114.    WWE has not paid WWE Network royalties (direct sale or in alternative
licensee) to Plaintiff Bagwell in any quarter since the Network's inception in February
2014.

115.    WWE's nonpayment of royalties within 90 days is a breach of Plaintiff
Bagwell's Early Contract Release and June 4, 2001 WCW, Inc. Booking Contract, and
appears to be WWE's widespread scheme and business practice.

      b.    <u>Plaintiff Levy</u>

116.    Under Section 7.12 (a) of Plaintiff Levy's Booking Contract:

*<u>PROMOTER shall prepare and send statements as to royalties payable
hereunder to WRESTLER within ninety (90) days following the end of each</u>*

*quarter*, based upon the royalties received and processed by PROMOTER in the previous quarter, together with payment of royalties, if any, earned by WRESTLER hereunder during such quarter-annual period, less advances and/or debits made by PROMOTER on WRESTLER's behalf. (emphasis added).

117.   Plaintiff Levy's Second Quarter 2016 WWE royalty statement (page 1) declares, "Royalty Earned Current Quarter…. $130.83."

118.   That amount is wrong because pages 2 and 3 of the statement evidences royalties earned in Quarter 4 of 2015, which should have been paid in First Quarter 2016 to satisfy the contractually requirement payment within 90 days following the end of each quarter.   **EXHIBIT 8** (Plaintiff Levy's Second Quarter 2016 royalty statement).

119.   Additionally, unlike Plaintiff Bagwell (WWE made a distinction between current quarter royalties and unpaid royalties (**EXHIBIT 14**)), there is no distinction made on Plaintiff Levy's summary of royalties, deceiving Plaintiff  Levy to believe he has received up to date royalties, which appears to be WWE's policy and practice. **EXHIBIT 8** (No distinction of Plaintiff Levy's royalty earnings).

120.   WWE has also not paid WWE Network royalties (direct sale or in alternative licensee) to Plaintiff Levy in any quarter since the Network's inception in February 2014.

121.   Nonpayment of royalties within 90 days is a breach of Plaintiff Levy's Early Contract Release and June 30, 2000 WWF Booking Contract.

<u>Plaintiff Bagwell's Lawsuit Prerequisites Have Been Satisfied</u>

a.   <u>Section 7.12 (b) and (d)</u>

26

122.   Section 7.12 (b) and (d) of Plaintiff Bagwell's June 4, 2001 WCW, Inc.

Booking Contract provides prerequisites for Plaintiff Bagwell to satisfy prior to filing

a claim for unpaid royalty payments:

> 7.12 (d) - No claim shall be filed pursuant to paragraph 13.8 below against WCW or WCW's affiliates that disputes any statement of royalties or accounting given by WCW hereunder or that makes any claim for royalties or royalty payments, unless the same is commenced or filed within one (1) year after the date such statement or accounting is first given, delivered or sent to Wrestler, and *unless Wrestler has first exhausted his remedies pursuant to paragraph 7.12 (b)* above. (emphasis added).

> 7.12 (b) – WCW shall maintain books of account related to the payment of royalties hereunder at its principal place of business. Wrestler or Wrestler's designated independent certified public accountant who is a member in good standing of the AICPA, may at Wrestler's sole expense examine WCW's books insofar as they pertain to this Agreement for the purpose of verifying the accuracy thereof, during WCW's normal business hours and upon reasonable notice. Such audit shall be conducted in a manner that will not unreasonably interfere with WCW's normal business operations. Wrestler shall not audit WCW's books and records more than twice during any calendar year and no such audit shall be conducted later than one (1) year after the last statement of royalties is given, delivered or sent to Wrestler. Each audit is limited to seven (7) days in duration. Statements of royalties may be changed from time to time to reflect year-end adjustments, to correct clerical errors and for similar purposes.

123.   Pursuant to Section 7.12(b), Plaintiff Bagwell engaged a certified public

accountant, who is a member in good standing of the AICPA, to examine WWE's

books for purposes of verifying the accuracy of royalty payments (no WWE Network

royalty payments) received by Plaintiff Bagwell.

124.   The accountant contacted WWE officials around June 23, 2016 to schedule a time to examine WWE's books and was told the last week of July 2016 or the first week of August 2016 would be possible times to conduct an audit.

