# EXHIBIT 1



ORIGINAL

# WORLD WRESTLING FEDERATION ENTERTAINMENT, INC.
## BOOKING CONTRACT

This World Wrestling Federation Entertainment, Inc. Booking Contract ("Agreement"), dated this thirtieth (30th) day of June, 2000, and made effective as of August 27, 2000, by and between World Wrestling Federation Entertainment, Inc., a Delaware corporation, with its principal place of business at 1241 East Main Street, Stamford, Connecticut 06902 (hereinafter referred to as "PROMOTER"), and Scott Levy, an individual residing at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ (hereinafter referred to as "WRESTLER").

## PREMISES

WHEREAS, PROMOTER is duly licensed, as required, to conduct professional wrestling exhibitions and is actually engaged in the business of organizing, publicizing, arranging, staging and conducting professional wrestling exhibitions and/or events, as defined below, throughout the world and of representing professional wrestlers in the promotion and exploitation of a professional wrestler's name, likeness, personality and character; and

WHEREAS, PROMOTER has established a nationwide network of television stations which regularly broadcast PROMOTER's wrestling programs for purposes of publicizing PROMOTER's professional wrestling exhibitions and/or events, as defined below, and PROMOTER has established a network of cable television organizations which regularly broadcast PROMOTER's professional wrestling exhibitions on a pay-per-view basis; and in addition thereto, PROMOTER has developed and produced certain other television programs, which are also used to publicize, display and promote PROMOTER's professional wrestling exhibitions; and

WHEREAS, PROMOTER's business operations afford WRESTLER opportunities to wrestle and obtain public exposure which will increase the value of his wrestling services and his standing in the professional wrestling community and entertainment industry; and

WHEREAS, WRESTLER is duly licensed, as required, to engage in professional wrestling exhibitions and/or events, as defined below, and is actually engaged in the business of performing as a professional wrestler; and

WHEREAS, WRESTLER is a performing artist and the professional wrestling exhibitions arranged by PROMOTER constitute demonstrations of wrestling skills and abilities designed to provide athletic-styled entertainment to the public, and such professional wrestling exhibitions and events constitute entertainment and are not competitive sports; and

WHEREAS, WRESTLER desires PROMOTER to arrange professional wrestling exhibitions and/or events, as defined below, for WRESTLER and to assist WRESTLER in obtaining public exposure through live exhibitions, television programs, public appearances, and merchandising activities, or otherwise;

NOW THEREFORE, in consideration of the mutual promises and agreements as set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are

1

hereby acknowledged, and the parties intending to be legally bound, do hereby agree as follows:

## 1. BOOKING

1.1    WRESTLER hereby grants exclusively to PROMOTER, and PROMOTER hereby accepts, the following worldwide rights:

(a)    During the term of this Agreement as defined below, the right to engage WRESTLER's performance in wrestling matches at professional wrestling exhibitions, as well as appearances of any type at other events, engagements or entertainment programs in which WRESTLER performs services as a professional wrestler, entertainer or otherwise directed by PROMOTER in its sole discretion, including any events, sessions, programs or any other such skills or physical development training required in PROMOTER's sole discretion to enhance or improve WRESTLER's overall wrestling ability or in-ring skills (collectively the "Events"), whether such Events are staged before a live audience, in a television broadcast studio, on location (for later viewing or broadcast) or otherwise. For the avoidance of doubt, the parties agree that included within the foregoing definition of Events PROMOTER shall have the right to assign WRESTLER to Events located within certain territories in which PROMOTER has an affiliation, such as Ohio Valley Wrestling and Memphis Championship Wrestling, for any period of time during the Agreement as PROMOTER shall see fit.

(b)    During the term of this Agreement as defined below, the right to sell or otherwise distribute tickets of admission to the general public for viewing of any or all of the Events that include the performance or appearance of WRESTLER, as well as on any closed circuit television, pay-per-view television, video exhibition, or any other medium now known or hereinafter discovered, of the Events.

(c)    During the term of this Agreement and thereafter, as provided for in this Agreement, the right to solicit, negotiate, and enter into agreements for and on behalf of WRESTLER for the exploitation of Intellectual Property (as defined hereinbelow) for merchandising, commercial tie-ups, publishing, personal appearances, performances in non-wrestling events, and endorsements.

1.2    In consideration of WRESTLER's granting of rights, license and other services, as set forth herein, and provided WRESTLER shall faithfully and fully perform all obligations hereunder, PROMOTER shall endeavor to book WRESTLER as an individual or as a member of a group, which determination shall be made in PROMOTER's sole discretion, in wrestling matches at various Events.

## 2. WORKS

2.1    If PROMOTER books WRESTLER to appear and perform at Events, WRESTLER hereby grants to PROMOTER and PROMOTER hereby accepts, the exclusive right during the term of this Agreement to video tape, film, photograph, or otherwise record, or to authorize others to do so, by any media now known or hereinafter discovered, WRESTLER's appearance, performance, commentary, and any other work product for any or all of the Events. (These recordings by tape, disc, film, or otherwise are collectively referred to herein as the "Programs".)

2

2.2    Notwithstanding the termination of this Agreement for any reason, and notwithstanding any other provision of this Agreement, PROMOTER shall have the right to produce, reproduce, reissue, manipulate, reconfigure, license, manufacture, record, perform, exhibit, broadcast, televise by any form of television (including without limitation, free, cable, pay cable, closed circuit and pay-per-view television), transmit, publish, copy, reconfigure, compile, print, reprint, vend, sell, distribute and use via any other medium now known or hereinafter discovered, and to authorize others to do so, the Programs, in perpetuity, in any manner or media and by any art, method or device, now known or hereinafter discovered (including without limitation, by means of videodisc, videocassette, optical, electrical and/or digital compilations, theatrical motion picture and/or non-theatrical motion picture). All gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible property provided to WRESTLER by PROMOTER and/or containing New Intellectual Property as defined in paragraph 3.2(a) shall be immediately returned to PROMOTER upon termination of this Agreement for any reason.

2.3    WRESTLER's appearance, performance and work product in any or all of the Events and/or Programs shall be deemed work for hire; and notwithstanding the termination of this Agreement, PROMOTER shall own, in perpetuity, all Programs and all of the rights, results, products and proceeds in and to, or derived from the Events and Programs (including without limitation, all incidents, dialogue, characters, actions, routines, ideas, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other tangible or intangible materials written, composed, submitted, added, improvised, or created by or for WRESTLER in connection with appearance at the Events and/or in the Programs) and PROMOTER may obtain copyright and/or trademark and/or any other legal protection therefor, now known or hereinafter discovered, in the name of PROMOTER and/or on behalf of PROMOTER's designee.

2.4    If PROMOTER directs WRESTLER, either singly or in conjunction with PROMOTER, to create, design or develop any copyrightable work (herein referred to as a "Development"), such Development shall be deemed work for hire and PROMOTER shall own such Development. All Programs and Developments referred to in this Agreement are collectively referred to as "Works."

2.5    All Works and WRESTLER's contributions thereto shall belong solely and exclusively to PROMOTER in perpetuity notwithstanding any termination of this Agreement. To the extent that such Works are considered: (i) contributions to collective works, (ii) a compilation, (iii) a supplementary work and/or (iv) as part or component of a motion picture or other audio-visual work, the parties hereby expressly agree that the Works shall be considered "works made for hire" under the United States Copyright Act of 1976, as amended (17 U.S.C. § 101 et seq.). In accordance therewith, all rights in and to the Works shall belong exclusively to PROMOTER in perpetuity, notwithstanding any termination of this Agreement. To the extent that such Works are deemed works other than "works made for hire," WRESTLER hereby assigns to PROMOTER all right, title and interest in and to all rights in such Works and all renewals and extensions of the copyrights or other rights that may be secured under the laws now or hereafter in force and effect in the United States of America or any other country or countries.

3

## 3. INTELLECTUAL PROPERTY

3.1     The parties agree that as of the date of this Agreement, all service marks, trademarks and any and all other distinctive and identifying indicia under which WRESTLER claims any rights, including but not limited to WRESTLER's legal name, nickname, ring name, likeness, personality, character, caricatures, voice, signature, costumes, props, gimmicks, gestures, routines and themes, which are owned by WRESTLER or in which WRESTLER has any rights anywhere in the world (collectively, the "Original Intellectual Property") are described and identified on Schedule A attached hereto and incorporated herein by reference. Except as specifically set forth herein to the contrary, WRESTLER represents and warrants that as of the date of execution of this Agreement WRESTLER owns solely and exclusively any and all rights to the Original Intellectual Property and shall fully indemnify PROMOTER from any issues whatsoever arising out of a claim of ownership to the Original Intellectual Property. WRESTLER hereby assigns, for the Term of this Agreement, in good faith to PROMOTER and PROMOTER hereby accepts all worldwide right, title and interest in and to WRESTLER's Original Intellectual Property, including, but not limited to, the rights to license, reproduce, manipulate, promote, expose, exploit and otherwise use the Original Intellectual Property anywhere in the world in any commercial manner, media, art form, method or device now known or hereinafter discovered. The foregoing provisions are a material condition to this Agreement, the breach of which may result in termination of the terms hereof.

3.2     (a)     (i)     With the exception of WRESTLER's Original Intellectual Property, any service marks, trademarks and/or distinctive and identifying indicia, including ring name, nickname, likeness, personality, character, caricatures, voice, signature, props, gestures, routines, themes, incidents, dialogue, actions, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible or intangible property written, composed, submitted, added, improvised, created and/or used by or associated with WRESTLER's performance in the business of professional wrestling or sports entertainment during the term of this Agreement (collectively the "New Intellectual Property") are hereby assigned to and shall belong to PROMOTER, in perpetuity, with PROMOTER retaining all such ownership rights exclusively throughout the world notwithstanding any termination of this Agreement.

(ii)     WRESTLER acknowledges that PROMOTER created and developed the ring name and persona of "Johnny Polo", and that all trademarks, service marks, ring names, characters, persona and related intellectual property set forth in paragraph 3.2 (a)(i) concerning "Johnny Polo", used alone and/or as part of any tag team, are hereinafter deemed New Intellectual Property.

(b)     Upon the termination of this Agreement, all rights in and to the Original Intellectual Property shall revert to WRESTLER, except that PROMOTER, its licensees, sublicensees and assigns may continue to exploit any and all materials, goods, merchandise and other items incorporating the Original Intellectual Property made before such termination, until all such materials, goods and merchandise are sold off.

3.3     It is the intention of the parties that the New Intellectual Property belongs to PROMOTER, in perpetuity, even to the exclusion of WRESTLER, and shall survive the termination of this Agreement for any reason. PROMOTER shall have the exclusive right to assign, license,

4

PJ\USRA\Legal Affairs\Booking Contract\Levy Scott 2000.doc
06/13/00

sublicense, reproduce, promote, expose, exploit and otherwise use the New Intellectual Property in any commercial manner now known or hereinafter discovered, regardless of whether such rights are exercised during or after the Term of this Agreement and notwithstanding termination of this Agreement for any reason.

3.4    The Original Intellectual Property and the New Intellectual Property are hereinafter collectively referred to as "Intellectual Property."

3.5    WRESTLER agrees to cooperate fully and in good faith with PROMOTER for the purpose of securing and preserving PROMOTER's rights in and to the Intellectual Property. In connection herewith, WRESTLER acknowledges and hereby grants to PROMOTER the exclusive worldwide right during the Term of this Agreement (with respect to Original Intellectual Property) and in perpetuity (with respect to New Intellectual Property) to apply for and obtain trademarks, service marks, copyrights and other registrations throughout the world in PROMOTER's name and/or on behalf of Promoter's designee. At PROMOTER's expense and request, PROMOTER and WRESTLER shall take such steps, as PROMOTER deems necessary for any registration or any litigation or other proceeding, to protect PROMOTER's rights in the Original Intellectual Property and/or New Intellectual Property and/or Works.

## 4. MERCHANDISING

4.1    WRESTLER hereby agrees that PROMOTER shall have the exclusive right (i) during the Term of this Agreement and thereafter, as provided in this Agreement, to use the Original Intellectual Property and (ii) in perpetuity, to use the New Intellectual Property in connection with the manufacture, production, reproduction, reissuance, manipulation, reconfiguration, broadcast, rebroadcast, distribution, sale, and other commercial exploitation in any manner, now known or hereinafter discovered, of any and all materials, goods, merchandise and other items incorporating the Intellectual Property. As to all such materials, goods, merchandise or items created, developed, produced and/or distributed during the Term of this Agreement using the Original Intellectual Property, PROMOTER shall have the exclusive right to sell and exploit such materials, goods and merchandise until the sell-off of same. As to all such materials, goods, merchandise or items using the New Intellectual Property, PROMOTER shall have the exclusive right, in perpetuity, to sell and exploit same forever. By way of example and not of limitation, such items include t-shirts, posters, photos, video tapes and video cassettes, dolls, books, biographies, articles and stories, and any other such material goods, merchandise, or items relating to WRESTLER.

4.2    It is the intention of the parties that PROMOTER's rights described under paragraph 4.1 are exclusive to PROMOTER even to the exclusion of WRESTLER. PROMOTER shall own all copyrights and trademarks in any and all such materials, goods, merchandise and items and shall be entitled to obtain copyright, trademark, service mark or other registrations in PROMOTER's name or on behalf of its designee; and WRESTLER shall provide all reasonable assistance to PROMOTER in so obtaining such copyright, trademark, service mark or other registrations.

## 5. EXCLUSIVITY

5.1    It is the understanding of the parties that all rights, licenses, privileges and all other items

5

herein given or granted or assigned by WRESTLER to PROMOTER are exclusive to PROMOTER even to the exclusion of WRESTLER.

5.2     In the event WRESTLER desires upon reasonable notice to PROMOTER during the Term of this Agreement either individually or through his authorized representative(s) to participate in movies, films, commercials, product endorsements, videos, television programs or similar activities (collectively "Permitted Activities") and promotional events for the Permitted Activities, WRESTLER may do so subject to PROMOTER's approval, which shall not be unreasonably withheld provided a written sublicense is executed between PROMOTER, WRESTLER and any relevant third parties and further provided WRESTLER shall not utilize the New Intellectual Property in any manner in connection with such Permitted Activities without PROMOTER's written consent, and that PROMOTER retains first priority, to the exclusion of any such Permitted Activities, with respect to the use and scheduling of WRESTLER's services at all times during the Term (as defined below) of this Agreement.  It is further agreed that PROMOTER shall receive from WRESTLER a management fee to reimburse PROMOTER for its reasonable administrative costs incurred in connection with WRESTLER's participation in each such Permitted Activity, provided that PROMOTER's costs shall not exceed ten percent (10%) of any fees received by WRESTLER for each such Permitted Activity described herein. Additionally, all monies earned by WRESTLER from such Permitted Activities in a specific Contract Year shall be credited against the Minimum Annual Compensation for that Contract Year as set forth in paragraph 7.1 below.

## 6.  TERM AND TERRITORY

6.1     The term of the Agreement shall be three (3) years from the effective date hereof ("Initial Term").  Thereafter, this Agreement shall automatically renew for a successive one (1) year term ("Renewal Term") unless PROMOTER opts to serve written notice to WRESTLER, at least ninety (90) days prior to the end of the Initial Term, terminating this Agreement upon expiration of the Initial Term. Each year of the Agreement may also be referred to hereinafter as a "Contract Year".

6.2     Reference herein to the Term hereof means the Initial Term and any such Renewal Term. During any such Renewal Term, all rights, duties, obligations, and privileges hereunder shall continue as stated herein. Notwithstanding anything herein to the contrary, termination of this Agreement for any reason shall not affect PROMOTER's ownership of and rights in, including but not limited to, any Works, New Intellectual Property and any registrations thereof, or the rights, results, products, and proceeds in and to and derived from WRESTLER during the Term of this Agreement; and the exploitation of rights set forth in Paragraphs 1, 2, 3 and 4 hereof in any and all media now known or hereinafter discovered.

6.3     At any time prior to the expiration of the first Renewal Term, should PROMOTER desire to renew the Term pursuant to the provisions of paragraph 6.1 above, but WRESTLER does not wish to renew the Term because WRESTLER has received an offer from a competing wrestling/sports entertainment organization or entity, WRESTLER must indicate same to PROMOTER in the written notice of non-rollover within the specified time periods, and further, WRESTLER must not provide or agree to provide any services to such other competing wrestling/sports entertainment organization or entity until providing PROMOTER the opportunity, during the ninety (90) day notice period, to enter into an agreement for

6

WRESTLER'S services on substantially similar terms.

6.4    The territory of this Agreement shall be the world.

## 7.  PAYMENTS/ROYALTIES

7.1    (a)    Provided that WRESTLER fulfills all obligations and warranties and provided WRESTLER does not breach any of the terms of this Agreement, PROMOTER guarantees WRESTLER that the total of the payments made to WRESTLER shall amount in the aggregate to be no less than



during the during the Renewal Term (if exercised) (referred to hereinafter as "Minimum Annual Compensation"), which shall be payable in fifty-two (52) equal weekly installments. In calculating such Minimum Annual Compensation, PROMOTER shall credit any payments earned by WRESTLER under the paragraphs of Section 5 and this Section 7 against the Minimum Annual Compensation. For the purposes of this paragraph, any royalty payments due under the Agreement shall be deemed "earned" only at the time they are paid to WRESTLER.

(b)    Subject to paragraphs 7.9, if applicable, and 10.2 (b) below, within one hundred twenty (120) days after the Contract Year has ended, if it is determined that WRESTLER has earned more than the Minimum Annual Compensation for services rendered during the Contract Year, WRESTLER shall be paid in one lump sum within fifteen (15) days thereafter the difference between the Minimum Annual Compensation and what WRESTLER actually earned for services rendered during the Contract Year.

7.2    (a)    If WRESTLER appears and performs in any Event in an arena before a live audience at which admission is charged other than those arena events which are taped or broadcast for purposes pursuant to paragraph 7.2 (b) and paragraph 7.2 (c) hereof (hereinafter "House Shows"), Wrestler shall be paid by PROMOTER an amount equal to such percentage of the paid receipts for such House Show from the live House Show gate receipts only as is consistent with the nature of the match in which WRESTLER appears, i.e., preliminary, mid-card, main event, etc. and any standards PROMOTER establishes specifically for such House Show.

(b)    If WRESTLER appears and performs in connection with an arena or studio Event which is taped or broadcast for use on PROMOTER's television network, ("TV Taping"), WRESTLER shall be paid by PROMOTER an amount in accordance with the nature of the match in which WRESTLER performs, i.e., preliminary card, mid card, main event, etc., or any other standard PROMOTER, in its sole discretion, establishes specifically for that TV Taping.

(c)    If Wrestler appears and performs in connection with an arena or studio event which is aired or broadcast via satellite broadcast or pay-per-view distribution technology ("Pay-Per-View"), WRESTLER shall be paid by PROMOTER an amount in accordance with the nature of the match in which WRESTLER performs, i.e., preliminary card, mid card, main event,

7

etc., or any other standard PROMOTER, in its sole discretion, establishes specifically for that Pay-Per-View.

7.3   (a)   Licensed Product Royalties: In the event that the Original and/or New Intellectual Property are used by PROMOTER and/or licensed, sublicensed, or otherwise assigned to third parties for production, reproduction and/or sale and distribution, in conjunction with any consumer materials, goods or merchandise, (hereinafter collectively referred to as "Licensed Products"), such that the applicable Licensed Product only features the Original and/or New Intellectual Property, WRESTLER shall be paid twenty-five percent (25%) of the Licensed Products' Net Receipts received by PROMOTER with respect to any such licensing, sublicensing or assignment. Licensed Products' Net Receipts means the gross amount received by PROMOTER less expenses incurred by PROMOTER or its licensing agent for the applicable Licensed Product. WRESTLER acknowledges and agrees that WRESTLER shall not be eligible for any royalties with respect to television license, advertising and distribution fees paid to PROMOTER by any entity in connection with the exploitation of Original and/or New Intellectual Property.

  (b)   In the event that the Original and/or New Intellectual Property are used by PROMOTER or licensed, sublicensed, or otherwise assigned to third parties in connection with Licensed Products featuring WRESTLER with other wrestlers represented by PROMOTER, PROMOTER shall allocate twenty-five percent (25%) of the Licensed Products Net Receipts, to be paid pro-rata among WRESTLER and all other talent so featured.

7.4   (a)   Direct Sales Royalties: In the event that PROMOTER distributes and sells directly any Licensed Products other than any WWF Pay-Per-Views ,as set forth in paragraph 7.5(c), below or any WWF Video Products, as set forth in Paragraph 7.5(d) below, including without limitation, at the arena, via mail order sales or directly on television, or via the Internet (hereinafter "Direct Sales Products"), such that the applicable product only features the Original and/or New Intellectual Property of the WRESTLER, WRESTLER shall be paid five percent (5%) of the Direct Sales Products' Net Receipts derived by PROMOTER from such exploitation. For purposes of this paragraph, Direct Sales Products' Net Receipts mean the gross amount received by PROMOTER for sales of such products after deduction of local taxes and applicable arena commission(s) allocated for concession sales and cost of goods.

  (b)   In the event that the Original and/or New Intellectual Property of the WRESTLER are exploited by PROMOTER, such that Direct Sales Products feature WRESTLER with other wrestlers represented by PROMOTER, PROMOTER shall allocate five percent (5%) of the Direct Sales Products Net Receipts to be paid pro-rata among WRESTLER and all other talent so featured.

7.5   (a)   (i) Royalties/Pay-Per-View Videos Sold By Licensees: PROMOTER shall allocate twenty-five percent (25%) of the Net Receipts paid to PROMOTER by licensees authorized to reproduce and sell video cassettes, videodiscs, CD ROM, or other technology, including technology not yet created (hereinafter referred to as "WWF Video Products"), of WWF pay-per-views in their entirety ("WWF Pay-Per-Views") to a talent royalty pool. Thereafter, PROMOTER shall pro-rate payment to WRESTLER and all other talent appearing in such WWF Pay-Per-Views in the same proportion as was the compensation paid to WRESTLER for his appearances in the pay-per-views to the total amount paid to all talent for their appearances in the pay-per-view. For purposes of

P:\WBSR\Legal Affairs\Wrestling Contracts\Levy Scott 2000.doc
090400

paragraphs 7.5(a)(i) and 7.5(a)(ii), Net Receipts shall mean the gross amount received by PROMOTER from the licensees for the WWF Pay-Per-Views less any and all costs incurred by PROMOTER to produce and/or distribute such WWF Pay-Per-Views.

(ii) In the event that the WWF Video Products are a compilation or derivative work of multiple individual WWF Pay-Per-Views in their entirety, such as a collection of videos, e.g., a Wrestlemania box set, payment to WRESTLER shall be calculated as follows: twenty-five percent (25%) of the Net Receipts paid to PROMOTER by licensees shall comprise the talent royalty pool, which shall first be pro-rated based on the number of individual videos in the compilation, and then the payment to WRESTLER for each video shall be consistent with the royalty payment to the WRESTLER at the time that each individual video was first released.

(b)    Royalties/Non-Pay-Per-View Videos Sold By Licensees:   PROMOTER shall allocate twenty-five percent (25%) of the Net Receipts paid to PROMOTER by licensees authorized to reproduce and sell all other WWF Video Products, other than those set forth in paragraphs 7.5(a)(i) and 7.5(a)(ii) above, to a talent royalty pool, from which PROMOTER shall pay WRESTLER and all other talent appearing in such WWF Video Products pro-rata among WRESTLER and all other talent so featured. For purposes of this paragraph 7.5(b), Net Receipts shall mean the gross amount received by PROMOTER for the WWF Video Products less any and all costs incurred by PROMOTER to produce and/or distribute such WWF Video Products.

(c)    (i) Royalties/Pay-Per-View Videos Sold By Promoter: PROMOTER shall allocate five percent (5%) of the Net Receipts paid to PROMOTER with respect to the direct sale by PROMOTER of WWF Pay-Per-Views to a talent royalty pool. Thereafter, PROMOTER shall pro-rate payment to WRESTLER and all other talent appearing in such WWF Pay-Per-Views in the same proportion as was the compensation paid to WRESTLER for his appearances in the pay-per-views to the total amount paid to all talent for their appearances on the pay-per-views For purposes of paragraphs 7.5(c)(i) and 7.5(c)(ii), Net Receipts shall mean the gross amount received by PROMOTER for the WWF Pay-Per-Views.

(ii) In the event that the WWF Video Product is a compilation or derivative work of multiple individual WWF Pay-Per-Views in their entirety, such as a collection of videos, e.g., a Wrestlemania box set, payment to WRESTLER shall be calculated as follows: five percent (5%) of the Net Receipts paid to PROMOTER shall comprise the talent royalty pool, which shall first be pro-rated based on the number of individual videos in the compilation, and then the payment to WRESTLER for each video shall be consistent with the royalty payment to the WRESTLER at the time each individual video was first released.



9

(d)    Royalties/Non Pay-Per-View Videos Sold By Promoter:    PROMOTER shall allocate five percent (5%) of the Net Receipts paid to PROMOTER with respect to the direct sale by PROMOTER of all other WWF Video Products other than those set forth in paragraphs 7.5(c)(i) and 7.5(c)(ii) above, to a talent royalty pool, from which PROMOTER shall pay WRESTLER and all other talent appearing in such WWF Video Products pro-rata among WRESTLER and all other talent so featured.  For purposes of this paragraph 7.5(d), Net Receipts shall mean the gross amount received by PROMOTER for the WWF Video Products. Notwithstanding the foregoing, if WRESTLER is deemed to be the "featured performer" as determined by PROMOTER in its sole discretion, WRESTLER shall receive a bonus of an additional five percent (5%) of WWFE's Net Receipts up to the sale of the first one hundred fifty thousand (150,000) units.  Once sales exceed 150,000, WRESTLER as a featured performer shall receive ten percent (10%) of WWFE's Net Receipts on all units sold, including the first 150,000 units.  For example, the featured performer in the video entitled "Cause Stone Cold Said So" is "Stone Cold Steve Austin". If WRESTLER is part of a group that is determined to be the "featured performer", WRESTLER shall share pro-rata with each and every member of the group in any bonus monies that may be due in connection with such WWF Video Products.

