**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MARCUS BAGWELL and SCOTT LEVY, individually and on behalf of all others similarly situated, | : | NO.  3:16-CV-01350-JCH |
| | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| vs. | : | |
| | : | |
| WORLD WRESTLING ENTERTAINMENT, INC., | : | |
| | : | |
| Defendant. | : | OCTOBER 27, 2017 |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO COMPEL REGARDING PRIVILEGE ISSUES**

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

I. INTRODUCTION ........................................................................................................ 1

II. BACKGROUND ....................................................................................................... 3

   A. The March 16, 2016 Email from Attorney Peterson ......................................... 3

   B. The Meeting Attended By Levy's Ex-Wife ...................................................... 7

III. LEGAL STANDARD ................................................................................................ 9

IV. ARGUMENT ........................................................................................................... 10

   A. Levy Should Be Compelled to Produce the March 16, 2016 Email ................ 10

      1. The March 16, 2016 Email Is Not Privileged ............................................ 10

      2. The March 16, 2016 Email Was Used to Refresh Levy's Recollection ....... 14

   B. Levy Should Be Compelled to Testify About the Meeting .............................. 19

V. CONCLUSION ....................................................................................................... 23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*,
  No. 08 Civ. 7508, 2011 U.S. Dist. LEXIS 122325 (S.D.N.Y. Oct. 14, 2011) .......................15

*Auscape International v. National Geographic Society*,
  No. 02 Civ. 6441, 2002 U.S. Dist. LEXIS 26318 (S.D.N.Y. Oct. 8, 2002) ...........................11

*Bank Hapoalim, B.M. v. American Home Assurance Co.*,
  No. 92 Civ. 3561, 1993 U.S. Dist. LEXIS 1300 (S.D.N.Y. Feb. 8, 1993) .............................14

*Bank Hapoalim, B.M. v. American Home Assurance Co.*,
  No. 92 Civ. 3561, 1994 U.S. Dist. LEXIS 4091 (S.D.N.Y. Apr. 1, 1994) .............................16

*Barcomb v. Sabo*,
  No. 07-CV-877, 2009 U.S. Dist. LEXIS 120402 (N.D.N.Y. Dec. 28, 2009).........................15

*Berkey Photo, Inc. v. Eastman Kodak Co*,
  74 F.R.D. 613 (S.D.N.Y. 1977) .........................................................................................18

*Bodner v. Oreck Direct, LLC*,
  No. 06-4756, 2007 U.S. Dist. LEXIS 30408 (N.D. Cal. Apr. 25, 2007) ...............................12

*In re Bonanno*,
  344 F.2d 830 (2d Cir. 1965)..............................................................................................10

*Buford v. American Finance Co.*,
  333 F. Supp. 1243 (N.D. Ga. 1971) ...................................................................................12

*Calandra v. Sodexo, Inc.*,
  No. 3:06CV49, 2007 U.S. Dist. LEXIS 31418 (D. Conn. Apr. 27, 2007) ............................15

*Carlisle v. LTV Electrosystems, Inc.*,
  54 F.R.D. 237 (N.D. Tex. 1972) ........................................................................................12

*Cole v. Towers Perrin Forster & Crosby*,
  256 F.R.D. 79 (D. Conn. 2009).............................................................................................9

*Curry v. McNeil*,
  No. 4:07cv351, 2008 U.S. Dist. LEXIS 115899 (N.D. Fla. Oct. 21, 2008) ..........................21

*DiStefano v. Milardo*,
  276 Conn. 416 (2005) .................................................................................................10, 11

*Donjon Marine Co. v. Buchanan Marine, L.P.*,
No. 3:09CV1005, 2010 U.S. Dist. LEXIS 73136 (D. Conn. July 21, 2010) ..........................15

*EEOC v. CRST Van Expedited, Inc.*,
No. C07-0095, 2009 U.S. Dist. LEXIS 3621 (N.D. Iowa Jan. 20, 2009) .........................11, 12

*EEOC v. Johnson & Higgins, Inc.*,
No. 93 Civ. 5481, 1998 U.S. Dist. LEXIS 17612 (S.D.N.Y. Nov. 5, 1998) ..........................16

*Ehrlich v. Howe*,
848 F. Supp. 482 (S.D.N.Y. 1994) .........................................................................................14

*Fangman v. Genuine Title, LLC*,
No. RDB-14-0081, 2016 U.S. Dist. LEXIS 79166 (D. Md. June 17, 2016) ...................11, 12

*Fisher v. Aetna Casualty & Surety Co.*,
No. 92-0340399, 1994 Conn. Super. LEXIS 2143 (Conn. Super. Ct. Aug 19,
1994) ......................................................................................................................................20

*Goddard v. Gardner*,
28 Conn. 172 (1859) ..............................................................................................................20

*Goguen v. World Wrestling Entertainment, Inc.*,
No. 3:16-cv-00542-SRU ...........................................................................................................6

*In re Gold*,
533 B.R. 851 (D. Conn. 2015) ...............................................................................................13

*James Julian, Inc. v. Raytheon Co.*,
93 F.R.D. 138 (D. Del. 1982) .................................................................................................15

*In re Joint Eastern & Southern District Asbestos Litigation*,
119 F.R.D. 4 (D.N.Y. Jan. 26, 1988) ................................................................................16, 18

*Jolly v. Coughlin*,
No. 92 Civ. 9026, 1995 U.S. Dist. LEXIS 11944 (S.D.N.Y. Aug. 16, 1995) ........................16

*Lawson v. United States, Dep't of Veterans Affairs*,
No. 97 Civ. 9239, 1998 U.S. Dist. LEXIS 8637 (S.D.N.Y. June 11, 1998)...........................16

*Leone v. Fisher*,
No. 3:05-CV-521, 2006 U.S. Dist. LEXIS 75571 (D. Conn. Oct. 18, 2006) .........................20

*Lindholm v. Lindholm*,
No. FA9801672992S, 1999 Conn. Super. LEXIS 2784 (Conn. Super. Ct. Oct.
15, 1999) ................................................................................................................................10

*Linnell v. Linnell*,
  No. FA064010515, 2010 Conn. Super. LEXIS 521 (Conn. Super. Ct. Feb. 16,
  2010) ................................................................................................................................. 13

*Meachum v. Outdoor World Corp.*,
  654 N.Y.S.2d 240 (1996) ................................................................................................ 12

*Ogden v. AmeriCredit Corp.*,
  225 F.RD. 529 (N.D. Tex. 2005) .................................................................................... 12

*Olson v. Accessory Controls & Equipment Corp.*,
  254 Conn. 145 (2000) ..................................................................................................... 19

