# EXHIBIT  B

In the Matter Of:

*MARCUS BAGWELL, ET AL.*

*-vs-*

*WORLD WRESTLING ENTERTAINMENT, INC.*

_____

*SCOTT LEVY*

*October 12, 2017*

_____

```
 1              UNITED STATES DISTRICT COURT

 2                 DISTRICT OF CONNECTICUT

 3                      - - - -

 4  MARCUS BAGWELL and SCOTT LEVY,

 5  individually and on behalf of

 6  all others similarly situated,

 7
            Plaintiffs,
 8

 9    -vs-          CIVIL ACTION NO: 3:16-CV-01350-JCH

10

11  WORLD WRESTLING ENTERTAINMENT,

12  INC.,

13         Defendants.

14

15                    - - - -

16

17         DEPOSITION OF:  SCOTT LEVY

18

19                    - - - -

20

21

22         DATE:  October 12, 2017

23            Thursday, 9:30 a.m.

24

25  Job No. WDC-145088
```

Page 2

```
1   LOCATION:          K&L/GATES
2                      Jerry S. McDevitt, Esq.
3                      Stefanie M. Lacy, Esq.
4                      Curtis B. Krasik, Esq
5                      K&L Gates Center
6                      210 Sixth Avenue
7                      Pittsburgh, PA 15222
8
9
10       TAKEN BY:  Defendant
11
12
13   REPORTED BY:  G. Donavich, RPR, CRR
14                 Notary Public
15                 Ref. No. gd46642
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1            FOR THE DEFENDANT:
2   K&L/GATES
3   Jerry S. McDevitt, Esq.
4   Stefanie M. Lacy, Esq.
5   Curtis B. Krasik, Esq
6   K&L Gates, LLP
7   210 Sixth Avenue
8   Pittsburgh, PA 15222
9   412-355-6500
10
11
12
13
14
15        ALSO PRESENT:
16   Nafi Ayvaci, Video Operator
17
18
19
20
21
22
23
24
25
```

Page 3

```
1            VIDEO DEPOSITION OF SCOTT LEVY,
2   a witness, called by the Defendant for examination,
3   in accordance with the Federal Rules of Civil
4   Procedure, taken by and before G. Donavich, RPR,
5   CRR, a Court Reporter and Notary Public in and for
6   the Commonwealth of Pennsylvania, at the offices of
7   K&L/GATES, K&L Gates Center, 210 Sixth Avenue,
8   Pittsburgh, Pennsylvania, on Thursday, October 12,
9   2017, commencing at 9:30 a.m.
10
                     - - - -
11
12   APPEARANCES:
13         FOR THE PLAINTIFFS:
14   Eric Zagrans, Esq.
15   Michael Silverman, Esq.
16   THE BRUNO FIRM, LLC
17   500 North Michigan Avenue
18   Suite 600
19   Chicago, IL 60611
20   312-321-6481
21   ez@brunolawus.com
22
23
24
25
```

Page 5

```
1            EXAMINATION INDEX
2   SCOTT LEVY
3     BY MR. McDEVITT                              8
4
             EXHIBIT INDEX
5
6   EXHIBIT
7   1    Plaintiff's handwritten letter        32
8   2    Talent summary report                 40
9   3    Correlation of royalty reports        42
10  4    Disner letter                         74
11  5    Complaint                             78
12  6    Opposition to dismiss                 81
13  7    Ichter draft letter                   83
14  8    Judge's Opinion                       89
15  9    Ichter letter                         90
16  10   Memorandum in Support                 95
17  11   Letter re:  Booking Contract          96
18  12   Opinion                              101
19  13   Privilege log                        110
20  14   Law firm web page                    115
21  15   Verified responses                   119
22  16   Supplement                           123
23  17   Response                             132
24  18   Class Action Complaint               138
25  19   Bagwell lawsuit                       144
```

Page 14

1   lawsuit?
2  A.   I don't think so.
3  Q.   So is it your testimony that you haven't
4       talked to any former wrestlers and none have
5       called you about joining this lawsuit?
6            MR. ZAGRANS:  Are you excluding the
7       coplaintiff?
8            MR. McDEVITT:  I don't pay attention
9       when the lawyers do that, so you just have to
10      answer the questions.
11           MR. ZAGRANS:  Well, I'm asking you,
12      Jerry, to clarify the question.
13           MR. McDEVITT:  I'm not here to
14      answer questions.  If you have an objection,
15      make it.
16           MR. ZAGRANS:  I object because it's
17      unclear whether you're including the
18      coplaintiff or not.
19           MR. McDEVITT:  You can answer the
20      question now.
21           THE WITNESS:  Can you repeat the
22      question, please.  I've forgotten all --
23           MR. McDEVITT:  So is it your
24      testimony that no other wrestlers have called
25      you about joining this lawsuit and you haven't

Page 15

1   called any other lawyers -- or any other
2   wrestlers about joining this lawsuit?
3        MR. ZAGRANS:  Objection.
4        THE WITNESS:  I don't recollect.  I
5   know I spoke to Bagwell, but that was after he
6   was already a member of the plaintiff team.
7  BY MR. McDEVITT:
8  Q.   Did you speak to any other wrestlers about
9       this lawsuit?
10 A.   I don't think so.
11 Q.   Who's your best friends in the business?
12 A.   Can you clarify?  Because best friends and
13      business are two different questions.
14 Q.   Who's your best friends from the wrestling
15      business?
16 A.   I don't have any best friends in the business.
17      My best friends are outside of the business.
18 Q.   So you don't have anybody in the business that
19      you would regard as your best friend?
20 A.   No.
21 Q.   Do you have any that you would regard as
22      friends?
23 A.   Yes.
24 Q.   Who?
25 A.   It's a lengthy list.

Page 16

1  Q.   Give me the top five
2  A.   Lodi, Brad Cain -- that would be Lodi; Tommy
3       Dreamer, or Tommy Laughlin is his real name;
4       Shane Douglass or Troy Martin.  I'm taking my
5       time because I'm trying to be precise.
6  Q.   The question is just name five friends from
7       the wrestling business.
8  A.   I thought you wanted my five best friends.
9  Q.   If you want to give me the five best friends,
10      go ahead.
11 A.   That's why I'm delaying.  I'm not sure who my
12      best friends are.  I'm trying to contemplate
13      that.
14 Q.   Well, give me five friends.
15 A.   Sandman, Jim Fullington, Hurricane Helms.
16      That's five, I think.
17 Q.   Did you talk to any of the people you just
18      identified about this lawsuit?
19 A.   No.
20 Q.   What did you do to prepare for your testimony
21      today?
22 A.   I spoke to counsel.
23 Q.   For how long?
24 A.   Ten, twelve hours maybe.  I'm not sure.
25 Q.   Was that yesterday?

Page 17

1  A.   Yesterday and --
2  Q.   Are you finished with your answer or are you
3       thinking?
4  A.   Yesterday I spoke with them.
5  Q.   Was that ten to twelve hours yesterday?
6  A.   Maybe eight, eight to ten.
7  Q.   Were you in Pittsburgh yesterday?
8  A.   Yes.
9  Q.   So were these meetings in person?
10 A.   Yes.
11 Q.   And who was present?
12 A.   Eric Zagrans, my counsel, and Michael
13      Silverman, my counsel.
14 Q.   During that meeting did you review any
15      documents?
16 A.   Yes.
17 Q.   How many documents did you review?
18 A.   A few.
19 Q.   What's a few?  More than ten?
20 A.   No, I don't think so.
21 Q.   More than five?
22 A.   Yeah, I guess five or so.
23 Q.   Did you review any documents that had been
24      sent to you by Matthew Peterson?
25 A.   Yes.

SCOTT LEVY - 10/12/2017                                    Pages 18..21

Page 18

1 Q.   What were the documents that you reviewed that
2      had been sent to you by Matthew Peterson?
3 A.   Wouldn't that be covered by client --
4 Q.   Your job is to answer questions, not ask them.
5 A.   Well, I can't answer that under client
6      confidentiality.
7 Q.   No, you can answer everything unless your
8      lawyer instructs you otherwise.
9           MR. ZAGRANS:  Yeah.  You can tell
10     him -- you can identify any documents you
11     looked at.
12          THE WITNESS:  Yes, an E-mail that he
13     sent to me.
14 BY MR. McDEVITT:
15 Q.   What was the date of the E-mail?
16 A.   It was March of 2016.
17 Q.   March 16th?
18 A.   I believe so.
19 Q.   And when you reviewed that E-mail did it
20     refresh your recollection about what he had
21     said?
22 A.   Yes.
23 Q.   What else did you review?
24 A.   My Interrogatories and other documents.
25 Q.   What other documents?

Page 19

1 A.   I'm not sure specifically.  I'm not sure how
2      you mean --
3 Q.   Just yesterday you did it.  Right?
4 A.   Yes, but by documents do you mean like the
5      supplemental plaintiffs' response?
6 Q.   Anything that's on a piece of paper that you
7      looked at yesterday.
8 A.   I looked at numerous pieces of paper
9      yesterday.
10 Q.   What other pieces of paper did you look at?
11 A.   They all referred to the case, but I don't
12     recall the names of each individual ones.
13     They were lengthy titles that I didn't
14     memorize.
15 Q.   So did you look at any other documents that
16     Matthew Peterson had sent you other than the
17     3-16-2016 E-mail?
18 A.   I don't believe so.
19 Q.   Have you ever met Mr. Peterson?
20 A.   Yes.
21 Q.   In person?
22 A.   Yes.
23 Q.   How many times?
24 A.   Once.
25 Q.   When was that?

Page 20

1 A.   Earlier this year or the end of last year.
2 Q.   Late 2016 or early 2017?
3 A.   Yes.
4 Q.   Where did you meet him?
5 A.   Houston's.
6 Q.   What was the occasion?
7 A.   Because he was my lawyer, we wanted to meet in
8      person so we would have a knowledge of one
9      another more than just a phone without a face.
10 Q.   So you met in Houston, Texas?
11 A.   No, at Houston's Restaurant in Atlanta,
12     Georgia.
13 Q.   That would have been after you filed the
14     lawsuit.  Right?
15 A.   I don't recall.
16 Q.   Did you meet him before you filed the lawsuit?
17 A.   I don't recall.
18 Q.   Well, do you recall if you met him before
19     Thanksgiving of last year?
20 A.   No.
21 Q.   You didn't?
22 A.   I don't know.  I don't recall.
23 Q.   Did you not want to meet him before you filed
24     the lawsuit?
25 A.   One had nothing to do with the other.

Page 21

1 Q.   Why did you eventually want to meet with him?
2 A.   We wanted to meet just so that we would know
3      each other in person.
4 Q.   Whose desire was it to meet?
5 A.   Matthew had suggested it.
6 Q.   So you didn't suggest even meeting him before
7      you filed the lawsuit necessarily?
8 A.   I don't recall the date.
9 Q.   Did you ever travel to Chicago to his law
10     office in Chicago?
11 A.   No.
12 Q.   Did you ever sit down with lawyers in an
13     office in Chicago and review any legal
14     documents that were filed on your behalf?
15 A.   I don't think so.
16 Q.   Did you ever meet Mr. Krislov?
17 A.   No, only by E-mail or by phone perhaps or
18     maybe just by E-mail.
19 Q.   What is your mobile phone number?
20 A.   770-624-4918.
21 Q.   Who is your carrier?
22 A.   AT&T.
23 Q.   So that's been your number and carrier since
24     2016?
25 A.   Yes.