125.   However, on August 5, 2016, Plaintiffs' former law firm (Krislov & Associates) received a letter from K&L Gates's Pittsburgh, Pennsylvania office declaring they are WWE's counsel, accusing Plaintiff Bagwell's accountant of having "asserted a pretextual and invalid audit request to attempt to stealthily obtain that information (WWE network royalty audit)."

126.   The August 5, 2016 letter further declared that "neither [Plaintiff's accountant] nor any other purported representative of Mr. Bagwell will be permitted to audit WWE accounting records. . . Because your client is not paid any such royalties (WWE Network), there is nothing to audit."

127.   Plaintiff Bagwell asserted his rights to audit WWE records (for purposes of verifying the accuracy of royalty payments (no WWE Network royalties)) and WWE denied his request, in violation of Plaintiff Bagwell's June 4, 2001 WCW, Inc. contract.

128.   By its denial of audit, WWE forfeits any claim that Plaintiff Bagwell did not satisfy Section 7.12 (b) lawsuit prerequisites because WWE denied Plaintiff Bagwell any chance to audit the records.

> b.   Notice of Disputed Royalty Statement - Section 7.12 (c)

129.   Section 7.12 (c) of Plaintiff Bagwell's June 4, 2001 Booking Contract provides the notice procedure for disputing a royalty statement:

Wrestler shall be deemed to have consented to all statements of royalties and all other accountings provided by WCW hereunder and each such statement of royalties or other accounting shall be conclusive, final, and binding; shall constitute an account stated; and shall not be subject to any objection for any reason whatsoever unless a specific objection in writing, stating the basis thereof, is given by Wrestler to WCW within one (1) year from the date the royalty statement was given, delivered or sent to Wrestler.

130.   This Complaint serves as Plaintiff Bagwell's notice (providing specific objections, the basis of the objections, and within one year of March 24, 2016- tolled by the first amended complaint filed) pursuant to Section 7.12(c) that he does not consent to his March 24, 2016 royalty statement.

131.   Plaintiff Bagwell does not consent to any inaccurate or nonpaid royalty statement he has ever received.

### Plaintiff Levy's Lawsuit Prerequisites Have Been Satisfied

a.     Section 7.12 (b) and (d)

132.   Section 7.12 (b) and (d) of Plaintiff Levy's June 30, 2000 WWF Booking Contract provides prerequisites for Plaintiff Levy to satisfy prior to filing a claim for unpaid royalty payments:

7.12 (d)- No claim shall be filed pursuant to paragraph 13.8 below against WWF or WWF's affiliates that disputes any statement of royalties or accounting given by WWF hereunder or that makes any claim for royalties or royalty payments, unless the same is commenced or filed within one (1) year after the date such statement or accounting is first given, delivered or sent to Wrestler, and *unless Wrestler has first exhausted his remedies pursuant to paragraph 7.12 (b)* above. (emphasis added).

7.12 (b) – WWF shall maintain books of account related to the payment of royalties hereunder at its principal place of business. Wrestler or Wrestler's designated independent certified public accountant who is a member in good standing of the AICPA, may at Wrestler's sole expense

examine WWF's books insofar as they pertain to this Agreement for the purpose of verifying the accuracy thereof, during WWF's normal business hours and upon reasonable notice. Such audit shall be conducted in a manner that will not unreasonably interfere with WWF's normal business operations. Wrestler shall not audit WWF's books and records more than twice during any calendar year and no such audit shall be conducted later than six (6) months after the last statement of royalties is given, delivered or sent to Wrestler. Each audit is limited to five (5) days in duration. Statements of royalties may be changed from time to time to reflect year-end adjustments, to correct clerical errors and for similar purposes.

133.   On August 5, 2016, Plaintiff Levy's former counsel (Krislov & Associates) received a letter from K&L Gates's Pittsburgh, Pennsylvania office declaring ". . . Because your client (Plaintiff Bagwell) is not paid any such royalties (WWE Network), there is nothing to audit."

134.   Plaintiff Levy will not waste resources to attempt to audit something WWE has already denied Plaintiff Bagwell's right to and asserted there is nothing to audit for WWE Network royalties, thus Plaintiff Levy has satisfied all prerequisites.

      b.   Notice of Disputed Royalty Statement - Section 7.12 (c)

135.   Section 7.12 (c) of Plaintiff Levy's June 30, 2000 Booking Contract provides the notice procedure for disputing a royalty statement:

Wrestler shall be deemed to have consented to all statements of royalties and all other accountings provided by PROMOTER hereunder and each such statement of royalties or other accounting shall be conclusive, final, and binding; shall constitute an account stated; and shall not be subject to any objection for any reason whatsoever unless a specific objection in writing, stating the basis thereof, is given by Wrestler to PROMOTER within one (1) year from the date the royalty statement was given, delivered or sent to Wrestler.