7.6    In the event the Original and/or New Intellectual Property are used by PROMOTER or licensed, sublicensed or assigned for non-wrestling personal appearances and performances such as personal appearances for advertising or non-wrestling promotional purposes, radio and television commercials, movies, etc., WRESTLER may earn an amount to be mutually agreed to by WRESTLER and by PROMOTER of the "Personal Appearance Net Receipts" received by PROMOTER, which amount may also be credited against WRESTLER'S Minimum Annual Compensation, if any.  Personal Appearance Net Receipts means the amount received by PROMOTER after payment of and provision for all of PROMOTER's costs and expenses, except income taxes.

7.7    If PROMOTER instructs WRESTLER to appear and perform in any Events or Programs as a commentator and/or to participate in post-Event production and/or voice-over activities as a commentator, WRESTLER's commentating shall be deemed work-for-hire and WRESTLER hereby assigns to PROMOTER and PROMOTER shall own all rights, in perpetuity, to all of WRESTLER's commentary and WRESTLER shall not be entitled to receive any royalty payments, or any additional compensation or residual payments whatsoever, as a result of PROMOTER's commercial exploitation of such commentary in any form, whether broadcast programming, cable programming, pay-per-view programming, videotapes, videodiscs, the Internet or other mediums now or hereinafter discovered.

7.8    It is the understanding of the parties that WRESTLER shall not be paid anything for PROMOTER's exploitation of the Original and/or New Intellectual Property in any of PROMOTER's magazines or other publications, which PROMOTER may publish, produce or distribute at arenas, at newsstands and/or by mail or through electronic or any other manner of media or distribution, now known or hereinafter discovered, including, but not limited to, publication or distribution on the Internet or America On Line.

7.9    If WRESTLER is unable to wrestle for six (6) consecutive weeks due to an injury suffered in the ring while performing services at PROMOTER's direction, for every house show or

10

television show per Contract Year in which WRESTLER is unable to wrestle thereafter, WRESTLER's Minimum Annual Compensation as defined below for that Contract Year shall be reduced by .5%. Additionally, for every pay-per-view event per Contract Year in which WRESTLER is unable to wrestle, WRESTLER's Minimum Annual Compensation for that Contract Year shall be reduced by the average pay received by WRESTLER for the three (3) immediately preceding or fewer if less than three (3) similar pay-per-view events for which he was compensated, or .5% if there are none. If WRESTLER is unable to wrestle for any other reason during the Term of this Agreement, such deductions shall begin immediately.

7.10    Subject to paragraph 12.2, the non-compete provisions of this Agreement, it is acknowledged and agreed that as it relates to WRESTLER's appearance or performance of any services pursuant to this Agreement, including the appearance and or performance of WRESTLER's services at Events or other activities conducted by PROMOTER, WRESTLER shall be eligible only for the payments and royalties specifically set forth in paragraphs 7.1 through 7.6. WRESTLER acknowledges and agrees that any payments or royalties earned in connection with any wrestling services WRESTLER may perform during the term of this Agreement for any other wrestling/sports entertainment organization and /or entity shall be credited against WRESTLER's Minimum Annual Compensation, if any.

7.11    All payments made to WRESTLER are in full without withholding, except where required by law. After the end of each calendar year, PROMOTER shall issue to WRESTLER Internal Revenue Service Form 1099 showing all payments to WRESTLER during that calendar year.

7.12    (a)    PROMOTER shall prepare and send statements as to royalties payable hereunder to WRESTLER within ninety (90) days following the end of each quarter, based upon the royalties received and processed by PROMOTER in the previous quarter, together with payment of royalties, if any, earned by WRESTLER hereunder during such quarter-annual period, less advances and/or debits made by PROMOTER on WRESTLER's behalf.

        (b)    PROMOTER shall maintain books of account related to the payment of royalties hereunder at its principal place of business. WRESTLER, or WRESTLER's designated independent certified public accountant who is a member in good standing of the AICPA, may at WRESTLER's sole expense examine PROMOTER's books insofar as they pertain to this Agreement for the purpose of verifying the accuracy thereof, during PROMOTER's normal business hours and upon reasonable notice. Such audit shall be conducted in a manner that will not unreasonably interfere with PROMOTER's normal business operations. WRESTLER shall not audit PROMOTER's books and records more than twice during any calendar year and no such audit shall be conducted later than six (6) months after the last statement of royalties is given, delivered or sent to WRESTLER. Each audit is limited to five (5) days in duration. Statements of royalties may be changed from time to time to reflect year-end adjustments, to correct clerical errors and for similar purposes.

        (c)    WRESTLER shall be deemed to have consented to all statements of royalties and all other accountings provided by PROMOTER hereunder and each such statement of royalties or other accounting shall be conclusive, final, and binding; shall constitute an account stated; and shall not be subject to any objection for any reason whatsoever unless a specific objection in writing,

11

stating the basis thereof, is given by WRESTLER to PROMOTER within one (1) year from the date the royalty statement was given, delivered or sent to WRESTLER.

(d)   No claim shall be filed pursuant to paragraph 13.8 below against PROMOTER or PROMOTER's affiliates that disputes any statement of royalties or accounting given by PROMOTER hereunder or that makes any claim for royalties or royalty payments, unless the same is commenced or filed within one (1) year after the date such statement or accounting is first given, delivered or sent to WRESTLER, and unless WRESTLER has first exhausted his remedies pursuant to paragraph 7.12(b) above.

## 8. PROMOTER'S OBLIGATIONS

8.1   Although under paragraph 9.1 WRESTLER shall bear responsibility for obtaining appropriate licenses for participating in wrestling exhibitions, PROMOTER shall be responsible for obtaining all other appropriate licenses to conduct professional wrestling exhibitions involving WRESTLER. If PROMOTER, at its discretion, agrees to assist WRESTLER in obtaining his licenses, WRESTLER shall reimburse PROMOTER for its fees and expenses incurred in connection therewith.

8.2   PROMOTER shall bear the following costs in connection with the development and enhancement of the value of WRESTLER's performance hereunder and WRESTLER's standing in the professional wrestling community, all of which shall benefit WRESTLER:

(a)   In connection with WRESTLER's appearances and performance at Events staged before a live audience, PROMOTER shall bear the cost of location rental, PROMOTER's third party comprehensive liability insurance for the benefit of the venues, applicable state and local admission taxes, promotional assistance, sound and light equipment, wrestling ring, officials, police and fire protection, and such additional security guards as PROMOTER shall require in its discretion during a professional wrestling match;

(b)   In connection with the production, distribution, and exploitation of the Programs, PROMOTER shall bear all costs incurred in connection with such production, distribution, broadcast, transmission or other forms of mass media communication;

(c)   In connection with any product or service licensing activities and/or merchandising activities, PROMOTER shall bear all costs of negotiating, securing or otherwise obtaining the product or service licensing arrangements, including costs of agents, consultants, attorneys and others involved in making the product or service licensing activities; and PROMOTER shall bear all costs of creating, designing, developing, producing and marketing merchandise or services. In order to fulfill these obligations, PROMOTER may make any arrangements, contractual or otherwise, it deems appropriate to delegate, assign, or otherwise transfer its obligations.

8.3   PROMOTER shall schedule the Events and book WRESTLER for the Events. In doing so, PROMOTER shall select the time and location of the Events at which WRESTLER is booked, WRESTLER's opponent, and any other wrestlers who will appear at such Event. PROMOTER shall provide WRESTLER with reasonable advance notice of the date, time, and place of any such

Event, and WRESTLER shall appear at the designated location for any such Event no later than one hour before the designated time. If WRESTLER fails to appear as required without advance twenty-four (24) hours notice to PROMOTER and PROMOTER must substitute another wrestler to appear in WRESTLER's place at the Event, then PROMOTER may fine, suspend or terminate WRESTLER in its sole discretion.

8.5    Notwithstanding the above, if WRESTLER shall be prevented from appearing at an Event by reason of Force Majeure, the above fines shall not be imposed. For purposes of this Agreement, Force Majeure shall mean any act of God, fire, flood, war or other calamity; strike or labor difficulties; any governmental action or any other serious emergency affecting WRESTLER which occurrence is beyond WRESTLER's reasonable control, and, which despite best efforts prohibits WRESTLER's performance or appearance at such Event.

## 9. WRESTLER'S OBLIGATIONS

9.1    WRESTLER shall bear responsibility for obtaining all appropriate licenses to engage in, participate in, or otherwise appear in professional wrestling exhibitions.

9.2    WRESTLER shall be responsible for WRESTLER's own training, conditioning, and maintenance of wrestling skills and abilities, as long as they do not interfere with WRESTLER's appearance at scheduled events as follows:

(a)    WRESTLER shall establish his own training program, shall select time of training, duration of training, exercises, pattern of exercise and other actions appropriate to obtaining and maintaining physical fitness for wrestling. WRESTLER shall select his own training apparatus, including mats, weights, machines and other exercise paraphernalia. WRESTLER is responsible for supplying his own training facilities and equipment, whether by purchase, lease, license, or otherwise.

(b)    WRESTLER shall establish his own method of physical conditioning, shall select time for conditioning, duration of conditioning and form of conditioning. WRESTLER shall select time for sleep, time for eating, and time for other activities. WRESTLER shall select his own foods, vitamins and other ingested items, excepting illegal and/or controlled substances and drugs, which are prohibited by PROMOTER's Drug Policy.

9.3    WRESTLER shall be responsible for providing all costumes, wardrobe, props, and make-up necessary for the performance of WRESTLER's services at any Event and WRESTLER shall bear all costs incurred in connection with his transportation to and from any such Events (except those transportation costs which are covered by PROMOTER's then current Travel Policy), as well as the costs of food consumed and hotel lodging utilized by WRESTLER in connection with his appearance at such Events.

9.4    WRESTLER shall use best efforts in employing WRESTLER's skills and abilities as a professional wrestler and be responsible for developing and executing the various details, movements, and maneuvers required of wrestlers in a professional wrestling exhibition.

13

RSUSE001Legal Affairs\Booking Contracts\Larry Scott 2000.doc
06/30/00

9.5    WRESTLER shall take such precautions as are appropriate to avoid any unreasonable risk of injury to other wrestlers in any and all Events.  These precautions shall include, without limitation, pre-match review of all wrestling moves and maneuvers with wrestling partners and opponents; and pre-match demonstration and/or practice with wrestling partners and opponents to insure familiarity with anticipated wrestling moves and maneuvers during a wrestling match.  In the event of injury to WRESTLER, and/or WRESTLER's partners and opponents during a wrestling match, WRESTLER shall immediately signal partner, opponent and/or referees that it is time for the match to end; and WRESTLER shall finish the match forthwith so as to avoid aggravation of such injury.

9.6    WRESTLER shall use best efforts in the ring in the performance of wrestling services for a match or other activity, in order to provide an honest exhibition of WRESTLER's wrestling skills and abilities, consistent with the customs of the professional wrestling industry; and WRESTLER agrees all matches shall be finished in accordance with the PROMOTER's direction.  Breach of this paragraph shall cause a forfeiture of any payment due WRESTLER pursuant to SECTION 7 of this Agreement and all other obligations of PROMOTER to WRESTLER hereunder, shall entitle PROMOTER to terminate this Agreement, but such breach shall not terminate PROMOTER's licenses and other rights under this Agreement.

9.7    WRESTLER agrees to cooperate and assist without any additional payment in the publicizing, advertising and promoting of scheduled Events, including without limitation, appearing at and participating in a reasonable number of joint and/or separate press conferences, interviews, and other publicity or exploitation appearances or activities (any or all of which may be filmed, taped, or otherwise recorded, telecast by any form of television now known or hereafter discovered, including without limitation free, cable, pay cable, and closed circuit and pay-per-view television, broadcast, exhibited, distributed, and used in any manner or media and by any art, method, or device now known or hereafter created, including without limitation by means of videodisc, video cassette, theatrical motion picture and/or non-theatrical motion picture and Internet), at times and places designated by PROMOTER, in connection therewith.

9.8    WRESTLER acknowledges the right of PROMOTER to make decisions with respect to the preparation and exploitation of the Programs and/or the exercise of any other rights respecting Original and/or New Intellectual Property, and in this connection WRESTLER acknowledges and agrees that PROMOTER's decision with respect to any agreements disposing of the rights to the Original and/or New Intellectual Property are final, except as to WRESTLER's legal name, which PROMOTER may only dispose of upon WRESTLER's written consent.  WRESTLER agrees to execute any agreements PROMOTER deems necessary in connection with any such agreements, and if WRESTLER is unavailable or refuses to execute such agreements, PROMOTER is hereby authorized to do so in WRESTLER's name as WRESTLER's attorney-in-fact.

9.9    WRESTLER agrees to cooperate fully and in good faith with PROMOTER to obtain any and all documentation, applications or physical examinations as may be required by any governing authority with respect to WRESTLER's appearance and/or performance in a professional wrestling match.

9.10   WRESTLER, on behalf of himself and his heirs, successors, assigns and personal

14

representatives, shall indemnify and defend PROMOTER and PROMOTER's licensees, assignees, parent corporation, subsidiaries and affiliates and its and their respective officers, directors, employees, advertisers, insurers and representatives and hold each of them harmless against any claims, demands, liabilities, actions, costs, suits, attorney fees, proceedings or expenses, incurred by any of them by reason of WRESTLER's breach or alleged breach of any warranty, undertaking, representation, agreement, or certification made or entered into herein or hereunder by WRESTLER. WRESTLER, on behalf of himself and his heirs, successors, assigns and personal representatives, shall indemnify and defend PROMOTER and PROMOTER's licensees, assignees, parent corporation, subsidiaries and affiliates and its and their respective officers, directors, employees, advertisers, insurers and representatives and hold each of the harmless against any and all claims, demands, liabilities, actions, costs, suits, attorney fees, proceedings or expenses, incurred by any of them, arising out of WRESTLER's acts, transactions and/or conduct within or around the ring, hallways, dressing rooms, parking lots, or other areas within or in the immediate vicinity of the facilities where PROMOTER has scheduled Events at which WRESTLER is booked. Such indemnification shall include all claims arising out of any acts, transactions and/or conduct of WRESTLER or others occurring at Events or in connection with any appearances or performances by WRESTLER not conducted by PROMOTER in accordance with this Agreement.

9.11   WRESTLER shall be responsible for payment of all of WRESTLER's own Federal, state or local income taxes, all social security, FICA and FUTA taxes, if any, as well as all contributions to retirement plans and programs, or other supplemental income plan or program that would provide WRESTLER with personal or monetary benefits upon retirement from professional wrestling.

9.12   (a)   WRESTLER shall be responsible for his own commercial general liability insurance, worker's compensation insurance, professional liability insurance, as well as any excess liability insurance, as WRESTLER deems appropriate to insure, indemnify and defend WRESTLER with respect to any and all claims arising out of WRESTLER's own acts, transactions, or conduct.

(b)   WRESTLER acknowledges that the participation and activities required by WRESTLER in connection with WRESTLER's performance in a professional wrestling exhibition may be dangerous and may involve the risk of serious bodily injury. WRESTLER knowingly and freely assumes full responsibility for all such inherent risks as well as those due to the negligence of PROMOTER, other wrestlers or otherwise.

(c)   WRESTLER, on behalf of himself and his heirs, successors, assigns and personal representatives, hereby releases, waives and discharges PROMOTER from all liability to WRESTLER and covenants not to sue PROMOTER for any and all loss or damage on account of injury to any person or property or resulting in serious or permanent injury to WRESTLER or WRESTLER's death, whether caused by the negligence of the PROMOTER, other wrestlers or otherwise.

(d)   WRESTLER acknowledges that the foregoing release, waiver and indemnity is intended to be as broad and inclusive as permitted by the law of the State, Province or Country in which the professional wrestling exhibition or Events are conducted and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full force and effect.

15

9.13   (a)   WRESTLER may at his election obtain health, life and/or disability insurance to provide benefits in the event of physical injury arising out of WRESTLER's professional activities; and WRESTLER acknowledges that PROMOTER shall not have any responsibility for such insurance or payment in the event of physical injury arising out of WRESTLER's professional activities.

(b)   In the event of physical injury arising out of WRESTLER's professional activities, WRESTLER acknowledges that WRESTLER is not entitled to any worker's compensation coverage or similar benefits for injury, disability, death or loss of wages; and WRESTLER shall make no claim against PROMOTER for such coverage or benefit.

9.14   WRESTLER shall act at all times with due regard to public morals and conventions during the term of this Agreement. If WRESTLER shall have committed or shall commit any act or do anything that is or shall be an offense or violation involving moral turpitude under Federal, state or local laws, or which brings WRESTLER into public disrepute, contempt, scandal or ridicule, or which insults or offends the community or any employee, agent or affiliate of PROMOTER or which injures WRESTLER's reputation in PROMOTER's sole judgment, or diminishes the value of WRESTLER's professional wrestling services to the public or PROMOTER, then at the time of any such act, or any time after PROMOTER learns of any such act, PROMOTER shall have the right to fine WRESTLER in an amount to be determined by PROMOTER; and PROMOTER shall have the right to suspend and/or terminate this Agreement forthwith.

## 10. WARRANTY

10.1   WRESTLER represents, warrants, and agrees that WRESTLER is free to enter into this Agreement and to grant the rights and licenses herein granted to PROMOTER; WRESTLER has not heretofore entered and shall not hereafter enter into any contract or agreement which is in conflict with the provisions hereof or which would or might interfere with the full and complete performance by WRESTLER of his obligations hereunder or the free and unimpaired exercise by PROMOTER of any of the rights and licenses herein granted to it; WRESTLER further represents and warrants there are no prior or pending claims, administrative proceedings, civil lawsuits, criminal prosecutions or other litigation matters, including without limitation any immigration or athletic commission related matters, affecting WRESTLER which would or might interfere with PROMOTER's full and complete exercise or enjoyment of any rights or licenses granted hereunder. Any exceptions to this Warranty are set forth in Schedule B, attached hereto.

10.2   (a)   WRESTLER represents, warrants and agrees that WRESTLER is in sound mental and physical condition; that WRESTLER is suffering from no disabilities that would impair or adversely affect WRESTLER's ability to perform professional wrestling services; and that WRESTLER is free from the influence of illegal drugs or controlled substances, which can threaten WRESTLER's well being and pose a risk of injury to WRESTLER or others. To insure compliance with this warranty, WRESTLER shall abide by PROMOTER's Drug Policy for wrestlers, as well as any and all amendments, additions, or modifications to the PROMOTER's Drug Policy implemented during the Term of this Agreement and consents to the sampling and testing of his urine in accordance with such Policy. In addition, WRESTLER agrees to submit annually to a

16

complete physical examination by a physician either selected or approved by PROMOTER. PROMOTER's current Drug Policy, which WRESTLER acknowledges herewith receiving, is annexed hereto and incorporated by reference and made a part hereof.

(b)     In the event that WRESTLER is unable to wrestle for six (6) consecutive weeks during the Term of this Agreement due to an injury suffered in the ring while performing services at PROMOTER's direction, PROMOTER shall have the right to thereafter terminate this Agreement or suspend WRESTLER without pay. If WRESTLER is unable to wrestle for any other reason during the Term of this Agreement, PROMOTER shall have the right to immediately terminate this Agreement or suspend WRESTLER without pay. PROMOTER can opt in its discretion to extend the Term of this Agreement for a period of time equal to the period of suspension or any portion thereof. Upon certification by WRESTLER or PROMOTER's physician during any period of suspension that WRESTLER is fully recovered and capable of performing all services as required under this Agreement, PROMOTER can reinstate the Agreement, and it will therefore continue to be of full force and effect throughout the remainder of the Initial Term of this Agreement and any Renewal Term thereof. WRESTLER right to have his own physician present.

(c)     Notwithstanding anything to the contrary set forth herein, this Agreement is conditioned upon WRESTLER providing PROMOTER a written clearance from a qualified doctor of PROMOTER's choosing which includes without limitation a statement (and the results thereof) that WRESTLER has successfully completed the pre-contract drug screening as requested herein, a statement that WRESTLER is medically and physically able to perform the services required herein by PROMOTER on a full-time basis and a statement that WRESTLER has successfully completed such other tests (and the results thereof) that PROMOTER has determined, in its sole discretion, are necessary ("Clearance"). At anytime during the Term hereof, PROMOTER reserves the right to have the Clearance (and the results thereof) re-confirmed by a doctor chosen by PROMOTER. In the event the Clearance can not be re-confirmed, PROMOTER shall have the right in its sole discretion to immediately terminate this Agreement or suspend the Term hereof. In addition to the pre-contract screening and Clearance, WRESTLER agrees to attend and be evaluated and counseled by a drug assessment service, at any time and place PROMOTER shall determine in its sole discretion, and WRESTLER shall at all times thereafter abide by the recommendations and directives of such services ("Assessment"). Failure to abide and comply with the recommendations and directives of the Assessment may also be cause for immediate termination of this Agreement.

(d)     In addition to the foregoing, WRESTLER acknowledges and agrees that PROMOTER shall have the right at any time during the Term to have WRESTLER submit to a drug screening, at such times and places as PROMOTER shall determine in its sole discretion. WRESTLER further agrees that the cost and expense of such drug screening shall be borne by WRESTLER and PROMOTER shall have the right to deduct such cost and expense from any and all compensation due WRESTLER without further notice to WRESTLER.

10.3   PROMOTER reserves the right to have WRESTLER examined by a physician of its own choosing at its expense at any point during the Term of this Agreement.

10.4   WRESTLER further represents, warrants and agrees that this Agreement supersedes all

17

WWE/HHKLegal Affairs\Booking Contract\Levy Joost 2000.doc
06/05/00

prior agreements between WRESTLER and PROMOTER, whether written or oral, and that he has been fully compensated, where applicable, under such prior agreement(s).

## 11. EARLY TERMINATION

11.1    (a) This Agreement may be terminated by PROMOTER during the Term for any reason whatsoever by providing WRESTLER ninety (90) days advance written notice of said termination.

(b) This Agreement may also be terminated prior to the end of its Term by a written instrument executed by each of the parties expressing their mutual consent to so terminate without any further liability on the part of either.

(c) In the event of such early termination, PROMOTER shall pay WRESTLER for all uses of the Intellectual Property in accordance with paragraphs 7.3, 7.4, 7.5 and 7.6.

11.2    This Agreement will be terminated by WRESTLER's death during the Term, with no further compensation due WRESTLER's heirs, successors, personal representatives or assigns.

11.3    Upon the termination of this Agreement for any reason, including breach, the parties acknowledge and agree that PROMOTER shall own all right, title and interest in all Works, New Intellectual Property and any registrations thereof and PROMOTER shall have the exclusive right to sell or otherwise dispose of any materials, goods, merchandise or other items (i) produced during the Term of this Agreement incorporating any Original Intellectual Property, and (ii) produced incorporating New Intellectual Property, in perpetuity.

## 12. BREACH

12.1    In addition to those reasons set forth elsewhere in this Agreement, PROMOTER shall have the right, in its sole discretion, to immediately suspend or terminate the operation of this Agreement, both as to services and compensation, if any of the following occurs:

(a)    WRESTLER violates PROMOTER's Drug Policy, fails PROMOTER's pre-contract drug screening or any mandatory drug screening scheduled by PROMOTER during the Term of this Agreement in accordance with Section 10.2(d) above;

(b)    WRESTLER is habitually late and/or absent for scheduled Events or appearances as PROMOTER determines in its sole discretion;

(c)    WRESTLER fails any physical examination conducted on behalf of PROMOTER, as required herein;

(d)    WRESTLER fails to maintain physical condition or training such that his weight, and/or his performance is unsatisfactory as determined by PROMOTER in its sole discretion; or

(e)    PROMOTER is unable to obtain any necessary athletic commission licenses or

18

immigration clearances for WRESTLER.

12.2   In the event WRESTLER breaches this Agreement, PROMOTER may recover such actual direct damages as may be established in a court of law, as provided in Paragraph 13.8. In addition, in the event of termination pursuant to this Paragraph, WRESTLER shall forfeit any future payments due pursuant to paragraph 7 and WRESTLER shall not appear under, use, refer to or exploit in any manner, parenthetically or otherwise, the Original Intellectual Property for the remainder of the Term and the New Intellectual Property forever.   Further, at PROMOTER's sole option, the Term of this Agreement may be extended by the term of any suspension period, in whole or in part, with all other terms and conditions hereof remaining in full force and effect during such extended period. In the event WRESTLER breaches this Agreement, WRESTLER acknowledges and agrees that he shall not work or perform in any capacity for "World Championship Wrestling", or any affiliated or subsidiary company thereof, or any other wrestling organization and/or entity owned or controlled by Turner Broadcasting System, Inc., Time-Warner, Inc. or any affiliated or subsidiary company thereof, including without limitation appearances in live events, pay-per-view or other televised events, for one (1) year from the date of the termination of this Agreement as a result of breach of this Agreement by WRESTLER.

12.3   The parties further agree that because of the special, unique, and extraordinary nature of the obligations of PROMOTER and WRESTLER respecting all rights and licenses concerning bookings, promoting, Programs, Events, Intellectual Property, which are the subject matter of this Agreement, WRESTLER's breach of this Agreement shall cause PROMOTER irreparable injury which cannot be adequately measured by monetary relief; as a consequence PROMOTER shall be entitled to injunctive and other equitable relief against WRESTLER to prevent WRESTLER's breach or default hereunder and such injunction or equitable relief shall be without prejudice to any other rights, remedies or damages which PROMOTER is legally entitled to obtain.

12.4   In no circumstances, whatsoever, shall either party to this Agreement be liable to the other party for any punitive or exemplary damages; and all such damages, whether arising out of the breach of this Agreement or otherwise, are expressly waived.

## 13. MISCELLANEOUS

13.1   Nothing contained in this Agreement shall be construed to constitute WRESTLER as an employee, partner or joint venturer of PROMOTER, nor shall WRESTLER have any authority to bind PROMOTER in any respect.   WRESTLER is an independent contractor and WRESTLER shall execute and hereby irrevocably appoints PROMOTER attorney-in-fact to execute, if WRESTLER refuses to do so, any instruments necessary to accomplish or confirm the foregoing or any and all of the rights granted to PROMOTER herein.

13.2   This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and all prior understandings, negotiations and agreements are merged in this Agreement. There are no other agreements, representations, or warranties not set forth herein with respect to the subject matter hereof, and the parties expressly acknowledge that any representation, promise or inducement by any party to any other party that is not embodied in this Agreement is not part of this Agreement, and they agree that no party shall be bound by or liable for any such

19

alleged representation, promise or inducement not set forth herein.