*Peck & Peck, Inc. v. Jack La Lanne Fifth Ave. Health Spa, Inc.*,
  No. 76 Civ. 4020, 1978 U.S. Dist. LEXIS 20202 (S.D.N.Y. Jan. 12, 1978) ................ 17

*People v. Investigation into a Certain Weapon*,
  113 Misc. 2d 348 (N.Y. Sup. Ct. Mar. 8, 1982) ........................................................... 21

*Pilcher v. Direct Equity Lending*,
  No. 99-1245, 2000 U.S. Dist. LEXIS 19811 (D. Kan. Dec. 22, 2000) .......................... 12

*Poseidon Capital Corp. v. Nicolet Instrument Corp.*,
  Nos. 85 Civ. 6118, -6151, 1985 U.S. Dist. LEXIS 13704 (S.D.N.Y.  Nov. 20,
  1985) .......................................................................................................................... 14, 16

*PSE Consulting, Inc. v. Frank Mercede & Sons, Inc.*,
  267 Conn. 279 (2004) ................................................................................................... 9, 19

*Redvanly v. NYNEX Corp.*,
  152 F.R.D. 460 (S.D.N.Y. 1993) .................................................................................... 16

*Rienzo v. Santangelo*,
  160 Conn. 391 (1971) ..................................................................................................... 19

*Saxholm AS v. Dynal, Inc.*,
  164 F.R.D. 331 (E.D.N.Y. 1996) .................................................................................... 21

*State v. Cascone*,
  195 Conn. 183 (1985) ..................................................................................................... 19

*State v. Christian*,
  267 Conn. 710 (2004) ..................................................................................................... 19

*State v. Gordon*,
  197 Conn. 413 (1985) ..................................................................................................... 20

*Taub v. Glickman*,
   No. 67 Civ. 3447, 1970 U.S. Dist. LEXIS 9352 (S.D.N.Y. Dec. 1, 1970) ............................12

*Thomas v. Euro RSCG Life*,
   264 F.R.D. 120 (S.D.N.Y. 2010) .......................................................................................15

*Ullmann v. State*,
   230 Conn. 698 (1994) ...........................................................................................................9

*United States v. Dennis*,
   843 F.2d 652 (2d Cir. 1988) ................................................................................................13

*United States v. HCA, Inc.*,
   No. 13-23671, 2016 U.S. Dist. LEXIS 121441 (S.D. Fla. Apr. 18, 2016) ............................14

*United States v. Sharpeta*,
   No. 10-777, 2012 U.S. Dist. LEXIS 34359 (D. Md. Mar. 14, 2012) ....................................21

*United States v. Stewart*,
   287 F.Supp.2d 461 (S.D.N.Y. 2003) ....................................................................................21

*Von Bulow v. Von Bulow*,
   811 F.2d 136 (2d Cir. 1987) ................................................................................................20

*Williamson v. Puritan Chemical Co.*,
   No. 80 Civ. 1698, 1981 U.S. Dist. LEXIS 11361 (S.D.N.Y. Mar. 6, 1981) .........................16

**Rules**

Fed. R. Civ. P. 26(b)(1) ...................................................................................................................9

Fed. R. Civ. P. 30(c) .....................................................................................................................14

Fed. R. Civ. P. 37(a)(1) ...................................................................................................................9

Fed. R. Civ. P. 37(a)(5)(A) ...........................................................................................................23

Fed. R. Evid. 612 ............................................................................................................14, 15, 19

Fed. R. Evid. 612(a) ......................................................................................................................14

Fed. R. Evid. 612(b) ......................................................................................................................14

Conn. Rules of Prof'l Conduct 7.3(a) ..............................................................................................2

Defendant World Wrestling Entertainment, Inc. ("WWE") hereby submits this memorandum of law in support of its motion to compel Plaintiff Scott Levy ("Levy") to (1) produce and provide testimony concerning an unsolicited March 16, 2016 email sent to Levy by Attorney Matthew Peterson prior to the formation of their attorney-client relationship, and (2) provide testimony concerning a meeting with Attorney Peterson and Plaintiff Marcus Bagwell ("Bagwell") in late 2016 or early 2017 that was also attended by a non-party, Levy's ex-wife, and produce all withheld communications that were shared with her.

I.   **INTRODUCTION**

This motion to compel has been necessitated by Levy's improper failure to produce documents and refusal to provide testimony based on spurious claims of privilege and improper instructions not to answer questions during his deposition.

First, Levy has refused to produce or provide testimony concerning an unsolicited March 16, 2016 email from Attorney Peterson purporting to provide Levy with a "case analysis" of a WWE Network royalties claim *prior to* the formation of an attorney-client relationship.  The March 16, 2016 email from Attorney Peterson was the *initial* communication between Levy and Attorney Peterson and appears to have been a second improper solicitation of a former performer to join this lawsuit.[1]  Levy had not asked Attorney Peterson to send him that email, had not

_____

[1] Prior to the lawsuits filed by Attorney Peterson, no former WWE performer had ever claimed an entitlement to royalties for works on the WWE Network or had ever objected to a royalty statement on the grounds that they had not been not paid royalties associated with the WWE Network.  Plaintiff Bagwell has already admitted in a publicly-recorded interview that he was solicited to join this lawsuit on a phone call from Attorney Peterson.  After stating he was directly solicited by Attorney Peterson, Bagwell stated:   "So this isn't something that just happened.  It's just something that just became relevant because I would never hire a lawyer, go out and do this. . . . If I have a lawyer call me up and go, 'hey, let me do this and let's see what we can do.'  Hey brother, knock yourself out."  (Ex. A, Transcript of Interview with Buff Bagwell on Pancakes and Powerslams, Episode 233, September 12, 2016, at 8.)  Still later in the interview, Bagwell stated:  "I didn't go out and hire a lawyer to do this.  This is something that

sought legal advice from or communicated with Attorney Peterson before the email was received, and knew nothing about Attorney Peterson prior to receiving the email. Levy then waited nearly a month after receiving the email to call Attorney Peterson for the first time and did not enter into a retention agreement with the Krislov Firm where Attorney Peterson was employed until more than five months *after* receiving the email. Plainly, no attorney-client relationship existed when Levy received the e-mail because he had never even spoken with Attorney Peterson or anyone from his firm. Because the March 16, 2016 email was sent prior to the formation of an attorney-client relationship, it cannot be privileged. Moreover, even if the email were privileged, it must be disclosed because Levy admitted that he reviewed the email in preparation for his deposition testimony and used it to refresh his recollection.