Page 50

1  Q.   Do you have any idea how much you made in
2       video royalties per your royalty reports in
3       the year 2013?
4  A.   I couldn't hazard a guess.
5  Q.   Do you know if it was on a par with what you
6       made in 2002?
7  A.   I wouldn't know.
8  Q.   Does the number 1525.04 sound about right?
9  A.   For what?
10 Q.   For that year.
11 A.   I don't know.
12 Q.   2013.
13 A.   I don't recall.
14 Q.   Do you recall whether you made more or less in
15      royalties after the WW Network was launched,
16      in video royalties?
17 A.   I don't know.
18 Q.   Did you ever compare what you made, for
19      example, in the year before the
20      video's launch -- before the WWE Network
21      launched the video royalties to what you made
22      in the years after that?
23 A.   No.
24 Q.   Did you ever speak with --
25          Strike that.  Do you know Rene

Page 51

1       Goguen?  Am I saying his name right?  He goes
2       by Rene Dupree.
3  A.   Yes.
4  Q.   Do you know him?
5  A.   Yes.
6  Q.   Did you ever speak with him about his lawsuit
7       against the WWE?
8  A.   I don't recall.  I haven't spoke to him in
9       many, many years.
10 Q.   So you haven't spoken to him in many years.
11         So if he brought a lawsuit in 2016,
12      then you probably haven't talked to him since
13      then?
14 A.   I haven't talked to him since way before that.
15 Q.   So you have no recollection of talking to him
16      about the lawsuit?
17 A.   Which lawsuit?
18 Q.   The one he brought.
19 A.   When did he bring a lawsuit?
20 Q.   Before you did.
21 A.   When?
22 Q.   We'll show you that when we get to it, but the
23      first lawsuit was filed against the WWE on
24      behalf of network royalty --
25 A.   I haven't spoke to him since the middle of

Page 52

1       2000 or -- wait -- well before that.
2  Q.   All right.  Did Mr. Peterson ever tell you how
3       he met Mr. Dupree?
4  A.   We never spoke about Mr. Dupree.
5  Q.   And I think you indicated you have talked to
6       Mr. Bagwell about this lawsuit.
7  A.   Only, I believe, at the restaurant where we
8       met Matthew Peterson.
9  Q.   So he was at that meeting too?
10 A.   Yes.
11 Q.   Who else was at the meeting?
12 A.   I brought my significant other.
13 Q.   Who is that?
14 A.   Marguerite Reynolds.
15 Q.   When you say "significant other," are you
16      engaged to her --
17 A.   She's my ex-wife, best friend, and significant
18      other.
19 Q.   All right.  So there's you, Mr. Bagwell --
20          Did he bring anybody?
21 A.   No.
22 Q.   He didn't bring his wife?
23 A.   No.
24 Q.   Mr. Peterson --
25          Anybody else?

Page 53

1  A.   I don't think so.
2  Q.   How long was the meeting?
3  A.   An hour I guess.
4  Q.   What was discussed in the meeting?
5          MR. ZAGRANS:  Objection.  I'm going
6  to instruct you not to answer the question.
7          MR. McDEVITT:  On what grounds?
8          MR. ZAGRANS:  Attorney/client
9  privilege.
10         MR. McDEVITT:  You heard the
11 testimony who was present at the meeting.
12         MR. ZAGRANS:  I did.
13 BY MR. McDEVITT:
14 Q.   Did your significant other talk during this
15      meeting?
16 A.   I imagine so.
17 Q.   Why did you take her?
18 A.   Because she's my significant other.
19 Q.   Did you want her to hear what was said?
20 A.   She manages me in a way, unofficially.
21 Q.   Aside from that meeting that Bagwell was at
22      with you and your significant other and
23      Mr. Peterson in the restaurant, have you had
24      any other conversations with Mr. Bagwell about
25      this lawsuit?

Page 54

1  A.  I don't think so.
2  Q.  So as you sit there your best recollection is
3      you have had the one and only conversation
4      with him, and that was the one in the
5      restaurant you've just described?
6  A.  That I can recall.
7  Q.  Was that meeting before or after you brought
8      this lawsuit?
9  A.  I think it was before.
10 Q.  Do you recall whether there was any discussion
11     about whether Mr. Bagwell had already brought
12     a lawsuit?
13 A.  I don't recall.
14 Q.  How did you first hear of Matthew Peterson?
15 A.  He contacted me.
16 Q.  How did you contact you?
17 A.  By E-mail.
18 Q.  Is that the March 16th one that you just
19     described earlier?
20 A.  I believe so.
21 Q.  The E-mail that you reviewed yesterday?
22 A.  Yes, sir.
23 Q.  And prior to receipt of that E-mail you had
24     not heard of him.  Is that correct?
25 A.  I don't recall.

Page 55

1  Q.  You hadn't spoken to him though.  Correct?
2  A.  Correct.
3  Q.  And you hadn't asked him to send you that
4      E-mail, did you?
5  A.  No.  I asked others --
6          I had put out the word to my
7      colleagues that I was looking for someone -- a
8      lawyer who could -- I could engage who knew
9      some of the intricacies of the WWE in order to
10     pursue avenues of relief against the WWE, for
11     I felt that they had harmed me by their
12     actions.
13 Q.  Who was those colleagues?
14 A.  I don't recall.
15 Q.  And what did they do when you told them that?
16 A.  I assume --
17          I would have to speculate on what
18     they said.
19 Q.  I don't want your speculation.  Do you have
20     any knowledge of what they did?
21 A.  No.
22 Q.  So you can't tell me what unnamed persons did
23     in response to this solicitation to put the
24     word out.  Is that your testimony?
25 A.  I would imagine that they put the word out.

Page 56

1  Q.  I don't want you to imagine.  What do you have
2      personal knowledge about?
3  A.  I don't recall.
4  Q.  You had an attorney at that point, didn't you?
5  A.  Yes.
6  Q.  You had an attorney by the name of Frank
7      Smith, didn't you?
8  A.  Yes.
9  Q.  So why would you need to put the word out if
10     you already had an attorney?
11 A.  Because Frank was too busy to file the case
12     for me.
13 Q.  Frank was too busy to file the case for you?
14 A.  Yes.
15 Q.  And so you put the word out to persons you can
16     no longer even remember who -- that you were
17     looking for somebody else.  Right?
18 A.  I put out to numerous people.  That is why I
19     can't recall it.
20 Q.  Since you left the WWE for the last time, how
21     many attorneys have you retained for purposes
22     of making claims or considering lawsuits
23     against the WWE?
24 A.  I don't know the number and the law firms.
25 Q.  Why don't you tell me all the ones you can

Page 57

1      remember as you sit there.
2  A.  Perrin Disner, but he had some kind of
3      musculature degenerative disease and passed
4      away, and so the case was taken up by David
5      Golub, I believe.
6  Q.  Who else?
7  A.  I don't recall.
8  Q.  How about Cary Ichter?
9  A.  Oh, Cary Ichter, yes.
10 Q.  You had him too, didn't you?
11 A.  I didn't file a lawsuit with him.
12 Q.  Does he no longer represent you?
13 A.  He only represented me for a period when I was
14     forced to go to him to get my monies owed to
15     me by the WWE.
16 Q.  And so you --
17          How many people did you put this
18     supposed word out to?
19 A.  I don't recall.
20 Q.  More than one?
21 A.  Yes.
22 Q.  Would it have been other than these friends
23     that you identified previously?
24 A.  I'm sorry?  The question?
25 Q.  Would you have put the word out to anybody

SCOTT LEVY - 10/12/2017                                       Pages 58..61

Page 58

1    other than these friends that you identified
2    previously?
3 A.   I'm not even sure who I put the would out to
4    that they would be included.
5 Q.   Did you ever make statements that you thought
6    you could bullshit your way through
7    litigation?
8 A.   No.
9 Q.   Never?
10 A.   No.
11 Q.   Did you ever say to anybody that you could
12    bullshit your way through problems in a
13    lawsuit?
14 A.   No
15 Q.   Are you trying to bullshit your way through a
16    problem now, Mr. Levy?
17        MR. ZAGRANS:  Objection.  You don't
18    have to answer that question.
19        On second thought, go ahead and
20    answer that.
21        THE WITNESS:  No.
22 BY MR. McDEVITT:
23 Q.   Well, how long ago was it that you put this
24    word out that you wanted to find somebody?
25 A.   Probably after I found out -- not probably --

Page 59

1    after I found out that the network was in
2    operation and that my likeness, my trademark
3    likeness, was being used and I wasn't
4    receiving royalties for it.
5 Q.   You learned that in 2014.  Right?
6 A.   Excuse me?
7 Q.   You learned that in 2014, didn't you?
8 A.   Whenever the network started.
9 Q.   That was 2014.
10 A.   Then yes.
11 Q.   Did you bring any lawsuits in 2014?
12 A.   No.
13 Q.   Did you bring lawsuits in 2015?
14 A.   No.
15 Q.   Did you have lawyers in 2014?
16 A.   I had my lawyer Frank Smith.
17 Q.   Did you have lawyers in 2015?
18 A.   Frank Smith.
19 Q.   Did you ask Frank Smith for a recommendation
20    of a lawyer who could bring a lawsuit if he
21    couldn't?
22 A.   I might have.
23 Q.   Did he give you a name?
24 A.   He might have.
25 Q.   I know he might have.  Did he?