136.    This Complaint serves as Plaintiff Levy's notice (providing specific objections, the basis of the objections, and within one year of June 20, 2016) pursuant to Section 7.12(c) that he does not consent to his June 20, 2016 royalty statement.

137.    Plaintiff Levy does not consent to any inaccurate or nonpaid royalty statement he has ever received.

## V.    CLASS ACTION ALLEGATIONS

138.    Plaintiffs bring this action for themselves, and on behalf of all others similarly situated.

139.    The Classes that Plaintiffs seek to represent are defined as follows:

<u>WWE Network Class</u>

All individuals who are parties to one or more of the following contracts with WWE or its predecessors in interest:

1) Titan Sports, Inc. d/b/a World Wrestling Federation Booking Contract from signing period of January 1, 1993 until December 31, 1993;

2) World Wrestling Federation Entertainment, Inc. Booking Contract from the signing period of January 1, 1999 until January 1, 2004;

3) WCW, Inc. Booking Contract from the signing period of March 24, 2001- January 1, 2004.

Excluded from the class are those who have signed (a) a WWE "Nostalgia" or "Legends" Contract, or (b) a settlement agreement with WWE that releases any claims in law or equity against WWE, except for enforcement of any royalty obligations that may exist.

<u>Royalties Not Paid Within 90 Days Following End Of The Quarter Class</u>

**Rule 23(b) Categories: (b)(2) and (b)(3)**

150.   **Predominance.** Common questions of law and fact predominate over questions affecting only individual class members, as class members, whose terms are substantially the same, having no individual issues other than calculating each member's royalty amount by an identical formula.

151.   **Superiority.** A class action is superior to all other feasible alternatives for the resolution of this matter.

152.   Individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the court and of the parties, and potentially could lead to inconsistent results that would be contrary to the interest of justice.

153.   Absent a class action, it would be highly unlikely that the representative Plaintiffs or any other members of the Class or any Subclass would be able to protect their own interest because the cost of litigation through individual lawsuits would exceed expected recovery.

154.   **Manageability.** This case is well suited for treatment as a class action and can easily be managed as a class action because evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a class-wide basis, while the allocation and distribution of damages to class members would be essentially a ministerial function.

155.   Defendant acted on grounds generally applicable to Plaintiffs and the Class members through breach of contract.

32

156.    Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with punitive damages are appropriate with respect to the Classes as a whole.

## VI. CAUSES OF ACTION

### <u>COUNT I</u>
### Breach Of Contract—Failure To Pay Direct Sales Royalties

157.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

158.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class.

159.    Plaintiffs and members of the Class formed binding and enforceable contracts when they executed written WWE Booking Contracts (including WWF and WCW, Inc.) and WWE Early Contract Releases (including WCW, Inc.)

160.    Plaintiff Bagwell's Early Contract Release declares, in Paragraph (4. A.), the agreement is:

> . . . a full and complete buyout of Bagwell's services under the Contract (June 4, 2001 WCW contract) *other than the obligation to pay Bagwell the royalties due to him pursuant to, and as determined by, the Contract (June 4, 2001 WCW, Inc. contract)*. (emphasis added)

161.    Plaintiff Levy's Early Contract Release declares, in Paragraph (4. A.), the agreement is:

> . . . a full and complete buyout of Levy's services under the Contract (June 30, 2000 WWF contract) *other than the obligation to pay Levy the royalties due to him pursuant to, and as determined by, the Contract (June 30, 2000 WWF contract)*. (emphasis added)

162.   Under Paragraph 7.5 of Plaintiff Bagwell's June 4, 2001 WCW, Inc. Booking Contract, Plaintiff and members of the Class are entitled to royalties from WWE's direct sales of "WCW Video Products" (streaming video on WWE Network) featuring Plaintiff Bagwell in WCW PPVs and Non WCW PPVs.

163.   Under Paragraph 7.5 of Plaintiff Levy's June 30, 2000 WWF Booking Contract, Plaintiff and members of the Class are entitled to royalties from WWE's sales of "WWF Video Products" (streaming video on WWE Network) featuring Plaintiff Levy in WWF PPVs and Non WWF PPVs.