13.3   This Agreement may not be changed or altered except in writing signed by PROMOTER and WRESTLER.

13.4   Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement, or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.

13.5   PROMOTER shall have the right to assign, license, or transfer any or all of the rights granted to and hereunder to any person, firm or corporation, provided that such assignee has the financial ability to meet the Promoter's obligations hereunder, and if any assignee shall assume in writing PROMOTER's obligations hereunder, PROMOTER shall have no further obligations to WRESTLER. WRESTLER may not assign, transfer or delegate his rights or obligations hereunder and any attempt to do so shall be void.

13.6   Any notices required or desired hereunder shall be in writing and sent postage prepaid by certified mail, return receipt requested, or by prepaid telegram addressed as follows, or as the parties may hereafter in writing otherwise designate:

TO PROMOTER:                                          TO WRESTLER:
      World Wrestling Federation
      Entertainment, Inc.                             Scott Levy
      Attn:  Linda E. McMahon
               President and Chief Executive Officer 
      1241 E. Main Street
      Stamford, CT  06902

      The date of mailing shall be deemed to constitute the date of service of any such notice by PROMOTER.  The date of receipt shall be deemed to constitute the date of service of any such notice by WRESTLER.

13.7   This Agreement is made in Connecticut and shall be governed by and interpreted in accordance with the laws of the State of Connecticut, exclusive of its provisions relating to conflicts of law.

13.8   In the event there is any claim, dispute, or other matter in question arising out of or relating to this Agreement, the enforcement of any provisions therein, or breach of any provision thereof, it shall be submitted to the Federal, state or local courts, as appropriate, only in the State of Connecticut.  This provision to submit all claims, disputes or matters in question to the Federal or state courts in the State of Connecticut shall be specifically enforceable; and each party, hereby waiving personal service of process and venue, consents to jurisdiction in Connecticut for purposes of any other party seeking or securing any legal and/or equitable relief.

20

13.9   In no circumstances, whatsoever, shall either party to this Agreement be liable to the other party for any punitive or exemplary damages; and all such damages, whether arising out of the breach of this Agreement or otherwise, are expressly waived.

## 14. CONFIDENTIALITY

14.1   (a) Other than as may be required by applicable law, government order or regulations, or by order or decree of the Court, WRESTLER hereby acknowledges and agrees that in further consideration of PROMOTER's entering into this Agreement, WRESTLER shall not, at any time during this Agreement, or after the termination of this Agreement for any reason whatsoever, disclose to any person, organization, or publication, or utilize for the benefit or profit of WRESTLER or any other person or organization, any sensitive or otherwise confidential business information, idea, proposal, secret, or any proprietary information obtained while with PROMOTER and/or regarding PROMOTER, its employees, independent contractors, agents, officers, directors, subsidiaries, affiliates, divisions, representatives, or assigns. Included in the foregoing, by way of illustration only and not limitation, are such items as reports, business plans, sales information, cost or pricing information, lists of suppliers or customers, talent lists, story lines, scripts, story boards or ideas, routines, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable) and any other tangible or intangible materials written, composed, submitted, added, improvised, or created by or for WRESTLER in connection with appearances in the Programs, information regarding any contractual relationships maintained by PROMOTER and/or the terms thereof, and/or any and all information regarding wrestlers engaged by PROMOTER

(b) Notwithstanding the foregoing, WRESTLER's obligation of confidentiality shall not include information which:

(i) at the time of disclosure was in the public domain;

(ii) after such disclosure, becomes generally available to the public other than through any act or omission by WRESTLER; and

(iii) is required to be disclosed by any court of competent jurisdiction, provided that prior written notice of such disclosure is furnished to PROMOTER in a timely manner in order to afford PROMOTER an opportunity to seek a protective order against such disclosure.

14.2   WRESTLER acknowledges and agrees that its agreement to be bound by the terms hereof is a material condition of PROMOTER's willingness to use and continue to use WRESTLER's services. Other than as may be required by applicable law, government order or regulation, or by order or decree of the court, the parties agree that neither of them shall publicly divulge or announce, or in any manner disclose, to any third party, any of the specific terms and conditions of this Agreement; and both parties warrant and covenant to one another that none of their officers, directors, employees or agents will do so either. Notwithstanding the foregoing, WRESTLER shall be free to disclose the terms and conditions of this Agreement to his lawyers, agents, financial advisers and spouse and PROMOTER shall be free to disclose the terms and conditions of this

21

Agreement to its lawyers, accountants and to those employees who have a legitimate need to know such information.

All of the terms and conditions of any Addenda or Schedules are incorporated herein by reference and made a part hereof.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

WORLD WRESTLING FEDERATION
ENTERTAINMENT, INC.
    ("PROMOTER")

By: _____
    James Ross
Its: Senior Vice President Talent Relations
    & Wrestling Administration

SCOTT LEVY
("WRESTLER")

By: _____
    Scott Levy

P:\USERS\Legal Affairs\Booking Contracts\Levy Scott 2000.doc
00/09/00

STATE OF CONNECTICUT          )
                              ) ss: Stamford
COUNTY OF FAIRFIELD           )

On _Judy 14_ 2000 before me personally came James Ross, Senior Vice President of Talent Relations & Wrestling Administration., to me known, and known to me to be the individual described in, and who executed the foregoing, and duly acknowledged to me that he is a duly authorized corporate officer of World Wrestling Federation Entertainment, Inc., and that he executed the same on behalf of said Company.

WITNESS my hand and notarial seal this _14th_ day of _July_, 2000.

_Karen Shapiro_
Notary Public

My commission expires:          **KAREN SHAPIRO**
                          NOTARY PUBLIC, STATE OF CT
                        MY COMMISSION EXPIRES SEP. 30, 2003

STATE OF _Georgia_            )
                              ) ss:
COUNTY OF _Cobb_              )

I am a Notary Public for said County and State, do hereby certify that Scott Levy personally appeared before me this day and acknowledged the due execution of the foregoing instrument to be his free act and deed for the purposes therein expressed.

WITNESS my hand and notarial seal this _12_ day of _July_, 2000.

_Donna J Salem_
Notary Public

My commission expires:

(Notary seal: DONNA J SALEM, NOTARY PUBLIC, GEORGIA, June 28, 2004, COBB COUNTY)

23

## SCHEDULE A
## ORIGINAL INTELLECTUAL PROPERTY

Scott Levy
Raven

## SCHEDULE B
### EXCEPTIONS TO WARRANTY
## PENDING CONTRACTS/CLAIMS/LITIGATION WHICH MAY INTERFERE OR
### CONFLICT WITH
### WRESTLER'S PERFORMANCE AND/OR GRANT OF RIGHTS

None

F:\OSDR\SLegal Affairs\Booking Contracts\avg Stars 2008.doc
06/08/00

# EXHIBIT 2

etc., or any other standard PROMOTER, in its sole discretion, establishes specifically for that Pay-Per-View.

7.3   (a)   Licensed Product Royalties: In the event that the Original and/or New Intellectual Property are used by PROMOTER and/or licensed, sublicensed, or otherwise assigned to third parties for production, reproduction and/or sale and distribution, in conjunction with any consumer materials, goods or merchandise, (hereinafter collectively referred to as "Licensed Products"), such that the applicable Licensed Product only features the Original and/or New Intellectual Property, WRESTLER shall be paid twenty-five percent (25%) of the Licensed Products' Net Receipts received by PROMOTER with respect to any such licensing, sublicensing or assignment. Licensed Products' Net Receipts means the gross amount received by PROMOTER less expenses incurred by PROMOTER or its licensing agent for the applicable Licensed Product. WRESTLER acknowledges and agrees that WRESTLER shall not be eligible for any royalties with respect to television license, advertising and distribution fees paid to PROMOTER by any entity in connection with the exploitation of Original and/or New Intellectual Property.

(b)   In the event that the Original and/or New Intellectual Property are used by PROMOTER or licensed, sublicensed, or otherwise assigned to third parties in connection with Licensed Products featuring WRESTLER with other wrestlers represented by PROMOTER, PROMOTER shall allocate twenty-five percent (25%) of the Licensed Products Net Receipts, to be paid pro-rata among WRESTLER and all other talent so featured.

7.4   (a)   Direct Sales Royalties: In the event that PROMOTER distributes and sells directly any Licensed Products other than any WWF Pay-Per-Views as set forth in paragraph 7.5(c), below or any WWF Video Products, as set forth in Paragraph 7.5(d) below, including without limitation, at the arena, via mail order sales or directly on television, or via the Internet (hereinafter "Direct Sales Products"), such that the applicable product only features the Original and/or New Intellectual Property of the WRESTLER, WRESTLER shall be paid five percent (5%) of the Direct Sales Products' Net Receipts derived by PROMOTER from such exploitation. For purposes of this paragraph, Direct Sales Products' Net Receipts mean the gross amount received by PROMOTER for sales of such products after deduction of local taxes and applicable arena commission(s) allocated for concession sales and cost of goods.

(b)   In the event that the Original and/or New Intellectual Property of the WRESTLER are exploited by PROMOTER, such that Direct Sales Products feature WRESTLER with other wrestlers represented by PROMOTER, PROMOTER shall allocate five percent (5%) of the Direct Sales Products Net Receipts to be paid pro-rata among WRESTLER and all other talent so featured.

7.5   (a)   (i) Royalties/Pay-Per-View Videos Sold By Licensees: PROMOTER shall allocate twenty-five percent (25%) of the Net Receipts paid to PROMOTER by licensees authorized to reproduce and sell video cassettes, videodiscs, CD ROM, or other technology, including technology not yet created (hereinafter referred to as "WWF Video Products") of WWF pay-per-views in their entirety ("WWF Pay-Per-Views") to a talent royalty pool. Thereafter, PROMOTER shall pro-rate payment to WRESTLER and all other talent appearing in such WWF Pay-Per-Views in the same proportion as was the compensation paid to WRESTLER for his appearances in the pay-per-views to the total amount paid to all talent for their appearances in the pay-per-view. For purposes of

8

# EXHIBIT 3

etc., or any other standard PROMOTER, in its sole discretion, establishes specifically for that Pay-Per-View.

7.3     (a)     Licensed Product Royalties:  In the event that the Original and/or New Intellectual Property are used by PROMOTER and/or licensed, sublicensed, or otherwise assigned to third parties for production, reproduction and/or sale and distribution, in conjunction with any consumer materials, goods or merchandise, (hereinafter collectively referred to as "Licensed Products"), such that the applicable Licensed Product only features the Original and/or New Intellectual Property, WRESTLER shall be paid twenty-five percent (25%) of the Licensed Products' Net Receipts received by PROMOTER with respect to any such licensing, sublicensing or assignment.  Licensed Products' Net Receipts means the gross amount received by PROMOTER less expenses incurred by PROMOTER or its licensing agent for the applicable Licensed Product.  WRESTLER acknowledges and agrees that WRESTLER shall not be eligible for any royalties with respect to television license, advertising and distribution fees paid to PROMOTER by any entity in connection with the exploitation of Original and/or New Intellectual Property.

        (b)     In the event that the Original and/or New Intellectual Property are used by PROMOTER or licensed, sublicensed, or otherwise assigned to third parties in connection with Licensed Products featuring WRESTLER with other wrestlers represented by PROMOTER, PROMOTER shall allocate twenty-five percent (25%) of the Licensed Products Net Receipts, to be paid pro-rata among WRESTLER and all other talent so featured.

7.4     (a)     Direct Sales Royalties:  In the event that PROMOTER distributes and sells directly any Licensed Products other than any WWF Pay-Per-Views as set forth in paragraph 7.5(c), below or any WWF Video Products, as set forth in Paragraph 7.5(d) below, including without limitation, at the arena, via mail order sales or directly on television, or via the Internet (hereinafter "Direct Sales Products"), such that the applicable product only features the Original and/or New Intellectual Property of the WRESTLER, WRESTLER shall be paid five percent (5%) of the Direct Sales Products' Net Receipts derived by PROMOTER from such exploitation.  For purposes of this paragraph, Direct Sales Products' Net Receipts mean the gross amount received by PROMOTER for sales of such products after deduction of local taxes and applicable arena commission(s) allocated for concession sales and cost of goods.

        (b)     In the event that the Original and/or New Intellectual Property of the WRESTLER are exploited by PROMOTER, such that Direct Sales Products feature WRESTLER with other wrestlers represented by PROMOTER, PROMOTER shall allocate five percent (5%) of the Direct Sales Products Net Receipts to be paid pro-rata among WRESTLER and all other talent so featured.

7.5     (a)     (i) Royalties/Pay-Per-View Videos Sold By Licensees:  PROMOTER shall allocate twenty-five percent (25%) of the Net Receipts paid to PROMOTER by licensees authorized to reproduce and sell video cassettes, videodiscs, CD ROM, or other technology, including technology not yet created (hereinafter referred to as "WWF Video Products"), of WWF pay-per-views in their entirety ("WWF Pay-Per-Views") to a talent royalty pool.  Thereafter, PROMOTER shall pro-rate payment to WRESTLER and all other talent appearing in such WWF Pay-Per-Views in the same proportion as was the compensation paid to WRESTLER for his appearances in the pay-per-views to the total amount paid to all talent for their appearances in the pay-per-view.  For purposes of

8

# EXHIBIT 4

(d)   Royalties/Non Pay-Per-View Videos Sold By Promoter:   PROMOTER shall allocate five percent (5%) of the Net Receipts paid to PROMOTER with respect to the direct sale by PROMOTER of all other WWF Video Products other than those set forth in paragraphs 7.5(c)(i) and 7.5(c)(ii) above, to a talent royalty pool, from which PROMOTER shall pay WRESTLER and all other talent appearing in such WWF Video Products pro-rata among WRESTLER and all other talent so featured.  For purposes of this paragraph 7.5(d), Net Receipts shall mean the gross amount received by PROMOTER for the WWF Video Products.  Notwithstanding the foregoing, if WRESTLER is deemed to be the "featured performer" as determined by PROMOTER in its sole discretion, WRESTLER shall receive a bonus of an additional five percent (5%) of WWFE's Net Receipts up to the sale of the first one hundred fifty thousand (150,000) units.  Once sales exceed 150,000, WRESTLER as a featured performer shall receive ten percent (10%) of WWFE's Net Receipts on all units sold, including the first 150,000 units.  For example, the featured performer in the video entitled "Cause Stone Cold Said So" is "Stone Cold Steve Austin".  If WRESTLER is part of a group that is determined to be the "featured performer", WRESTLER shall share pro-rata with each and every member of the group in any bonus monies that may be due in connection with such WWF Video Products.

7.6   In the event the Original and/or New Intellectual Property are used by PROMOTER or licensed, sublicensed or assigned for non-wrestling personal appearances and performances such as personal appearances for advertising or non-wrestling promotional purposes, radio and television commercials, movies, etc., WRESTLER may earn an amount to be mutually agreed to by WRESTLER and by PROMOTER of the "Personal Appearance Net Receipts" received by PROMOTER, which amount may also be credited against WRESTLER'S Minimum Annual Compensation, if any.   Personal Appearance Net Receipts means the amount received by PROMOTER after payment of and provision for all of PROMOTER's costs and expenses, except income taxes.

7.7   If PROMOTER instructs WRESTLER to appear and perform in any Events or Programs as a commentator and/or to participate in post-Event production and/or voice-over activities as a commentator, WRESTLER's commentating shall be deemed work-for-hire and WRESTLER hereby assigns to PROMOTER and PROMOTER shall own all rights, in perpetuity, to all of WRESTLER's commentary and WRESTLER shall not be entitled to receive any royalty payments, or any additional compensation or residual payments whatsoever, as a result of PROMOTER's commercial exploitation of such commentary in any form, whether broadcast programming, cable programming, pay-per-view programming, videotapes, videodiscs, the Internet or other mediums now or hereinafter discovered.

7.8   It is the understanding of the parties that WRESTLER shall not be paid anything for PROMOTER's exploitation of the Original and/or New Intellectual Property in any of PROMOTER's magazines or other publications, which PROMOTER may publish, produce or distribute at arenas, at newsstands and/or by mail or through electronic or any other manner of media or distribution, now known or hereinafter discovered, including, but not limited to, publication or distribution on the Internet or America On Line.

7.9   If WRESTLER is unable to wrestle for six (6) consecutive weeks due to an injury suffered in the ring while performing services at PROMOTER's direction, for every house show or

10

# EXHIBIT 5

5/17/2017 WWE® Reports Strong Fourth-Quarter 2016 Results Achieving Record Revenue for the Full Year — World Wrestling Entertainment Inc.

Case 3:16-cv-01350-JCH Document 83-2 Filed 06/09/17 Page 34 of 104

Providing perspective on the growth of *WWE Network* and the Company's targeted profit expansion, Mr. Barrios reiterated previous comments, "Given the current scale and leverage of *WWE Network*, increases in its subscribers have the potential to drive meaningful growth in revenue and profit." Mr. Barrios added, "Based on anticipated subscriber growth, we believe we can achieve our targeted record financial results. In 2017, we will continue to evaluate our financial performance and to balance earnings growth with investments that could enable us to deliver a wider range of content, strengthen our engagement with a broadening audience, and support our continuing digital and direct-to-consumer transformation."

### Comparability of Results

For the fourth quarter 2016, there were no material items that impacted the comparability of results on a year-over-year basis. For the fourth quarter 2015, Corporate and Other expense included a $7.1 million non-cash abandonment charge to write-off the value of costs related to a media center expansion project. These costs were incurred several years ago but the expansion was delayed and the Company determined that these plans would no longer be viable and deemed them abandoned.

### Performance of Segments

The schedules below reflect WWE's performance by line of business (in millions):[1, 3]

| | Three Months Ended December 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| **Net Revenues:** | **2016** | **2015** | **2016** | **2015** |
| *Media Division* | | | | |
| Network | $ 43.7 | $ 40.8 | $ 180.9 | $ 159.4 |
| Television | 68.6 | 55.6 | 241.7 | 231.1 |
| Home Entertainment | 4.2 | 2.6 | 13.1 | 13.4 |
| Digital Media | 8.5 | 7.6 | 26.9 | 21.5 |
| *Live Events* | 38.6 | 32.9 | 144.4 | 124.7 |
| *Consumer Products Division* | | | | |
| Licensing | 10.1 | 9.6 | 49.1 | 48.9 |
| Venue Merchandise | 4.9 | 4.4 | 24.2 | 22.4 |
| WWEShop | 12.8 | 10.0 | 34.6 | 27.1 |
| *WWE Studios* | 2.4 | 1.8 | 10.1 | 7.1 |
| *Corporate & Other* | 1.1 | 0.9 | 4.2 | 3.2 |
| **Total Net Revenues** | $ 194.9 | $ 166.2 | $ 729.2 | $ 658.8 |
| | | | | |
| **Operating Income:** | | | | |
| *Media Division* | | | | |
| Network | $ 13.7 | $ 15.0 | $ 36.9 | $ 48.4 |
| Television | 30.6 | 21.0 | 114.8 | 88.0 |

# EXHIBIT 6

*Original*

## TITAN SPORTS, INC.
## BOOKING CONTRACT

This contract is made this __4__ day of __May__, 1993, by and between Titan Sports, Inc., a Delaware corporation d/b/a The World Wrestling Federation ("WWF") with its principal place of business at 1241 East Main Street in Stamford, Connecticut (hereinafter referred to as "PROMOTER"), and _____ _____ residing at _____ _____ (hereinafter referred to as "WRESTLER"), whose ring name is "__Johnny Polo_____".

### PREMISES

WHEREAS, PROMOTER is duly licensed, as required, to conduct professional wrestling exhibitions and is actually engaged in the business of organizing, publicizing, arranging, staging and conducting professional wrestling exhibitions throughout the world and of representing professional wrestlers in the promotion and exploitation of a WRESTLER's name, likeness, personality and character; and

WHEREAS, PROMOTER has established a nationwide network of television stations which regularly broadcast PROMOTER's wrestling programs for purposes of publicizing PROMOTER's professional wrestling exhibitions; and in addition thereto, PROMOTER has developed and produced certain other television programs, such as "TNT" and "Saturday Night's Main Event" which are also used to publicize PROMOTER's professional wrestling exhibitions; and

WHEREAS, PROMOTER's business operations afford WRESTLER opportunities to wrestle and obtain public exposure which will increase the value of his/her wrestling services and his/her standing in the professional wrestling community and entertainment industry; and

WHEREAS, WRESTLER is duly licensed, as required, to engage in professional wrestling exhibitions and is actually engaged in the business of performing as a professional wrestler; and

WHEREAS, WRESTLER is a performing artist and the professional wrestling exhibitions arranged by PROMOTER constitute exhibitions and promotions organized to provide athletic-styled entertainment to the public, and such wrestling exhibitions constitute entertainment and are not competitive athletic competition; and

WHEREAS, WRESTLER desires PROMOTER to arrange wrestling matches for WRESTLER and to assist WRESTLER in obtaining public exposure through live exhibitions, television programs, public appearances, and merchandising activities, or otherwise;

NOW THEREFORE, in consideration of the premises and of their mutual promises and agreements as herein set forth, the parties do hereby agree as follows:

## 1.  BOOKING

1.1        WRESTLER hereby grants exclusively to PROMOTER, and PROMOTER hereby accepts, the following worldwide rights:

(a)  During the term of this Agreement, the right to book WRESTLER for and to arrange WRESTLER's performance in wrestling matches at professional wrestling exhibitions, as well as appearances of any type at other events, engagements or entertainment programs in which WRESTLER performs services as a professional wrestler (collectively the "Events"), whether such Events are staged before a live audience, in a television broadcast studio, on location (for later viewing or broadcast), or otherwise.

(b)  During the term of this Agreement, the right to sell or otherwise distribute tickets of admission to the general public for viewing any or all of the Events, as well as any closed circuit television, or other video exhibition of the Events.

(c)  During the term of this Agreement, the right to solicit, negotiate, and enter into agreements for and on behalf of WRESTLER for the exploitation of publicity, merchandising, commercial tie-up, publishing, personal appearance, performing in non-wrestling events, and endorsement rights (collectively referred to as the "Rights") of WRESTLER, his/her legal and/or ring name, likeness, personality, and character, or any other of his/her distinctive or identifying indicia; provided PROMOTER shall inform WRESTLER of any such agreements.

1.2        In consideration of WRESTLER's grant of rights, license and other services, as hereinafter set forth, and provided WRESTLER shall faithfully and fully perform all obligations hereunder, PROMOTER shall endeavor to book WRESTLER in wrestling matches at various Events, and during the term of this Agreement PROMOTER guarantees WRESTLER a minimum of ten (10) bookings per year at PROMOTER's own Events.

- 2 -

## 2.   PROGRAMS

2.1       WRESTLER hereby grants to PROMOTER and PROMOTER hereby accepts, the exclusive right during the term of this Agreement to video tape, film, photograph, or otherwise record, or to authorize others to do so, by any media now known or hereafter created, any or all of the Events.   (These recordings by tape, disc, film, or otherwise are collectively referred to herein as "Programs").

2.2       PROMOTER may produce, reproduce, manufacture, record, perform, exhibit, broadcast, televise by any form of television (including without limitations, free, cable, pay cable, closed circuit and pay-per-view television), transmit, publish, copy, print, reprint, vend, sell, distribute and use, and to authorize others to do so, the Programs in perpetuity and in any manner or media and by any art, method or device, now known or hereafter created (including without limitation, by means of videodisc, videocassette, theatrical motion picture and non-theatrical motion picture).

2.3.      PROMOTER shall own in perpetuity all of the rights, results, products and proceeds in and to, or derived from the Programs (including without limitation, all incidents, dialogue, characters, actions, gags, routines, ideas, titles, inventions, and other material written, composed, submitted, added, improvised, interpolated and invented by WRESTLER in connection with his/her appearance in the Programs) and to obtain copyright and/or trademark protection therefor in the name of PROMOTER or PROMOTER's designee.

## 3.   TRADEMARKS

3.1       WRESTLER hereby assigns in good faith to PROMOTER and PROMOTER hereby accepts, the exclusive right during the term of this Agreement, to use WRESTLER's service marks, trademarks and any and all of his/her other distinctive and identifying indicia, including but not limited to his/her legal name, his/her ring name, likeness, voice, signature, costumes, props, gimmicks, gestures, routines, themes, personality, character, and caricatures as used by or associated with WRESTLER in the business of professional wrestling, (collectively the "Intellectual Property").   It is the intention of the parties that the assignment granted with respect to Intellectual Property is exclusive to PROMOTER during the term hereof, even to the exclusion of WRESTLER, and includes the right to sublicense, promote, expose, exploit and otherwise use the Intellectual Property in any commercial manner now known or hereafter discovered.

3.2       If WRESTLER does not own, possess or use service marks, trademarks or distinctive and identifying indicia and PROMOTER develops such service marks, trademarks, and distinctive and

- 3 -

identifying indicia for WRESTLER, they shall belong to PROMOTER and PROMOTER shall have the exclusive license and right in perpetuity, to use, and to authorize others to use, WRESTLER's ring name, likeness, voice, signature, costumes, props, gimmicks, gestures, routines, themes, personality, character and caricatures as used by or associated with WRESTLER's performance as a professional wrestler (collectively "Name and Likeness").  It is the intention of the parties that the assignment with respect to Name and Likeness belongs to PROMOTER in perpetuity, even to the exclusion of WRESTLER, and the assignment includes the right to sublicense, promote, expose, exploit and otherwise use the Name and Likeness in any commercial manner now known or hereinafter discovered.

3.3        WRESTLER agrees to cooperate fully and in good faith with PROMOTER for the purpose of securing and preserving their respective rights in and to the trademarks, service marks, Intellectual Property, and Name and Likeness.   At PROMOTER's expense and request PROMOTER and WRESTLER shall take such steps as PROMOTER deems necessary for any registration or any litigation or other proceeding, to protect their respective rights in such service marks, trademarks or other Intellectual Property, and Name and Likeness.

## 4.  MERCHANDISING

4.1        WRESTLER hereby grants to PROMOTER, and PROMOTER hereby accepts, the exclusive right during the term of this Agreement to use the Intellectual Property and/or Name and Likeness to manufacture, have manufactured, print, produce, reproduce, broadcast, rebroadcast, distribute, sell, and otherwise commercially exploit and use, any and all copyrightable material, goods, or merchandise, or any other item containing copyrightable material; and, as to all such items created and produced during the term of this Agreement, PROMOTER shall have exclusive right in perpetuity, to sell and/or distribute them. By way of example and not of limitation, such items include t-shirts, posters, photos, television rights, video tapes and video cassettes, dolls, books, biographies, articles and stories, and any other such copyrightable material or item relating to WRESTLER or his/her performance as a professional wrestler.  It is the intention of the parties that this grant is exclusive to PROMOTER even to the exclusion of WRESTLER. PROMOTER shall own all copyrights in any and all such materials, goods, merchandise and items and shall be entitled to obtain registrations thereof in its own name, and wrestler shall provide all reasonable assistance to PROMOTER in so obtaining such copyrights.