<u>Second</u>, Levy has improperly refused to provide testimony concerning discussions at a meeting with Attorney Peterson and Plaintiff Bagwell in late 2016 or early 2017 that was also attended by a non-party, Levy's ex-wife. Levy's ex-wife was not acting as an agent or employee of Levy or Attorney Peterson, was not necessary to facilitate the consultation between them, and served no function at the meeting. Levy testified that the reason he brought his ex-wife to the meeting was simply "because she's my significant other." The presence of Levy's ex-wife at the meeting destroyed the confidentiality of any attorney-client communications and therefore vitiated any privilege that otherwise might have attached to the discussions at the meeting.

---

was presented to me and it will not cost me a dime. And if I can do that who wouldn't do what I'm doing, everybody would. And that's basically what happened." (*Id.* at 9.) Such solicitation constitutes a violation of the Rules of Professional Conduct. *See* Conn. Rules of Prof'l Conduct 7.3(a) ("[A] lawyer shall not initiate personal, live telephone, or real-time electronic contact, including telemarketing contact, for the purpose of obtaining professional employment.").

Because Levy's claims of privilege are baseless, the Court should compel him to produce and provide testimony concerning the unsolicited March 16, 2016 email from Attorney Peterson and the non-confidential meeting with Attorney Peterson.[2]

## II.   BACKGROUND

### A.   The March 16, 2016 Email from Attorney Peterson

It is undisputed that Attorney Peterson solicited Levy to join this lawsuit before Levy retained him as counsel.  The *initial* communication between Levy and any counsel in this case was an unsolicited email from Attorney Peterson *to* Levy providing what has been described on Plaintiff's privilege log as a "case analysis of WWE Network royalties claim" on March 16, 2016.  (*See* Ex. C, Pl.'s Privilege Log, dated August 7, 2017, Entry 15; Ex. D, Pl.'s Privilege Log, dated September 22, 2017, Entry 1; Ex. E, Pl.'s Supplemental Resp. to Def.'s Third Req. for Produc. of Docs., dated October 5, 2017, Resp. to No. 8.)

Levy testified that he reviewed the March 16, 2016 email from Attorney Peterson in preparation for his deposition and that it refreshed his recollection as to its contents:

---

[2] Throughout the course of his deposition, Levy's counsel repeatedly instructed him not to provide testimony concerning several other topics based on questionable or specious claims of privilege.  For example, Levy's counsel instructed him not to answer questions concerning:  (1) why he did not join the lawsuit when it was originally filed (Ex. B, Levy Dep. at 72-74); (2) whether there was even a conversation with counsel about whether Levy would be an original party to the lawsuit (*id.* at 146-147); (3) why Levy did not file a lawsuit for many years after he was told by WWE that it did not pay royalties on WCW or ECW works (the instruction not to answer this question was eventually withdrawn after Levy admitted that his decision was not based on any legal advice he received) (*id.* at 103-107); (4) conversations with his attorneys about the substance of his testimony during breaks in the deposition (*id.* at 110-112); (5) the specific royalty issue that Levy was dealing with in 2012 (*id.* at 113-114); (6) why Levy did not take any legal action regarding royalties in 2012 or 2014 (*id.* at 114-115); (7) whether Attorney Peterson ever asked Levy to introduce him to other wrestlers (*id.* at 140-141); and (8) whether Levy intends to pursue his claims if this case is not certified as a class action in view of his interrogatory response that he is not asserting an individual damages claim (*id.* at 222-225).  Despite the repeated obstruction of examination on these topics, WWE has limited this motion to compel to the improper instructions on the two issues discussed herein but reserves its rights to seek future relief in connection with these other issues.

Q.      Did you review any documents that had been sent to you by Matthew Peterson?

A.      Yes.

Q.      What were the documents that you reviewed that had been sent to you by Matthew Peterson? . . .

A:      Yes, an E-mail that he sent to me . . .

Q.      What was the date of the E-mail?

A.      It was March of 2016.

Q.      March 16th?

A.      I believe so.

Q       And when you reviewed that E-mail did it refresh your recollection about what he had said?

A.      Yes.

(Ex. B, Levy Dep. at 17-18.)

Levy squarely admitted that he had never communicated with Attorney Peterson before he received the March 16, 2016 email and had not asked him to send that email:

Q.      How did you first hear of Matthew Peterson?

A.      He contacted me.

Q.      How did [he] contact you?

A.      By E-mail.

Q.      Is that the March 16th one that you just described earlier?

A.      I believe so.

Q.      The E-mail that you reviewed yesterday?

A.      Yes, sir.

Q      And prior to receipt of that E-mail you had not heard of him.  Is that correct?

A.      I don't recall.

Q.      You hadn't spoken to him though.  Correct?

A.      Correct.

Q.      And you hadn't asked him to send you that E-mail, did you?

A.      No. . .

(*Id.* at 54-55.)  Levy also never provided Attorney Peterson with a copy of his contract with WWE before receiving the email purporting to provide him with a "case analysis" of potential contractual claims against WWE.  (*Id.* at 62.)

In a transparent attempt to mitigate the plain fact that Attorney Peterson had solicited him to join the lawsuit, Levy attempted to concoct a cover story suggesting that Attorney Peterson, an otherwise obscure associate in a Chicago firm, somehow was responding to "feelers" put out by Levy.  In reality, Levy was actually represented by another attorney at the time.  (*Id.* at 56.) Levy nevertheless claimed that he had told certain "colleagues" that he was looking for an attorney to pursue claims against WWE, yet could not name *any* of these friends and had no knowledge of what these unknown friends did after he allegedly spoke with them.

A.      . . . I had put out the word to my colleagues that I was looking for someone -- a lawyer who could -- I could engage who knew some of the intricacies of the WWE in order to pursue avenues of relief against the WWE, for I felt that they had harmed me by their actions.

Q.      Who [were] those colleagues?

A.      I don't recall.

Q.      And what did they do when you told them that?

A.      I assume -- I would have to speculate on what they said.

Q.      I don't want your speculation.  Do you have any knowledge of what they did?

A.      No.

Q.      So you can't tell me what unnamed persons did in response to this solicitation to put the word out.  Is that your testimony?

A.      I would imagine that they put the word out.

Q.      I don't want you to imagine.  What do you have personal knowledge about?

A.      I don't recall.

(*Id.* at 55-56.)   Because Levy, a Georgia resident, could not identify any of the friends he allegedly spoke with or what actions they may have taken after he spoke with them, he could not testify as to whether any of them actually contacted Attorney Peterson, an associate at a Chicago firm who knew nothing about the intricacies of WWE.  (*Id.* 55-58, 132.)  Levy admitted that he knew nothing about Attorney Peterson's background or experience at the time he received the March 16, 2016 email.  (*Id.* at 62, 127-128.)