Page 60

1 A.   I don't know.  I don't recall.
2 Q.   So with all these lawyers that you've had
3    representing you, you're reduced to putting
4    the word out through people you don't even
5    remember to have somebody find a lawyer to
6    represent you.  Is that your testimony?
7        MR. ZAGRANS:  Objection.  Asked and
8    answered.  You can say it again.
9        THE WITNESS:  Cary Ichter wasn't
10    interested, Frank Smith had no time, Perrin
11    Disner was dead.
12 BY MR. McDEVITT:
13 Q.   So when you received this March 16th E-mail,
14    did it come by E-mail?
15 A.   Did the E-mail come by E-mail?
16 Q.   Let me rephrase.  Was it an E-mail?
17 A.   Yes.
18 Q.   How many pages?
19 A.   One.
20 Q.   One page?
21 A.   Yes.
22 Q.   An was it an analysis of your contract?
23        MR. ZAGRANS:  Objection, and in
24    order to protect the objection to the
25    production of that document that we've already

Page 61

1    made I'm going to instruct you not to answer
2    about the content of the document.
3        MR. McDEVITT:  I actually will ask
4    you to produce the document now so that I can
5    examine it
6        MR. ZAGRANS:  I don't have the
7    document.
8        MR. McDEVITT:  He reviewed it last
9    night.  It must have been here in Pittsburgh
10    to be able to review it.
11        MR. ZAGRANS:  We're not producing it
12    because we've already said --
13        MR. McDEVITT:  He's already
14    testified he used it to refresh his
15    recollection for this testimony, so I'm
16    entitled to see the document.
17        MR. ZAGRANS:  He didn't refresh his
18    recollection for purposes of testifying about
19    the contents of the document.
20        MR. McDEVITT:  He testified it
21    refreshed his recollection.
22        MR. ZAGRANS:  Not about the contents
23    of the document.
24        MR. McDEVITT:  So you refuse to
25    produce the document --

Page 62

1        MR. ZAGRANS:  We object consistently
2    about producing that document, yes.
3 BY MR. McDEVITT:
4 Q.   Had you produced your contract to Mr. Peterson
5      by the time that E-mail had been sent to you?
6 A.   That was the first time I had met him.
7 Q.   He sent you an E-mail.  Right?
8 A.   Yes.
9 Q.   You didn't meet him for months after that.
10     Right?
11 A.  Yes.
12 Q.   What did you know about Mr. Peterson when he
13     sent that E-mail?  Anything?
14 A.  I don't recall.
15 Q.   Did you know how long he even practiced law?
16 A.  I don't recall.
17 Q.   Did you know if he was a partner in a law
18     firm?
19 A.  I don't recall.
20 Q.   Did you know if he ever tried a case?
21 A.  I don't recall.
22 Q.   Did you ask him any of those things?
23 A.  I'm sure I asked him many questions --
24 Q.   Did he --
25 A.  -- but not prior to the E-mail.

Page 63

1 Q.   Well, after you got the E-mail did you find
2      out if he ever tried a case?
3 A.   Say that again.
4 Q.   Did you ask him whether he ever tried a
5      lawsuit?
6 A.   I guess; I assume so.
7 Q.   I don't want you to assume anything.  Did you
8      ask him --
9 A.   I don't recall.  I either have to assume or
10     recall, but if I don't recall.
11 Q.   I don't want you to assume anything.  If you
12     don't recall, you don't recall.
13 A.  All right.
14 Q.   Did he tell you whether he had ever tried a
15     lawsuit?
16 A.  I believe he had.
17 Q.   Did he tell you that?
18 A.  I believe so, but I don't recall.
19 Q.   This document that was sent to you on
20     March 16th, who did you send it to?
21 A.  Myself.
22 Q.   Did you give it to anybody else?
23 A.  My attorneys.
24 Q.   Did you show it to your significant other?
25 A.  I don't recall.

Page 64

1 Q.   You say she's your sort of semi official
2      business advisor?
3 A.   She's my life advisor.
4 Q.   You took her to the meetings with him?  You
5      don't recall whether you showed her this
6      document?
7 A.   I don't show her everything.
8 Q.   I understand that, but did you show her that
9      document?
10        MR. ZAGRANS:  Objection.  Asked and
11     answered.  You can answer it again.
12        THE WITNESS:  I don't recall.  That
13     was a long time ago.
14 BY MR. McDEVITT:
15 Q.   Did you send that document to Mr. Smith?
16 A.   I'm not sure.
17 Q.   Did Mr. Peterson ever tell you how he got your
18     E-mail address?
19 A.   We discussed it.
20 Q.   How did you discuss that?
21 A.   He had said someone had contacted him on my
22     behalf.
23 Q.   Who?
24 A.   I don't recall.
25 Q.   Did he tell you who?

Page 65

1 A.   He may have.
2 Q.   I know he may have, but did he?
3 A.   I don't recall.
4 Q.   When did he tell you that somebody may have
5      contacted HIM on your behalf?
6 A.   I don't recall the dates.
7 Q.   When did you first have a telephone call with
8      him?
9 A.   I don't recall.
10 Q.   You received an E-mail in March.  Did you talk
11     to him right after that?
12 A.  I think so.
13 Q.   How long after that?
14 A.  I don't recall.
15 Q.   In that phone call did you ask him how did you
16     get my E-mail address?
17 A.  I imagine so.
18 Q.   Is that when he told you what he told you,
19     what you just testified to, somebody might
20     have given him --
21 A.  That somebody did, yes.
22 Q.   So Mr. Peterson, somebody would know whether
23     somebody called him on your behalf?
24 A.  I guess.  That would be speculating on what he
25     knows.  I don't know what he knows.

SCOTT LEVY - 10/12/2017                                    Pages 66..69

Page 66

1  Q.   Were you told by Mr. Peterson that joining
2       into the lawsuit would not cost you anything?
3           MR. ZAGRANS:  I'm going to object
4       and instruct you not to answer.
5  BY MR. McDEVITT:
6  Q.   Did you sign any fee agreements with the
7       Krislov firm?
8  A.   For?
9  Q.   This case.
10 A.   Not to start the case.
11 Q.   Did you sign a fee agreement for some other
12      purpose?
13 A.   Yes.
14 Q.   What was the other purpose?
15 A.   Because Peterson was leaving the firm and
16      because the Krislov firm felt entitled to
17      monetary entitlements if the case was
18      successful, and since Peterson was leaving the
19      company, that he -- that I wrote an E-mail, I
20      believe, stating that they would receive
21      something if the case went to fruition for
22      their work prior.
23 Q.   When you say "they" would receive something,
24      you mean the Krislov firm?
25 A.   Yes.

Page 67

1  Q.   Did you sign any fee agreement ever with
2       Krislov firm?
3  A.   What do you mean "fee agreement"?
4  Q.   A document that says what their fee will be if
5       they're successful.
6  A.   No.
7  Q.   Did you sign a fee agreement with Peterson?
8  A.   No.
9  Q.   Did Peterson tell you why he left the Krislov
10      firm?
11 A.   Yes.
12 Q.   Why did he leave the firm?
13 A.   He wasn't happy there.
14 Q.   Why?
15 A.   I don't recall.
16 Q.   Did you ever talk to Krislov.
17 A.   Only through E-mail, I believe.
18 Q.   In the conversation that you were at in the
19      restaurant with Mr. Bagwell, did Mr. Bagwell
20      make any statements to the effect that
21      Mr. Peterson had solicited him?
22           MR. ZAGRANS:  Objection.  I instruct
23      you not to respond as part of an
24      attorney/client privileged discussion.
25 BY MR. McDEVITT:

Page 68

1  Q.   Are you aware that Mr. Bagwell has stated that
2       Mr. Peterson called him?
3  A.   No.
4  Q.   Did Mr. Peterson ever tell you whether he had
5       contacted other wrestlers about joining in
6       this lawsuit?
7           MR. ZAGRANS:  Objection.  Instruct
8       not to answer.
9           MR. McDEVITT:  I again assume you're
10      talking on privilege grounds.
11          MR. ZAGRANS:  Yes, sir.
12 BY MR. McDEVITT:
13 Q.   So as you sit there today it's your testimony
14      you've never signed a fee agreement with
15      Krislov or Peterson?
16 A.   Not for specific fees, no.
17 Q.   Have you ever signed a retainer agreement with
18      them?
19 A.   To retain their services?
20 Q.   Yes.
21 A.   I believe I had.
22 Q.   Did you sign a retainer agreement with
23      Krislov?
24 A.   With the firm, yes.
25 Q.   Did you sign a retainer agreement with

Page 69

1       Peterson?
2  A.   Yes, I think so.
3  Q.   When did you do that?
4  A.   I don't recall.
5  Q.   How many months after you were originally
6       contacted by this E-mail did you do so?
7  A.   I don't recall.
8  Q.   Was there a delay?
9  A.   What do you mean?
10 Q.   Well, when you received this March document,
11      did you immediately retain him to represent
12      you and file a lawsuit?
13 A.   I didn't retain him to file a lawsuit, but I
14      felt that I had engaged him and that we were
15      going to investigate things so I felt that he
16      was acting as my lawyer on behalf of me.
17 Q.   My question was did you retain him to be your
18      lawyer.
19 A.   In --
20          Yes, then.
21 Q.   How did you do that?
22 A.   By verbally -- by verbal.
23 Q.   By verbal what?
24 A.   By verbal agreement.
25 Q.   What was the verbal agreement?

SCOTT LEVY - 10/12/2017                          Pages 70..73

Page 70

1  A.   I don't recall the exact words, but we had
2       spoke about three different potential areas
3       where I felt I had been harmed by WWE and he
4       was going to help me resolve these issues, so
5       I felt that once we started talking that he
6       immediately was working on my behalf as my
7       lawyer even though I hadn't written it in a
8       written document.
9  Q.   When did they first ask you to sign a retainer
10      agreement?
11 A.   I don't recall.
12 Q.   We've been told that your retainer agreement
13      with him wasn't signed until August. Is that
14      consistent with your recollection, August of
15      2016?
16 A.   I guess.
17 Q.   Five months after the original contact?
18 A.   Sure, but I considered him my lawyer from the
19      beginning.
20 Q.   Why did it take you five months to sign a
21      retainer agreement?
22 A.   Because he was investigating things.
23 Q.   You can investigate with a retainer agreement
24      too.
25           MR. ZAGRANS: Objection. That's

Page 71

1       argumentative.
2  BY MR. McDEVITT:
3  Q.   Did he ask you to sign a retainer agreement
4       prior to August?
5  A.   I don't think so.
6  Q.   Did the Krislov firm ask you to sign a
7       retainer agreement prior to August?
8  A.   I don't recall.
9  Q.   When Mr. Bagwell filed his lawsuit, did he
10      notify you that he had filed a lawsuit on
11      behalf of Bagwell?
12 A.   Did Matthew or did Bagwell?
13 Q.   Did Matthew.
14 A.   I thought he filed them at the same time.
15 Q.   Thought he filed what at the same time?
16 A.   My claim and Bagwell's.
17 Q.   No, he didn't.
18 A.   Oh.
19 Q.   So when he filed the lawsuit on behalf of
20      Mr. Bagwell, did he tell you that he had done
21      that?
22 A.   I don't recall.
23 Q.   Why weren't you originally in the lawsuit with
24      Mr. Bagwell?
25           MR. ZAGRANS: If you can answer that

Page 72

1       question without disclosing any
2       attorney/client privileged conversations
3       please do so, but if you can't answer it
4       without disclosing attorney/client privileged
5       information, then tell Mr. McDevitt that you
6       cannot.
7           THE WITNESS: Repeat the question.
8  BY MR. McDEVITT:
9  Q.   Why weren't you in the original lawsuit with
10      Mr. Bagwell?
11 A.   That would require me to violate
12      attorney/client privilege.
13 Q.   With who?
14 A.   My attorney.
15 Q.   Which one?
16 A.   Peterson.
17 Q.   Anybody else?
18 A.   Well, my counsel now.
19 Q.   Well, he wasn't your counsel then, was he?
20 A.   No.
21 Q.   So you're not claiming a privilege with
22      Mr. Zagrans for that; you're claiming it with
23      Mr. Peterson. Correct?
24 A.   For when?
25 Q.   When was the conversation that you're claiming

Page 73

1       this privilege over?
2  A.   As soon as we had a phone call we discussed
3       the fact that I was never paid or even
4       contacted by --
5           MR. ZAGRANS: Wait. Don't discuss
6       what you talked about with Mr. Peterson.
7           THE WITNESS: That's right.
8  BY MR. McDEVITT:
9  Q.   The conversation --
10          Was there a conversation about
11      whether you would be named in the original
12      lawsuit with Mr. Bagwell?
13 A.   Say it again.
14 Q.   Was there a conversation with Mr. Peterson
15      about whether you would be named in the
16      original lawsuit with Mr. Bagwell?
17          MR. ZAGRANS: And that's a yes-or-no
18      question.
19          THE WITNESS: Was there a
20      conversation --
21 BY MR. McDEVITT:
22 Q.   About whether you would be named in the
23      original lawsuit as a plaintiff with
24      Mr. Bagwell.
25 A.   There was a conversation.