164.   WWE has not paid Plaintiffs and members of the Class any royalties from WWE's sales of the WWE Network (a WCW Video Product and WWF Video Product) featuring Plaintiffs in WWC PPVs, WWF PPVs, Non WCW PPVs and Non WWF PPVs.

165.   Plaintiffs and members of the Class have been damaged by WWE's breach of the obligation to pay royalties to Plaintiffs and members of the Class.

## COUNT II
### Breach Of Fiduciary Duty

166.   Plaintiffs incorporate by reference each and every prior and subsequent allegation as though fully set forth at this point.

167.   In agreeing to allow WWE to serve as their Promotor, Plaintiffs and each member of the Class placed a unique degree of trust and confidence in  WWE, who clearly had superior knowledge, skill or expertise in managing such affairs and was under a duty to represent the interests of Plaintiffs and each member of the Class as their Promoter.

168.   WWE's role as Plaintiffs' Promotor placed it in a dominant position, thereby creating a relationship of dependency, particularly since Plaintiffs had no meaningful access to the financial information upon which the royalty rights depend.

169.   WWE placed itself in the role of Trustee of royalties due to Plaintiffs and each member of the Class, who depended and continues to depend on WWE's integrity and good faith in honoring the royalty obligation and proper accounting (pay within 90 days) due to Plaintiffs and each member of the Class.

170.   WWE advanced its interests to the detriment of Plaintiffs and each member of the Class by failing to properly pay royalties as described above.

171.   As a result therefrom, Plaintiffs and each member of the Class have sustained damages.

## COUNT III
### Connecticut Unfair Trade Practices Act, C.G.S. §42-110A, Et Seq. Violation

172.   Plaintiffs incorporate by reference each and every prior subsequent allegation as though fully set forth at this point.

173.   Defendant WWE has acted in bad faith and in breach of fiduciary duties owed to Plaintiffs and members of the Class by failing to account for millions of dollars in owed WWE Network royalties and failed to pay royalties due within 90 days following the end of the quarter.

174.   Defendant WWE has repeatedly misrepresented to Plaintiffs and members of the Class the amounts rightfully owed to them (including nonpayment of royalties within 90 days).

175.   Said conduct is a violation of the Connecticut Unfair Trade Practices Act, C.G.S. §42-110a, *et seq*. on the part of the Defendant WWE, in that said actions, during the course of Defendant WWE's trade or business were immoral, oppressive, unscrupulous, and caused substantial injury to the Plaintiffs and the Class.

176.   WWE's conduct caused substantial ascertainable loss to the Plaintiffs and members of the Class, including but not limited to, the loss of valuable WWE Network royalties, the information necessary to determine the amounts properly due to Plaintiffs, and the loss of income each quarter from WWE's failure to send royalty payments within 90 days following the end of the fiscal quarter.

177.   Defendant WWE obtained substantial benefit as a direct result of its invasion of the privacy of Plaintiffs and members of Class, which in equity and good conscience ought not to be able to keep.

178.   A copy of this complaint has been mailed to the Attorney General of the State of Connecticut and the Commissioner of Consumer Protection.

## <u>COUNT IV</u>
## Breach of Contract
## Failure To Pay Royalties Within 90 Days Following The End Of Quarter

179.   Plaintiffs incorporate by reference each and every prior and subsequent allegation as though fully set forth at this point.

180.   Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class.

181.    Plaintiffs and members of the Class formed binding and enforceable contracts when they executed written WWE Booking Contracts (including WWF and WCW, Inc.) and WWE Early Contract Releases (including WCW, Inc.)

182.    Plaintiff Bagwell's Early Contract Release declares, in Paragraph (4. A.), the agreement is:

. . . a full and complete buyout of Bagwell's services under the Contract (June 4, 2001 WCW-WWE contract) *other than the obligation to pay Bagwell the royalties due to him pursuant to, and as determined by, the Contract (June 4, 2001 WCW Inc. contract)* (emphasis added).

183.    Plaintiff Levy's Early Contract Release declares, in Paragraph (4. A.), the agreement is:

. . . a full and complete buyout of Bagwell's services under the Contract (June 30, 2000 WWF contract) *other than the obligation to pay Levy the royalties due to him pursuant to, and as determined by, the Contract (June 30, 2000 WWF contract)* (emphasis added).