4.2        WRESTLER hereby grants to PROMOTER, and PROMOTER hereby accepts, the identical rights described in paragraph 4.1 above for non-copyrightable material and items, such as key chains, pens, etc., upon the same terms and conditions as stated in paragraph

- 4 -

4.1.   It is the intention of the parties that this grant is exclusive to PROMOTER, even to the exclusion of WRESTLER.

## 5.   EXCLUSIVITY

5.1     It is the understanding of the parties that all rights, licenses, privileges and all other items herein given or granted to PROMOTER during the term of this Agreement are exclusive to the PROMOTER even to the exclusion of WRESTLER.

5.2   In the event WRESTLER desires to participate in any commercial activity in which PROMOTER is not otherwise engaged, and WRESTLER's participation in such activity requires use of his/her Intellectual Property or Name and Likeness, PROMOTER may at its discretion, upon WRESTLER's written request, execute a sublicense to WRESTLER for the limited purpose of authorizing WRESTLER to participate in such specific commercial activity upon mutually agreeable terms and conditions.  PROMOTER's sublicense to WRESTLER shall constitute an exception to paragraphs 3 and 4 herein, solely with respect to WRESTLER's participation in such specific commercial activity and shall not license, sublicense, authorize, grant or permit any other or further appropriation or infringement of PROMOTER's rights whatsoever.

## 6.   TERM AND TERRITORY

6.1     The term of the Agreement shall be two (2) years from the date hereof.  Thereafter, this Agreement shall automatically renew for successive one year terms, unless either party shall serve written notice to the other party at least ninety (90) days' prior to the end of the term of this Agreement of such party's decision to terminate this Agreement as at the end of the term.  Reference herein to the term hereof means the original term and any such renewal or extended term.  During any such extended term, all rights, duties, obligations, and privileges hereunder shall continue as stated herein.  Notwithstanding anything herein to the contrary, termination of this Agreement shall not affect PROMOTER's ownership of and rights to any Programs; the rights, results, products, and proceeds in and to and derived from WRESTLER's performance as a professional wrestler during the term of this Agreement; and the exploitation of the rights set forth in Paragraphs 1, 2, 3 and 4 hereof in any and all media now known or hereafter developed; and any Agreement concerning any and all of the Rights to WRESTLER's Name and Likeness.

6.2     The territory of this Agreement shall be the world.

- 5 -

## 7.  PAYMENTS

7.1      If WRESTLER appears in any Event in an arena before a live audience at which admission is charged other than those arena events which are taped for promotional purposes pursuant to paragraph 7.2 hereof, he/she shall be paid by PROMOTER an amount equal to such percentage of the gate receipts for such Event as is consistent with the nature of the match in which WRESTLER appears, i.e., preliminary bout, main event, etc.; the prevailing practices of the United States professional wrestling community; and any standards PROMOTER or others establish specifically for such Event. However, such amount shall not be less than One Hundred Fifty ($150.00) Dollars, per Event.

7.2      If WRESTLER renders his/her service in connection with an arena or studio event which is taped for promotional use on PROMOTER's television network or otherwise, he/she shall be paid by PROMOTER an amount not less than Fifty Dollars ($50.00) for each day, if any, on which WRESTLER renders services hereunder in connection with the production of such promotional television show(s)/spots.

7.3      In the event WRESTLER's Intellectual Property and/or Name and Likeness are licensed, sublicensed, or otherwise assigned to third parties for reproduction and/or sale and distribution, in conjunction with any copyrightable material or items, pursuant to paragraph 4.1 hereof, or non-copyrightable material or items, pursuant to paragraph 4.2 hereof (hereinafter "Licensed Products"), such that the applicable product features WRESTLER's Intellectual Property and/or Name and Likeness only, WRESTLER shall receive twenty-five percent (25%) of "Licensed Products' Net Receipts" received by PROMOTER with respect to any such licensing, sublicensing or assignment. Licensed Products' Net Receipts means the gross amount received by PROMOTER less expenses incurred by PROMOTER's licensing agent for the applicable product.

If WRESTLER's Intellectual Property and/or Name and Likeness are licensed, sublicensed, or otherwise assigned to third parties in connection with Licensed Products featuring WRESTLER with other wrestlers represented by PROMOTER, PROMOTER shall allocate and prorate the amount of compensation paid to WRESTLER pursuant to this paragraph 7.3, based upon the number of wrestlers whose Intellectual Property and/or Name and Likeness are so exploited.

7.4      In the event WRESTLER's Intellectual Property and/or Name and Likeness are licensed, sublicensed or assigned for non-wrestling personal appearances and performances such as personal appearances for advertising or non-wrestling promotional purposes, radio and television commercials, movies, etc., WRESTLER shall be paid an amount to be mutually agreed to by WRESTLER and by PROMOTER of the "Personal Appearance Net Receipts" received by

- 6 -

PROMOTER.   Personal Appearance Net Receipts means the amount received by PROMOTER after payment of and provision for all costs and expenses, except income taxes.

7.5      In the event any other products developed by Promoter pursuant to paragraph 4.1 or 4.2 above are exploited directly through Arena Sales, and/or Mail Order Sales (hereinafter "Direct Sales Products"), such that the applicable product features WRESTLER's Intellectual Property and/or Name and Likeness only, WRESTLER shall receive an amount equal to five percent (5%) of the "Direct Sales Products' Net Receipts" derived by PROMOTER from such exploitation.  Direct Sales Products' Net Receipts means the gross amount received by PROMOTER for sales of such products sold at Arenas and/or via Mail Order after deduction of local taxes and applicable arena commission(s) allocated for concession sales.

         In the event WRESTLER's Intellectual Property and/or Name and Likeness are exploited by PROMOTER such that Direct Sales Products feature WRESTLER's Intellectual Property and/or Name and Likeness with other wrestlers represented by PROMOTER, PROMOTER shall allocate and prorate the amount paid to WRESTLER pursuant to this paragraph 7.5, based upon the number of wrestlers whose Intellectual Property and/or Name and Likeness are so exploited.

7.6      In the event WRESTLER is a featured performer whose Intellectual Property and/or Name and Likeness are exploited with other wrestlers represented by PROMOTER in the videos made of Pay-Per-View Specials such as "Wrestlemania," "Royal Rumble," "Summerslam" and "Survivor Series" (hereinafter "WWF Video Specials"), PROMOTER shall allocate and prorate twenty-five percent (25%) of the "WWF Video Specials' Net Receipts" paid to PROMOTER by Licensee based upon the total amount paid to the wrestlers for the live event whose Intellectual Property and/or Name and Likeness are so exploited.  WWF Video Specials' Net Receipts mean the gross amount received by PROMOTER from its licensees less all costs, if any, incurred by PROMOTER to produce the applicable WWF Video Special.

7.7      In the event WRESTLER is a featured performer whose Intellectual Property and/or Name and Likeness are exploited with other wrestlers represented by PROMOTER, in non-pay-per-view video programs such as "Best of WWF" and "Saturday Night's Main Event" (hereinafter "WWF Series"), PROMOTER shall allocate and prorate twenty-five percent (25%) of the "WWF Series' Net Receipts" paid to PROMOTER from its licensees based upon the number of wrestlers whose Intellectual Property and/or Name and Likeness are so exploited.  WWF Series' Net Receipts mean the gross amount received by PROMOTER from its licensees less expenses, if any, incurred by PROMOTER in connection with production of the applicable WWF Series.

- 7 -

7.8      In the event WRESTLER's Intellectual Property and/or Name and Likeness are featured exclusively (as described below) in videodiscs or cassettes (hereinafter "Video Products"), WRESTLER shall receive an amount equal to twelve and one-half percent (12-1/2%) of the "Video Net Receipts" derived by PROMOTER for such exploitation. The remaining twelve and one-half percent (12-1/2%) royalty allocation will be prorated among the other wrestlers who appear incidentally on the Video Products but who are not the featured WRESTLER.  Video Net Receipts mean the gross amount received by PROMOTER from its licensees less all costs, if any, incurred by PROMOTER to produce the applicable Video Product.

An Exclusive Feature shall mean that the WRESTLER is shown in each and every match on the Video Product.  WRESTLER is entitled to the payment provided for above only for those Video Products which feature him/her exclusively, i.e., "Roddy Piper," or "Andre the Giant," or on those Video Products which feature a tag team or group to which WRESTLER belongs, i.e., the "Hart Foundation." Relative to a tag team or group appearing on a Video Product, the remaining twelve and one-half percent (12-1/2%) royalty will be prorated among the wrestlers according to the number of wrestlers in the featured group.

7.9      It is the understanding of the parties that WRESTLER shall not be paid anything for PROMOTER's exploitation of his/her Intellectual Property and/or Name and Likeness in PROMOTER's wrestling magazine known as the WWF Official Magazine, or any of PROMOTER's other magazines, which PROMOTER may publish, produce or distribute at arenas, at newsstands and/or by mail.

7.10     All payments made to WRESTLER are in full without withholding of any Federal, state or local income taxes, and/or any social security, FICA or FUTA taxes.  After the end of each calendar year, PROMOTER shall issue to WRESTLER Internal Revenue Service Form 1099 showing all payments to WRESTLER.

7.11     Statements as to royalties payable hereunder shall be sent by PROMOTER to WRESTLER within ninety (90) days following the end of each quarter-annual period together with payment of royalties, if any, earned by WRESTLER hereunder during such quarter-annual period, less advances and/or debits made by PROMOTER on WRESTLER's behalf.

(a)  WRESTLER shall be deemed to have consented to all royalty Statements and all other accountings rendered by PROMOTER hereunder and each such royalty statement or other accounting shall be conclusive, final, and binding, shall constitute an account stated, and shall not be subject to any objection for any reason whatsoever unless specific objection in writing, stating the basis thereof, is given by WRESTLER to PROMOTER within one (1) year from the date rendered.

(b)   PROMOTER shall maintain books of account related to the payment of royalties hereunder at its principal place of business in Stamford, Connecticut. WRESTLER, or WRESTLER's designated independent certified public accountant who is a member in good standing of the AICPA, may at WRESTLER's sole expense examine and copy PROMOTER's books insofar as they pertain to this Agreement for the purpose of verifying the accuracy thereof, during PROMOTER's normal business hours and upon reasonable notice. Such audit shall be conducted in a manner that will not unreasonably interfere with PROMOTER's normal business operations. WRESTLER shall not audit PROMOTER's books and records more than once during any calendar year of the term hereof and such audit may not continue for more than thirty (30) days. Statements may be changed from time to time to reflect year-end adjustments, to correct errors and for similar purposes.

## 8. PROMOTER'S OBLIGATIONS

8.1        PROMOTER shall be responsible for obtaining all appropriate licenses to conduct professional wrestling exhibitions.

8.2        PROMOTER shall bear the following costs in connection with the development and enhancement of the value of WRESTLER's performance as professional WRESTLER and his/her standing in the professional wrestling community, all of which shall inure to the benefit of WRESTLER:

(a)   In connection with WRESTLER's appearances at Events staged before a live audience, PROMOTER shall bear the cost of location rental, PROMOTER's third party comprehensive liability insurance for the benefit of the venues, applicable state and local admission taxes, promotional assistance, sound and light equipment, wrestling ring, officials, police and fire protection, and such additional security guards as PROMOTER shall require in its discretion to protect WRESTLER'S safety during his/her performance in a professional wrestling match;

(b)   In connection with the production, distribution, and exploitation of the Programs, PROMOTER shall bear all costs incurred in connection with such production, distribution, broadcast, transmission or other forms of mass media communication.

(c)   In connection with any licensing activities and/or merchandising activities, PROMOTER shall bear all costs of negotiating, securing or otherwise obtaining the licensing arrangements, including costs of agents, consultants, attorneys and others involved in making the licensing arrangements; and PROMOTER shall bear all costs of creating, designing, developing, producing and marketing merchandise. In order to fulfill these obligations, PROMOTER may make any arrangements, contractual or otherwise, it

deems appropriate to delegate, assign, or otherwise transfer its obligations.

8.3        PROMOTER shall schedule events and book WRESTLER for Events.  In doing so, PROMOTER shall select the time and location of the Events at which WRESTLER is booked, WRESTLER's opponent, and any other wrestlers who will appear at such Event.  PROMOTER shall provide WRESTLER with reasonable advance notice of the date, time, and place of any such Event, and WRESTLER shall appear at the designated location for any such Event no later than one hour before the designated time.   If WRESTLER fails to appear as required without advance 24 hour notice to PROMOTER and PROMOTER must substitute another wrestler to appear in WRESTLER's place at the Event, then WRESTLER shall be subject to a fine to be determined by PROMOTER.

8.4        Notwithstanding the above, if WRESTLER shall be prevented from appearing at an Event by reason of Force Majeure, the above fine shall not be imposed.  For purposes of this Agreement, Force Majeure shall mean any act of God, fire, flood, war or other calamity; a strike or labor difficulties; any governmental action or any other serious emergency affecting WRESTLER which occurrence is beyond WRESTLER's reasonable control, and, which despite his/her best efforts prohibits his/her performance or appearance at such Event.

## 9.   WRESTLER'S OBLIGATIONS

9.1        WRESTLER shall bear responsibility for obtaining all appropriate licenses to engage in, participate in, or otherwise appear in professional wrestling exhibitions.

9.2        WRESTLER shall be responsible for his/her own training, conditioning, and maintenance of wrestling skills and abilities, as long as they do not interfere with WRESTLER's appearance at scheduled events as follows:

        (a)  WRESTLER shall establish his/her own training program, shall select time of training, duration of training, exercises, pattern of exercise and other actions appropriate to obtaining and maintaining his/her physical fitness for wrestling. WRESTLER shall select his/her own training apparatus, including mats, weights, machines and other exercise paraphernalia. WRESTLER is responsible for supplying his/her own training facilities and equipment, whether by purchase, lease, license, or otherwise.

        (b)  WRESTLER shall establish his/her own method of physical conditioning, shall select time for conditioning, duration of conditioning and form of conditioning.  WRESTLER shall select his/her time for sleep, time for eating, and time for other activities. WRESTLER shall select his/her own foods, vitamins and

- 10 -

other ingested items, excepting illegal and/or controlled substances and drugs.

9.3     WRESTLER shall be responsible for supplying all wardrobe, props, and make-up necessary for the performance of WRESTLER's services at any Event at which WRESTLER appears and for any costs incurred in connection with his/her transportation to and from any such Events (except those transportation costs which are covered by PROMOTER's current travel policy), as well as the costs of food consumed and hotel lodging utilized by WRESTLER in connection with his/her appearance at such Events.

9.4     WRESTLER shall use his/her skills and talents as a professional wrestler and be responsible for developing and executing the various details, movements, and maneuvers of each match consistent with and complying with all requirements, directions and requests made by PROMOTER in connection with the booking of WRESTLER at scheduled Events.

9.5     WRESTLER agrees to cooperate and assist without any additional payment in the publicizing, advertising and promoting of scheduled Events, and to appear at and participate in a reasonable number of joint and/or separate press conferences, interviews, and other publicity or exploitation appearances or activities (any or all of which may be filmed, taped, or otherwise recorded, telecast by any form of television now known or hereafter created, including without limitation free, cable, pay cable, and closed circuit and pay-per-view television, broadcast, exhibited, distributed, and used in any manner or media and by any art, method, or device now known or hereafter created, including without limitation by means of videodisc, video cassette, theatrical motion picture and/or non-theatrical motion picture), at times and places designated by PROMOTER.   WRESTLER will receive no additional compensation in connection therewith.

9.6     WRESTLER shall use his/her best efforts in the ring in the performance of wrestling services for a match or other activity, in order to provide an honest exhibition of his/her wrestling skills and abilities, consistent with the customs of the professional wrestling industry; and WRESTLER agrees all matches shall be finished in accordance with the PROMOTER's direction. Breach of this paragraph shall cause a forfeiture of any payment due WRESTLER, pursuant to paragraph 7.1, for the Event at which the breach occurs and shall terminate PROMOTER's guarantee as provided in paragraph 1.2 above, as well as all other obligations of PROMOTER to WRESTLER hereunder, but such breach shall not terminate PROMOTER's licenses and other rights hereunder during the term hereof.

9.7     WRESTLER acknowledges the right of PROMOTER to make decisions with respect to the preparation and exploitation of the Programs or the exercise of any other rights respecting

- 11 -

Intellectual Property or Name and Likeness, and in this connection WRESTLER acknowledges and agrees that PROMOTER's decision with respect to any agreements disposing of the rights to WRESTLER's Intellectual Property and/or Name and Likeness are final, except as to WRESTLER's legal name, which PROMOTER may only dispose of upon WRESTLER's consent.   WRESTLER agrees to execute any agreements PROMOTER deems necessary in connection with any such agreements, and if WRESTLER is unavailable or refuses to execute such agreements, PROMOTER is hereby authorized to do so in WRESTLER's name as WRESTLER's attorney-in-fact.

9.8      WRESTLER agrees to cooperate fully and in good faith with PROMOTER to obtain any and all documentation, applications or physical examinations as may be required by any governing authority with respect to WRESTLER'S appearance and/or performance in a professional wrestling match.

9.9      WRESTLER shall indemnify and defend PROMOTER and PROMOTER's licensees, assignees, and affiliates and their respective officers, directors, employees, and representatives and hold each of them harmless against any claims, demands, liabilities, actions, costs, suits, proceedings or expenses, incurred by any of them by reason of WRESTLER'S breach or alleged breach of any warranty, undertaking, representation, agreement, or certification made or entered into herein or hereunder by WRESTLER. And, WRESTLER shall indemnify and defend PROMOTER against any and all claims arising out of WRESTLER'S acts, transactions and/or conduct within or around the ring, hallways, dressing rooms, parking lots, or other areas within or in the immediate vicinity of the facilities where PROMOTER has scheduled Events at which WRESTLER is booked.

9.10     WRESTLER shall be responsible for payment of all his/her own Federal, state or local income taxes; all social security, FICA and FUTA taxes, if any, as well as all contributions to his retirement plans and programs, or other supplemental income plan or program that would provide WRESTLER with personal or monetary benefits upon his retirement from professional wrestling.

9.11     (a)  WRESTLER shall be responsible for his/her own commercial general liability insurance, workman's compensation insurance, professional liability insurance and as well as any excess liability insurance, as he/she deems appropriate to insure, indemnify and defend WRESTLER with respect to any and all claims arising out of his/her own acts, transactions, or conduct as a professional wrestler.

(b) WRESTLER acknowledges that the participation and activities required by WRESTLER in connection with his/her performance in a professional wrestling exhibition may be dangerous and may involve the risk of serious bodily injury.  WRESTLER

knowingly and freely assumes full responsibility for all such risks whether due to the negligence of PROMOTER or otherwise.

(c)  WRESTLER hereby releases, waives and discharges PROMOTER from all liability to WRESTLER and covenants not to sue PROMOTER for any and all loss or damage on account of injury to the person or property or resulting in serious or permanent injury to WRESTLER or in WRESTLER'S death, whether caused by the negligence of the PROMOTER or otherwise.

(d)  WRESTLER acknowledges that the foregoing release, waiver and indemnity is intended to be as broad and inclusive as permitted by the law of the State, Province or Country in which the professional wrestling exhibition or Events are conducted and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full force and effect.

9.12    (a)  WRESTLER may at his/her election obtain health, life and/or disability insurance to provide benefits in the event of physical injury arising out of his/her professional activities; and WRESTLER acknowledges that PROMOTER shall not have any responsibility for such insurance or payment in the event of physical injury arising out of his/her professional activities.

(b)  In the event of physical injury arising out of WRESTLER'S professional activities, WRESTLER acknowledges that he/she is not entitled to any workman's compensation coverage or similar benefits for injury, disability, death or loss of wages; and WRESTLER shall make no claim against PROMOTER for such coverage or benefit.

9.13    WRESTLER shall act at all times with due regard to public morals and conventions during the Term of this Agreement.  If WRESTLER shall have committed or shall commit any act or do anything that is or shall be an offense or violation involving moral turpitude under Federal, state or local laws, or which brings him/her into public disrepute, contempt, scandal or ridicule, or which insults or offends the community or any employee, agent or affiliate of PROMOTER or which injures his/her reputation or diminishes the value of his/her professional wrestling services to the public or PROMOTER then at the time of any such act, or any time after PROMOTER learns of any such act, PROMOTER shall have the right to fine WRESTLER in an amount to be determined by PROMOTER, in addition to its other legal and equitable remedies, and/or to suspend and/or terminate this Agreement forthwith.

## 10.  WARRANTY

10.1    WRESTLER represents, warrants, and agrees that he/she is free to enter into this Agreement and to grant the rights and licenses herein granted to PROMOTER; he/she has not heretofore

- 13 -

entered and shall not hereafter enter into any contract or agreement which is in conflict with the provisions hereof or which would or might interfere with the full and complete performance by WRESTLER of his/her obligations hereunder or the free and unimpaired exercise by PROMOTER of any of the rights and licenses herein granted to it; WRESTLER further represents and warrants there are not pending claims or litigation affecting WRESTLER which would or might interfere with the full and complete exercise or enjoyment by PROMOTER of any rights and licenses granted hereunder. Any exceptions to this Warranty are set forth in Exhibit A, attached hereto.

10.2     WRESTLER represents, warrants and agrees that he/she is in sound mental and physical condition; that he/she is suffering from no disabilities that would impair or adversely affect his/her ability to perform professional wrestling services; and that he/she is free from the influence of illegal drugs or controlled substances, which can threaten his/her well being and pose a risk of injury to himself/herself or others. To insure compliance with this warranty, WRESTLER shall abide by PROMOTER's Drug Policy for Wrestlers and consents to the sampling and testing (insofar as permitted by applicable law) of his/her urine in accordance with such policy. In addition, WRESTLER agrees to submit annually to a complete physical examination by a physician either selected or approved by PROMOTER. PROMOTER'S current Drug Policy, which WRESTLER acknowledges herewith receiving, is annexed hereto and incorporated herein.

## 11.   EARLY TERMINATION

11.1     This Agreement may be terminated prior to the end of its term by a written instrument executed by each of the parties expressing their mutual consent to so terminate without any further liability on the part of either. In the event of such early termination, WRESTLER hereby waives any claims to future compensation or payments in connection with revenues derived from use of the Intellectual Property and/or Name and Likeness subsequent to such termination.

11.2     This Agreement will be terminated by WRESTLER's death during the term.

## 12.   BREACH

12.1     In the event PROMOTER breaches this Agreement, WRESTLER may recover such actual direct damages as may be established in any Court of law having jurisdiction of the parties and the subject matter.

12.2     In the event WRESTLER breaches this Agreement, PROMOTER may recover such actual direct damages as may be established in a court of law having jurisdiction of the parties and the subject

matter, as provided in paragraph 13.8. In addition, WRESTLER shall forfeit any future payments due pursuant to paragraphs 7.3, 7.4, 7.5, and 7.6, 7.7 and 7.8; WRESTLER shall not appear under, use or exploit in any manner, parenthetically or otherwise, his/her Intellectual Property (except for his/her legal name) for the remaining term of this Agreement; and WRESTLER shall not appear under, use or exploit in any manner, parenthetically or otherwise his/her Name and Likeness forever.

12.3     The parties further agree that because of the special, unique, and extraordinary nature of the obligations of PROMOTER and WRESTLER respecting all rights and licenses concerning bookings, promoting, programs, Events, Intellectual Property and/or Name and Likeness, which are the subject matter of this agreement, WRESTLER's breach of this Agreement shall cause PROMOTER irreparable injury which cannot be adequately measured by monetary relief; as a consequence PROMOTER shall be entitled to injunctive and other equitable relief against WRESTLER to prevent WRESTLER's breach or default hereunder and such injunction or equitable relief which shall be without prejudice to any other rights, remedies or damages which PROMOTER is legally entitled to obtain.

12.4     In no circumstances, whatsoever, shall either party to this Agreement be liable to the other party for any punitive or exemplary damages; and all such damages, whether arising out of the breach of this Agreement, or otherwise, are expressly waived.

### 13.  MISCELLANEOUS

13.1     Nothing contained in this Agreement shall be construed to constitute WRESTLER as a partner or joint venturer of PROMOTER, nor shall WRESTLER have any authority to bind PROMOTER in any respect. WRESTLER is an independent contractor and WRESTLER shall execute and hereby irrevocably appoints PROMOTER his/her attorney-in-fact to execute, if WRESTLER refuses to do so, any instruments necessary to accomplish or confirm the foregoing.

13.2     This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and all prior understandings, negotiations and agreements are merged in this Agreement.    There are no other agreements, representations, or warranties not set forth herein with respect to the subject matter hereof; and the parties expressly acknowledge that any representation, promise or inducement by any party to any other party that is not embodied in this Agreement is not part of this Agreement, and they agree that no party shall be bound by or liable for any such alleged representation, promise or inducement not set forth herein.

13.3     This Agreement may not be changed or altered except in writing signed by PROMOTER and WRESTLER.

- 15 -

13.4     Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement, or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.

13.5     PROMOTER shall have the right to assign, license, or transfer any or all of the rights granted to and hereunder to any firm or corporation, and if any assignee shall assume in writing PROMOTER's obligations hereunder, PROMOTER shall have no further obligations to WRESTLER.   WRESTLER may not assign, transfer or delegate his/her rights or obligations hereunder and any attempt to do so shall be void.

13.6     Any notices required or desired hereunder shall be in writing and sent postage prepaid by certified mail, return receipt requested, or by prepaid telegram addressed as follows, or as the parties may hereafter in writing otherwise designate:

>        Titan Sports, Inc.
>        ATTENTION: President
>        1241 E. Main Street
>        P.O. Box 3857
>        Stamford, Connecticut 06902

TO WRESTLER:



Scott Levy

The date of mailing shall be deemed to constitute the date of service of any such notice.

13.7     This Agreement is made in Connecticut and shall be governed by and interpreted in accordance with the laws of the State of Connecticut.