After receiving the email on March 16, 2016, Levy waited nearly *one month* to call Attorney Peterson for the first time on April 11, 2016.  (*See* Ex. B, Levy Dep. at 134-135; Ex. E, Pl.'s Supplemental Resp. to Def.'s Third Req. for Produc. of Docs., dated October 5, 2017, Resp. to Nos. 6-7; Ex. F, Phone Record.)  As a result of his discussions with Attorney Peterson, Levy learned that he had a potential legal claim relating to WWE Network royalties.  (Ex. G, Pl.'s Supp. Resp. to Def.'s First Set of Interrogs., dated August 7, 2017, Resp. to Interrog. 9.)

Levy nevertheless waited more than another *five months* after receiving the March 16, 2017 email to execute a retention agreement with the Krislov Firm on August 25, 2016.[3]  (*See*

---

[3] Levy did not join the lawsuit filed by the Krislov Firm on behalf of Rene Goguen on April 6, 2016.  *See Goguen v. World Wrestling Entertainment, Inc.*, No. 3:16-cv-00542-SRU (Doc. No.

Ex. H, Levy Fee Agreement.)  Despite the absence of any retention agreement prior to August 25, 2016, there were dozens of communications between Levy and Attorney Peterson before that date that were withheld from production based on claims of privilege.  (*See* Ex. C, Pl.'s Privilege Log, dated August 7, 2017, Entries 12-13, 16-36, 38-39; Ex. D, Pl.'s Privilege Log, dated September 22, 2017, Entries 22-34, 38-40, 42-43, 67-70, 73-75.)

Levy has steadfastly refused to produce the unsolicited March 16, 2016 email sent to him by Attorney Peterson prior to the formation of their attorney-client relationship and has objected to providing any testimony about the email on the basis of the attorney-client privilege and the work product doctrine.  (*See* Ex. B, Levy Dep. 60-61; Ex. I; Pl.'s Supp. Resp. to First Req. for Produc. of Docs., dated October 20, 2017, Resp. to Nos. 31, 43.)

### B.     The Meeting Attended By Levy's Ex-Wife

Levy only met Attorney Peterson and Plaintiff Bagwell on one occasion in late 2016 or early 2017 for approximately an hour at a restaurant in Atlanta, Georgia.  (Ex. B, Levy Dep. at 19-20, 53.)   Levy testified that this meeting was also attended by his ex-wife, Marguerite Reynolds, who he brought to the meeting "because she's my significant other." (*Id.* at 52-53.)

> Q.      And I think you indicated you have talked to Mr. Bagwell about this lawsuit.
>
> A.      Only, I believe, at the restaurant where we met Matthew Peterson.
>
> Q.      So he was at that meeting too?
>
> A.      Yes.
>
> Q.      Who else was at the meeting?

---

1).  He also did not at first join the lawsuit filed by the Krislov Firm on behalf of Bagwell on August 9, 2016.  *See Bagwell v. World Wrestling Entertainment, Inc.*, No. 3:16-cv-01350-JCH (Doc. No. 1).  Levy did not become a plaintiff in this action until the First Amended Complaint was filed on November 7, 2016.  (*Id.* Doc. No. 35.)

A.      I brought my significant other.

Q.      Who is that?

A.      Marguerite Reynolds.

Q.      When you say "significant other," are you engaged to her –

A.      She's my ex-wife, best friend, and significant other.

Q.      All right.  So there's you, Mr. Bagwell -- Did he bring anybody?

A.      No.

Q.      He didn't bring his wife?

A.      No.

Q.      Mr. Peterson -- Anybody else?

A.      I don't think so.

Q.      How long was the meeting?

A.      An hour I guess.

Q.      What was discussed in the meeting?

MR. ZAGRANS:      Objection.  I'm going to instruct you not to answer the question.

MR. McDEVITT:      On what grounds?

MR. ZAGRANS:      Attorney/client privilege.

MR. McDEVITT:      You heard the testimony who was present at the meeting.

MR. ZAGRANS:      I did.

BY MR. McDEVITT:

Q.      Did your significant other talk during this meeting?

A.      I imagine so.

Q.      Why did you take her?

A.      Because she's my significant other.

Q.      Did you want her to hear what was said.

A.      She manages me in a way, unofficially.

*****

Q.      You say she's your sort of semi-official business advisor?

A.      She's my life advisor.

(*Id.* at 52-53, 64.)   Despite the testimony concerning the presence of Ms. Reynolds at the meeting, Levy's counsel instructed him not to answer any questions concerning the discussions at the meeting on the grounds of the attorney-client privilege.  (*Id.* at 53, 67-68.)  In addition, Levy has withheld numerous other documents or communications that he sent to or shared with Ms. Reynolds on the basis of specious claims that they are privileged.  (*See* Ex. D, Pl.'s Privilege Log, dated September 22, 2017, Entries 6, 58-59, 62, 64, 81-83.)

## III.  <u>LEGAL STANDARD</u>

"[A] party may move for an order compelling disclosure or discovery."  Fed. R. Civ. P. 37(a)(1).  "The party resisting discovery bears the burden of showing why discovery should be denied."  *Cole v. Towers Perrin Forster & Crosby*, 256 F.R.D. 79, 80 (D. Conn. 2009).  "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).

"The attorney-client privilege is strictly construed because it tends to prevent a full disclosure of the truth in court."  *Ullmann v. State*, 230 Conn. 698, 710 (1994) (internal quotation marks omitted).  "The burden of proving each element of the privilege, by a fair preponderance of the evidence" rests with "the party seeking to assert the privilege."  *PSE Consulting, Inc. v. Frank Mercede & Sons, Inc.*, 267 Conn. 279, 330 (2004).  Similarly, "[t]he party asserting work

product protection has the burden to prove that the doctrine applies." *Lindholm v. Lindholm*, No. FA9801672992S, 1999 Conn. Super. LEXIS 2784, at *6 (Conn. Super. Ct. Oct. 15, 1999).

## IV.    ARGUMENT

### A.    Levy Should Be Compelled to Produce the March 16, 2016 Email.

Levy should be compelled to produce the March 16, 2016 email sent to him by Attorney Peterson for two independent reasons.  First, the document is not privileged since it was sent prior to the existence of an attorney-client relationship.  Second, even assuming that the document were privileged, it was reviewed by Levy prior to testifying at his deposition in order to refresh his recollection and therefore should be disclosed.

#### 1.    The March 16, 2016 Email Is Not Privileged.

The evidence clearly shows that Attorney Peterson sent the March 16, 2016 email to Levy in an attempt to solicit him to join this lawsuit, just as he did with Bagwell.  Levy cannot meet his burden of establishing that the email is protected by either the attorney-client privilege or the work product doctrine because it was sent prior to formation of an attorney-client relationship with Attorney Peterson.