Page 74

1 Q.  When was that?

2 A.  I don't recall.

3 Q.  Was it before he filed a lawsuit on behalf of

4     Mr. Bagwell?

5 A.  I don't recall.

6              - - - -

7     (Exhibit 4 marked for identification.)

8              - - - -

9 BY MR. McDEVITT:

10 Q.  Mr. Levy, I've handed you what has been marked

11    as Exhibit 4. I don't have any extensive

12    questions for you on this document other than

13    to ask you do you recognize the document?

14 A.  Yeah, I guess.

15 Q.  This is one that you produced to us in this

16    litigation. When did you last perform for

17    WWE, what year?

18 A.  2016 maybe.

19 Q.  2016?

20 A.  Yes, or 2015. I'm not sure.

21 Q.  When did you perform in 2015 or '16 for WWE?

22 A.  On videos.

23 Q.  Aside from that video, I'm talking in the ring

24    performing, when did you last perform?

25 A.  Oh, before my contract ended.

Page 75

1 Q.  And that's the contract that was entered into

2     in 2000?

3 A.  Yes.

4 Q.  The one that's the subject of this lawsuit,

5     and so that was over long before this 2008

6     letter. Correct?

7 A.  Say that again.

8 Q.  You were done as a performer for WWE long

9     before 2008. Correct?

10 A.  Yes.

11 Q.  And how did you meet the Disner law firm?

12 A.  I don't remember.

13 Q.  And this indicates that you had retained them

14    to represent you in connection with an

15    employment and antitrust class action against

16    WWE.

17        Do you see that?

18 A.  Where?

19 Q.  In the first paragraph where it says scope of

20    engagement.

21 A.  Okay.

22 Q.  Is that correct you had retained them for that

23    purpose?

24 A.  For what purpose?

25 Q.  The purposes stated in the letter in

Page 76

1     connection with employment and antitrust class

2     action against WWE.

3 A.  Yes. Actually, wait --

4         Yes.

5 Q.  And am I correct that no antitrust claim was

6     ever brought by you against WWE?

7 A.  I don't believe so.

8 Q.  What was the employment claim that you had

9     retained them to look into?

10        MR. ZAGRANS: Well, I don't want you

11    to get into attorney/client privileged

12    conversations with them. There's still a

13    privilege.

14        MR. McDEVITT: I'm not asking him

15    for conversations. I'm asking him what he

16    perceived to be the employment issue that he

17    was retaining counsel for.

18        MR. ZAGRANS: If you brought a claim

19    that was made public, then you can answer the

20    question.

21        THE WITNESS: I --

22        MR. McDEVITT: That's an improper

23    instruction. That's a totally improper

24    instruction. That question I've raised for

25    him does not call for any communication

Page 77

1     whatsoever between him and any attorney.

2         MR. ZAGRANS: It calls for protected

3     both discursions and work product if it was

4     not made public.

5         MR. McDEVITT: Well, you have the

6     letter.

7         MR. ZAGRANS: So I have my

8     objection. You have the letter. Beyond the

9     letter, any details about it are privileged if

10    it was not made public.

11        MR. McDEVITT: What was the

12    employment matter that you were retaining them

13    to consider?

14        MR. ZAGRANS: If it was public you

15    can answer that.

16 BY MR. McDEVITT:

17 Q.  That's an improper instruction, but you can

18    answer.

19 A.  We were independent contractors according to

20    our contract, but we were treated like

21    employees.

22 Q.  All right. You hired him to look into the

23    same issues you eventually brought a lawsuit

24    about. Correct?

25 A.  Yes.

SCOTT LEVY - 10/12/2017                    Pages 98..101

Page 98

1    Correct?
2 A.   Yes.
3 Q.   You know that.  Right?
4 A.   Yes.
5 Q.   And they had not done that by the time you
6    signed your contract with them in 2000.
7    Correct?
8 A.   I guess.
9 Q.   And when you were negotiating your contract --
10        Strike that.
11        Who did you talk about the terms of
12    your contract with in connection with the 2000
13    contract at WWE?
14 A.   What?
15 Q.   Well, strike that.
16        Did you negotiate any of the terms
17    of your 2000 contract with anybody at WWE?
18 A.   Jim Ross.
19 Q.   Anybody else?
20 A.   I don't think so.
21 Q.   All right.  When that contract was being
22    negotiated, did Jim Ross ever tell you that
23    the contract you were about to sign would pay
24    you royalties on ECW video works?
25 A.   If I'm to understand you, ECW wasn't purchased

Page 99

1    by WWE yet, so that wouldn't be --
2        There would be no reason for it.
3 Q.   I agree.  Would you agree that Mr. Ross never
4    told you that the contract you were about to
5    sign in 2000 would pay you royalties on ECW
6    video work?
7 A.   He couldn't.  They didn't own it.
8 Q.   And would the same be true for WCW?
9 A.   Correct.
10 Q.   Nobody told you that that contract would pay
11    you royalties for ECW or WCW video work?
12 A.   Because they didn't own them yet.
13 Q.   All right.  Now, going back if you will to
14    Exhibit 11, do you see the statement made by
15    me at the end of the second paragraph to
16    Mr. Ichter your thesis appears to be that the
17    booking contract he signed with the WWE
18    governing his performances for WWE somehow
19    obligates WWE contractually to pay Mr. Levy
20    royalties for his ECW and WCW performances
21    depicted on the videos in question.
22        Do you see that?
23 A.   Yes.
24 Q.   And then in the end of the last paragraph
25    after I explained to him the circumstances of

Page 100

1    the acquisition of the rights of WCW and ECW,
2    am I correct that the statement is made to
3    your lawyer, quote, in sum WWE's right to
4    exploit the copyrighted works purchased from
5    WCW and ECW do not require it to pay Mr. Levy
6    royalties when it exercises the right of
7    copyright ownership in those works.  Right?
8 A.   Yes, you did say that.
9 Q.   So you knew as early as 2009 WWE's position
10    was that it was not contractually obligated to
11    pay you royalties on WCW or ECW video works.
12    Correct?
13 A.   That it was their position?  Yes.
14 Q.   Did you seek once you received this letter to
15    amend your lawsuit or go back to the judge and
16    ask for permission to include claims in that
17    lawsuit related to your assertion that you
18    were entitled to such royalties?
19 A.   The lawsuit was over.
20 Q.   I'm asking you did you go back to the judge
21    and file anything with the judge asking him
22    for permission to amend your lawsuit to
23    include such claims?
24 A.   As far as I know, the lawsuit was over.
25 Q.   So is the answer no?

Page 101

1 A.   Is the answer to --
2 Q.   Did you seek to ask the federal judge if you
3    could amend your lawsuit to include claims for
4    royalties?
5 A.   No, because the lawsuit was over.
6 Q.   Well, you had a pending motion we just went
7    through on March 10th that you filed with the
8    Court.
9        Do you know if that had been decided
10    by the time I sent the April 6 letter?
11 A.   I don't recall.
12 Q.   Well, it wasn't decided until July of 2009,
13    which we'll come to in a minute.
14        MR. ZAGRANS:  You want him to accept
15    that representation from you as factual?
16        MR. McDEVITT:  Well, I'll show you
17    the opinion.  It's a matter of opinion.
18        - - - -
19    (Exhibit 12 marked for identification.)
20        - - - -
21 BY MR. McDEVITT:
22 Q.   Let me show you what has been marked as Levy
23    12.  This is the judge's opinion essentially
24    denying your motion in support of -- or in an
25    attempt to alter or amend the judgment that

SCOTT LEVY - 10/12/2017                    Pages 102..105

Page 102

1    was filed in July of 2009.
2         Do you recognize that?
3  A.  I suppose.
4  Q.  So if the judge didn't decide that until July
5       of 2009 and you received my letter in April,
6       you had the rest of April, you had the rest of
7       May, you had the rest of June to go back to
8       the judge and ask him to amend the lawsuit for
9       further grounds.  Did you do so?
10          MR. ZAGRANS:  Wait, wait.  Object to
11      the form of the question because it states
12      legal representations that may or may not be
13      correct, but this lay witness who's not a
14      lawyer doesn't have any basis of knowing
15      whether that's true or not, so I object to the
16      form of the question.
17          MR. McDEVITT:  You can answer now.
18          THE WITNESS:  I can't even remember
19      the question.
20          MR. McDEVITT:  Would you read the
21      question back, please.
22          - - - -
23      (The reporter read from the record.)
24          - - - -
25          MR. ZAGRANS:  Object to the form of

Page 103

1    the question.
2          THE WITNESS:  I thought we
3    already --
4          I don't recall any of this.
5  BY MR. McDEVITT:
6  Q.  What do you recall doing --
7       Strike that.
8       Do you remember Mr. Ichter saying he
9       would take action to enforce your rights when
10      he sent the letter to us?  Correct?
11 A.  Yes.
12 Q.  And now you received a letter on behalf of WWE
13      saying WWE does not believe it had any
14      contractual obligation to pay you those
15      royalties.  Right?
16 A.  For those particular things.
17 Q.  Did you file a lawsuit in 2009 then over that?
18 A.  No.
19 Q.  Did you file one in 2010?
20 A.  No.
21 Q.  '11?
22 A.  No.
23 Q.  '12?
24 A.  No.
25 Q.  '13?

Page 104

1  A.  No.
2  Q.  '14?
3  A.  No.
4  Q.  '15?
5  A.  No.
6  Q.  Why not?
7          MR. ZAGRANS:  Objection.  Instruct
8    not to answer.
9          MR. McDEVITT:  On what grounds?
10         MR. ZAGRANS:  Privilege and work
11   product.
12         MR. McDEVITT:  Privilege with who?
13         MR. ZAGRANS:  With his lawyers.
14         MR. McDEVITT:  What lawyers?  He
15   hasn't identified any lawyers.  I asked him
16   why he didn't file anything.  I didn't ask for
17   any communication with lawyers.  That's a
18   privilege in a vacuum for seven years, Eric.
19         MR. ZAGRANS:  I'm instructing him
20   not to answer.
21         MR. McDEVITT:  Privilege with what
22   attorney?
23         MR. ZAGRANS:  Cary Ichter for one.
24         MR. McDEVITT:  Was Cary Ichter still
25   your attorney in all those years?