184.    Under Paragraph 7.12 (a) of both Plaintiffs' Booking Contracts, Plaintiffs and members of the Class are entitled to statements of royalties payable within 90 days following the end of each quarter.

185.    WWE failed to send royalty statements within 90 days following the end of each quarter to Plaintiffs.

186.    Plaintiffs and members of the Class have been damaged by WWE's breach of the obligation to pay royalties within 90 days following the end of each quarter to Plaintiffs and members of the Class.

## <u>COUNT V</u>
## Breach Of Contract- Failure To Pay Licensees' Sales Royalties

187.    Plaintiffs incorporate by reference each and every prior and subsequent allegation as though fully set forth at this point.

188.    Section 7.5(a)(i), 7.5 (a)(ii), and 7.5 (b) of Plaintiff Levy's June 30, 2000 WWF booking contract requires WWE to pay royalties for licensees' sales of "WWF Video Products" of WWF PPVs and Non WWF PPVs.

189.    Plaintiff Levy and members of the Class and Subclasses has not received WWE royalty payments from licensee WWE Network, LLC's and/or undisclosed licensees' sale of WWF Video Products (WWE Network) of WWF PPVs and Non WWF PPVs.

190.    Under Section 7.6 of Plaintiff Levy's May 4, 1993 booking contract, WWE is required to pay royalties to Plaintiff and members of the Class for licensees' sales of "WWF Video Specials," "WWF Series," and "Video Programs."

191.    Plaintiff Levy and members of the Class have not been paid by WWE for licensee WWE Network, LLC's and/ or undisclosed licensees' sales of "WWF Video Specials," "WWF Series," and "Video Programs."

192.    Section 7.5(a)(i), 7.5 (a)(ii), and 7.5 (b) of Plaintiff Bagwell's June 4, 2001 WCW, Inc. booking contract requires WWE to pay royalties for licensees' sales of "WCW Video Products" of WCW PPVs and Non WCW PPVs.

193.    Plaintiff Bagwell has not received WWE royalty payments from licensee WWE Network, LLC's and/ or undisclosed licensees' sale of WCW Video Products (WWE Network) of WCW PPVs and Non WCW PPVs.

38

194.    Plaintiffs and members of the Class have been damaged by WWE's breach of the obligation to pay licensees' sales royalties to Plaintiffs and members of the Class.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the Classes of persons described herein, pray for an Order as follows:

a)    Certify the Class and Subclass as requested herein, appoint Plaintiffs as Class Representative and their selection of counsel as lead Class Counsel, and order class-wide relief;

b)    Adjudge and decree that WWE has engaged in the conduct alleged herein;

c)    Enjoin and restrain WWE and its officers and agents from continuing or engaging in similar conduct as alleged herein;

d)    Impose a constructive trust on monetary amounts wrongfully withheld from Plaintiffs and the Class members pending resolution of their claims herein;

e)    Order that WWE pay all compensatory damages as a result of its breaches of contracts;

f)    Order that WWE pay punitive damages as a result of its breaches of contracts;

g)    Order that WWE pay interest on the monies wrongfully obtained from the date of nonpayment through the date of entry of judgment in this action;

h)    Order WWE to identify victims and amounts of unpaid royalties from its breaches of contracts;

i)    Disgorgement of all proceeds unjustly flowing from WWE's actions and/or omissions;

j)    Award attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and

k)    Grant all other relief as the Court deems necessary and proper.

## VIII.  JURY DEMAND

Plaintiffs and members of the Classes respectfully demand a trial by jury on all issues so triable.

Dated:  May 19, 2017                    Respectfully submitted,

                                        By: /s/ Matthew T. Peterson

                    *Pro Hac*     Matthew T. Peterson (CT08146)
                                  900 W. Jackson Blvd., Suite 4e
                                  Chicago, IL 60607
                                  Phone: (815) 999-9130
                                  Email: matthew@matthewtpetersonlaw.com

                                  Brenden P. Leydon (CT16026)
                                  80 Fourth Street
                                  Stamford, CT 06905
                                  Phone: (203) 324-6164
                                  Email: BLeydon@tooherwocol.com

*Counsel For Plaintiffs and Classes*

CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of May, 2017, a copy of the foregoing Second Amended Complaint was served via this Court's electronic case filing system.


*/s/ Matthew T. Peterson*
Matthew T. Peterson

41