13.8     In the event that there is any claim, dispute, or other matter in question arising out of or relating to this Agreement, the enforcement of any provisions therein, or breach of any provision thereof, it shall be submitted to the Federal, state or local courts, as appropriate, only in the State of Connecticut. This provision to submit all claims, disputes or matters in question to the Federal or state courts in the State of Connecticut

shall be specifically enforceable; and each party, hereby waiving personal service of process and venue, consents to jurisdiction in Connecticut for purposes of any other party seeking or securing any legal and/or equitable relief.

13.9     In the event that any legal action or any other proceeding is commenced to enforce any provision of this Agreement or as a result of a dispute, breach, default or misrepresentation in conjunction with this Agreement, the successful or prevailing party shall be entitled, in addition to any other relief, to recover all costs of litigation, including expert fees and reasonable attorneys' fees incurred in such action or proceeding; and all such costs and fees shall be made part of the judgment.

## 14.   CONFIDENTIALITY

14.1     Other than as may be required by applicable law, government order or regulation; or by order or decree of the court, the parties agree that neither of them shall publicly divulge or announce, or in any manner disclose, to any third party, any of the specific terms and conditions of this Agreement; and both parties warrant and covenant to one another that none of their officers, directors, employees or agents will do so either.

14.2     Each party acknowledges that he/she has read this Agreement; that he/she understands the terms and conditions set forth therein; and that his/her execution of this Agreement is a voluntary act by which he/she intends to be legally bound in a court of law.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

TITAN SPORTS, INC.

BY: _____
   Title:


_____Scott Levy_____
WRESTLER's legal name, or
professional corporation


_____Johnny Polo_____
Wrestler's Ring Name


_____
WRESTLER's signature and title, if a
professional corporation

- 17 -

STATE OF CONNECTICUT)
                } ss: Stamford
COUNTY OF FAIRFIELD )

      I, _Susan L. DeRosa_ , a Notary Public for said County and State, do hereby certify that _Vincent K. McMahon_ , _C.E.O. & Chairman_ of Titan Sports, Inc., personally appeared before me this day and acknowledged the due execution of the foregoing instrument to be his/her free act and deed for the purposes therein expressed.

      WITNESS my hand and notarial seal this _28th_ day of _May_ , 1993.

                              _Susan L. DeRosa_
                              Notary Public

My Commission expires: _My Commission Expires May 31, 1996_

STATE OF _Tennessee_ )
                 } ss:
COUNTY OF _Shelby_ )

      I, _Cynthia L. Sharp_ , a Notary Public for said County and State, do hereby certify that _Scott Levy_ (Real Name) _Johnny Polo_ (Ring Name) personally appeared before me this day and acknowledged the due execution of the foregoing instrument to be his/her free act and deed for the purposes therein expressed.

      WITNESS my hand and notarial seal this _18th_ day of _May_ , 1993.

                              _Cynthia L. Sharp_
                              Notary Public

My commission expires: _1-27-97_

- 18 -

# EXHIBIT 7



World Wrestling
Entertainment, Inc.

1241 East Main St.
Stamford, CT 06902
Tel: 203 352 8600

Via Federal Express

January 21, 2003

Mr. Scott Levy

Re:    Early Contract Release ("Release")

Dear Mr. Levy:

Reference is hereby made to that certain Booking Contract between Scott Levy ("Levy") and World Wrestling Entertainment, Inc. ("WWE") dated June 30, 2000, and made effective August 27, 2000, and any amendments or modifications thereto, in full force and effect as of the date hereof (collectively, the "Contract"). In consideration of the mutual promises and covenants set forth below and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Levy and WWE hereby agree as follows:

1.      Upon mutual agreement by the parties, the Contract shall be and is hereby terminated and canceled effective as of January 15, 2003 (the "Termination Date").

2.      Levy acknowledges and agrees that WWE created and owns the "New Intellectual Property" as described in the Contract, including without limitation the name and likeness of the character "Johnny Polo" and that all rights in and to the history, name, likeness and images of such character have belonged to, and forever belong to, WWE. Levy further acknowledges and agrees that WWE retains the exclusive right to retain and exploit in perpetuity history, for whatsoever purpose in any and all media and means of commerce, whether now or hereafter devised, the New Intellectual Property, including without limitation, the name and likeness of the character "Johnny Polo". Levy acknowledges and agrees that he is forever precluded from using any name, likeness, costumes, props, gimmicks, gestures, routines, themes, music, personalities, caricatures or anything else which refer or relate to, or which are confusingly similar to "Johnny Polo". Levy shall also immediately return to WWE all gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible property provided to Levy by WWE.

3.      Levy hereby acknowledges and agrees that WWE has performed all of its obligations pursuant to the Contract and WWE hereby acknowledges that Levy has performed all of his obligations pursuant to the Contract, except as required hereunder.

4.      A.      In consideration of the representations and warranties set forth herein by WWE and for WWE's agreement to grant this Release, WWE shall pay Levy the total sum of ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉), payable in a lump sum payment as a full and complete buyout of Levy's services under the Contract, other than the obligation to pay Levy the royalties due him pursuant to, and as determined by, the Contract.

G:\Departments\Legal Affairs\Contract Releases\Levy, Scott Early Contract Release.doc
01/21/03



January 21, 2003
Page 2

B.    In addition to the foregoing, Levy represents and warrants as follows:

(i)    Other than as may be required by applicable law, government order or regulations, or by order or decree of the Court, Levy hereby acknowledges and agrees that in further consideration of WWE's entering into this Release, Levy shall not, at any time during the Contract, or after the execution of the Release for any reason whatsoever, disclose to any person, organization, or publication, or utilize for the benefit or profit of Levy or any other person or organization, any sensitive or otherwise confidential business information, idea, proposal, secret, or any proprietary information obtained while with WWE and/or regarding WWE, its employees, independent contractors, agents, officers, directors, subsidiaries, affiliates, divisions, representatives, or assigns. Included in the foregoing, by way of illustration only and not limitation, are such items as reports, business plans, sales information, cost or pricing information, lists of suppliers or customers, talent lists, story lines, scripts, story boards or ideas, routines, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable) and any other tangible or intangible materials written, composed, submitted, added, improvised, or created by or for Levy in connection with appearances for WWE, information regarding any contractual relationships maintained by WWE and/or the terms thereof, and/or any and all information regarding wrestlers engaged by WWE.

(ii)    Levy further acknowledges and agrees that his agreement to be bound by the terms hereof is a material condition of WWE's willingness to execute this Release. Other than as may be required by applicable law, government order or regulation, or by order or decree of the court, the parties agree that neither of them shall publicly divulge or announce, or in any manner disclose, to any third party, any of the specific terms and conditions of the Contract or this Release; and both parties warrant and covenant to each other that none of their officers, directors, employees or agents will do so either.

(iii)    To that end, Levy further agrees that he shall not make any statement or comments (written or otherwise) that criticize, disparage, injure or harm the reputation of WWE and/or the World Wrestling Entertainment including, but not limited to any statements or comments regarding the Levy character, the McMahon Family and/or any representative of WWE/World Wrestling Entertainment.  As such, the parties mutually agree that if and when asked about the terms of this Release or the reasons why Levy has left WWE, the parties will state essentially as follows:

"I ("Scott Levy") have asked the WWF for my early release so that I may pursue other interests."

5.    Effective as of the Termination Date, WWE hereby releases and discharges Levy from any and all further obligations pursuant to the Contract, except: a) those provisions which by their terms survive the expiration of the Contract; and b) the provisions of this Release, Levy shall have no further obligations to render or perform any services of any



January 21, 2003
Page 3

nature whatsoever pursuant to the Contract after the Termination Date, and WWE shall have no right to cause Levy to provide any further services under the Contract thereafter.

6.      Effective as of the Termination Date, Levy hereby releases and discharges WWE from any and all obligations pursuant to the Contract except as required hereunder. Levy acknowledges that except as expressly set forth herein, no representations of any kind or character have been made to Levy by WWE or by any of WWE's agents, representatives or attorneys to induce the execution of this Release. In order for Levy to induce WWE to sign this Release, Levy hereby releases WWE, its parent companies, affiliates, subsidiaries, successors, assigns, and its and their respective officers, directors, employees, independent contractors, licensees, representatives and agents from any and all claims, liabilities and obligations whatsoever in law or equity (whether now known or hereinafter discovered) which Levy has or may ever have arising out of or in connection with the Contract.

7.      This Release shall be binding upon and inure to the benefit of Levy and WWE and their respective heirs, representatives, successors and assigns. This Release contains the entire understanding of the parties hereto and supersedes all prior oral and written communications and agreements with respect to the subject matter hereof.

8.      This Release, its validity, construction and effect, shall be governed by and construed in accordance with the laws of the State of Connecticut applicable to contracts to be performed wholly therein, and shall not be modified or amended except by an instrument in writing signed by each of the parties hereto duly authorized to execute such modification or amendment. The invalidity or unenforceability of any provision hereof shall not affect the validity or enforceability of any other provision hereof.

9.      Any claim, dispute, or other matter in question arising out of or relating to this Release shall be submitted only to courts in the state of Connecticut. The parties' agreement to submit all claims, disputes or matters in question to the courts in the state of Connecticut shall be specifically enforceable, and each party consents to jurisdiction in Connecticut.

10.     In the event a legal action or any other proceeding is commenced to enforce any provision of this Release or as a result of any breach, default, or dispute related to this Release, the successful or prevailing party shall be entitled, in addition to any other relief, to recover all costs of litigation, including expert fees and reasonable attorneys' fees incurred in such action or proceeding.

11.     The parties further agree that because of the special and unique obligations of Levy under this Release, a breach by Levy of the provisions in this Release shall cause WWE and/or World Wrestling Entertainment irreparable injury, which cannot be adequately measured by monetary relief. Consequently, without prejudice to or limitation of any other rights, remedies or damages which WWE is legally entitled to obtain, WWE

C:\Documents\Legal Affairs\Contract Releases\Levy, Scott Levy Contract Release.doc
01/21/03



January 21, 2003
Page 4

shall be entitled to injunctive and other equitable relief against Levy to enforce the provisions of this Release.

Please confirm your acceptance of this Release as set forth above by signing in the space provided below on each of the enclosed two (2) copies and return them to me. One fully executed copy will be returned to you for your files. Thank you in advance for your prompt attention to this matter.

Very truly yours,

John A. Ruzich
Associate Counsel

cc:     Jim Ross
        Ed Kaufman
        John Laurinaitis
        Benny Morales
        Tom Bergamasco

AGREED AND ACCEPTED:

SCOTT LEVY                          WORLD WRESTLING ENTERTAINMENT INC.
("Levy")                            ("WWE")

By:_____        By:_____
        Scott Levy                          James Ross
Its:                                Senior Vice President Talent Relations
                                    and Wrestling Administration

Date:_____        Date:_____

G:\Department\Legal Affairs\Contract Releases\Levy, Scott Italy Contract Release.doc
01/21/03



January 21, 2003
Page 5

STATE OF CONNECTICUT )
                       ) ss:   Stamford
COUNTY OF FAIRFIELD    )

On _____, 2003, before me personally came James Ross, Senior Vice President Talent Relations and Wrestling Administration of World Wrestling Entertainment, Inc., to me known, and known to me to be the individual described in, and who executed the foregoing Release, and duly acknowledged to me that he is a duly authorized corporate officer of World Wrestling Entertainment, Inc., and that he executed the same on behalf of said Company.

WITNESS my hand and notarial seal this _____ day of _____, 2003.

_____
Notary Public

My commission expires: _____

STATE OF              )
                       ) ss:
COUNTY OF             )

I am a Notary Public for said County and State, do hereby certify that Scott Levy personally appeared before me this day and acknowledged the due execution of the attached Release to be his free act and deed for the purposes therein expressed.

WITNESS my hand and notarial seal this _____ day of _____, 2003.

_____
Notary Public

My commission expires: _____

G:\Department\Legal Affairs\Contract Release\Levy, Scott Body Contract Release.doc
01/21/03

# EXHIBIT 8

Account # ▓▓▓▓



June 20, 2016

SCOTT LEVY


Dear SCOTT LEVY,

Enclosed is your royalty earnings statement for the Second Quarter - 2016. Your earnings are summarized below:

### SUMMARY OF ROYALTY EARNINGS

#### ROYALTY EARNED CURRENT QUARTER

| | |
|---|---:|
| Direct | $4.07 |
| Other Licensing | $19.79 |
| Video | $106.97 |
| **TOTAL EARNINGS** | **$130.83** |
| **NET ROYALTIES PAID** | **$130.83** |

#### COMMENTS

If you receive guaranteed weekly pay, your royalty payment will be applied to your guarantee for this week. Otherwise, please find enclosed a check or direct deposit notification.

If you have any questions, please contact me at 203-352-8682.

Sincerely,

*Tom Bergamasco*

Tom Bergamasco
Director of Talent Participations

Enclosure

Print Date: 6/20/2016  
Page : 1 of 2  
Account: ~~████~~

TALENT NAME: RAVEN

2016 Q2

| Item Code | Item Description | Activity Date | Venue | WWE Earned Royalties | Royalty Rate (%) | Talent Royalty Earned |
|---|---|---|---|---|---|---|
| *Direct* | | | | | | |
| | **WWE SHOP** | | | | | |
| WWE94917 | THE TRUE STORY OF WM DV | 2016 Q1 | 2016 Q1 | 348.41 | 0.02841 | 0.10 |
| WWE95176 | HISTORY OF WWE:50 YEARS | 2016 Q1 | 2016 Q1 | 56.09 | 0.01718 | 0.01 |
| WWE95177 | HISTORY OF WWE:50 YEARS | 2016 Q1 | 2016 Q1 | 65.00 | 0.01718 | 0.01 |
| WWE95331 | LADIES AND GENTLEMAN, MY | 2016 Q1 | 2016 Q1 | 331.39 | 0.05747 | 0.19 |
| WWE95332 | LADIES AND GENTLEMAN, MY | 2016 Q1 | 2016 Q1 | 212.02 | 0.05747 | 0.12 |
| WWE95409 | IT'S GOOD TO BE THE KING: T | 2016 Q1 | 2016 Q1 | 895.89 | 0.10000 | 0.90 |
| WWE95410 | IT'S GOOD TO BE THE KING: T | 2016 Q1 | 2016 Q1 | 443.77 | 0.10000 | 0.44 |
| WWE95423 | MONDAY NIGHT VOL.2 : "KNO | 2016 Q1 | 2016 Q1 | 523.38 | 0.02336 | 0.12 |
| WWE95431 | OWEN: HART OF GOLD DVD | 2016 Q1 | 2016 Q1 | 3,147.22 | 0.04274 | 1.35 |
| WWE95432 | OWEN: HART OF GOLD BLU R | 2016 Q1 | 2016 Q1 | 1,945.94 | 0.04274 | 0.83 |
| | TOTAL : WWE SHOP | | | 7,969.11 | | $4.07 |
| *TOTAL : Direct* | | | | 7,969.11 | | $4.07 |
| *OtherLicensing* | | | | | | |
| | **TUNECORE** | | | | | |
| 012369 | RAVEN | 2015 Q4 | 2015 Q4 | 73.39 | 25.00000 | 18.35 |
| TMUSICVOL5 | THE MUSIC VOL 5 | 2015 Q4 | 2015 Q4 | 86.56 | 1.66667 | 1.44 |
| | TOTAL : TUNECORE | | | 159.95 | | $19.79 |
| *TOTAL : OtherLicensing* | | | | 159.95 | | $19.79 |
| *Video* | | | | | | |
| | **ENTERTAINMENT ONE FILMS CANADA INC.** | | | | | |
| KOC-DV-9066 | RAW 10TH ANNIVERSARY DV | 2016 Q1 | 2016 Q1 | 5.55 | 0.13681 | 0.01 |
| WWEBD95424 | MONDAY NIGHT VOL.2 : "KNO | 2015 Q4 | 2015 Q4 | 11.95 | 0.11682 | 0.01 |
| WWEDV95424 | MONDAY NIGHT VOL.2 : "KNO | 2016 Q1 | 2016 Q1 | 6.13 | 0.11682 | 0.01 |
| TOTAL : WWEBD95424 | | | | 18.08 | | $0.02 |
| WWEBD95432 | OWEN: HART OF GOLD BR | 2015 Q4 | 2015 Q4 | 2,471.06 | 0.21368 | 5.28 |
| WWEDV94950 | STONE COLD STEVE AUSTIN | 2015 Q4 | 2015 Q4 | 26.37 | 0.22936 | -0.06 |
| WWEDV94950 | STONE COLD STEVE AUSTIN | 2016 Q1 | 2016 Q1 | 37.18 | 0.22936 | 0.09 |
| TOTAL : WWEDV94950 | | | | 63.55 | | $0.15 |
| WWEDV95083 | TOP 100 MOMENTS IN RAW HI | 2015 Q4 | 2015 Q4 | 13.40 | 0.12626 | 0.02 |
| WWEDV95083 | TOP 100 MOMENTS IN RAW HI | 2016 Q1 | 2016 Q1 | 14.67 | 0.12626 | 0.02 |
| TOTAL : WWEDV95083 | | | | 28.07 | | $0.04 |
| WWEDV95331 | LADIES & GENTLEMAN, MY NA | 2015 Q4 | 2015 Q4 | 225.05 | 0.28736 | 0.65 |
| WWEDV95331 | LADIES & GENTLEMAN, MY NA | 2016 Q1 | 2016 Q1 | 7.91 | 0.28736 | 0.02 |
| TOTAL : WWEDV95331 | | | | 232.96 | | $0.67 |
| WWEDV95431 | OWEN: HART OF GOLD DVD | 2015 Q4 | 2015 Q4 | 9,716.80 | 0.21368 | 20.76 |
| | TOTAL : ENTERTAINMENT ONE FILMS CANADA INC. | | | 12,534.57 | | $26.93 |
| | **FREMANTLEMEDIA LIMITED** | | | | | |
| FHEBWWE051 | LADIES & GENTLEMAN, MY NA | 2015 Q4 | 2015 Q4 | 303.64 | 0.28736 | 0.87 |
| FHEBWWE051 | LADIES & GENTLEMAN, MY NA | 2016 Q1 | 2016 Q1 | 296.20 | 0.28736 | 0.85 |
| TOTAL : FHEBWWE051 | | | | 599.84 | | $1.72 |
| FHEBWWE086 | IT'S GOOD TO BE THE KING: T | 2015 Q4 | 2015 Q4 | 2,148.61 | 0.50000 | 10.74 |
| FHEBWWE086 | IT'S GOOD TO BE THE KING: T | 2016 Q1 | 2016 Q1 | 382.30 | 0.50000 | 1.91 |
| TOTAL : FHEBWWE086 | | | | 2,530.91 | | $12.65 |
| FHEBWWE119 | OWEN: HART OF GOLD BR | 2016 Q1 | 2016 Q1 | 6,599.71 | 0.21368 | 14.10 |
| FHEDWWE051 | LADIES & GENTLEMAN, MY NAME IS PAUL HEYMAN DVD | 2015 Q4 | 2015 Q4 | 373.34 | 0.28736 | 1.07 |

Print Date:6/20/2016
Page :2 of 2
Account:

TALENT NAME: RAVEN

2016 Q2

| Item Code | Item Description | Activity Date | Venue | WWE Earned Royalties | Royalty Rate (%) | Talent Royalty Earned |
|---|---|---|---|---|---|---|
| FHEDWWE061 | LADIES & GENTLEMAN, MY NA | 2016 Q1 | 2016 Q1 | 265.88 | 0.28736 | 0.76 |
| TOTAL : FHEDWWE061 | | | | 639.22 | | $1.83 |
| FHEDWWE085 | IT'S GOOD TO BE THE KING: T | 2016 Q1 | 2016 Q1 | 113.17 | 0.50000 | 0.57 |
| FHEDWWE118 | OWEN: HART OF GOLD DVD | 2016 Q1 | 2016 Q1 | 5,944.11 | 0.21368 | 12.70 |
| FHEDWWE534 | OMG! THE TOP 50 INCIDENTS | 2015 Q4 | 2015 Q4 | 118.75 | 0.13089 | 0.16 |
| FHEDWWE534 | OMG! THE TOP 50 INCIDENTS | 2016 Q1 | 2016 Q1 | 537.81 | 0.13089 | 0.70 |
| TOTAL : FHEDWWE534 | | | | 656.56 | | $0.86 |
| FHEDWWE535 | STONE COLD THE BOTTOM LI | 2015 Q4 | 2015 Q4 | 572.62 | 0.22936 | 1.31 |
| FHEDWWE535 | STONE COLD THE BOTTOM LI | 2016 Q1 | 2016 Q1 | 360.84 | 0.22936 | 0.83 |
| TOTAL : FHEDWWE535 | | | | 933.46 | | $2.14 |
| FHEDWWE549 | GREATEST SUPERSTARS OF | 2015 Q4 | 2015 Q4 | 16.56 | 0.13889 | 0.02 |
| FHEDWWE586 | THE TRUE STORY OF WM DV | 2015 Q4 | 2015 Q4 | 476.78 | 0.14206 | 0.68 |
| FHEDWWE590 | GREATEST STARS OF THE 90 | 2015 Q4 | 2015 Q4 | 830.69 | 0.15060 | 1.25 |
| FHEDWWE590 | GREATEST STARS OF THE 90 | 2016 Q1 | 2016 Q1 | 640.53 | 0.15060 | 0.96 |
| TOTAL : FHEDWWE590 | | | | 1,471.22 | | $2.21 |
| TOTAL : FREMANTLEMEDIA LIMITED | | | | 19,981.54 | | $49.46 |
| **HVDIRECT** | | | | | | |
| WWE56592 | MONDAY NIGHT WAR DVD | 2016 Q1 | 2016 Q1 | 17.56 | 0.08475 | 0.01 |
| WWE94856 | BEST OF RAW 15TH ANIV DVD | 2016 Q1 | 2016 Q1 | 176.86 | 0.02825 | 0.05 |
| WWE95083 | WWE THE TOP 100 MOMENTS | 2016 Q1 | 2016 Q1 | 2,052.62 | 0.02525 | 0.52 |
| WWE95177 | HISTORY OF WWE:50 YEARS | 2016 Q1 | 2016 Q1 | 46.83 | 0.01716 | 0.01 |
| WWE95251 | RAW 20TH ANNIVERSARY CO | 2016 Q1 | 2016 Q1 | 1,271.14 | 0.01355 | 0.17 |
| WWE95332 | LADIES AND GENTLEMAN, MY | 2016 Q1 | 2016 Q1 | 3,365.17 | 0.05747 | 1.95 |
| WWE95378 | WWE PRESENTS - TRUE GIAN | 2016 Q1 | 2016 Q1 | 2,833.16 | 0.03125 | 0.89 |
| WWE95431 | OWEN: HART OF GOLD DVD | 2016 Q1 | 2016 Q1 | 62,520.01 | 0.04274 | 26.72 |
| TOTAL : HVDIRECT | | | | 72,302.38 | | $30.32 |
| **HVDIRECT1** | | | | | | |
| WWE56592 | MONDAY NIGHT WAR DVD | | | 251.59 | 0.08475 | 0.21 |
| TOTAL : WWE56592 | | | | 251.59 | | $0.21 |
| WWF610 | WMANIA X 93 VIDEO | | | 1,179.23 | 0.00800 | 0.02 |
| TOTAL : WWF610 | | | | 1,179.23 | | $0.02 |
| TOTAL : HVDIRECT1 | | | | 1,430.82 | | $0.23 |
| **MADMAN ENTERTAINMENT PTY LTD** | | | | | | |
| MMWWE95423 | MONDAY NIGHT VOL.2 : "KNO | 2016 Q1 | 2016 Q1 | 9.26 | 0.11682 | 0.01 |
| TOTAL : MADMAN ENTERTAINMENT PTY LTD | | | | 9.26 | | $0.01 |
| TOTAL : Video | | | | 105,258.57 | | $106.97 |
| **TOTAL :RAVEN** | | | | 114,407.63 | | $130.83 |

*World Wrestling Entertainment, Inc.*

| INVOICE DATE MO DAY YEAR | DESCRIPTION | VENUE | NET AMOUNT |
|---|---|---|---|
| | Royalties (See statement for details) | | 130.83 |
| SUB TOTAL | | | 130.83 |
| GROSS AMOUNT | | | 130.83 |

| CHECK DATE 06/23/2016 | CHECK NUMBER ███████ | ███████ | TOTALS | 130.83 |
|---|---|---|---|---|

# EXHIBIT 9

# WCW, INC.
## BOOKING CONTRACT

This WCW, Inc. Booking Contract ("Agreement"), dated this Eighteenth (18th) day of May, 2001, and made effective as of ~~May 28~~, 2001, by and between WCW, Inc., a Delaware corporation, with its principal place of business at 1241 East Main Street, Stamford, Connecticut 06902 (hereinafter referred to as "WCW"), and Marcus Bagwell, an individual residing at ███ ████████ (hereinafter referred to as "WRESTLER").

## PREMISES

WHEREAS, WCW is engaged in the business of professional wrestling and of representing professional wrestlers in the promotion and exploitation of a professional wrestler's name, likeness, personality and character; and

WHEREAS, WCW intends to broadcast WCW's wrestling programs for purposes of publicizing WCW's professional wrestling exhibitions and/or events, as defined below, and WCW intends to broadcast on a pay-per-view basis and publicize, display and promote WCW's professional wrestling exhibitions; and

WHEREAS, WCW intends that its business operations will afford WRESTLER opportunities to wrestle and obtain public exposure which will increase the value of his wrestling services and his standing in the professional wrestling community and entertainment industry; and

WHEREAS, WRESTLER is duly licensed, as required, to engage in professional wrestling exhibitions and/or events, as defined below, and is actually engaged in the business of performing as a professional wrestler; and

WHEREAS, WRESTLER is a performing artist and the professional wrestling exhibitions arranged by WCW constitute demonstrations of wrestling skills and abilities designed to provide athletic-styled entertainment to the public, and such professional wrestling exhibitions and events constitute entertainment and are not competitive sports; and

WHEREAS, WRESTLER desires WCW to arrange professional wrestling exhibitions and/or events, as defined below, for WRESTLER and to assist WRESTLER in obtaining public exposure through live exhibitions, television programs, public appearances, and merchandising activities, or otherwise;

NOW THEREFORE, in consideration of the mutual promises and agreements as set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and the parties intending to be legally bound, do hereby agree as follows:

## 1. BOOKING

1.1   WRESTLER hereby grants exclusively to WCW, and WCW hereby accepts, the following worldwide rights:

1

(a)      During the term of this Agreement as defined below, the right to engage WRESTLER's performance in wrestling matches at professional wrestling exhibitions, as well as appearances of any type at other events, engagements or entertainment programs in which WRESTLER performs services as a professional wrestler, entertainer or otherwise directed by WCW in its sole discretion (collectively the "Events"), whether such Events are staged before a live audience, in a television broadcast studio, on location (for later viewing or broadcast) or otherwise.