The existence of an attorney-client relationship is an "essential predicate to invocation of the privilege."  *In re Bonanno*, 344 F.2d 830, 831 (2d Cir. 1965).  "An attorney-client relationship is established when the advice and assistance of the attorney is sought and received in matters pertinent to his profession.  The burden of establishing an attorney-client relationship is on the party claiming the existence of such a relationship."  *DiStefano v. Milardo*, 276 Conn. 416, 422 (2005) (internal citation omitted).  "That burden is not, of course, discharged by mere conclusory or *ipse dixit* assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed."  *In re Bonanno*,

344 F.2d at  833.  "Evidence of either a retainer agreement or a contract between the parties is relevant to the determination of its existence."  *DiStefano*, 276 Conn. at 422.  "Communications which occur prior to the establishment of an attorney-client relationship are not privileged, even if an attorney-client relationship is later established."  *EEOC v. CRST Van Expedited, Inc.*, No. C07-0095, 2009 U.S. Dist. LEXIS 3621, at *9 (N.D. Iowa Jan. 20, 2009).

Documents or communications soliciting a plaintiff to participate in a lawsuit are not protected by the attorney-client privilege because they are made prior to the existence of an attorney-client relationship.  *See Fangman v. Genuine Title, LLC*, No. RDB-14-0081, 2016 U.S. Dist. LEXIS 79166, at *12-14 (D. Md. June 17, 2016) ("solicitation letters are not privileged because an attorney-client relationship had not yet been established" and "documents reflecting communications and solicitation letters sent to potential class members" are "not privileged") (internal citations and quotation marks omitted); *EEOC*, 2009 U.S. Dist. LEXIS 3621, at *9-14 ("Merely sending a letter to potential class members, or calling potential class members when they failed to respond to the letter, does not establish an attorney-client relationship. Accordingly, representations made in those communications in an effort to persuade the employee to join the class are not protected by the attorney-client privilege."); *Auscape Int'l v. Nat'l Geographic Soc'y*, No. 02 Civ. 6441, 2002 U.S. Dist. LEXIS 26318, at *2-4 (S.D.N.Y. Oct. 8, 2002) ("[L]etters to prospective clients to encourage their involvement in a class action and a proposed form of retainer agreement, regardless of whether the sending of them was in furtherance of the interests of existing clients, are not communications between attorney and client and are not confidential.  They are, in significant measure, direct mail advertising.").

Documents or communications soliciting a plaintiff to join a lawsuit prior to the existence of an attorney-client relationship also are not protected by the work product doctrine.  *See*

*Fangman*, 2016 U.S. Dist. LEXIS 79166, at *10-11 (holding that solicitation materials are not shielded from discovery by the work product doctrine); *EEOC,* 2009 U.S. Dist. LEXIS 3621, at *13-14 (holding that solicitation letters sent to prospective class members or representations made to prospective class members prior to the establishment of an attorney-client relationship are not protected by the work product doctrine and that the defendant "has a substantial need for the information, but cannot without undue hardship, obtain the information by other means").[4]

The March 16, 2016 email is nothing more than an improper attempt to solicit Levy's participation in this lawsuit by Attorney Peterson.  Attorney Peterson first initiated contact with Levy by sending him the email on March 16, 2016.  No privilege or relationship of any kind existed at that time.  Levy had not asked Attorney Peterson to send him that email, had not contacted Attorney Peterson to seek legal advice, and had no prior communication with Attorney Peterson at all prior to receiving the email.  Levy also had never sent Attorney Peterson a copy of

---

[4] Documents or communications soliciting a plaintiff's participation in this lawsuit are also plainly relevant to the merits of the plaintiff's claims and his credibility and to class certification issues, including the adequacy of class counsel and the class representatives.  *See EEOC v. CRST Van Expedited, Inc.*, No. C07-0095, 2009 U.S. Dist. LEXIS 3621, at *13-14 (N.D. Iowa Jan. 20, 2009) ("The Court believes that representations made to prospective class members in order to induce their participation in the lawsuit is relevant to the issue of their credibility."); *Fangman v. Genuine Title, LLC*, No. RDB-14-0081, 2016 U.S. Dist. LEXIS 79166, at *12-14 (D. Md. June 17, 2016) ("documents reflecting communications and solicitation letters sent to potential class members should be produced in discovery because they are relevant to class certification and not privileged") (internal quotation marks and citation omitted); *Pilcher v. Direct Equity Lending*, No. 99-1245, 2000 U.S. Dist. LEXIS 19811, at *4, 11-12 (D. Kan. Dec. 22, 2000) (granting motion to compel documents and answers regarding whether plaintiffs' counsel engaged in unethical solicitation of prospective plaintiffs and class members because such information was relevant to class certification issues and not privileged).  Numerous courts have held that evidence of solicitation of plaintiffs in class action cases in violation of applicable ethical rules constitutes an abuse of the class action device and may provide a basis for denying class certification.  *See Bodner v. Oreck Direct, LLC*, No. 06-4756, 2007 U.S. Dist. LEXIS 30408, at *5-7 (N.D. Cal. Apr. 25, 2007);  *Ogden v. AmeriCredit Corp.*, 225 F.R.D. 529, 535 (N.D. Tex. 2005); *Carlisle v. LTV Electrosystems, Inc.*, 54 F.R.D. 237, 240 (N.D. Tex. 1972); *Buford v. American Finance Co.*, 333 F. Supp. 1243, 1251 (N.D. Ga. 1971); *Taub v. Glickman*, No. 67 Civ. 3447, 1970 U.S. Dist. LEXIS 9352, at *6-7 (S.D.N.Y. Dec. 1, 1970); *Meachum v. Outdoor World Corp.*, 654 N.Y.S.2d 240, 251 (1996).

his contract before receiving the email purporting to provide him with a "case analysis."  Levy had not even heard of Attorney Peterson and did not know anything about his background or experience at the time he received the email.  Indeed, Levy did not even speak to Attorney Peterson until almost one month later when Levy called him for the first time on April 11, 2016.  Levy did not sign a retainer agreement with the Krislov Firm until more than five months later on August 25, 2016 and did not become a plaintiff in this action until November 7, 2016.[5]

There obviously could be no attorney-client relationship with Attorney Peterson before Levy even communicated with him.  *See In re Gold*, 533 B.R. 851, 859 (D. Conn. 2015) ("The relationship is based on principles of agency, so the attorney must be authorized to act for the client, and the client must exercise control over the attorney, for a relationship to exist.") (internal quotation marks omitted).  Because no attorney-client relationship between Levy and Attorney Peterson existed at the time the March 16, 2016 email was sent, it is not protected from disclosure by either the attorney-client privilege or the work product doctrine.  *See Linnell v. Linnell*, No. FA064010515, 2010 Conn. Super. LEXIS 521, at *10 (Conn. Super. Ct. Feb. 16, 2010) ("Without the presence of an attorney-client relationship, the possibility of protecting the materials requested from discovery is unavailable under both the attorney client privilege and the work product doctrine.").  Accordingly, Levy should be compelled to produce the March 16, 2016 email and to provide testimony concerning it.