Page 105

1          MR. ZAGRANS:  If he got legal advice
2    in the first year --
3          MR. McDEVITT:  Could I ask you to
4    quit coaching the witness.
5          MR. ZAGRANS:  I was talking to you.
6          MR. McDEVITT:  No, you're coaching
7    the witness
8          MR. ZAGRANS:  No I'm not.
9  BY MR. McDEVITT:
10 Q.  The pending question:  Was Cary Ichter your
11      lawyer after 2009?
12 A.  I don't believe --
13      I don't recall.
14 Q.  When did he last act our behalf?
15 A.  I don't recall.
16 Q.  Did he have any further communications with
17      WWE on this subject to your knowledge?
18 A.  I don't recall.
19 Q.  Did you have any conversations with Cary
20      Ichter in 2010 about potential lawsuits?
21 A.  I don't recall.
22 Q.  Did you have any in 2011?
23 A.  I don't recall.
24 Q.  '12?
25 A.  I don't recall.

SCOTT LEVY - 10/12/2017          Pages 106..109

Page 106

1  Q.   Did you have any conversations with any
2       attorneys in those years between 2009 and 2015
3       about a potential lawsuit against WWE?
4  A.   Yes.
5  Q.   Which attorney?
6  A.   Cary Ichter.
7  Q.   What year?
8  A.   Frank Smith.
9  Q.   What year Cary Ichter?
10 A.   I don't recall.  I'm sure it was right after
11      this.
12 Q.   2009?
13 A.   And again in the future, no longer past.
14 Q.   Again let me ask you.  When did Cary Ichter
15      stop representing you?
16 A.   He represented my interests at the time, and
17      at some point he stopped, but I don't recall
18      the dates.
19 Q.   Once you retained Mr. Smith did you continue
20      to use Mr. Ichter?
21 A.   I'm not sure when I stopped using Mr. Ichter.
22 Q.   When's the last time he did something for you?
23          MR. ZAGRANS:  Objection.  Asked and
24      answered.  You may answer again.
25          THE WITNESS:  I guess the last time

Page 107

1       was when the last time with -- that you wrote,
2       that you said.
3  BY MR. McDEVITT:
4  Q.   Did you not bring a lawsuit against the WWE in
5       those years because of legal advice?
6  A.   No.
7  Q.   Why didn't you bring a lawsuit against WWE in
8       those years then?
9  A.   Cary Ichter's firm wouldn't allow him to bring
10      another lawsuit involving wrestlers because
11      the people --
12          When he had sued WCW, the people who
13      won the money, the judgment, then turned
14      around and sued Ichter's firm for not helping
15      them -- for them pissing away all the money,
16      and so --
17          MR. ZAGRANS:  I withdraw my previous
18      instruction.
19          MR. McDEVITT:  I think it just goes
20      to show you make instructions without basis in
21      fact to do so.
22          MR. ZAGRANS:  No.  It had to do with
23      communications with the lawyer.  I didn't
24      realize that they didn't have anything to do
25      with providing legal advice.

Page 108

1          MR. McDEVITT:  There's no basis for
2       that objection.
3          MR. ZAGRANS:  Move to strike the
4       comment.
5  BY MR. McDEVITT:
6  Q.   So after Mr. Ichter couldn't represent you
7       anymore, who did you retain next?
8  A.   Frank Smith, I suppose.
9  Q.   What year did you retain him?
10 A.   I don't know.  We were friends first.
11 Q.   Did you rely on legal advice from Mr. Smith
12      not to bring a lawsuit?
13 A.   No.
14 Q.   So what was your reason why you went all these
15      years without bringing a lawsuit to challenge
16      WWE's position that it didn't have an
17      obligation to pay you royalties on ECW and WCW
18      works?
19 A.   Because Frank couldn't take up the case and I
20      thought -- and he had said --
21          Let me rephrase that.
22          He had said it was a good case, but
23      he just didn't have the time for such a large
24      case on his docket, and I didn't know of any
25      other lawyers which is how I came to ask about

Page 109

1       it and got Matthew Peterson.
2  Q.   You didn't ask Mr. Smith about it.  You asked
3       other friends of yours that you can't even
4       name any more that led to Mr. Peterson.
5       Right?
6  A.   What?
7  Q.   Well, you didn't get Mr. Peterson's name from
8       Mr. Smith.
9  A.   I might have.
10 Q.   Well, you might have, but you didn't testify
11      to that previously when I asked you.
12 A.   I said I don't recall.
13 Q.   No, you didn't say you didn't recall.  You
14      said you pull out feelers through your friends
15      --
16 A.   Right.
17 Q.   -- and sort of somehow it came back to
18      Mr. Peterson.
19 A.   I put feelers out through my friends, but I
20      don't recall which friends.
21 Q.   Well, did Mr. Smith recommend Mr. Peterson?
22 A.   I don't recall, but I would like to take a
23      break.
24          MR. McDEVITT:  All right.  Take
25      five.

SCOTT LEVY - 10/12/2017                    Pages 110..113

Page 110

1           - - - -
2     (There was a recess in the proceedings.)
3           - - - -
4     (Exhibit 13 marked for identification.)
5           - - - -
6 BY MR. McDEVITT:
7 Q.   **Mr. Levy, you understand you're still under**
8      **oath?**
9 A.   Yes.
10 Q.  **And during the break have you discussed your**
11     **testimony with anybody?**
12 A.  My counsel.
13 Q.  **What aspect of your testimony did you discuss?**
14          MR. ZAGRANS: Objection. Instruct
15     you not to answer.
16          MR. McDEVITT: Were you discussing
17     his testimony on the break?
18          MR. ZAGRANS: Are you questioning me
19     now?
20          MR. McDEVITT: Yeah.
21          MR. ZAGRANS: When you get me under
22     oath you can ask me that.
23          MR. McDEVITT: You just asserted a
24     privilege. You can't assert a privilege
25     unless there was such communication.

Page 111

1          MR. ZAGRANS: Well, of course we
2  communicated during the break.
3          MR. McDEVITT: About his testimony?
4          MR. ZAGRANS: Not about his
5  testimony.
6          MR. McDEVITT: I just asked him that
7  question and you instructed him not to answer.
8          MR. ZAGRANS: You asked about a
9  communication with counsel. Of course we
10 talked.
11         MR. McDEVITT: I asked specifically
12 about his testimony. Did you talk about your
13 testimony with counsel during the break?
14         THE WITNESS: I spoke about what we
15 just talked about, the proceedings.
16         MR. McDEVITT: Did you speak about
17 the testimony that you had given with your
18 counsel?
19         THE WITNESS: Sure.
20         MR. McDEVITT: So you're talking
21 about his testimony during breaks.
22         MR. ZAGRANS: I'm instructing him
23 not to tell you what we talked about.
24         MR. McDEVITT: Do we have an
25 agreement that you're not supposed to be

Page 112

1  talking to witnesses during their examination
2  about their testimony or are you following a
3  different set of rules?
4          MR. ZAGRANS: Jerry, I'm following
5  the Federal Rules of Civil Procedure and the
6  Federal Rules of Evidence in the conduct of
7  this and any other civil litigation in federal
8  court.
9          MR. McDEVITT: That's not really
10 responsive to what I asked you, Eric, and I
11 think you know what I'm talking about. Are we
12 operating under the understanding that you're
13 not supposed to be talking with witnesses on a
14 break about their testimony?
15         MR. ZAGRANS: My answer stands.
16         MR. McDEVITT: All right. Mr. Levy,
17 I've shown you Exhibit 13, and I would like to
18 direct your attention to the Entry No. 13 on
19 this privilege log that was produced --
20         THE WITNESS: What time is lunch?
21         MR. McDEVITT: What time do you want
22 to break for lunch?
23         THE WITNESS: A half hour.
24         MR. McDEVITT: Twelve-thirty?
25         THE WITNESS: Right.

Page 113

1          MR. ZAGRANS: That's about forty
2     minutes. Is that okay?
3          THE WITNESS: Sure.
4 BY MR. McDEVITT:
5 Q.   **Did you look at Entry 13, sir?**
6 A.   Sure.
7 Q.   **And this lists a privileged communication**
8      **between you and Mr. Smith dated July of 2012**
9      **regarding legal advice involving payment of**
10     **royalties.**
11          **Do you see that?**
12 A.  Uh-huh.
13 Q.  **This issue about royalties, is this**
14     **WWE-related?**
15 A.  I don't remember.
16 Q.  **Do you have any other royalty issue that**
17     **you're dealing with in 2012 other than with**
18     **WWE?**
19 A.  Yes.
20 Q.  **What other ones were you dealing with?**
21          MR. ZAGRANS: Objection. Instruct
22     you not to answer.
23          MR. McDEVITT: I'm not asking for
24     communications with his lawyer. I'm asking
25     what other royalty issue he was dealing with.

Page 114

1        MR. ZAGRANS:  That may be a
2   privileged subject if it's not publicly known.
3        MR. McDEVITT:  You have a much
4   different conception of privilege than I do.
5   BY MR. McDEVITT:
6   Q.   With respect to the next entry in Item 14
7        where it says legal advice involving payment
8        of royalties, was that in connection with any
9        WWE issue?
10  A.   I don't recall.
11  Q.   So in both years 2012 and 2014, apparently
12       you're having communications with Mr. Smith,
13       something to do with royalties.  Correct?
14  A.   It would appear so.
15  Q.   And it looks like from Item 15 you had two
16       communications with him actually in October of
17       2014.  Right?
18  A.   Two communications.
19  Q.   Yes, about royalties.
20  A.   On the same day?
21  Q.   Yeah.
22  A.   I guess so?
23  Q.   Why did you not take any legal action against
24       WWE in 2012 related to WCW or ECW royalties?
25          MR. ZAGRANS:  Objection.  I instruct

Page 115

1   you not to answer on privilege grounds.
2          MR. McDEVITT:  So I take it you're
3   going to instruct him not to answer any
4   question about why he did not act in any of
5   those years?
6          MR. ZAGRANS:  Yes.
7
8   (Exhibit 14 marked for identification.)
9          - - - -
10  BY MR. McDEVITT:
11  Q.   Let me though you what has been marked as
12       Levy 14.  Is that Mr. Smith that's depicted in
13       Levy 14.
14  A.   Him and his wife?
15  Q.   All right.  And that's the Mr. Smith that's
16       your lawyer?
17  A.   Yes.
18  Q.   Is he still your lawyer?
19  A.   Yes.
20  Q.   And it indicates his practice was commercial
21       litigation, among other things.  Correct?
22  A.   That's what it says.
23  Q.   Are there other lawyers in his firm?
24  A.   I don't know.
25  Q.   Have you ever been in his law office?