(b)      During the term of this Agreement as defined below, the right, in perpetuity, to sell or otherwise distribute tickets of admission to the general public for viewing of any or all of the Events that include the performance or appearance of WRESTLER, as well as on any closed circuit television, pay-per-view television, video exhibition, or any other medium now known or hereinafter discovered, of the Events.

(c)      During the term of this Agreement and thereafter, as provided for in this Agreement, the right to solicit, negotiate, and enter into agreements for and on behalf of WRESTLER for the exploitation of Intellectual Property (as defined herein below) for merchandising, commercial tie-ups, publishing, personal appearances, performances in non-wrestling events, and endorsements.

1.2      In consideration of WRESTLER's granting of rights, license and other services, as set forth herein, and provided WRESTLER shall faithfully and fully perform all obligations hereunder, WCW shall endeavor to book WRESTLER as an individual or as a member of a group, which determination shall be made in WCW's sole discretion, in wrestling matches at various Events.

## 2. WORKS

2.1      If WCW books WRESTLER to appear and perform at Events, WRESTLER hereby grants to WCW and WCW hereby accepts, the exclusive right during the term of this Agreement to video tape, film, photograph, or otherwise record, or to authorize others to do so, by any media now known or hereinafter discovered, WRESTLER's appearance, performance, commentary, and any other work product for any or all of the Events. (These recordings by tape, disc, film, or otherwise are collectively referred to herein as the "Programs".)

2.2      Notwithstanding the termination of this Agreement for any reason, and notwithstanding any other provision of this Agreement, WCW shall have the right to produce, reproduce, reissue, manipulate, reconfigure, license, manufacture, record, perform, exhibit, broadcast, televise by any form of television (including without limitation, free, cable, pay cable, closed circuit and pay-per-view television), transmit, publish, copy, reconfigure, compile, print, reprint, vend, sell, distribute and use via any other medium now known or hereinafter discovered, and to authorize others to do so, the Programs, in perpetuity, in any manner or media and by any art, method or device, now known or hereinafter discovered (including without limitation, by means of videodisc, videocassette, optical, electrical and/or digital compilations, theatrical motion picture and/or non-theatrical motion picture). All gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible property provided to WRESTLER by WCW and/or containing New Intellectual Property as defined in paragraph 3.2(a) shall be immediately returned to WCW upon termination of this

2

Agreement for any reason.

2.3     WRESTLER's appearance, performance and work product in any or all of the Events and/or Programs shall be deemed work for hire; and notwithstanding the termination of this Agreement, WCW shall own, in perpetuity, all Programs and all of the rights, results, products and proceeds in and to, or derived from the Events and Programs (including without limitation, all incidents, dialogue, characters, actions, routines, ideas, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other tangible or intangible materials written, composed, submitted, added, improvised, or created by or for WRESTLER in connection with appearance at the Events and/or in the Programs) and WCW may obtain copyright and/or trademark and/or any other legal protection therefor, now known or hereinafter discovered, in the name of WCW and/or on behalf of WCW's designee.

2.4     If WCW directs WRESTLER, either singly or in conjunction with WCW, to create, design or develop any copyrightable work (herein referred to as a "Development"), such Development shall be deemed work for hire and WCW shall own such Development.  All Programs and Developments referred to in this Agreement are collectively referred to as "Works."

2.5     All Works and WRESTLER's contributions thereto shall belong solely and exclusively to WCW in perpetuity notwithstanding any termination of this Agreement.  To the extent that such Works are considered: (i) contributions to collective works, (ii) a compilation, (iii) a supplementary work and/or (iv) as part or component of a motion picture or other audio-visual work, the parties hereby expressly agree that the Works shall be considered "works made for hire" under the United States Copyright Act of 1976, as amended (17 U.S.C. § 101 et seq.).  In accordance therewith, all rights in and to the Works shall belong exclusively to WCW in perpetuity, notwithstanding any termination of this Agreement.  To the extent that such Works are deemed works other than "works made for hire," WRESTLER hereby assigns to WCW all right, title and interest in and to all rights in such Works and all renewals and extensions of the copyrights or other rights that may be secured under the laws now or hereafter in force and effect in the United States of America or any other country or countries.

## 3.  INTELLECTUAL PROPERTY

3.1     The parties agree that as of the date of this Agreement, all service marks, trademarks and any and all other distinctive and identifying indicia under which WRESTLER claims any rights, including but not limited to WRESTLER's legal name, nickname, ring name, likeness, personality, character, caricatures, voice, signature, costumes, props, gimmicks, gestures, routines and themes, which are owned by WRESTLER or in which WRESTLER has any rights anywhere in the world (collectively, the "Original Intellectual Property") are described and identified on Schedule A attached hereto and incorporated herein by reference.  WRESTLER hereby assigns, for the Term of this Agreement, in good faith to WCW and WCW hereby accepts all worldwide right, title and interest in and to WRESTLER's Original Intellectual Property, including, but not limited to, the rights to license, reproduce, manipulate, promote, expose, exploit and otherwise use the Original Intellectual Property anywhere in the world in any commercial manner, media, art form, method or device now known or hereinafter discovered.

3

3.2    (a)    (i)    With the exception of WRESTLER's Original Intellectual Property, any service marks, trademarks and/or distinctive and identifying indicia, including ring name, nickname, likeness, personality, character, caricatures, voice, signature, props, gestures, routines, themes, incidents, dialogue, actions, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible or intangible property written, composed, submitted, added, improvised, created and/or used by or associated with WRESTLER's performance in the business of professional wrestling or sports entertainment during the term of this Agreement (collectively the "New Intellectual Property") are hereby assigned to and shall belong to WCW, in perpetuity, with WCW retaining all such ownership rights exclusively throughout the world notwithstanding any termination of this Agreement.

(ii)    Subject to Schedule A, WRESTLER acknowledges that WCW created and developed the ring name and persona of "Buff Bagwell" and that all the trademarks and service marks and related intellectual property set forth in paragraph 3.2 (a)(i) concerning "Buff Bagwell", used alone and/or as part of any tag team, are hereinafter deemed New Intellectual Property.

(b)    Upon the termination of this Agreement, all rights in and to the Original Intellectual Property shall revert to WRESTLER, except that WCW, its licensees, sublicensees and assigns may continue to exploit any and all materials, goods, merchandise and other items incorporating the Original Intellectual Property made before such termination, until all such materials, goods and merchandise are sold off which sell-off period shall not exceed one (1) year from the date of termination of this Agreement.

3.3    It is the intention of the parties that the New Intellectual Property belongs to WCW, in perpetuity, even to the exclusion of WRESTLER, and shall survive the termination of this Agreement for any reason. WCW shall have the exclusive right to assign, license, sublicense, reproduce, promote, expose, exploit and otherwise use the New Intellectual Property in any commercial manner now known or hereinafter discovered, regardless of whether such rights are exercised during or after the Term of this Agreement and notwithstanding termination of this Agreement for any reason.

3.4    The Original Intellectual Property and the New Intellectual Property are hereinafter collectively referred to as "Intellectual Property."

3.5    WRESTLER agrees to cooperate fully and in good faith with WCW for the purpose of securing and preserving WCW's rights in and to the Intellectual Property. In connection herewith, WRESTLER acknowledges and hereby grants to WCW the exclusive worldwide right during the Term of this Agreement (with respect to Original Intellectual Property) and in perpetuity (with respect to New Intellectual Property) to apply for and obtain trademarks, service marks, copyrights and other registrations throughout the world in WCW's name and/or on behalf of WCW's designee. At WCW's expense and request, WCW and WRESTLER shall take such steps, as WCW deems necessary for any registration or any litigation or other proceeding, to protect WCW's rights in the Original Intellectual Property and/or New Intellectual Property and/or Works.

4

## 4. MERCHANDISING

4.1     WRESTLER hereby agrees that WCW shall have the exclusive right (i) during the Term of this Agreement and thereafter, as provided in this Agreement, to use the Original Intellectual Property and (ii) in perpetuity, to use the New Intellectual Property in connection with the manufacture, production, reproduction, reissuance, manipulation, reconfiguration, broadcast, rebroadcast, distribution, sale, and other commercial exploitation in any manner, now known or hereinafter discovered, of any and all materials, goods, merchandise and other items incorporating the Intellectual Property.  As to all such materials, goods, merchandise or items created, developed, produced and/or distributed during the Term of this Agreement using the Original Intellectual Property, WCW shall have the exclusive right to sell and exploit such materials, goods and merchandise until the sell-off of same which shall not exceed one (1) year after the date of termination of this Agreement.  As to all such materials, goods, merchandise or items using the New Intellectual Property, WCW shall have the exclusive right, in perpetuity, to sell and exploit same forever.  By way of example and not of limitation, such items include t-shirts, posters, photos, video tapes and video cassettes, dolls, books, biographies, articles and stories, and any other such material goods, merchandise, or items relating to WRESTLER.

4.2     It is the intention of the parties that WCW's rights described under paragraph 4.1 are exclusive to WCW even to the exclusion of WRESTLER.  WCW shall own all copyrights and trademarks in any and all such materials, goods, merchandise and items and shall be entitled to obtain copyright, trademark, service mark or other registrations in WCW's name or on behalf of its designee; and  WRESTLER shall provide all reasonable assistance to WCW in so obtaining such copyright, trademark, service mark or other registrations.

## 5. EXCLUSIVITY

5.1     Except as otherwise set forth herein, it is the understanding of the parties that all rights, licenses, privileges and all other items herein given or granted or assigned by WRESTLER to WCW are exclusive to WCW even to the exclusion of WRESTLER.

5.2     In the event WRESTLER desires upon reasonable notice to WCW during the Term of this Agreement either individually or through his authorized representative(s) to participate in movies, films, speaking engagements, commercials, product endorsements, videos, television programs or similar activities (collectively "Permitted Activities") and promotional events for the Permitted Activities, WRESTLER may do so subject to WCW's approval, which shall not be unreasonably withheld or delayed provided WRESTLER shall not utilize the New Intellectual Property in any manner in connection with such Permitted Activities without WCW's written consent, and that WCW retains first priority, to the exclusion of any such Permitted Activities, with respect to the use and scheduling of WRESTLER's services at all times during the Term (as defined below) of this Agreement.  It is further agreed that WCW shall receive from WRESTLER a management fee to reimburse WCW for its reasonable administrative costs incurred in connection with WRESTLER's participation in each such Permitted Activity, provided that WCW's costs shall not be less than ten percent (10%) of any fees received by WRESTLER for each such Permitted Activity described herein.  Additionally, all monies earned by WRESTLER from such Permitted Activities in a specific Contract Year shall be credited against the Minimum Annual Compensation for that

5

Contract Year as set forth in paragraph 7.1 below.

## 6. TERM AND TERRITORY

6.1     The term of the Agreement shall be three (3) years from the effective date hereof ("Initial Term").

6.2     Notwithstanding anything herein to the contrary, termination of this Agreement for any reason shall not affect WCW's ownership of and rights in, including but not limited to, any Works, New Intellectual Property and any registrations thereof, or the rights, results, products, and proceeds in and to and derived from WRESTLER during the Term of this Agreement; and the exploitation of rights set forth in Paragraphs 1, 2, 3 and 4 hereof in any and all media now known or hereinafter discovered.

6.3     The territory of this Agreement shall be the world.

## 7. PAYMENTS/ROYALTIES

7.1     (a)     Provided that WRESTLER fulfills all obligations and warranties and provided WRESTLER does not materially breach any of the terms of this Agreement, WCW guarantees WRESTLER that the total of the payments made to WRESTLER shall amount in the aggregate to be no less than ████████████████████████████████████████ for the First Contract Year of this Agreement; ██████████████████████████████████ for the Second Contract Year of this Agreement; and ████████████████████████████████████ for the Third Contract Year of this Agreement (referred to hereinafter as "Minimum Annual Compensation"), which shall be payable in fifty-two (52) equal weekly installments. In calculating such Minimum Annual Compensation, WCW shall credit any payments earned by WRESTLER under the paragraphs of this Section 7 against the Minimum Annual Compensation. For the purposes of this paragraph, any royalty payments due under the Agreement shall be deemed "earned" only at the time they are paid to WRESTLER.

        (b)     Subject to paragraphs 7.9, if applicable, and 10.2 (b) below, within one hundred twenty (120) days after the Contract Year has ended, if it is determined that WRESTLER has earned more than the Minimum Annual Compensation for services rendered during the Contract Year, WRESTLER shall be paid in one lump sum within fifteen (15) days thereafter the difference between the Minimum Annual Compensation and what WRESTLER actually earned for services rendered during the Contract Year.

7.2     (a)     If WRESTLER appears and performs in any Event produced by WCW in an arena before a live audience at which admission is charged other than those arena events which are taped or broadcast for purposes pursuant to paragraph 7.2 (b) and paragraph 7.2 (c) hereof (hereinafter "House Shows"), Wrestler shall be paid by WCW an amount equal to such percentage of the paid receipts for such House Show from the live House Show gate receipts only as is consistent with the nature of the match in which WRESTLER appears, i.e., preliminary, mid-card, main event, etc. and any standards WCW establishes specifically for such House Show.

F:\USDRS\Legal Affairs\Booking Contracts\WCW, Inc\Bagwell Marcus 2001.doc
05/22/01

(b)     If WRESTLER appears and performs in connection with an arena or studio Event produced by WCW which is taped or broadcast for use on WCW's television network ("TV Taping"), WRESTLER shall be paid by WCW an amount in accordance with the nature of the match in which WRESTLER performs, i.e., preliminary card, mid card, main event, etc. or any other standard WCW, in its sole discretion establishes specifically for that TV Taping.

(c)     If Wrestler appears and performs in connection with an arena or studio Event produced by WCW which is aired or broadcast via satellite broadcast or pay-per-view distribution technology for use by WCW ("Pay-Per-View"), WRESTLER shall be paid by WCW an amount in accordance with the nature of the match in which WRESTLER performs, i.e., preliminary card, mid card, main event, etc., or any other standard WCW, in its sole discretion, establishes specifically for that Pay-Per-View.

7.3   (a)   Licensed Product Royalties: In the event that the Original and/or New Intellectual Property are used by WCW and/or licensed, sublicensed, or otherwise assigned to third parties for production, reproduction and/or sale and distribution, in conjunction with any consumer materials, goods or merchandise, (hereinafter collectively referred to as "Licensed Products"), such that the applicable Licensed Product only features the Original and/or New Intellectual Property, WRESTLER shall be paid twenty-five percent (25%) of the "Licensed Products' Net Receipts" received by WCW with respect to any such licensing, sublicensing or assignment.   "Licensed Products' Net Receipts" means the gross amount received by WCW less expenses incurred by WCW or its licensing agent for the applicable Licensed Product. WRESTLER acknowledges and agrees that WRESTLER shall not be eligible for any royalties with respect to television license, advertising and distribution fees paid to WCW by any entity in connection with the exploitation of Original and/or New Intellectual Property.

(b)     In the event that the Original and/or New Intellectual Property are used by WCW or licensed, sublicensed, or otherwise assigned to third parties in connection with Licensed Products featuring WRESTLER with other wrestlers represented by WCW, WCW shall allocate twenty-five percent (25%) of the Licensed Products Net Receipts, to be paid pro-rata among WRESTLER and all other talent so featured.

7.4   (a)   Direct Sales Royalties: In the event that WCW distributes and sells directly any Licensed Products other than any WCW Pay-Per-Views, as set forth in paragraph 7.5(c), below or any WCW Video Products, as set forth in Paragraph 7.5(d) below, including without limitation, at the arena, via mail order sales or directly on television, or via the Internet (hereinafter "Direct Sales Products"), such that the applicable product only features the Original and/or New Intellectual Property of the WRESTLER, WRESTLER shall be paid five percent (5%) of the Direct Sales Products' Net Receipts derived by WCW from such exploitation. For purposes of this paragraph, Direct Sales Products' Net Receipts mean the gross amount received by WCW for sales of such products after deduction of local taxes and applicable arena commission(s) allocated for concession sales and cost of goods.

(b)     In the event that the Original and/or New Intellectual Property of the WRESTLER are exploited by WCW, such that Direct Sales Products feature WRESTLER with other wrestlers

7

represented by WCW, WCW shall allocate five percent (5%) of the Direct Sales Products Net Receipts to be paid pro-rata among WRESTLER and all other talent so featured.

7.5    (a)    (i)   Royalties/Pay-Per-View Videos Sold By Licensees:   WCW shall allocate twenty-five percent (25%) of the Net Receipts paid to WCW by licensees authorized to reproduce and sell video cassettes, videodiscs, CD ROM, or other technology, including technology not yet created (hereinafter referred to as "WCW Video Products"), of WCW pay-per-views in their entirety ("WCW Pay-Per-Views") to a talent royalty pool. Thereafter, WCW shall pro-rate payment to WRESTLER and all other talent appearing in such WCW Pay-Per-Views in the same proportion as was the compensation paid to WRESTLER for his appearances in the pay-per-views to the total amount paid to all talent for their appearances in the pay-per-view.  For purposes of paragraphs 7.5(a)(i) and 7.5(a)(ii), Net Receipts shall mean the gross amount received by WCW from the licensees for the WCW Pay-Per-Views less any and all costs incurred by WCW to produce and/or distribute such WCW Pay-Per-Views.

(ii)  In the event that the WCW Video Products are a compilation or derivative work of multiple individual WCW Pay-Per-Views in their entirety, such as a collection of videos, e.g., a Wrestlemania box set, payment to WRESTLER shall be calculated as follows:  twenty-five percent (25%) of the Net Receipts paid to WCW by licensees shall comprise the talent royalty pool, which shall first be pro-rated based on the number of individual videos in the compilation, and then the payment to WRESTLER for each video shall be consistent with the royalty payment to the WRESTLER at the time that each individual video was first released.

(b)    Royalties/Non-Pay-Per-View Videos Sold By Licensees:   WCW shall allocate twenty-five percent (25%) of the Net Receipts paid to WCW by licensees authorized to reproduce and sell all other WCW Video Products, other than those set forth in paragraphs 7.5(a)(i) and 7.5(a)(ii) above, to a talent royalty pool, from which WCW shall pay WRESTLER and all other talent appearing in such WCW Video Products pro-rata among WRESTLER and all other talent so featured. For purposes of this paragraph 7.5(b), Net Receipts shall mean the gross amount received by WCW for the WCW Video Products less any and all costs incurred by WCW to produce and/or distribute such WCW Video Products.

(c)    (i)   Royalties/Pay-Per-View Videos Sold By WCW:   WCW shall allocate five percent (5%) of the Net Receipts paid to WCW with respect to the direct sale by WCW of WCW Pay-Per-Views to a talent royalty pool.  Thereafter, WCW shall pro-rate payment to WRESTLER and all other talent appearing in such WCW Pay-Per-Views in the same proportion as was the compensation paid to WRESTLER for his appearances in the pay-per-views to the total amount paid to all talent for their appearances on the pay-per-views  For purposes of paragraphs 7.5(c)(i) and 7.5(c)(ii), Net Receipts shall mean the gross amount received by WCW for the WCW Pay-Per-Views.

(ii) In the event that the WCW Video Product is a compilation or derivative work of multiple individual WCW Pay-Per-Views in their entirety, such as a collection of videos, e.g., a Wrestlemania box set, payment to WRESTLER shall be calculated as follows: five percent (5%) of the Net Receipts paid to WCW shall comprise the talent royalty pool, which shall first be pro-rated based on the number of individual videos in the compilation, and then the payment to WRESTLER

8

for each video shall be consistent with the royalty payment to the WRESTLER at the time each individual video was first released.

(d)    Royalties/Non Pay-Per-View Videos Sold By WCW:  WCW shall allocate five percent (5%) of the Net Receipts paid to WCW with respect to the direct sale by WCW of all other WCW Video Products other than those set forth in paragraphs 7.5(c)(i) and 7.5(c)(ii) above, to a talent royalty pool, from which WCW shall pay WRESTLER and all other talent appearing in such WCW Video Products pro-rata among WRESTLER and all other talent so featured.  For purposes of this paragraph 7.5(d), Net Receipts shall mean the gross amount received by WCW for the WCW Video Products. Notwithstanding the foregoing, if WRESTLER is deemed to be the "featured performer" as determined by WCW in its sole discretion, WRESTLER shall receive a bonus of an additional five percent (5%) of WCW's Net Receipts up to the sale of the first one hundred fifty thousand (150,000) units.  Once sales exceed 150,000, WRESTLER as a featured performer shall receive ten percent (10%) of WCW's Net Receipts on all units sold, including the first 150,000 units.  For example, the featured performer in the video entitled "Cause Stone Cold Said So" is "Stone Cold Steve Austin". If WRESTLER is part of a group that is determined to be the "featured performer", WRESTLER shall share pro-rata with each and every member of the group in any bonus monies that may be due in connection with such WCW Video Products.

7.6    In the event the Original and/or New Intellectual Property are used by WCW or licensed, sublicensed or assigned for non-wrestling personal appearances and performances such as personal appearances for advertising or non-wrestling promotional purposes, radio and television commercials, movies, etc., WRESTLER shall earn an amount to be mutually agreed to by WRESTLER and by WCW of the "Personal Appearance Net Receipts" received by WCW, which amount shall also be credited against WRESTLER'S Minimum Annual Compensation, if any. Personal Appearance Net Receipts means the amount received by WCW after payment of and provision for all of WCW's costs and expenses, except income taxes.

7.7    If WCW instructs WRESTLER to appear and perform in any Events or Programs as a commentator and/or to participate in post-Event production and/or voice-over activities as a commentator, WRESTLER's commentating shall be deemed work-for-hire and WRESTLER hereby assigns to WCW and WCW shall own all rights, in perpetuity, to all of WRESTLER's commentary and WRESTLER shall not be entitled to receive any royalty payments, or any additional compensation or residual payments whatsoever, as a result of WCW's commercial exploitation of such commentary in any form, whether broadcast programming, cable programming, pay-per-view programming, videotapes, videodiscs, the Internet or other mediums now or hereinafter discovered.

7.8    It is the understanding of the parties that WRESTLER shall not be paid anything for WCW's exploitation of the Original and/or New Intellectual Property in any of WCW's magazines or other publications, which WCW may publish, produce or distribute at arenas, at newsstands and/or by mail or through electronic or any other manner of media or distribution, now known or hereinafter discovered, including, but not limited to, publication or distribution on the Internet or America On Line.

7.9    If WRESTLER is unable to wrestle for eight (8) consecutive weeks due to an injury

9

suffered in the ring while performing services at WCW's direction, for every house show or television show per Contract Year in which WRESTLER is unable to wrestle thereafter, WRESTLER's Minimum Annual Compensation as defined below for that Contract Year shall be reduced by .5%. Additionally, for every pay-per-view event per Contract Year in which WRESTLER is unable to wrestle, WRESTLER's Minimum Annual Compensation for that Contract Year shall be reduced by the average pay received by WRESTLER for the three (3) immediately preceding or fewer if less than three (3) similar pay-per-view events for which he was compensated, or .5% if there are none. If WRESTLER is unable to wrestle for any other reason during the Term of this Agreement, such deductions shall begin immediately.

7.10    For the avoidance of doubt and subject to paragraph 12.2, the non-compete provisions of this Agreement, it is acknowledged and agreed that as it relates to WRESTLER's appearance or performance of any services pursuant to this Agreement, including the appearance and or performance of WRESTLER's services at Events or other activities conducted by WCW, WRESTLER shall be eligible only for the payments and royalties specifically set forth in paragraphs 7.1 through 7.6. WRESTLER acknowledges and agrees that any payments or royalties earned in connection with any wrestling services WRESTLER may perform during the term of this Agreement for any other wrestling/sports entertainment organization and /or entity shall be credited against WRESTLER's Minimum Annual Compensation, if any.

7.11    All payments made to WRESTLER are in full without withholding, except where required by law. After the end of each calendar year, WCW shall issue to WRESTLER Internal Revenue Service Form 1099 showing all payments to WRESTLER during that calendar year.

7.12    (a)    WCW shall prepare and send statements as to royalties payable hereunder to WRESTLER within ninety (90) days following the end of each quarter, based upon the royalties received and processed by WCW in the previous quarter, together with payment of royalties, if any, earned by WRESTLER hereunder during such quarter-annual period, less advances and/or debits made by WCW on WRESTLER's behalf.

        (b)    WCW shall maintain books of account related to the payment of royalties hereunder at its principal place of business. WRESTLER, or WRESTLER's designated independent certified public accountant who is a member in good standing of the AICPA, may at WRESTLER's sole expense examine WCW's books insofar as they pertain to this Agreement for the purpose of verifying the accuracy thereof, during WCW's normal business hours and upon reasonable notice. Such audit shall be conducted in a manner that will not unreasonably interfere with WCW's normal business operations. WRESTLER shall not audit WCW's books and records more than twice during any calendar year and no such audit shall be conducted later than one (1) year after the last statement of royalties is given, delivered or sent to WRESTLER. Each audit is limited to seven (7) days in duration. Statements of royalties may be changed from time to time to reflect year-end adjustments, to correct clerical errors and for similar purposes.

        (c)    WRESTLER shall be deemed to have consented to all statements of royalties and all other accountings provided by WCW hereunder and each such statement of royalties or other accounting shall be conclusive, final, and binding; shall constitute an account stated; and shall not be subject to any objection for any reason whatsoever unless a specific objection in writing, stating

10

the basis thereof, is given by WRESTLER to WCW within one (1) year from the date the royalty statement was given, delivered or sent to WRESTLER.

(d)     No claim shall be filed pursuant to paragraph 13.8 below against WCW or WCW's affiliates that disputes any statement of royalties or accounting given by WCW hereunder or that makes any claim for royalties or royalty payments, unless the same is commenced or filed within one (1) year after the date such statement or accounting is first given, delivered or sent to WRESTLER, and unless WRESTLER has first exhausted his remedies pursuant to paragraph 7.12(b) above.