---

[5] WWE acknowledges that an attorney-client relationship may be formed prior to the execution of a formal retention agreement in certain circumstances where *the client* consults with an attorney in anticipation of retaining them.  *See United States v. Dennis*, 843 F.2d 652, 656-657 (2d Cir. 1988).  However, such cases are plainly distinguishable from those involving communications from *the attorney* soliciting potential clients to join a lawsuit, which are not privileged because they necessarily occur prior to the existence of an attorney-client relationship.

### 2.   <u>The March 16, 2016 Email Was Used to Refresh Levy's Recollection.</u>

In addition to not being privileged, the March 16, 2016 email should be produced for a separate and independent reason under Federal Rule of Evidence 612 because Levy used the email to refresh his recollection prior to testifying at his deposition.

Federal Rule of Evidence 612 "gives an adverse party certain options when a witness uses a writing to refresh memory: (1) while testifying; or (2) before testifying, if the court decides that justice requires the party to have those options." Fed. R. Evid. 612(a).  It provides that "an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness about it, and to introduce in evidence any portion that relates to the witness's testimony." Fed. R. Evid. 612(b).  The purpose of Rule 612 is "to promote the search of credibility and memory." *Id.* advisory committee's notes.

"Rule 612 is designed to allow access to documents that have influenced the witness' testimony, and thus materials used to refresh a witness' recollection prior to deposition are generally subject to disclosure despite the attorney-client privilege and the work product doctrine." *Bank Hapoalim, B.M. v. American Home Assurance Co.,* No. 92 Civ. 3561, 1993 U.S. Dist. LEXIS 1300, at *7 (S.D.N.Y. Feb. 8, 1993) (internal citations omitted). "[W]hen confronted with the conflict between the command of Rule 612 to disclose materials used to refresh recollection and the protection afforded by the attorney client privilege[,] the weight of authority holds that the privilege is waived." *Ehrlich v. Howe*, 848 F. Supp. 482, 493 (S.D.N.Y. 1994)  (internal quotation marks and ellipses omitted).[6]  Rule 612 is applicable to depositions pursuant to Federal Rule of Civil Procedure 30(c).  *Id.* at 494.

---

[6] *See also United States v. HCA, Inc.*, No. 13-23671, 2016 U.S. Dist. LEXIS 121441, at *3-4 (S.D. Fla. Apr. 18, 2016) ("Most courts, however, have ordered the production of privileged material used to refresh a witness['s] recollection before testifying."); *Poseidon Capital Corp. v.*

Federal courts in Connecticut have adopted a "functional analysis approach" to determining whether privileged documents used to refresh the recollection of a witness prior to testifying at a deposition should be produced. *Calandra v. Sodexo, Inc.*, No. 3:06CV49, 2007 U.S. Dist. LEXIS 31418, at *10-11 (D. Conn. Apr. 27, 2007). Under this approach, "if a court found that the documents can be said to have a sufficient impact on the witness' testimony[,] then a balancing test [must] consider such factors as whether production is necessary for fair cross-examination or whether the examining party is simply engaged in a fishing expedition." *Donjon Marine Co. v. Buchanan Marine, L.P.*, No. 3:09CV1005, 2010 U.S. Dist. LEXIS 73136, at *4-6 (D. Conn. July 21, 2010) (internal quotation marks and ellipses omitted).

Considering the relevant factors, numerous courts in this circuit have ordered the production of documents that were used to refresh the recollection of a witness prior to deposition testimony notwithstanding the fact that such documents were protected by the attorney-client privilege or the work product doctrine. See *Abu Dhabi Commer. Bank v. Morgan Stanley & Co.*, No. 08 Civ. 7508, 2011 U.S. Dist. LEXIS 122325, at *13-17 (S.D.N.Y. Oct. 14, 2011) (granting motion to compel production of written answers that witness used for purposes of refreshing recollection prior to the deposition); *Thomas v. Euro RSCG Life*, 264 F.R.D. 120, 122 (S.D.N.Y. 2010) (holding that attorney-client privilege was waived with respect to notes that witness reviewed close in time to her deposition testimony); *Barcomb v. Sabo*, No. 07-CV-877, 2009 U.S. Dist. LEXIS 120402, at *25-26 (N.D.N.Y. Dec. 28, 2009) (ordering production of

---

*Nicolet Instrument Corp.*, No. 85 Civ. 6118, 85 Civ. 6151, 1985 U.S. Dist. LEXIS 13704, at *12-13 (S.D.N.Y. 1985) ("The weight of authority extends the provisions of Rule 612 even to documents subject to a claim of privilege, and holds that the use of protected documents to refresh a witness' memory prior to testifying constitutes a waiver of the privilege."); *James Julian, Inc. v. Raytheon Co.*, 93 F.R.D. 138, 145 (D. Del. 1982) ("those courts which have considered the issue have generally agreed that the use of protected documents to refresh a witness' memory prior to testifying constitutes a waiver of the protection").

documents that were reviewed by witness prior to deposition testimony and were directly relevant to the plaintiff's theory of the case); *EEOC v. Johnson & Higgins, Inc.*, No. 93 Civ. 5481, 1998 U.S. Dist. LEXIS 17612, at *39-40 (S.D.N.Y. Nov. 5, 1998) (ordering witness to produce a handwritten note that he had "reviewed to refresh his recollection in preparing for the deposition"); *Bank Hapoalim, B.M. v. American Home Assurance Co.,* No. 92 Civ. 3561, 1994 U.S. Dist. LEXIS 4091, at *16 (S.D.N.Y. Apr. 1, 1994) (ordering production of documents that witness had reviewed in preparation for his deposition); *Lawson v.  United States, Dep't of Veterans Affairs*, No. 97 Civ. 9239, 1998 U.S. Dist. LEXIS 8637, at *3-4 (S.D.N.Y. June 11, 1998) (ordering the production of transcripts that the witness used to prepare for the deposition); *Jolly v. Coughlin*, No. 92 Civ. 9026, 1995 U.S. Dist. LEXIS 11944, at *3 (S.D.N.Y. Aug. 16, 1995) (ordering the production of a privileged document used to refresh a witness' recollection that "relates to an important issue in the litigation" and "would be a valuable source of material for cross examination"); *Redvanly v. NYNEX Corp.*, 152 F.R.D. 460, 469-472 (S.D.N.Y. 1993) (ordering disclosure of meeting notes that witnesses reviewed to refresh their recollections prior to their depositions); *In re Joint Eastern & Southern Dist. Asbestos Litigation*, 119 F.R.D. 4, 5-6 (D.N.Y. Jan. 26, 1988) (ordering disclosure of work product materials because such documents focus on the crucial issue in the case and "[t]he documents used by plaintiff to prepare for deposition on that issue are necessary to defendants in order to test the credibility and memory of the witness and to determine what effect the document review had upon the witness' testimony"); *Poseidon Capital Corp. v. Nicolet Instrument Corp.*, No. 85 Civ. 6118, 85 Civ. 6151, 1985 U.S. Dist. LEXIS 13704, at *12-13 (S.D.N.Y. 1985) (ordering the production of a notebook recording an attorney's advice to a client reviewed by the witness prior to his testimony); *Williamson v. Puritan Chem. Co.*, No. 80 Civ. 1698, 1981 U.S. Dist. LEXIS 11361,