Page 116

1   A.   I don't think so.
2   Q.   When did you become aware of the claims that
3        you are asserting here in this litigation?
4   A.   When did I become aware of the network?
5   Q.   Let's start with that, yes.  When did you
6        become aware of that?
7   A.   When it started or maybe --
8             Yeah, I guess when it started.
9   Q.   When was that?
10  A.   2014.
11  Q.   All right.  And did you ever watch the
12       network?
13  A.   No.
14  Q.   To this day you've never watched it?
15  A.   No.
16  Q.   Do you have any understanding of what's on the
17       network?
18  A.   Yes.
19  Q.   What's your understanding?
20  A.   They have programs that are designed to
21       entertain WWE fans.
22  Q.   All right.  Do you know whether they put
23       current Pay-Per-Views on there, for example?
24  A.   They probably do.
25  Q.   You don't know for sure?

Page 117

1   A.   I don't watch it.
2   Q.   Do you know, for example, if Wrestle Mania is
3        available on the network?
4   A.   Yes.
5   Q.   Do you know if Summer Slam is available on the
6        network?
7   A.   Let me answer your question.  Re-ask the
8        question so I can provide an accurate answer.
9   Q.   Do you know whether their current Pay-Per-
10       Views are put on the network?
11  A.   Yes.
12  Q.   Yes, you know; or, yes, they are?
13  A.   Yes.
14  Q.   Which?
15  A.   Both.
16  Q.   Both.  All right.  Do you know whether they
17       put original programming on there?
18  A.   Yes.
19  Q.   They do?
20  A.   Yes.
21  Q.   And do you know whether they have archives of
22       ECW videos on the network?
23  A.   I don't know.
24  Q.   Do you know if they have archives of WCW works
25       on the network?

SCOTT LEVY - 10/12/2017                    Pages 126..129

Page 126

1    learned he had a claim as a result of
2    discussing the matter with one of plaintiff's
3    attorneys who you've identified as
4    Mr. Peterson.
5         Did you not know you had a claim as
6    a result of conversations with Mr. Smith?
7 A.  Yes, and before I spoke with Mr. Smith.
8 Q.  So you did know when you were talking to
9    Mr. Smith you had a claim?
10 A.  Yes.
11 Q.  But Mr. Smith never brought claims?
12 A.  No.  He was too busy.
13 Q.  That's what he told you, too busy to bring
14    claims on your behalf?
15 A.  Yes. It was too big a case.
16 Q.  Too big of a case.  That's what he said?
17 A.  I don't recall the exact specifics.
18 Q.  Were you talking with him about a class action
19    case?
20 A.  I don't recall.
21 Q.  Who was the first person that talked about a
22    class action case?
23 A.  I don't recall.
24 Q.  Did anybody do so before Mr. Peterson?
25 A.  I don't recall.

Page 127

1 Q.  What experience does Mr. Peterson have with
2    WWE contracts?
3         MR. ZAGRANS:  If you can answer that
4    question outside the context of
5    communications, discussions you've had with
6    Mr. Peterson, you may go ahead and answer it.
7    If you can't, let Mr. McDevitt it know you
8    can't.
9         THE WITNESS:  What's the question
10    again?
11 BY MR. McDEVITT:
12 Q.  What experience does Mr. Peterson have with
13    WWE contracts?
14 A.  I don't recall.
15 Q.  Well, you indicated I think previously you put
16    out feelers saying you were looking for
17    somebody who had such experience.  Right?
18 A.  Who understood the intricacies of the WWE.
19 Q.  What in Mr. Peterson's background allows him
20    to understand the intricacies of the WWE?
21 A.  I don't recall exactly.
22 Q.  Did you ask him whether he had any prior
23    experience against WWE?
24 A.  I don't recall.
25 Q.  Did you ask him if he had any prior suits

Page 128

1    against WWE?
2 A.  I don't recall.
3 Q.  Did you ask him if he represented anybody
4    against WWE?
5 A.  I don't recall.
6 Q.  How many years was Mr. Peterson out of law
7    school by the time you first talked to him?
8 A.  I don't know.
9 Q.  Do you know now?
10 A.  No.
11 Q.  In the year 2014 did you send any kind of
12    written document to WWE objecting to the fact
13    that you were not being paid royalties
14    associated with the WWE Network?
15 A.  Excuse me?
16 Q.  In 2014 did you send any written document to
17    WWE objecting to the fact you were not being
18    paid royalties in connection with the WWE
19    Network?
20 A.  No, because I didn't think it would be of any
21    value.  Let me rephrase that.  I didn't think
22    they would respond in my favor.
23 Q.  But your answer is you did not send such a
24    document?
25 A.  I don't think so.

Page 129

1 Q.  And you did not instruct any of these lawyers
2    that you knew in 2014 to do so either, did
3    you?
4 A.  I don't think so.
5 Q.  Did you send any document in 2015, written
6    document to the WWE in 2015, at any time
7    objecting to the fact that you were not
8    receiving royalties in association with the
9    WWE Network?
10 A.  I don't think so.
11 Q.  Did you at any time in 2014 request to do an
12    audit of the WWE's royalty payments to you?
13 A.  I don't think so.
14 Q.  Did you do so at any time in 2015?
15 A.  I don't think so.
16 Q.  At any time in 2016 did you send a written
17    document to WWE objecting to the fact you were
18    not being paid royalties associated with the
19    WWE Network?
20        MR. ZAGRANS:  You mean before the
21    lawsuit was filed?
22        THE WITNESS:  Say the question
23    again.
24 BY MR. McDEVITT:
25 Q.  In 2016 did you send a written document to the

Page 130

1  WWE --
2  A.  Did I personally?
3  Q.  Yes.  Did you send such a document to WWE?
4  A.  I didn't.  My attorneys may have.
5  Q.  Do you know if your attorneys did?
6  A.  They sent a letter --
7        I'm not sure.
8  Q.  As you sit there today can you identify any
9       written documents sent to WWE in 2016
10      objecting to the fact that you were not being
11      paid royalties in association with the WWE
12      Network?
13 A.  That's what my case is about.
14 Q.  Other than filing the lawsuit, did you send
15      any written documents to them beforehand
16      complaining about the fact you were not
17      receiving royalties in association with the
18      WWE Network?
19 A.  I don't think so.  That's why we filed the
20      lawsuit.
21 Q.  Did you ever request an audit of WWE at any
22      time?
23 A.  I don't recall.
24 Q.  As you sit there today can you identify any
25      specific time when you did?

Page 131

1  A.  I don't recall.
2  Q.  You received royalty reports throughout 2014
3       and 2015, didn't you?
4  A.  Uh-huh.
5  Q.  And you would get those quarterly.  Correct?
6  A.  Yes.
7  Q.  And they indicated you were not being paid any
8       royalties for the network.  Correct?
9  A.  Say that again.
10 Q.  They showed on their face that you were not
11      being paid any royalties for the network?
12 A.  After the network started.
13 Q.  Right.
14 A.  Yes.
15 Q.  Did you take any action whatsoever regarding
16      that in 2014?
17 A.  Yes.
18 Q.  What?
19 A.  I put the word out to friends that I was
20      looking for an attorney who would be
21      interested in working -- in investigating some
22      interests of mine.
23 Q.  You did that in 2014?
24 A.  I believe so.
25 Q.  And it's your belief that the things that you

Page 132

1      just identified doing in 2014 is what led to
2      Mr. Peterson sending you an E-mail in March of
3      2016?
4  A.  I didn't just put out the word once; I put it
5      out numerous times over the year of 2015 and I
6      imagine the year of 2014 after the network
7      started.
8  Q.  You said that several times, but you can't
9      identify so much as one human being you put
10     that word out to, can you?
11 A.  Not without being unsure.
12 Q.  You can't testify to the identity of one
13     single person --
14 A.  No.
15 Q.  -- that you did that with, can you?
16 A.  Not a hundred percent recollection.
17 Q.  Despite supposedly doing it multiple times.
18 A.  I can't recall.
19         - - - -
20  (There was a discussion off the record.)
21         - - - -
22  (Exhibit 17 marked for identification.)
23         - - - -
24 BY MR. McDEVITT:
25 Q.  Mr. Levy, I've handed you what has been marked

Page 133

1      as Exhibit 17 which is a response that you've
2      provided in the Request for Production of
3      certain phone records.
4  A.  Uh-huh.
5  Q.  Would you turn back to the phone record that
6      is yours that's page I think 1191, that page.
7      It looks like this.
8          Your response indicates this is the
9      first communication by phone that you had with
10     Mr. Peterson.
11         Is that consistent with your
12     recollection, that it was April 11th?
13 A.  I don't recall.
14 Q.  Do you recognize those phone numbers there?
15 A.  No.
16 Q.  Do you know Mr. Peterson's phone number?
17 A.  No.
18 Q.  How do you get in touch with him?
19 A.  Pressing his name on my phone.
20 Q.  Does your phone contain his phone number?
21 A.  Yes.
22 Q.  Do you have your phone with you?
23 A.  Yes.
24 Q.  Can you look to see what his phone number is,
25     please.

Page 134

1          Did you have his number?
2  A.   It's still turning on.
3          My phone isn't working properly.
4      Okay.  There it goes.  I thought my phone
5      broke.  Okay.
6  Q.   Do you have his number?
7  A.   Uh-huh.
8  Q.   What is it?
9  A.   815-999-9130.
10 Q.   All right.  And if you would look at the phone
11     record I just put in front of you on the
12     exhibit on Page 1191, am I correct that
13     there's two entries for that phone number on
14     April 11th?
15 A.   Yes.
16 Q.   Do you recognize the number that is between
17     those, that 31260 -- looks like six, might be
18     an eight -- 0500?
19 A.   Yes.  That's the work number it says on my
20     phone for Matthew Peterson.
21 Q.   All right.  So all those numbers are Matthew
22     Peterson's numbers or were at the time I
23     guess, the work number at the time?
24 A.   Yes.
25 Q.   All right.  Why did it take you almost a month

Page 135

1      to make a phone call to Mr. Peterson after you
2      received his E-mail?
3  A.   I don't know.  I don't recall.
4          Will I need my phone again or should
5      I turn it off?
6  Q.   No, you won't need it anymore.
7          What made you call him in April?
8  A.   I don't recall.
9  Q.   After you received his March 16th case
10     analysis, did you discuss it with anybody that
11     you had been talking to about trying to find
12     some lawyer that would represent you?
13 A.   Say that again in smaller segments.
14 Q.   Well, you received this E-mail from him
15     March 16th, correct --
16 A.   Correct.
17 Q.   -- a so-called case analysis?
18 A.   That's not --
19        That's not incorrect.
20 Q.   That's not correct?
21 A.   That's --
22        I don't know if --
23        Isn't that client privilege?
24 Q.   Well, I don't know what the content of it was
25     because your lawyer is instructing you --

Page 136

1  A.   That's what I'm saying.
2  Q.   But they give a description.
3  A.   They do?
4  Q.   Yes, on the privilege log.  They have to give
5      a slight description of what it is, and it's
6      described as E-mail between counsel and client
7      providing case analysis --
8  A.   Which one's that?
9          MS. LACY:  Thirteen, I believe.
10 BY MR. McDEVITT:
11 Q.   It's Exhibit 13.
12 A.   Okay.
13 Q.   If you look at Entry No. 1 --
14        See Entry No. 1?
15 A.   For 13?
16 Q.   No, Exhibit 13 but it's Entry No. 1, the very
17     first one.
18 A.   Oh.
19 Q.   And the description that's been given by your
20     counsel to us of that document is an E-mail
21     between counsel and client providing case
22     analysis of WWE Network royalties claim.  All
23     right?
24        So you received this case analysis.
25     Did you discuss that case analysis with