## 8. WCW'S OBLIGATIONS

8.1     Although under paragraph 9.1 WRESTLER shall bear responsibility for obtaining appropriate licenses for participating in wrestling exhibitions, WCW shall be responsible for obtaining all other appropriate licenses to conduct professional wrestling exhibitions involving WRESTLER. If WCW, at its discretion, agrees to assist WRESTLER in obtaining his licenses, WRESTLER shall reimburse WCW for its fees and expenses incurred in connection therewith.

8.2     WCW shall bear the following costs in connection with the development and enhancement of the value of WRESTLER's performance hereunder and WRESTLER's standing in the professional wrestling community, all of which shall benefit WRESTLER:

(a)     In connection with WRESTLER's appearances and performance at Events staged before a live audience, WCW shall bear the cost of location rental, WCW's third party comprehensive liability insurance for the benefit of the venues, applicable state and local admission taxes, promotional assistance, sound and light equipment, wrestling ring, officials, police and fire protection, and such additional security guards as WCW shall require in its discretion during a professional wrestling match;

(b)     In connection with the production, distribution, and exploitation of the Programs, WCW shall bear all costs incurred in connection with such production, distribution, broadcast, transmission or other forms of mass media communication;

(c)     In connection with any product or service licensing activities and/or merchandising activities, WCW shall bear all costs of negotiating, securing or otherwise obtaining the product or service licensing arrangements, including costs of agents, consultants, attorneys and others involved in making the product or service licensing activities; and WCW shall bear all costs of creating, designing, developing, producing and marketing merchandise or services. In order to fulfill these obligations, WCW may make any arrangements, contractual or otherwise, it deems appropriate to delegate, assign, or otherwise transfer its obligations.

8.3     WCW shall schedule the Events and book WRESTLER for the Events. In doing so, WCW shall select the time and location of the Events at which WRESTLER is booked, WRESTLER's opponent, and any other wrestlers who will appear at such Event. WCW shall provide WRESTLER with reasonable advance notice of the date, time, and place of any such Event, and WRESTLER shall appear at the designated location for any such Event no later than one hour

11

before the designated time. If WRESTLER fails to appear as required without advance twenty-four (24) hours notice to WCW and WCW must substitute another wrestler to appear in WRESTLER's place at the Event, then WCW may fine, suspend or terminate WRESTLER in its sole discretion.

8.4    WCW agrees that it shall use commercially reasonable efforts to limit the number of Bookings each year of the Contract that WRESTLER will perform his wrestling services for or on behalf of WCW; provided, however, WCW shall not book WRESTLER for more than fifteen (15) days per month during each Contract Year of the Agreement. For the purposes of this Agreement, "Bookings" shall include house shows (whether live or taped) whether for distribution on television and/or on a pay-per-view basis and any personal appearances required by WCW occurring on days other than those on which a house show, television show or a pay-per-view is held.

8.5    Notwithstanding the above, if WRESTLER shall be prevented from appearing at an Event by reason of Force Majeure, the above fines shall not be imposed. For purposes of this Agreement, Force Majeure shall mean any act of God, fire, flood, war or other calamity; strike or labor difficulties; any governmental action or any other serious emergency affecting WRESTLER which occurrence is beyond WRESTLER's reasonable control, and, which despite best efforts prohibits WRESTLER's performance or appearance at such Event.

## 9.  WRESTLER'S OBLIGATIONS

9.1    WRESTLER shall bear responsibility for obtaining all appropriate licenses to engage in, participate in, or otherwise appear in professional wrestling exhibitions.

9.2    WRESTLER shall be responsible for WRESTLER's own training, conditioning, and maintenance of wrestling skills and abilities, as long as they do not interfere with WRESTLER's appearance at scheduled events as follows:

       (a)    WRESTLER shall establish his own training program, shall select time of training, duration of training, exercises, pattern of exercise and other actions appropriate to obtaining and maintaining physical fitness for wrestling. WRESTLER shall select his own training apparatus, including mats, weights, machines and other exercise paraphernalia. WRESTLER is responsible for supplying his own training facilities and equipment, whether by purchase, lease, license, or otherwise.

       (b)    WRESTLER shall establish his own method of physical conditioning, shall select time for conditioning, duration of conditioning and form of conditioning. WRESTLER shall select time for sleep, time for eating, and time for other activities. WRESTLER shall select his own foods, vitamins and other ingested items, excepting illegal and/or controlled substances and drugs, which are prohibited by WCW's Drug Policy.

9.3    WRESTLER shall be responsible for providing all costumes, wardrobe, props, and make-up necessary for the performance of WRESTLER's services at any Event and WRESTLER shall bear all costs incurred in connection with his transportation to and from any such Events, as well as the costs of food consumed and hotel lodging utilized by WRESTLER in connection with his appearance at such Events. Notwithstanding, WCW shall pay for WRESTLER's air transportation

12

to and from the Events, which air transportation shall be "full-Y" round-trip airfare between domestic locations (i.e., within the United States), if available, and business class airfare where the point of origination or the destination are international (i.e., outside the United States), if available, as well as those other transportation costs which are covered by WCW's then current Travel Policy.

9.4    WRESTLER shall use best efforts in employing WRESTLER's skills and abilities as a professional wrestler and be responsible for developing and executing the various details, movements, and maneuvers required of wrestlers in a professional wrestling exhibition.

9.5    WRESTLER shall take such precautions as are appropriate to avoid any unreasonable risk of injury to other wrestlers in any and all Events.  These precautions shall include, without limitation, pre-match review of all wrestling moves and maneuvers with wrestling partners and opponents; and pre-match demonstration and/or practice with wrestling partners and opponents to insure familiarity with anticipated wrestling moves and maneuvers during a wrestling match. In the event of injury to WRESTLER, and/or WRESTLER's partners and opponents during a wrestling match, WRESTLER shall immediately signal partner, opponent and/or referees that it is time for the match to end; and WRESTLER shall finish the match forthwith so as to avoid aggravation of such injury.

9.6    WRESTLER shall use best efforts in the ring in the performance of wrestling services for a match or other activity, in order to provide an honest exhibition of WRESTLER's wrestling skills and abilities, consistent with the customs of the professional wrestling industry; and WRESTLER agrees all matches shall be finished in accordance with the WCW's direction.  Breach of this paragraph shall cause a forfeiture of any payment due WRESTLER pursuant to SECTION 7 of this Agreement and all other obligations of WCW to WRESTLER hereunder, shall entitle WCW to terminate this Agreement, but such breach shall not terminate WCW's licenses and other rights under this Agreement.

9.7    WRESTLER agrees to cooperate and assist without any additional payment in the publicizing, advertising and promoting of scheduled Events, including without limitation, appearing at and participating in a reasonable number of joint and/or separate press conferences, interviews, and other publicity or exploitation appearances or activities (any or all of which may be filmed, taped, or otherwise recorded, telecast by any form of television now known or hereafter discovered, including without limitation free, cable, pay cable, and closed circuit and pay-per-view television, broadcast, exhibited, distributed, and used in any manner or media and by any art, method, or device now known or hereafter created, including without limitation by means of videodisc, video cassette, theatrical motion picture and/or non-theatrical motion picture and Internet), at times and places designated by WCW, in connection therewith.

9.8    WRESTLER acknowledges the right of WCW to make decisions with respect to the preparation and exploitation of the Programs and/or the exercise of any other rights respecting Original and/or New Intellectual Property, and in this connection WRESTLER acknowledges and agrees that WCW's decision with respect to any agreements disposing of the rights to the Original and/or New Intellectual Property are final, except as to WRESTLER's legal name, and subject to Schedule A, which WCW may only dispose of upon WRESTLER's written consent.  WRESTLER

13

agrees to execute any agreements consistent herewith that WCW deems necessary in connection with any such agreements, and if WRESTLER is unavailable or refuses to execute such agreements, WCW is hereby authorized to do so in WRESTLER's name as WRESTLER's attorney-in-fact. WCW shall provide copies of all such documents so executed.

9.9    WRESTLER agrees to cooperate fully and in good faith with WCW to obtain any and all documentation, applications or physical examinations as may be required by any governing authority with respect to WRESTLER's appearance and/or performance in a professional wrestling match.

9.10    WRESTLER, on behalf of himself and his heirs successors, assigns and personal representatives, shall indemnify and defend WCW and WCW's licensees, assignees, parent corporation, subsidiaries and affiliates and its and their respective officers, directors, employees, advertisers, insurers and representatives and hold each of them harmless against any claims, demands, liabilities, actions, costs, suits, reasonable outside attorney fees, proceedings or expenses, incurred by any of them by reason of WRESTLER's breach or alleged breach of any warranty, undertaking, representation, agreement, or certification made or entered into herein or hereunder by WRESTLER. WRESTLER, on behalf of himself and his heirs, successors, assigns and personal representatives, shall indemnify and defend WCW and WCW's licensees, assignees, parent corporation, subsidiaries and affiliates and its and their respective officers, directors, employees, advertisers, insurers and representatives and hold each of the harmless against any and all claims, demands, liabilities, actions, costs, suits, reasonable outside attorney fees, proceedings or expenses, incurred by any of them, arising out of WRESTLER'S acts, transactions and/or conduct not directed by WCW within or around the ring, hallways, dressing rooms, parking lots, or other areas within or in the immediate vicinity of the facilities where WCW has scheduled Events at which WRESTLER is booked. Such indemnification shall include all claims arising out of any acts, transactions and/or conduct of WRESTLER or others occurring at Events or in connection with any appearances or performances by WRESTLER not conducted by WCW in accordance with this Agreement. WCW on behalf of its parent company, subsidiaries, successors and assigns and its and their officers, directors, employees, agents and representatives shall indemnify and defend WRESTLER and hold WRESTLER harmless against any claims, demands, liabilities, actions, costs, suits reasonable attorney fees, proceedings or expenses, incurred by WRESTLER by reason of WCW's breach of any warranty, undertaking, representation, agreement or certification made under this Agreement.

9.11    WRESTLER shall be responsible for payment of all of WRESTLER's own Federal, state or local income taxes; all social security, FICA and FUTA taxes, if any, as well as all contributions to retirement plans and programs; or other supplemental income plan or program that would provide WRESTLER with personal or monetary benefits upon retirement from professional wrestling.

9.12    (a)    WRESTLER shall be responsible for his own commercial general liability insurance, worker's compensation insurance, professional liability insurance, as well as any excess liability insurance, as WRESTLER deems appropriate to insure, indemnify and defend WRESTLER with respect to any and all claims arising out of WRESTLER's own acts, transactions, or conduct .

(b)    WRESTLER acknowledges that the participation and activities required by

14

WRESTLER in connection with WRESTLER's performance in a professional wrestling exhibition may be dangerous and may involve the risk of serious bodily injury. WRESTLER knowingly and freely assumes full responsibility for all such inherent risks as well as those due to the negligence of WCW, other wrestlers or otherwise.

(c)     WRESTLER, on behalf of himself and his heirs, successors, assigns and personal representatives, hereby releases, waives and discharges WCW from all liability to WRESTLER and covenants not to sue WCW for any and all loss or damage on account of injury to any person or property or resulting in serious or permanent injury to WRESTLER or WRESTLER's death, whether caused by the negligence of the WCW, other wrestlers or otherwise.

(d)     WRESTLER acknowledges that the foregoing release, waiver and indemnity is intended to be as broad and inclusive as permitted by the law of the State, Province or Country in which the professional wrestling exhibition or Events are conducted and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full force and effect.

9.13     (a)     WRESTLER may at his election obtain health, life and/or disability insurance to provide benefits in the event of physical injury arising out of WRESTLER's professional activities; and WRESTLER acknowledges that WCW shall not have any responsibility for such insurance or payment in the event of physical injury arising out of WRESTLER's professional activities.

(b)     In the event of physical injury arising out of WRESTLER's professional activities, WRESTLER acknowledges that WRESTLER is not entitled to any worker's compensation coverage or similar benefits for injury, disability, death or loss of wages; and WRESTLER shall make no claim against WCW for such coverage or benefit.

9.14     WRESTLER shall act at all times with due regard to public morals and conventions during the term of this Agreement. If WRESTLER shall have committed or shall commit any act or do anything that is or shall be an offense or violation involving moral turpitude under Federal, state or local laws, or which brings WRESTLER into public disrepute, contempt, scandal or ridicule, or which insults or offends the community or any employee, agent or affiliate of WCW or which injures WRESTLER's reputation in WCW's sole judgment, or diminishes the value of WRESTLER's professional wrestling services to the public or WCW, then at the time of any such act, or any time after WCW learns of any such act, WCW shall have the right to fine WRESTLER in an amount to be determined by WCW; and WCW shall have the right to suspend and/or terminate this Agreement forthwith.

## 10. WARRANTY

10.1     WRESTLER represents, warrants, and agrees that WRESTLER is free to enter into this Agreement and to grant the rights and licenses herein granted to WCW; WRESTLER has not heretofore entered and shall not hereafter enter into any contract or agreement which is in conflict with the provisions hereof or which would or might interfere with the full and complete performance by WRESTLER of his obligations hereunder or the free and unimpaired exercise by WCW of any of the rights and licenses herein granted to it; WRESTLER further represents and warrants there are no prior or pending claims, administrative proceedings, civil lawsuits, criminal

15

prosecutions or other litigation matters, including without limitation any immigration or athletic commission related matters, affecting WRESTLER which would or might interfere with WCW's full and complete exercise or enjoyment of any rights or licenses granted hereunder. Any exceptions to this Warranty are set forth in Schedule B, attached hereto.

10.2   (a)   WRESTLER represents, warrants and agrees that WRESTLER is in sound mental and physical condition; that WRESTLER is suffering from no disabilities that would impair or adversely affect WRESTLER's ability to perform professional wrestling services; and that WRESTLER is free from the influence of illegal drugs or controlled substances, which can threaten WRESTLER's well being and pose a risk of injury to WRESTLER or others. To insure compliance with this warranty, WRESTLER shall abide by WCW's Drug Policy for wrestlers, as well as any and all amendments, additions, or modifications to the WCW's Drug Policy implemented during the Term of this Agreement and consents to the sampling and testing of his urine in accordance with such Policy. In addition, WRESTLER agrees to submit annually to a complete physical examination by a physician either selected or approved by WCW. WCW's current Drug Policy, which WRESTLER acknowledges herewith receiving, is annexed hereto and incorporated by reference and made a part hereof.

(b)   In the event that WRESTLER is unable to wrestle for eight (8) consecutive weeks during the Term of this Agreement due to an injury suffered in the ring while performing services at WCW's direction, WCW shall have the right to thereafter terminate this Agreement or suspend WRESTLER without pay. If WRESTLER is unable to wrestle for any other reason during the Term of this Agreement, WCW shall have the right to immediately terminate this Agreement or suspend WRESTLER without pay. WCW can opt in its discretion to extend the Term of this Agreement for a period of time equal to the period of suspension or any portion thereof. Upon certification by WRESTLER or WCW's physician during any period of suspension that WRESTLER is fully recovered and capable of performing all services as required under this Agreement, WCW can reinstate the Agreement, and it will therefore continue to be of full force and effect throughout the remainder of the Initial Term of this Agreement and any Renewal Term thereof. WRESTLER shall have the right to have his own physician present.

10.3   Upon reasonable notice, WCW reserves the right to have WRESTLER examined by a physician of its own choosing at its expense at any point during the Term of this Agreement.

10.4   WRESTLER further represents, warrants and agrees that this Agreement supersedes all prior agreements between WRESTLER and WCW, whether written or oral, and that he has been fully compensated, where applicable, under such prior agreement(s).

## 11. EARLY TERMINATION

11.1   This Agreement may be terminated prior to the end of its Term by a written instrument executed by each of the parties expressing their mutual consent to so terminate without any further liability on the part of either. In the event of such early termination, WCW shall pay WRESTLER for all uses of the Intellectual Property in accordance with paragraphs 7.3, 7.4, 7.5 and 7.6.

11.2   This Agreement will be terminated by WRESTLER's death during the Term, with no

16

further compensation due WRESTLER's heirs, successors, personal representatives or assigns.

11.3   Upon the termination of this Agreement for any reason, including breach, the parties acknowledge and agree that WCW shall own all right, title and interest in all Works, New Intellectual Property and any registrations thereof and WCW shall have the exclusive right to sell or otherwise dispose of any materials, goods, merchandise or other items (i) produced during the Term of this Agreement incorporating any Original Intellectual Property, and (ii) produced incorporating New Intellectual Property, in perpetuity.

## 12. BREACH

12.1   In addition to those reasons set forth elsewhere in this Agreement, WCW shall have the right, in its sole discretion, to immediately suspend or terminate the operation of this Agreement, both as to services and compensation, if any of the following occurs:

    (a)   WRESTLER violates WCW's Drug Policy or fails WCW's pre-contract drug screening;

    (b)   WRESTLER is habitually late and/or absent for scheduled Events or appearances as WCW determines in its sole discretion;

    (c)   WRESTLER fails any physical examination conducted on behalf of WCW, as required herein;

    (d)   WRESTLER fails to maintain physical condition or training such that his weight, and/or his performance is unsatisfactory as determined by WCW in its sole discretion; or

    (e)   WCW is unable to obtain any necessary athletic commission licenses or immigration clearances for WRESTLER.

12.2   In the event WRESTLER breaches this Agreement, WCW may recover such actual direct damages as may be established in a court of law, as provided in Paragraph 13.8. In addition, in the event of termination pursuant to this Paragraph, WRESTLER shall forfeit any future payments due pursuant to paragraph 7 and WRESTLER shall not appear under, use, refer to or exploit in any manner, parenthetically or otherwise, the Original Intellectual Property for the remainder of the Term and the New Intellectual Property forever.   Further, at WCW's sole option, the Term of this Agreement may be extended by the term of any suspension period, in whole or in part, with all other terms and conditions hereof remaining in full force and effect during such extended period. In the event WRESTLER breaches this Agreement, WRESTLER acknowledges and agrees that he shall not work or perform in any capacity for any other wrestling organization and/or entity not owned or controlled by WCW or any affiliated or subsidiary company thereof that promotes and/or broadcasts any wrestling Programs and/or Events in the United States, its territories and possessions, including without limitation appearances in live events, pay-per-view or other televised events, for one (1) year from the date of the termination of this Agreement as a result of breach of this Agreement by WRESTLER.

17

12.3    The parties further agree that because of the special, unique, and extraordinary nature of the obligations of WCW and WRESTLER respecting all rights and licenses concerning bookings, promoting, Programs, Events, Intellectual Property, which are the subject matter of this Agreement, WRESTLER's breach of this Agreement shall cause WCW irreparable injury which cannot be adequately measured by monetary relief; as a consequence WCW shall be entitled to seek injunctive and other equitable relief against WRESTLER to prevent WRESTLER's breach or default hereunder and such injunction or equitable relief shall be without prejudice to any other rights, remedies or damages which WCW is legally entitled to obtain.

12.4    In no circumstances, whatsoever, shall either party to this Agreement be liable to the other party for any punitive or exemplary damages; and all such damages, whether arising out of the breach of this Agreement or otherwise, are expressly waived.

## 13. MISCELLANEOUS

13.1    Nothing contained in this Agreement shall be construed to constitute WRESTLER as an employee, partner or joint venturer of WCW, nor shall WRESTLER have any authority to bind WCW in any respect.  WRESTLER is an independent contractor and WRESTLER shall execute and hereby irrevocably appoints WCW attorney-in-fact to execute, if WRESTLER refuses to do so, any instruments necessary to accomplish or confirm the foregoing or any and all of the rights granted to WCW herein.

13.2    This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and all prior understandings, negotiations and agreements are merged in this Agreement.  There are no other agreements, representations, or warranties not set forth herein with respect to the subject matter hereof; and the parties expressly acknowledge that any representation, promise or inducement by any party to any other party that is not embodied in this Agreement is not part of this Agreement, and they agree that no party shall be bound by or liable for any such alleged representation, promise or inducement not set forth herein.

13.3    This Agreement may not be changed or altered except in writing signed by WCW and WRESTLER.

13.4    If any provision or clause of this Agreement, or portion thereof, shall be held by any court or other tribunal of competent jurisdiction to be illegal, invalid, or unenforceable in such jurisdiction, the remainder of such provision shall not thereby be affected and shall be given full effect, without regard to the invalid portion.  It is the intention of the parties that, if any court construes any provision or clause of this Agreement, or any portion thereof, to be illegal, void or unenforceable because of the duration of such provision or the area or matter covered thereby, such court shall reduce or modify the duration, area, or matter of such provision, and, in its reduced or modified form, such provision shall then be enforceable and shall be enforced.

13.5    WCW shall have the exclusive and unlimited right to assign, license, or transfer, in writing and upon notice to WRESTLER, any or all of the rights granted to and hereunder to any person, firm or corporation, provided such assignee has the financial ability to meet WCW's obligations hereunder and WRESTLER hereby consents to any assignment, license or transfer of such rights

18

and WCW shall have no further obligations to WRESTLER. WRESTLER may not assign, transfer or delegate his rights or obligations hereunder and any attempt to do so shall be void.

13.6     Any notices required or desired hereunder shall be in writing and sent postage prepaid by certified mail, return receipt requested, or by prepaid telegram addressed as follows, or as the parties may hereafter in writing otherwise designate:

TO WCW:

    WCW, Inc.
    Attn:   Edward L. Kaufman
    Vice President and Secretary
    1241 E. Main Street
    Stamford, CT  06902

TO WRESTLER:

    Marcus Bagwell
    4868 Helga Way
    Woodstock, GA  30188

    WITH A COPY TO:

    Brad Small, Esq.
    Erickson, Halloran and Small
    1620 26th Street
    Suite 2060 North
    Santa Monica, CA   90404

    The date of mailing shall be deemed to constitute the date of service of any such notice by WCW.  The date of receipt shall be deemed to constitute the date of service of any such notice by WRESTLER.

13.7     This Agreement is made in Connecticut and shall be governed by and interpreted in accordance with the laws of the State of Connecticut, exclusive of its provisions relating to conflicts of law.

13.8     In the event there is any claim, dispute, or other matter in question arising out of or relating to this Agreement, the enforcement of any provisions therein, or breach of any provision thereof, it shall be submitted to the Federal, state or local courts, as appropriate, only in the State of Connecticut.   This provision to submit all claims, disputes or matters in question to the Federal or state courts in the State of Connecticut shall be specifically enforceable; and each party, hereby waiving personal service of process and venue, consents to jurisdiction in Connecticut for purposes of any other party seeking or securing any legal and/or equitable relief.

13.9     In no circumstances, whatsoever, shall either party to this Agreement be liable to the other party for any punitive or exemplary damages; and all such damages, whether arising out of the breach of this Agreement or otherwise, are expressly waived.

## 14. CONFIDENTIALITY

14.1     (a) Other than as may be required by applicable law, government order or regulations, or by order or decree of the Court, WRESTLER hereby acknowledges and agrees that in further

19

consideration of WCW's entering into this Agreement, WRESTLER shall not, at any time during this Agreement, or after the termination of this Agreement for any reason whatsoever, disclose to any person, organization, or publication, or utilize for the benefit or profit of WRESTLER or any other person or organization, any sensitive or otherwise confidential business information, idea, proposal, secret, or any proprietary information obtained while with WCW and/or regarding WCW, its employees, independent contractors, agents, officers, directors, subsidiaries, affiliates, divisions, representatives, or assigns. Included in the foregoing, by way of illustration only and not limitation, are such items as reports, business plans, sales information, cost or pricing information, lists of suppliers or customers, talent lists, story lines, scripts, story boards or ideas, routines, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable) and any other tangible or intangible materials written, composed, submitted, added, improvised, or created by or for WRESTLER in connection with appearances in the Programs, information regarding any contractual relationships maintained by WCW and/or the terms thereof, and/or any and all information regarding wrestlers engaged by WCW.

(b) Notwithstanding the foregoing, WRESTLER's obligation of confidentiality shall not include information which:

(i) at the time of disclosure was in the public domain;

(ii) after such disclosure, becomes generally available to the public other than through any act or omission by WRESTLER; and

(iii) is required to be disclosed by any court of competent jurisdiction, provided that prior written notice of such disclosure is furnished to WCW in a timely manner in order to afford WCW an opportunity to seek a protective order against such disclosure.

14.2     WRESTLER acknowledges and agrees that its agreement to be bound by the terms hereof is a material condition of WCW's willingness to use and continue to use WRESTLER's services. Other than as may be required by applicable law, government order or regulation, or by order or decree of the court, the parties agree that neither of them shall publicly divulge or announce, or in any manner disclose, to any third party, any of the specific terms and conditions of this Agreement; and both parties warrant and covenant to one another that none of their officers, directors, employees or agents will do so either. Notwithstanding the foregoing, WRESTLER shall be free to disclose the terms and conditions of this Agreement to his lawyers, agents, financial advisers and spouse and WCW shall be free to disclose the terms and conditions of this Agreement to its lawyers, accountants and to those employees who have a legitimate need to know such information.

All of the terms and conditions of any Addenda or Schedules are incorporated herein by reference and made a part hereof.

20

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

WCW, INC.                                      MARCUS BAGWELL
("WCW")                                      ("WRESTLER")

By: _____           By: _____
      Edward L. Kaufman                       Marcus Bagwell
Its:   Vice President and Secretary

STATE OF CONNECTICUT      )
                              ) ss: Stamford
COUNTY OF FAIRFIELD       )

On _June 1_ 2001 before me personally came Edward L. Kaufman, Vice President and Secretary, to me known, and known to me to be the individual described in, and who executed the foregoing, and duly acknowledged to me that he is a duly authorized corporate officer of WCW, Inc., and that he executed the same on behalf of said Company.

WITNESS my hand and notarial seal this _1st_ day of _June_, 2001.

KAREN SHAPIRO
NOTARY PUBLIC, STATE OF CT
MY COMMISSION EXPIRES SEP. 30, 2003

_____
Notary Public

My commission expires: _____

STATE OF GEORGIA           )
                           ) ss:
COUNTY OF COBB          )

I am a Notary Public for said County and State, do hereby certify that Marcus Bagwell personally appeared before me this day and acknowledged the due execution of the foregoing instrument to be his free act and deed for the purposes therein expressed.

WITNESS my hand and notarial seal this _30th_ day of _MAY_, 2001.