at \*3-5 (S.D.N.Y. Mar. 6, 1981) (stating that "a witness's use of attorney-client material to refresh his recollection before appearing at a deposition constituted a waiver of the attorney-client privilege as to those specific documents" and that "[t]he interests of justice are furthered by allowing even-handed access to the materials relied upon by [the witness] to refresh his recollection."); *Peck & Peck, Inc. v. Jack La Lanne Fifth Ave. Health Spa, Inc.*, No. 76 Civ. 4020, 1978 U.S. Dist. LEXIS 20202, 9-17 (S.D.N.Y. Jan. 12, 1978) (stating that "if a witness examines trial preparation material before testifying, in order to prepare his testimony and for the purpose of refreshing recollection, any privilege previously enjoyed by the document is deemed waived, and the court in its discretion may direct that the opposing party inspect the document for the purpose of conducting a full and meaningful cross-examination of the witness.").

Balancing the relevant factors, this Court should compel Levy to produce the March 16, 2016 email from Attorney Peterson regardless of whether it is protected by the attorney-client privilege or the work product doctrine, which it is not.  First, Levy admitted that he reviewed the email from Attorney Peterson the day before his deposition testimony and that it refreshed Levy's "recollection about what he had said."  (Ex. B, Levy Dep. at 17-18.)

Second, the email clearly had an impact on Levy's testimony concerning how Attorney Peterson came in contact with him and how Levy ultimately became involved in this lawsuit. Since the email also provided a "case analysis" with respect to claims for royalties on the WWE Network, it likely also affected Levy's testimony concerning the claims asserted in this case.  For example, Levy admitted that WWE never told him that he would be paid royalties on WCW or ECW works and would not have done so because it did not own such works at the time he entered into his contract with WWE.  (*Id.* at 98-99.)  However, Levy testified that his claim for royalties on WCW and ECW works was based on the theory that his prior contracts with WCW

and ECW somehow merged into his WWE contract.  (*Id.* at 212-213, 230-231.)  That aspect of Levy's testimony reflected the original theory of the case that was previously advanced by Attorney Peterson in earlier complaints.  Thus, it is very likely that the case analysis provided by Attorney Peterson in March 2016 echoed the original theory and influenced Levy's testimony regarding his understanding of his claims.  Levy's refusal to disclose the document has prevented WWE from knowing the full extent it has impacted his testimony.  *See In re Joint Eastern & Southern Dist. Asbestos Litigation*, 119 F.R.D. at 5-6 ("Without reviewing the product book, defendants' counsel cannot know or inquire into the extent to which the witness' testimony was affected by counsel's presentation").

Third, disclosure of the email is necessary to provide a fair opportunity for cross-examination of Levy.  The production of the email would enable WWE to test and challenge Levy's credibility with respect to his testimony regarding the events that led to his involvement in this lawsuit and the basis for his assertions regarding his claims in this case.  Indeed, WWE believes that the email would establish that Levy was improperly solicited to join this lawsuit by Attorney Peterson based on legal theories that have been completely discredited.  Levy's refusal to produce the email based on claims of privilege unfairly prevented WWE from examining him about the contents of a document that was used to refresh his recollection and from thoroughly exploring the issues raised by the document.  *See Berkey Photo, Inc. v. Eastman Kodak Co*, 74 F.R.D. 613, 616 (S.D.N.Y. 1977) (stating that "there is not a compelling rationale for the view that counsel may (1) deliver work product to an expert or other witness to be useful to the client but then (2) withhold the material from an adversary who seeks to exploit the fact of this assistance in cross-examining the witness") (internal quotation marks omitted).

Fourth, WWE's request for the March 16, 2016 email does not constitute a fishing expedition.  WWE has made a narrowly tailored request for a single document that was used to refresh Levy's recollection on critical issues in the case and is not seeking production all of the documents that may have been used in connection with preparation for his deposition.

Accordingly, Federal Rule of Evidence 612 provides a wholly independent basis for ordering disclosure of the March 16, 2016 email from Attorney Peterson.

### B.   Levy Should Be Compelled to Testify About the Meeting.

Levy should be compelled to testify about the discussion that occurred during the in-person meeting with Plaintiff Bagwell and Attorney Peterson because the presence of Levy's ex-wife destroyed any privilege that otherwise might have applied to the meeting.

"As a general rule, communications between client and attorney are privileged when made in confidence for the purpose of seeking legal advice."  *Olson v. Accessory Controls & Equip. Corp.*, 254 Conn. 145, 157 (2000)  (internal quotation marks omitted).  "Not every communication between client and attorney, however, is protected by the attorney-client privilege."  *PSE Consulting, Inc.,* 267 Conn. at 330.  "One of the essential elements of the claim of privilege between attorney and client is that the communication be confidential."  *Rienzo v. Santangelo*, 160 Conn. 391, 395 (1971).  "[S]tatements made in the presence of a third party are usually not privileged because there is then no reasonable expectation of confidentiality."  *State v. Cascone*, 195 Conn. 183, 186 (1985).  The only exceptions to this rule are for "certain third parties who are agents or employees of an attorney or client, and who are necessary to the consultation."  *Olson*, 254 Conn. at 157 (internal quotation marks and ellipses omitted).  Thus, "[t]he only recognized exceptions to this rule are when the third party was an interpreter, clerk or agent of the client's attorney."  *State v. Christian,* 267 Conn. 710, 749 (2004).

The Connecticut Supreme Court has held that the presence of a party's wife at a meeting with his attorney destroyed the privilege because her presence was neither requested by counsel nor necessary to the representation. *See State v. Gordon*, 197 Conn. 413, 424 (1985) ("Defense counsel did not initiate [her] attendance at attorney-client conferences or directly seek her assistance in the development of defense strategy.  It appears instead that it was the defendant who encouraged her involvement.  We cannot conclude, therefore, that [she] was constrained by the attorney-client privilege as if she had been a legal associate of defense counsel.").