Page 137

1      anybody before you called Mr. Peterson about
2      it?
3  A.   I don't recall.
4  Q.   Did you share that case analysis with anybody?
5  A.   I don't recall.
6  Q.   Would you look at Item 16 on that same
7      privilege log.  Do you see Item 16?
8  A.   Uh-huh.
9  Q.   So two days after you get the E-mail from
10     Mr. Peterson there's an entry that says on
11     March 18th there's an E-mail between you and
12     Mr. Smith reflecting mental impressions of
13     Krislov Associates', Ltd., analysis of WWE
14     Network royalty case and legal issues.
15        Do you see that?
16 A.   Yes.
17 Q.   Does that refresh your recollection that you
18     took Mr. Peterson's E-mail and sent it to
19     Mr. Smith?
20 A.   I don't recall.
21 Q.   As you sit there today do you know whether you
22     did send that to Mr. Smith?
23 A.   I don't know.
24 Q.   And then it looks like after March 18th of
25     2016 you have several other communications

Page 138

1    with Mr. Smith in April that are listed in 17
2    to 20 and over to 21 to 22 about legal advice
3    on payment of royalties.
4            Is this all associated with the
5    Peterson memo that was sent to you on
6    March 16th?
7  A.  I don't recall.
8  Q.  Did Mr. Smith ever give you any input on his
9    assessment of Mr. Peterson's legal abilities
10   to handle the claim that he was claiming you
11   had?
12 A.  That's a lot of questions.  Can you break it
13   down into individual questions so I can
14   answer --
15 Q.  Did Mr. Smith ever give you his impression
16   about Mr. Peterson's ability to handle the
17   claim that you were going to made?
18 A.  I don't recall.
19          Is it lunchtime yet?
20 Q.  You know, actually this might be a decent
21   time.  If you want to do it now, that's fine
22   and we'll pick up here.
23          - - - -
24   (Exhibit 18 marked for identification.)
25          - - - -

Page 139

1  (There was a recess in the proceedings for lunch.)
2          - - - -
3  BY MR. McDEVITT:
4  Q.  Mr. Levy, you understand you're still under
5    oath?
6  A.  Yes.
7  Q.  Did you discuss your testimony at the break
8    with anybody?
9  A.  My counsel, but nothing of anything
10   substantial.
11 Q.  What does that mean, "nothing of anything
12   substantial"?
13 A.  We only discussed --
14          MR. ZAGRANS:  No.  I'm going to
15   instruct you not to answer as to what we
16   discussed.
17 BY MR. McDEVITT:
18 Q.  Did you discuss any of the specific testimony
19   that you had given?
20 A.  No.
21 Q.  Do you ever attend any of these conventions
22   where wrestlers go to meet fans and sign
23   autographs and things of that nature?
24 A.  There's numerous questions in there.  Can you
25   break it down so I can answer each one

Page 140

1    individually?
2  Q.  What do you perceive to be the numerous
3    questions?
4  A.  Well, there's numerous facts stated that may
5    not all align.
6  Q.  Do you go to conventions where fans are
7    present?
8  A.  Yes.
9  Q.  Do you go to conventions where you sign
10   autographs for fans?
11 A.  Yes.
12 Q.  In any of those conventions have you ever seen
13   Mr. Peterson?
14 A.  No.
15 Q.  Do you know whether Mr. Peterson goes to fan
16   conventions?
17 A.  I don't know.
18 Q.  Do you know whether he goes to such
19   conventions to meet wrestlers?
20 A.  I don't know.
21 Q.  Have you ever introduced him to any other
22   wrestlers?
23 A.  I don't think so.
24 Q.  Has he asked you to introduce him to other
25   wrestlers?

Page 141

1          MR. ZAGRANS:  Objection.  Instruct
2  not to answer.
3          MR. McDEVITT:  That's privileged?
4  That's seeking legal advice?
5          MR. ZAGRANS:  It's privileged or
6  potentially work product.  Absolutely.
7  BY MR. McDEVITT:
8  Q.  You're aware that various Complaints have been
9    filed in this case on your behalf.  Correct?
10 A.  Yes.
11 Q.  And did you review each one of them?
12 A.  Yes.
13 Q.  Did you read them carefully?
14 A.  I read them.
15 Q.  Did you see anything in any of the Complaints
16   that have been filed on your behalf that was
17   not correct?
18 A.  I don't recall everything.
19 Q.  Would it be safe to assume if there was
20   something in these complaints that was
21   believed by you not to be correct that you
22   would have advised your counsel to that
23   effect?
24 A.  I would think so.
25 Q.  Do you have a recollection of ever advising

Page 146

1  A.   Mr. Peterson worked on my behalf to find out
2      the answers.
3  Q.   Why weren't you in this lawsuit in August when
4      it was filed?
5            MR. ZAGRANS:  If the answer to that
6      question depends on attorney/client privileged
7      communications, you are not to discuss it.
8            If you can answer Mr. McDevitt's
9      question without reference to attorney/client
10     privileged discussions, go ahead and answer
11     that.
12           THE WITNESS:  It would have violated
13     attorney/client privilege.
14           MR. McDEVITT:  So you had a specific
15     conversation then with Mr. Peterson about
16     whether you were going to be party to the
17     lawsuit that Mr. Bagwell filed?
18           MR. ZAGRANS:  I'm objecting and
19     instructing you not to answer even that
20     question.
21           MR. McDEVITT:  I don't want the
22     contents; I want the subject matter.
23           MR. ZAGRANS:  Even that, whether
24     there was that discussion, is violating
25     privilege.

Page 147

1            MR. McDEVITT:  No, it's not.
2            MR. ZAGRANS:  Sure it is.
3            MR. McDEVITT:  No, it isn't.  It's
4      the content of communication that violates the
5      privilege.  It's no different than giving a
6      privilege log that gives a description of the
7      conversation.  If there was no such
8      conversation, there's no privilege to protect.
9            - - - -
10     (Exhibit 20 marked for identification.)
11           - - - -
12           MR. McDEVITT:  Let me show you
13     what's been marked as Levy 20.  Do you
14     recognize that document?
15           THE WITNESS:  Let me read it first,
16     please.
17           - - - -
18     (The witness reviewed the document.)
19           - - - -
20  BY MR. McDEVITT:
21  Q.   The only part of this I'm interested in,
22      Mr. Levy, is the part on the first page.
23  A.   Okay.
24  Q.   Do you recall receiving this E-mail on
25      August 10th from Mr. Peterson?

Page 148

1  A.   I don't recall receiving it, but I'm seeing it
2      in front of me.
3  Q.   And this is something you've produced to us.
4      Correct?
5  A.   Yes, I believe so.
6  Q.   He makes a statement in the second paragraph,
7      by the way, I filed a class action for WWE
8      Networks yesterday -- WWE Network royalties
9      yesterday.
10           I'll keep you updated on it, but it
11     is out there now.
12           See that?
13  A.   Yes.
14  Q.   Was that the first time you had learned that
15      he had filed a royalties case?
16  A.   I don't recall.
17  Q.   When you received this, did you wonder, well,
18      why am I not in it?
19  A.   No.
20  Q.   Did you know why you weren't in it?
21  A.   No.
22  Q.   Why weren't you in it?
23           MR. ZAGRANS:  If you can answer that
24      question without referring to a communication
25      that you had with Mr. Peterson, go ahead and

Page 149

1      answer it; but otherwise if the answer is
2      solely based on communications with
3      Mr. Peterson, let Mr. McDevitt know that.
4            THE WITNESS:  It was solely based on
5      communications with Matthew Peterson and Frank
6      Smith.
7  BY MR. McDEVITT:
8  Q.   Were they both in the same conversation?
9  A.   I don't recall.
10  Q.   When was the conversation with Mr. Smith?
11  A.   I don't recall.
12  Q.   Was it in person?
13  A.   I don't think so.
14  Q.   So you had a conversation with Mr. Smith about
15      the subject matter of whether you'd join the
16      lawsuit?
17  A.   I believe so.
18  Q.   And you had a conversation with Mr. Peterson
19      about the subject matter of whether you would
20      join the lawsuit?
21  A.   I believe so.
22  Q.   As of August of 2016, did you personally want
23      to sue WWE?
24  A.   I never wanted to sue WWE.  I just wanted to
25      be compensated for the actions that they

SCOTT LEVY - 10/12/2017                    Pages 210..213

Page 210

1    DVD, and that same item also appeared on the
2    network that those were the things that they
3    had to pay a royalty on?
4  A.   Among others.
5  Q.   What else do you identify specifically in here
6    they have to pay royalties on?
7  A.   Everything that's listed?
8  Q.   Do you mention ECW in here?
9  A.   I have to read the rest of it.
10 Q.   Do you see the initials ECW anywhere in your
11   answer?
12           - - - -
13   (The witness reviewed the document.)
14           - - - -
15        THE WITNESS:  ECW is owned by WWE.
16 BY MR. McDEVITT:
17 Q.   No, ECW is not owned by WWE.
18 A.   It isn't?
19 Q.   No.
20 A.   Who owns it?
21 Q.   ECW went bankrupt.
22 A.   And were bought by WWE.
23 Q.   No, they weren't bought by WWE.
24 A.   I'm confused then.
25 Q.   Yes, you are.

Page 211

1        Do you see ECW anywhere in here?
2  A.   That WWE did not buy the ECW?
3  Q.   ECW went Chapter 7 bankruptcy as you know.
4    They don't exist anymore.
5  A.   Then why did WWE have an ECW?
6  Q.   They bought the trademarks and the copyrights
7    and the assets out of bankruptcy.
8  A.   So they do own it.
9  Q.   No, they don't.  They own the assets they
10   bought out of bankruptcy.
11 A.   That would still mean they own it.
12 Q.   They bought the assets they bought out of
13   bankruptcy.
14 A.   Which would mean they own it.
15 Q.   Do you have any indication in here that you
16   think WWE should be paying royalties on ECW
17   video works that are displayed on the network?
18 A.   Do I see it there?
19 Q.   Yes.
20 A.   I think it's included.
21 Q.   Where?
22 A.   By the WWE video products.
23 Q.   So it's your contention then when you signed
24   this Interrogatory that you're claiming that
25   WWE should be paying you royalties on the ECW

Page 212

1    works that it owns that are displayed on the
2    network --
3  A.   Yes.
4  Q.   -- pursuant to the 2000 contract?
5  A.   Yes, everything that WWE owns.
6  Q.   And was it your position whenever you signed
7    this that WCW works that are on the network
8    owned by WWE should also be paying royalties
9    to you?
10 A.   Yes.
11 Q.   WCW Pay-Per-Views on the network, they're
12   supposed to pay you royalties?
13 A.   I would think so.
14 Q.   Under your contract?
15 A.   I would think so.
16 Q.   Even though that was never discussed with
17   anybody at WWE and even though they didn't
18   even own it at the time you entered into that
19   contract?  That's your position?  Is that your
20   position?
21 A.   If I'm not mistaken, through discussing with
22   counsel, my contract for WWE superseded my ECW
23   and WCW contracts thus entitling me to
24   royalties for those promotions.
25 Q.   Which counsel was that?