_____
Notary Public

Notary Public, Cobb County, Georgia
My Commission Expires May 20, 2004

My commission expires: _____

21

## SCHEDULE A
## ORIGINAL INTELLECTUAL PROPERTY

Marcus Bagwell
Mark Bagwell

P:\USERS\Legal Affairs\Booking Contracts\WCW, Inc\Bagwell Marcus 2081.doc
05/22/01

## SCHEDULE B
### EXCEPTIONS TO WARRANTY
#### PENDING CONTRACTS/CLAIMS/LITIGATION WHICH MAY INTERFERE OR CONFLICT WITH
#### WRESTLER'S PERFORMANCE AND/OR GRANT OF RIGHTS

Independent Contractor Agreement dated March 26, 1998 between Marcus Bagwell and World Championship Wrestling, Inc.

23

# EXHIBIT 10

represented by WCW, WCW shall allocate five percent (5%) of the Direct Sales Products. Net Receipts to be paid pro-rata among WRESTLER and all other talent so featured.

7.5   (a)   (i)   Royalties/Pay-Per-View Videos Sold By Licensees:   WCW shall allocate twenty-five percent (25%) of the Net Receipts paid to WCW by licensees authorized to reproduce and sell video cassettes, videodiscs, CD ROM, or other technology, including technology not yet created (hereinafter referred to as "WCW Video Products"), of WCW pay-per-views in their entirety ("WCW Pay-Per-Views") to a talent royalty pool. Thereafter, WCW shall pro-rate payment to WRESTLER and all other talent appearing in such WCW Pay-Per-Views in the same proportion as was the compensation paid to WRESTLER for his appearances in the pay-per-views to the total amount paid to all talent for their appearances in the pay-per-view.   For purposes of paragraphs 7.5(a)(i) and 7.5(a)(ii), Net Receipts shall mean the gross amount received by WCW from the licensees for the WCW Pay-Per-Views less any and all costs incurred by WCW to produce and/or distribute such WCW Pay-Per-Views.

(ii)   In the event that the WCW Video Products are a compilation or derivative work of multiple individual WCW Pay-Per-Views in their entirety, such as a collection of videos, e.g., a Wrestlemania box set, payment to WRESTLER shall be calculated as follows: twenty-five percent (25%) of the Net Receipts paid to WCW by licensees shall comprise the talent royalty pool, which shall first be pro-rated based on the number of individual videos in the compilation, and then the payment to WRESTLER for each video shall be consistent with the royalty payment to the WRESTLER at the time that each individual video was first released.

(b)   Royalties/Non-Pay-Per-View Videos Sold By Licensees:   WCW shall allocate twenty-five percent (25%) of the Net Receipts paid to WCW by licensees authorized to reproduce and sell all other WCW Video Products, other than those set forth in paragraphs 7.5(a)(i) and 7.5(a)(ii) above, to a talent royalty pool, from which WCW shall pay WRESTLER and all other talent appearing in such WCW Video Products pro-rata among WRESTLER and all other talent so featured. For purposes of this paragraph 7.5(b), Net Receipts shall mean the gross amount received by WCW for the WCW Video Products less any and all costs incurred by WCW to produce and/or distribute such WCW Video Products.

(c)   (i)   Royalties/Pay-Per-View Videos Sold By WCW:   WCW shall allocate five percent (5%) of the Net Receipts paid to WCW with respect to the direct sale by WCW of WCW Pay-Per-Views to a talent royalty pool.   Thereafter, WCW shall pro-rate payment to WRESTLER and all other talent appearing in such WCW Pay-Per-Views in the same proportion as was the compensation paid to WRESTLER for his appearances in the pay-per-views to the total amount paid to all talent for their appearances on the pay-per-views   For purposes of paragraphs 7.5(c)(i) and 7.5(c)(ii), Net Receipts shall mean the gross amount received by WCW for the WCW Pay-Per-Views.

(ii)   In the event that the WCW Video Product is a compilation or derivative work of multiple individual WCW Pay-Per-Views in their entirety, such as a collection of videos, e.g., a Wrestlemania box set, payment to WRESTLER shall be calculated as follows: five percent (5%) of the Net Receipts paid to WCW shall comprise the talent royalty pool, which shall first be pro-rated based on the number of individual videos in the compilation, and then the payment to WRESTLER

8

**EXHIBIT 11**

represented by WCW, WCW shall allocate five percent (5%) of the Direct Sales Products Net Receipts to be paid pro-rata among WRESTLER and all other talent so featured.

7.5    (a)    (i)    Royalties/Pay-Per-View Videos Sold By Licensees:    WCW shall allocate twenty-five percent (25%) of the Net Receipts paid to WCW by licensees authorized to reproduce and sell video cassettes, videodiscs, CD ROM, or other technology, including technology not yet created (hereinafter referred to as "WCW Video Products"), of WCW pay-per-views in their entirety ("WCW Pay-Per-Views") to a talent royalty pool. Thereafter, WCW shall pro-rate payment to WRESTLER and all other talent appearing in such WCW Pay-Per-Views in the same proportion as was the compensation paid to WRESTLER for his appearances in the pay-per-views to the total amount paid to all talent for their appearances in the pay-per-view. For purposes of paragraphs 7.5(a)(i) and 7.5(a)(ii), Net Receipts shall mean the gross amount received by WCW from the licensees for the WCW Pay-Per-Views less any and all costs incurred by WCW to produce and/or distribute such WCW Pay-Per-Views.

(ii) In the event that the WCW Video Products are a compilation or derivative work of multiple individual WCW Pay-Per-Views in their entirety, such as a collection of videos, e.g., a Wrestlemania box set, payment to WRESTLER shall be calculated as follows: twenty-five percent (25%) of the Net Receipts paid to WCW by licensees shall comprise the talent royalty pool, which shall first be pro-rated based on the number of individual videos in the compilation, and then the payment to WRESTLER for each video shall be consistent with the royalty payment to the WRESTLER at the time that each individual video was first released.

(b)    Royalties/Non-Pay-Per-View Videos Sold By Licensees:    WCW shall allocate twenty-five percent (25%) of the Net Receipts paid to WCW by licensees authorized to reproduce and sell all other WCW Video Products, other than those set forth in paragraphs 7.5(a)(i) and 7.5(a)(ii) above, to a talent royalty pool, from which WCW shall pay WRESTLER and all other talent appearing in such WCW Video Products pro-rata among WRESTLER and all other talent so featured. For purposes of this paragraph 7.5(b), Net Receipts shall mean the gross amount received by WCW for the WCW Video Products less any and all costs incurred by WCW to produce and/or distribute such WCW Video Products.

(c)    (i)    Royalties/Pay-Per-View Videos Sold By WCW:    WCW shall allocate five percent (5%) of the Net Receipts paid to WCW with respect to the direct sale by WCW of WCW Pay-Per-Views to a talent royalty pool. Thereafter, WCW shall pro-rate payment to WRESTLER and all other talent appearing in such WCW Pay-Per-Views in the same proportion as was the compensation paid to WRESTLER for his appearances in the pay-per-views to the total amount paid to all talent for their appearances on the pay-per-views. For purposes of paragraphs 7.5(c)(i) and 7.5(c)(ii), Net Receipts shall mean the gross amount received by WCW for the WCW Pay-Per-Views.

(ii) In the event that the WCW Video Product is a compilation or derivative work of multiple individual WCW Pay-Per-Views in their entirety, such as a collection of videos, e.g., a Wrestlemania box set, payment to WRESTLER shall be calculated as follows: five percent (5%) of the Net Receipts paid to WCW shall comprise the talent royalty pool, which shall first be pro-rated based on the number of individual videos in the compilation, and then the payment to WRESTLER

8

# EXHIBIT 12

for each video shall be consistent with the royalty payment to the WRESTLER at the time each individual video was first released.

(d)   Royalties/Non Pay-Per-View Videos Sold By WCW:   WCW shall allocate five percent (5%) of the Net Receipts paid to WCW with respect to the direct sale by WCW of all other WCW Video Products other than those set forth in paragraphs 7.5(c)(i) and 7.5(c)(ii) above, to a talent royalty pool, from which WCW shall pay WRESTLER and all other talent appearing in such WCW Video Products pro-rata among WRESTLER and all other talent so featured.   For purposes of this paragraph 7.5(d), Net Receipts shall mean the gross amount received by WCW for the WCW Video Products.   Notwithstanding the foregoing, if WRESTLER is deemed to be the "featured performer" as determined by WCW in its sole discretion, WRESTLER shall receive a bonus of an additional five percent (5%) of WCW's Net Receipts up to the sale of the first one hundred fifty thousand (150,000) units.   Once sales exceed 150,000, WRESTLER as a featured performer shall receive ten percent (10%) of WCW's Net Receipts on all units sold, including the first 150,000 units.   For example, the featured performer in the video entitled "Cause Stone Cold Said So" is "Stone Cold Steve Austin".   If WRESTLER is part of a group that is determined to be the "featured performer", WRESTLER shall share pro-rata with each and every member of the group in any bonus monies that may be due in connection with such WCW Video Products.

7.6     In the event the Original and/or New Intellectual Property are used by WCW or licensed, sublicensed or assigned for non-wrestling personal appearances and performances such as personal appearances for advertising or non-wrestling promotional purposes, radio and television commercials, movies, etc., WRESTLER shall earn an amount to be mutually agreed to by WRESTLER and by WCW of the "Personal Appearance Net Receipts" received by WCW, which amount shall also be credited against WRESTLER'S Minimum Annual Compensation, if any. Personal Appearance Net Receipts means the amount received by WCW after payment of and provision for all of WCW's costs and expenses, except income taxes.

7.7     If WCW instructs WRESTLER to appear and perform in any Events or Programs as a commentator and/or to participate in post-Event production and/or voice-over activities as a commentator, WRESTLER's commentating shall be deemed work-for-hire and WRESTLER hereby assigns to WCW and WCW shall own all rights, in perpetuity, to all of WRESTLER's commentary and WRESTLER shall not be entitled to receive any royalty payments, or any additional compensation or residual payments whatsoever, as a result of WCW's commercial exploitation of such commentary in any form, whether broadcast programming, cable programming, pay-per-view programming, videotapes, videodiscs, the Internet or other mediums now or hereinafter discovered.

7.8     It is the understanding of the parties that WRESTLER shall not be paid anything for WCW's exploitation of the Original and/or New Intellectual Property in any of WCW's magazines or other publications, which WCW may publish, produce or distribute at arenas, at newsstands and/or by mail or through electronic or any other manner of media or distribution, now known or hereinafter discovered, including, but not limited to, publication or distribution on the Internet or America On Line.

7.9     If WRESTLER is unable to wrestle for eight (8) consecutive weeks due to an injury

9

# EXHIBIT 13



Via Federal Express

August 7, 2001

Buff Stuff, Inc.
c/o Marcus Bagwell
~~████████████~~

Re:     Early Contract Release ("Release")

Dear Mr. Bagwell:

Reference is hereby made to that certain Loan Out Agreement and Booking Contract between Buff Stuff, Inc. f/s/o Marcus Bagwell ("Bagwell") and WCW, Inc. ("WCW") dated May 18, 2001 and any prior contracts, amendments or modifications thereto in full force and effect as of the date hereof (collectively, the "Contract"). In consideration of the mutual promises and covenants set forth below and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Bagwell and WCW hereby agree as follows:

1.      At the mutual request of the parties, the Contract shall be and is hereby terminated and canceled effective as of the execution date of this letter (the "Termination Date").

2.      Bagwell acknowledges and agrees that WCW created and owns the "New Intellectual Property" as described in the Contract, including without limitation the Name and Likeness of the character "Buff Bagwell" and that all rights in and to the history, name, likeness and image of such character have belonged to, and forever belong to, WCW. Bagwell further acknowledges and agrees that WCW retains the exclusive right to retain and exploit in perpetuity history, for whatsoever purpose in any and all media and means of commerce, whether now or hereafter devised, the New Intellectual Property, including without limitation, the name and likeness of the character "Buff Bagwell". Bagwell acknowledges and agrees that he is forever precluded from using any names, likenesses, costumes, props, gimmicks, gestures, routines, themes, music, personalities, caricatures or anything else which refer or relate to, or which are confusingly similar to the character "Buff Bagwell". Bagwell shall also immediately return to WCW all gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible property provided to Bagwell by WCW. For the avoidance of doubt, WCW may continue to exploit Bagwell's Original Intellectual Property beyond the Termination Date in previously recorded programming, home videos, music and the like. Notwithstanding the foregoing, WCW will return to you your "Buff Bagwell" hat and grants you a non-precedential, non-exclusive revocable license to portray the "Buff Bagwell" character for third party promoters.

3.      Bagwell hereby acknowledges and agrees that WCW has performed all of its obligations pursuant to the Contract and WCW hereby acknowledges that Bagwell has performed all of his obligations pursuant to the Contract, except as required hereunder.

4.      A.      In consideration of the representations and warranties set forth herein by WCW and for WCW's agreement to grant this Release, WCW shall pay Bagwell the total sum of ~~████████████~~

F:\USERS\Legal Affairs\Releases\WCW, Inc\Copy of Bagwell Marcus re BCR.doc
08/07/01



Mr. Marcus Bagwell
August 7, 2001
Page 2

equal weekly installments beginning the week of July 16, 2001 and ending the week of October 15, 2001 as a full and complete buyout of Bagwell's services under the Contract, other than the obligation to pay Bagwell the royalties due him pursuant to, and as determined by, the Contract.

      B.    In addition to the foregoing, Bagwell represents and warrants as follows:

            (i)   Other than as may be required by applicable law, government order or regulations, or by order or decree of the Court, Bagwell hereby acknowledges and agrees that in further consideration of WCW's entering into this Release, Bagwell shall not, at any time during the Contract, or after the execution of the Release for any reason whatsoever, disclose to any person, organization, or publication, or utilize for the benefit or profit of Bagwell or any other person or organization, any sensitive or otherwise confidential business information, idea, proposal, secret, or any proprietary information obtained while with WCW and/or regarding WCW, its employees, independent contractors, agents, officers, directors, parents, subsidiaries, affiliates, divisions, representatives, or assigns. Included in the foregoing, by way of illustration only and not limitation, are such items as reports, business plans, sales information, cost or pricing information, lists of suppliers or customers, talent lists, story lines, scripts, story boards or ideas, routines, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable) and any other tangible or intangible materials written, composed, submitted, added, improvised, or created by or for Bagwell in connection with appearances for WCW, information regarding any contractual relationships maintained by WCW and/or the terms thereof, and/or any and all information regarding wrestlers engaged by WCW.

            (ii)   Bagwell further acknowledges and agrees that his agreement to be bound by the terms hereof is a material condition of WCW's willingness to execute this Release. Other than as may be required by applicable law, government order or regulation, or by order or decree of the court, the parties agree that neither of them shall publicly divulge or announce, or in any manner disclose, to any third party, any of the specific terms and conditions of the Contract or this Release, and both parties warrant and covenant to each other that none of their officers, directors, employees or agents will do so either.

            (iii)   To that end, Bagwell further agrees that he shall not make any statement or comments (written or otherwise) that criticize, disparage, injure or harm the reputation of WCW and/or the World Wrestling Federation including, but not limited to any statements or comments regarding the Buff Bagwell character, the McMahon Family and/or any representative of WCW or World Wrestling Federation Entertaining, Inc. As such, the parties mutually agree that if and when asked about the terms of this Release or the reasons why Bagwell has left WCW, the parties will state essentially as follows:



5.    Effective as of the Termination Date, WCW hereby releases and discharges Bagwell from any and all further obligations pursuant to the Contract, except the provisions of this Release. Bagwell shall have no further obligations to render or perform any services of any



Mr. Marcus Bagwell
August 7, 2001
Page 3

nature whatsoever pursuant to the Contract after the Termination Date, and WCW shall have no right to cause Bagwell to provide any further services under the Contract thereafter.

6.      Effective as of the Termination Date, Bagwell hereby releases and discharges WCW from any and all obligations pursuant to the Contract except as required hereunder. Bagwell acknowledges that except as expressly set forth herein, no representations or any kind or character have been made to Bagwell by WCW or by any of WCW's agents, representatives or attorneys to induce the execution of this Release. In order for Bagwell to induce WCW to sign this Release, Bagwell hereby releases WCW, its parent companies, affiliates, subsidiaries, successors, assigns, and its and their respective officers, directors, employees, independent contractors, licensees, representatives and agents from any and all claims, liabilities and obligations whatsoever in law or equity (whether now known or hereinafter discovered) which Bagwell has or may ever have arising out of or in connection with the Contract.

7.      This Release shall be binding upon and inure to the benefit of Bagwell and WCW and their respective heirs, representatives, successors and assigns. This Release contains the entire understanding of the parties hereto and supersedes all prior oral and written communications and agreements with respect to the subject matter hereof.

8.      This Release, its validity, construction and effect, shall be governed by and construed in accordance with the laws of the State of Connecticut applicable to contracts to be performed wholly therein, and shall not be modified or amended except by an instrument in writing signed by each of the parties hereto duly authorized to execute such modification or amendment. The invalidity or unenforceability of any provision hereof shall not affect the validity or enforceability of any other provision hereof.

9.      Any claim, dispute, or other matter in question arising out of or relating to this Release shall be solely under the jurisdiction of the United States District Court located in Bridgeport, Connecticut and the Judicial District Court of Stamford located in Stamford, Connecticut. The parties agree that service of process by mail shall be effective service of same and such service shall have the same effect as personal service with the State of Connecticut and result in personal jurisdiction over the parties in the forum in the State of Connecticut. The parties' agreement to submit all claims, disputes or matters in question to the courts in the state of Connecticut shall be specifically enforceable, and each party consents to jurisdiction in Connecticut.

10.     In the event a legal action or any other proceeding is commenced to enforce any provision of this Release or as a result of any breach, default, or dispute related to this Release, the successful or prevailing party shall be entitled, in addition to any other relief, to recover all costs of litigation, including expert fees and reasonable attorneys' fees incurred in such action or proceeding.

11.     The parties further agree that because of the special and unique obligations of Bagwell under this Release, a breach by Bagwell of the provisions in this Release shall cause WCW and/or World Wrestling Federation irreparable injury which cannot be adequately measured by monetary relief. Consequently, without prejudice to or limitation of any other

Mr. Marcus Bagwell
August 7, 2001
Page 4

rights, remedies or damages which WCW is legally entitled to obtain, WCW shall be entitled to seek injunctive and other equitable relief against Bagwell to enforce the provisions of this Release.

Please confirm your acceptance of this Release as set forth above by signing in the space provided below on each of the enclosed two (2) copies and return them to me. One fully executed copy will be returned to you for your files. Thank you in advance for your prompt attention to this matter.

Very truly yours,

*Edward L. Kaufman ks.*

Edward L. Kaufman

ELK:ks

cc:    Jim Ross
       Rich Hering
       Benny Morales


AGREED AND ACCEPTED:

BUFF STUFF, INC.                          WCW, INC.
("Bagwell")                              ("WCW")


By: _____              By: _____
    Marcus Bagwell                           Edward L. Kaufman
                                             Vice President and Secretary


Date: _____            Date: _____

# EXHIBIT 14

Account # 



March 24, 2016

MARCUS BAGWELL

Dear MARCUS BAGWELL,

Enclosed is your royalty earnings statement for the First Quarter - 2016. Your earnings are summarized below:

## SUMMARY OF ROYALTY EARNINGS

### ROYALTY EARNED CURRENT QUARTER

| | |
|---|---:|
| Direct | $1.38 |
| Other Licensing | $39.43 |
| TOTAL EARNINGS | $40.81 |

### PREVIOUSLY UNPAID ROYALTIES EARNED

| | |
|---|---:|
| Direct | $1.55 |
| Other Licensing | $20.77 |
| Video | $1.27 |
| TOTAL PREVIOUSLY UNPAID EARNINGS | $23.59 |
| NET ROYALTIES PAID | $64.40 |

### COMMENTS

If you receive guaranteed weekly pay, your royalty payment will be applied to your guarantee for this week. Otherwise, please find enclosed a check or direct deposit notification.

If you have any questions, please contact me at 203-352-8682.

Sincerely,

Tom Bergamasco
Director of Talent Participations

Enclosure

Print Date:3/24/2016
Page :1 of 2
Account:

TALENT NAME: BUFF BAGWELL

2016 Q1

| Item Code | Item Description | Activity Date | Venue | WWE Earned Royalties | Royalty Rate (%) | Talent Royalty Earned |
|---|---|---|---|---|---|---|
| **Direct** | | | | | | |
| | **WWE AMAZON UK** | | | | | |
| WWE220013 | WWE: THE ATTITUDE ERA BO | 2015 Q4 | 2015 Q4 | 441.40 | 0.03623 | 0.16 |
| | TOTAL : WWE AMAZON UK | | | 441.40 | | $0.16 |
| | **WWE SHOP** | | | | | |
| WWE220013 | WWE: THE ATTITUDE ERA BO | 2015 Q2 | 2015 Q2 | 2,761.32 | 0.03623 | 1.00 |
| WWE220013 | WWE: THE ATTITUDE ERA BO | 2015 Q3 | 2015 Q3 | 1,507.46 | 0.03623 | 0.55 |
| WWE220013 | WWE: THE ATTITUDE ERA BO | 2015 Q4 | 2015 Q4 | 3,360.45 | 0.03623 | 1.22 |
| TOTAL : WWE220013 | | | | 7,629.23 | | $2.77 |
| | TOTAL : WWE SHOP | | | 7,629.23 | | $2.77 |
| **TOTAL : Direct** | | | | 8,070.63 | | $2.93 |
| **OtherLicensing** | | | | | | |
| | **PENGUIN GROUP (DK/BRADY GAMES)** | | | | | |
| 9781465431233 | DK THE ATTITUDE ERA | 2015 Q2 | 2015 Q2 | 21,922.18 | 0.17996 | 39.43 |
| | TOTAL : PENGUIN GROUP (BRADY GAMES) | | | 21,922.18 | | $39.43 |
| | TOTAL : OtherLicensing | | | 21,922.18 | | $39.43 |
| **Video** | | | | | | |
| | **CLEARVISION LTD** | | | | | |
| 9LVWTC085 | NWO BACK IN BLACK DVD | 2013 Q2 | 2013 Q2 | 632.36 | 0.44000 | 0.93 |
| WWE1039 | VENGEANCE 2002 - DVD | 2012 Q3 | 2012 Q3 | 233.19 | 0.01724 | 0.04 |
| WWE1058 | BEST OF CONFIDENTIAL VOL | 2012 Q3 | 2012 Q3 | 54.71 | 0.21552 | 0.12 |
| WWE1058 | BEST OF CONFIDENTIAL VOL | 2012 Q4 | 2012 Q4 | 28.45 | 0.21552 | 0.06 |
| WWE1058 | BEST OF CONFIDENTIAL VOL | 2013 Q1 | 2013 Q1 | 3.98 | 0.21552 | 0.01 |
| TOTAL : WWE1058 | | | | 87.14 | | $0.19 |
| | TOTAL : CLEARVISION LTD | | | 952.71 | | $1.16 |
| | **ENTERTAINMENT ONE FILMS CANADA INC.** | | | | | |
| KOO-DV-5064 | BEST OF CONFIDENTIAL VOL | 2012 Q3 | 2012 Q3 | 10.23 | 0.21552 | 0.02 |
| KOO-DV-5064 | BEST OF CONFIDENTIAL VOL | 2014 Q4 | 2014 Q4 | 14.45 | 0.21552 | 0.03 |
| TOTAL : KOO-DV-5064 | | | | 24.68 | | $0.05 |
| | TOTAL : ENTERTAINMENT ONE FILMS CANADA INC. | | | 24.68 | | $0.05 |
| | **HVDIRECT** | | | | | |
| WWE58250 | BEST OF CONFIDENTIAL 2002 | 2013 Q1 | 2013 Q1 | 24.14 | 0.04310 | 0.01 |
| | TOTAL : HVDIRECT | | | 24.14 | | $0.01 |
| | **HVDIRECT1** | | | | | |
| WWE58250 | BEST OF CONFIDENTIAL 2002 | | | 16.09 | 0.04310 | 0.01 |
| TOTAL : WWE58250 | | | | 16.09 | | $0.01 |
| | TOTAL : HVDIRECT1 | | | 16.09 | | $0.01 |
| | **REGENCY MEDIA** | | | | | |
| KAL0212 | VENGEANCE 2002 | 2012 Q3 | 2012 Q3 | 46.90 | 0.01724 | 0.01 |
| KAL0212 | VENGEANCE 2002 | 2014 Q2 | 2014 Q2 | 112.04 | 0.01724 | 0.02 |
| TOTAL : KAL0212 | | | | 158.94 | | $0.03 |
| | TOTAL : REGENCY MEDIA | | | 158.94 | | $0.03 |
| | **VIDEO UNLIMITED** | | | | | |
| VDUWWE59340 | HULK HOGAN STILL RULES D | 2013 Q4 | 2013 Q4 | 3.35 | 0.27776 | 0.01 |
| | TOTAL : VIDEO UNLIMITED | | | 3.35 | | $0.01 |
| **TOTAL : Video** | | | | 1,179.91 | | $1.27 |

Print Date:3/24/2016
Page :2 of 2
Account:

TALENT NAME: BUFF BAGWELL

2016 Q1

| Item Code | Item Description | Activity Date | Venue | WWE Earned Royalties | Royalty Rate (%) | Talent Royalty Earned |
|---|---|---|---|---|---|---|
| *Royalty \ Nostalgia Advance* | | | | | | |
| | Royalty \ Nostalgia Advance | | | | | |
| 06 | Royalty \ Nostalgia Advance | | | | | |
| TOTAL : 06 | | | | 0.00 | 1.00000 | 20.77 |
| TOTAL : Royalty \ Nostalgia Advance | | | | 0.00 | | $20.77 |
| *TOTAL : Royalty \ Nostalgia Advance* | | | | 0.00 | | $20.77 |
| **TOTAL :BUFF BAGWELL** | | | | 0.00 | | $20.77 |
| | | | | $1,172.72 | | $64.40 |

**World Wrestling Entertainment, Inc.**

| INVOICE DATE MO DAY YEAR | DESCRIPTION | VENUE | NET AMOUNT |
|---|---|---|---|
| | Royalties (See statement for details) | | 64.40 |
| SUB TOTAL | | | 64.40 |
| GROSS AMOUNT | | | 64.40 |

| CHECK DATE 03/24/2016 | CHECK NUMBER | | TOTALS | 64.40 |
|---|---|---|---|---|