Connecticut courts also have held that the presence of other family members or relatives at meetings between an attorney and a client vitiated the privilege.  *See Leone v. Fisher*, No. 3:05-CV-521, 2006 U.S. Dist. LEXIS 75571, at *9-16 (D. Conn. Oct. 18, 2006) (holding that correspondence between an attorney and a client's husband was not protected by the attorney-client privilege because the information was not necessary to the representation and could have been communicated by the client herself); *Goddard v. Gardner*, 28 Conn. 172, 175-76 (1859) (holding that a communication between an attorney and client made in the presence of the attorney's son was not privileged); *Fisher v. Aetna Casualty & Sur. Co.*, No. 92-0340399, 1994 Conn. Super. LEXIS 2143, at *2-3 (Conn. Super. Ct. Aug 19, 1994) (holding that discussions during a meeting between the plaintiff and her attorney were not privileged because the meeting took place in the presence of the plaintiff's daughter and her counsel).

Federal courts in this circuit similarly have held that the presence of a family member, close friend, or personal advisor at a meeting with an attorney destroyed the privilege.  *See Von Bulow v. Von Bulow*, 811 F.2d 136, 146-47 (2d Cir. 1987) (ordering the production of documents from an "intimate friend" of the defendant who "attended legal strategy and planning sessions" but lacked "any professional reasons for her attendance" because such documents were not

shielded by the attorney-client privilege); *United States v. Stewart*, 287 F.Supp.2d 461, 464 (S.D.N.Y. 2003) (finding waiver of the attorney-client privilege when defendant forwarded an email from her attorney to her family member); *Saxholm AS v. Dynal, Inc.*, 164 F.R.D. 331, 339-40 (E.D.N.Y. 1996) (holding that plaintiffs failed to establish that the attorney-client privilege applied to a meeting between client and attorney because their "personal advisor" was present and did not serve any function at the meeting).

Several other courts specifically have recognized that the presence of a party's girlfriend or significant other is plainly insufficient to preserve the privilege. *See United States v. Sharpeta*, No. 10-777, 2012 U.S. Dist. LEXIS 34359, at *7 (D. Md. Mar. 14, 2012) ("No confidential communication occurred as the presence of a third party—[client's] girlfriend—during the entire meeting prevented application of the attorney client privilege."); *Curry v. McNeil*, No. 4:07cv351, 2008 U.S. Dist. LEXIS 115899, at *20-21 (N.D. Fla. Oct. 21, 2008) ("The presence of Petitioner's girlfriend during the communication negated the [attorney-client] privilege"); *People v. Investigation into a Certain Weapon*, 113 Misc. 2d 348, 353-354 (N.Y. Sup. Ct. Mar. 8, 1982) (the presence of the defendant's live-in girlfriend at attorney-client meeting contravened the confidentiality of the communication and destroyed the privilege).

Levy cannot satisfy his burden of establishing that the discussions at the in-person meeting were privileged.  The discussions at the meeting were not confidential attorney-client communications because Levy brought his "ex-wife, best friend, and significant other" to the meeting.  (Ex. B, Levy Dep. at 53.)  The presence of Ms. Reynolds destroyed any privilege that otherwise might have applied to the discussions at the meeting.

Levy cannot meet his burden of proving an exception to this rule under governing Connecticut law because he cannot establish that his ex-wife was both (1) an agent or employee of the attorney or the client, and (2) necessary to the consultation between the attorney and client.

First, Ms. Reynolds was not acting as an agent or employee of Attorney Peterson and her presence was neither required or requested by him.  Ms. Reynolds also was not acting as an agent or employee of Levy at the meeting.  Levy's testimony that Ms. Reynolds "manages [him] unofficially" is plainly insufficient to maintain the privilege.  (*Id.* at 53.)  When Levy was asked what was meant by this statement, he clarified that Ms. Reynolds acts as his "life advisor."  (*Id.* at 64.)  A client's "life advisor" does not fall within the definition of an agent of the client recognized by Connecticut courts for purposes of maintaining the attorney-client privilege.

Second, Ms. Reynolds plainly was not necessary to the attorney-client consultation. There is no evidence that her presence was essential to the transmission of information at the meeting or was necessary for the protection of Levy's interests at the meeting.  There also is no evidence that Ms. Reynolds served any function at the meeting other than to accompany Levy. Indeed, Levy testified that the reason that he brought Ms. Reynolds to the meeting was simply "because she's my significant other."  (*Id.* at 53.)

Accordingly, the presence of Ms. Reynolds at the meeting destroyed the attorney-client privilege, and Levy must be compelled to testify about the discussions at the meeting.   In addition, Levy should be required to produce all of the communications listed on his privilege log that were sent to or shared with Ms. Reynolds.  (*See* Ex. D, Pl.'s Plaintiff's Privilege Log, dated September 22, 2017, Entries 6, 58-59, 62, 64, 81-83.)

## V.  <u>CONCLUSION</u>

For the reasons set forth above, the Court should grant WWE's motion to compel Levy to (1) produce and provide testimony concerning the March 16, 2016 email sent to Levy by Attorney Peterson prior to the formation of their attorney-client relationship, and (2) provide testimony concerning his meeting with Attorney Peterson and Plaintiff Bagwell that was also attended by Levy's ex-wife and produce all withheld communications shared with her.  Pursuant to Federal Rule of Civil Procedure 37(a)(5)(A), the Court also should require Plaintiffs to pay WWE its reasonable attorney's fees and expenses incurred in connection with this motion.

DEFENDANT WORLD WRESTLING
ENTERTAINMENT, INC.

By: */s/ Jerry S. McDevitt*
    Jerry S. McDevitt (*pro hac vice*)
    Curtis B. Krasik *(pro hac vice)*
    K&L GATES LLP
    K&L Gates Center
    210 Sixth Avenue
    Pittsburgh, PA 15222
    Phone: (412) 355-6500
    Fax: (412) 355-6501
    Email: jerry.mcdevitt@klgates.com
    Email: curtis.krasik@klgates.com

    Jonathan B. Tropp (ct11295)
    Jeffrey P. Mueller (ct27870)
    DAY PITNEY LLP
    242 Trumbull Street
    Hartford, CT 06103
    Phone: (860) 275-0100
    Fax: (860) 275-0343
    Email: jbtropp@daypitney.com
    Email: jmueller@daypitney.com

    Their Attorneys

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 27, 2017, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

_/s/ Jeffrey P. Mueller_
Jeffrey P. Mueller (ct27870)