Page 213

1  A.   Current counsel.
2  Q.   The people sitting here in the room?
3  A.   Yes, and Matthew as well and Clint as well.
4  Q.   That was your belief when you filed the
5    lawsuit?
6  A.   Yes.
7  Q.   And is that your current thinking about what
8    the theory of the lawsuit is right now?
9  A.   No.  The theory behind my lawsuit is that I'm
10   owed royalty rights.  Those are just part of
11   them.
12 Q.   So is it your belief then that any WCW
13   Pay-Per-View that you appeared on is supposed
14   to pay you a royalty pursuant to the contract?
15 A.   I think that any appearance of me on the
16   network, regardless of WCW or ECW or WWE, is a
17   use of my trademark and so I'm entitled to
18   royalties.
19 Q.   And how is that supposed to be calculated
20   under your contract with WCW Pay-Per-View?
21 A.   I leave that to counsel.  That's above my pay
22   grade.
23 Q.   Well, are you contending that's pursuant to
24   your contract?
25 A.   Pursuant to my WWE contract, yes.

SCOTT LEVY - 10/12/2017                    Pages 222..225

Page 222

1 Q.   What are you confused about?

2 A.   I'm confused, the difference between -- I'm
3      not confused -- I'm confused because I'm
4      pursuing a class action.

5 Q.   If you would look at Levy 23, it begins as all
6      Complaints do.  It says Plaintiffs Marcus
7      Bagwell and Scott Levy individually and on
8      behalf of all others similarly situated allege
9      for their class action Complaint da, da, da,
10     as follows.

11         So you're not making an individual
12     claim here?

13 A.  To my knowledge it is a collective class
14     action. I'm not a lawyer.  I don't speak
15     legalese.

16 Q.  Well, you signed this saying it was true and
17     correct to your knowledge and belief.

18         What did you believe when you signed
19     this you were saying about that you weren't
20     seeking individual damages?  What did you
21     think that meant?

22         MR. ZAGRANS: Objection. The
23     Interrogatory response clearly states that
24     objections are being made by counsel --

25         MR. McDEVITT: If you have an

Page 223

1      objection, make it.  Don't --

2          MR. ZAGRANS:  Factual answers are
3      being verified by Mr. Levy.  This is an
4      objection, not a factual answer.

5 BY MR. McDEVITT:

6 Q.   What did you understand you to be saying when
7      you said --

8          MR. McDEVITT:  By the way, that's
9      not what the Affidavit says.  It says the
10     Affidavit, to the best of his knowledge,
11     information, and belief and responses
12     contained therein are true and correct.

13         It doesn't say anything about what
14     you said.

15 BY MR. McDEVITT:

16 Q.  But Mr. Levy, what did you understand it to
17     mean when you said that you were not seeking
18     individual damages?

19 A.  Exactly what I said, that I took it to mean
20     that I've taken to represent myself in a
21     class of people.  That's what I thought it
22     meant.

23 Q.  And what if the Court doesn't certify a class
24     action?  Then what?  Are you going to drop
25     your lawsuit?

Page 224

1          MR. ZAGRANS: Objection. Calls for
2      work product and attorney/client privileged
3      communication.

4          MR. McDEVITT: No it doesn't.

5          MR. ZAGRANS: Yes, it does.

6          MR. McDEVITT: I'm probing this
7      answer.  If you don't have an individual
8      damage claim and there's no class action case,
9      do you intend to pursue this case?

10         MR. ZAGRANS: I'm instructing the
11     witness not to answer the question on the
12     grounds of privilege.

13         MR. McDEVITT:  That's not
14     privileged.

15         MR. ZAGRANS:  Sure it is.

16         MR. McDEVITT:  How is it privileged?

17         MR. ZAGRANS:  Because the answer to
18     the question incorporates attorney/client
19     privileged communications and discussions.

20         MR. McDEVITT:  With whom?

21         MR. ZAGRANS:  With his lawyers.

22         MR. McDEVITT:  So you've talked to
23     him about whether or not he's going to drop
24     the case --

25         MR. ZAGRANS:  We've talked with him

Page 225

1      about a number of ramifications.

2          MR. McDEVITT:  You can't answer
3      things and shield things that way, Eric.  You
4      know you can't.  He's a class representative.
5      He has to answer questions about the
6      Interrogatories that you filed.

7          MR. ZAGRANS:  Proper questions.

8          MR. McDEVITT:  That is a proper
9      question.  If he doesn't have an individual
10     damage claim, I'm entitled to ask him what
11     happens if the class is not certified then.

12         MR. ZAGRANS:  And I'm telling you
13     that's the subject of attorney/client
14     privileged communications.

15         MR. McDEVITT:  We'll see what the
16     court --

17 BY MR. McDEVITT:

18 Q.  Then it goes on to state here, sir, it says
19     plaintiff does not contend he has and will not
20     have an individual damage calculation.

21         What's your understanding of what
22     that means?

23 A.  Because it's a class damage.

24 Q.  So do you not intend to put forth a number of
25     what you contend you personally have been

SCOTT LEVY - 10/12/2017                     Pages 230..233

Page 230

1  Q.  So anybody who signed a WWE contract with an
2      other technology provision, if they appeared
3      one time in a Nitro program on the WWE
4      Network, they're people who share this royalty
5      pool equally?
6  A.  Yes.
7  Q.  Same true for ECW shows?
8  A.  I would assume so.
9  Q.  Even though those people were never paid any
10     royalties on any of those shows?
11 A.  That is --
12         So only if they had it in their
13     contract, in the WWE contract that superseded,
14     and the other contracts.
15 Q.  So as you sit there today is it your belief
16     that this lawsuit is based on the supposition
17     that WWE contracts supersede to take the place
18     of ECW contracts, for example?
19         MR. ZAGRANS:  Object to the form of
20     the question.
21         THE WITNESS:  What the --
22         With my contract specifically it
23     states that -- if I'm not mistaken, and I
24     don't speak legalese and I'm not an
25     attorney -- but basically my contract

Page 231

1      supersedes the WCW and ECW thus being the
2      last -- the last contract, thus my rights by
3      that are the rights by the others, and if
4      others have that same language in their
5      contract and they were previously in WCW or
6      ECW and they meet the qualifications for the
7      Complaint, then yes, they should all receive
8      an equal amount.
9  Q.  So in this equal amount contention you have,
10     then if somebody's on the network one time,
11     they're in the royalty pool forever?
12         MR. ZAGRANS:  Objection.  Object to
13     the form of the question.
14         MR. McDEVITT:  Let me restate that.
15 BY MR. McDEVITT:
16 Q.  If somebody was on the WWE Network at
17     launch --
18 A.  At lunch?
19 Q.  -- at launch, at the launch of the network,
20     that had this other technology provision in
21     the WWE contract and they were somewhere on
22     the network, whether in WWE, ECW, WCW, B-roll,
23     whatever, then they're in this royalty pool
24     for 2014, 2015, 2016.  Is that your view?
25 A.  That's what I believe to be correct by the --

Page 232

1  Q.  Just one time?
2  A.  Yes.
3  Q.  And they share equally with anybody who's on
4      the network, say, 200 times?
5  A.  Yes.
6  Q.  So the fact that you're on the network, say, a
7      thousand times has no significance to the
8      amount of money that anybody's going to be
9      paid on your theory.  Right?
10 A.  Because it's a pro rata performance fee.
11 Q.  Am I correct in what I just said?
12 A.  Say it again, please.
13 Q.  So somebody that's on the network, say, in a
14     thousand different performances is treated
15     equally under your contention as somebody who
16     appears one time?
17 A.  Yes.
18 Q.  So if you have --
19         Do you know what a jabroni is?
20 A.  Yes.
21 Q.  What is that?
22 A.  It's a jobber.
23 Q.  So if there's a jobber who by chance had
24     signed a WWE contract with that other
25     technology provision and appears one time on

Page 233

1      the network, they're going to get the same
2      amount of money as, let say, Stone Cold Steve
3      Austin or Rock if they're in the class.
4  A.  Stone Cold Austin and Rock wouldn't be in the
5      class.
6  Q.  If they are, they would share equally.  Right?
7  A.  If they were.
8  Q.  Do you have any idea who's in the class?
9  A.  People who --
10 Q.  I mean individuals.
11 A.  No, I don't know all the names.
12 Q.  And so in your theory the person who's the
13     main event in the Pay-Per-View that is a
14     royalty-generating event is paid the same
15     amount as somebody who is the opening match.
16     Is that correct?
17 A.  It says here in 7.4 (b) of my contract in the
18     event that the original and/or new
19     intellectual property of the wrestler are
20     exploited by the promoter such that direct
21     sale products feature wrestler with other
22     wrestlers represented by promoter, promoter
23     shall allocate five percent of the direct
24     sales product net receipts to be paid pro rata
25     among wrestler and all other talents so

Page 246

1          - - - -
2   (The proceedings were concluded at 3:57 p.m.)
3          - - - -
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 247

```
1   COMMONWEALTH OF PENNSYLVANIA
2   COUNTY OF ALLEGHENY
3        I, G. Donavich, RPR, CRR, a Court Reporter and
4   Notary Public in and for the Commonwealth of
5   Pennsylvania, do hereby certify that the witness,
6   SCOTT LEVY, was by me first duly sworn to testify to
7   the truth; that the foregoing deposition was taken
8   at the time and place stated herein; and that the
9   said deposition was recorded stenographically by me
10  and then reduced to printing under my direction, and
11  constitutes a true record of the testimony given by
12  said witness.
13       I further certify that the inspection, reading
14  and signing of said deposition were not waived by
15  counsel for the respective parties and by the
16  witness.
17       I further certify that I am not a relative or
18  employee of any of the parties, or a relative or
19  employee of either counsel, and that I am in no way
20  interested directly or indirectly in this action.
21       IN WITNESS WHEREOF, I have hereunto set my hand
22  and affixed my seal of office this 16th day of
23  October, 2017.
24       _____
25              Notary Public
```

Page 248

```
1   COMMONWEALTH OF PENNSYLVANIA
2   COUNTY OF ALLEGHENY
3   I, SCOTT LEVY, have read the foregoing pages of my
4   deposition given on October 12, 2017, and wish to
5   make the following, if any, amendments, additions,
6   deletions or corrections:
7   Page/Line Should Read            Reason for Change
8
9
10
11
12
13
14
15
16
17  In all other respects, the transcript is true and
18  correct.
19       _____
20              SCOTT LEVY
21  Subscribed and sworn to before me this
22  _____ day of _____, 2017.
23  _____
24              Notary Public
25              Ref. No. gd46642
```